Exhibit A to Lewin Declaration

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Ex rel. BRIAN BURKE, | : | Case No. 1:08-CV-00364 (EGS) |
| | : | |
| Plaintiff, | : | **DEFENDANT'S DECLARATION IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT TO DISMISS THE COMPLAINT** |
| -against- | : | |
| RECORD PRESS, INC., | : | |
| Defendant. | : | |

Hugh Wilmot, declares the following to be true under penalties of perjury:

1.     I am the president of defendant, Record Press, Inc. ("Record Press") and I have personal knowledge of the facts in this matter.  I respectfully submit this declaration in support of Record Press' motion for summary judgment to dismiss this complaint (copy attached as Exhibit 1) on the ground that it fails to state a claim for relief and that Record Press' defenses are fully supported by incontrovertible documents which this plaintiff was given shortly after he served Record Press.  Record Press' answer is attached as Exhibit 2.

2.     Although plaintiff ("Burke") has claimed Record Press overcharged the Government for appellate printing, Burke did not even have Record Press' bills to the Government, or Record Press' contract with the Government.  All he had was a blank contract form and another government document which was incorrect.  Nevertheless, Burke filed his ("verified") complaint based on his unconditional allegations that Record Press' bills were wrong.  Burke and his lawyers failed to do even a minimal investigation.  If they had, they would

have learned (as we recently told them) that Record Press' bills were exactly consistent with its agreement with the Government and were always accepted by the Government as entirely consistent with the Government's agreement with Record Press.

3.      In 2006, when Burke lost his New York Federal Court *pro se* action against the Commerce Department [1] claiming he was supposed to have been hired permanently as an "enumerator" for the 2000 Census, instead of being hired on a temporary basis, he appealed and he lost again. [2]  Apparently upset at the notion of losing twice, he commenced this purported *qui tam* action (verifying his complaint, alleging it on knowledge, not alleging any part of his complaint on information and belief) based on the wrong documents and on faulty reasoning. The Government, according to the records of this Court, declined to intervene.

4.      The relevant facts are simple, and documented, and I believe, beyond dispute.  Record Press, for over twenty years, has been a contracting party with the Government to produce Appellate and related briefs for the United States Attorney's Office in the Southern District of New York and in other jurisdictions.  Each year during its contract tenure with the Government, Record Press has been a successful bidder on the Government's requests for proposals for such work ("RFP").  A copy of Record Press' 2006 RFP contract which covers the time period (hence the events) set forth in Burke's complaint, and which is the relevant printing contract between Record Press and the Government, is attached as Exhibit 5.

---

[1]      Attached as Exhibit 3 is the docket sheet in <u>Burke v. Evans</u> (Docket No. 07593/04 (PRC)).
[2]      Attached as Exhibit 4, for background purposes, is a copy of the cover and pages 1-21 from the Government's brief as Defendant-Appellee in the U.S. Court of Appeals, Second Circuit, which sets forth the Government's description of the facts.

#1404781 v1 \007123 \0013

2

5.      When the U.S. Attorney in the Southern District of New York was required to deal with Burke's appeal from that Court's dismissal of Burke's complaint, that U.S. Attorney's office, pursuant to the Government's contract with Record Press, had Record Press print its brief and appendix.  Remarkably, Burke sued Record Press without ever seeing these bills, or the actual contract.

6.      Attached as Exhibit 6 are Record Press' two, detailed bills to the Government, in connection with Burke's case, both dated December 12, 2006.  The first bill (Invoice #A 71700) is for the Government's brief.  The second bill (Invoice #A71701) is for the Government's appendix.  These bills are precisely in accord with Record Press' government contract (Exhibit 5) and accepted by the Government as accurate and proper.

7.      Attached as Exhibit 7 is a copy of the U.S. Attorneys' Office "Itemized and Verified Bill of Costs," dated June 21, 2007, as filed in Burke's New York action including the GPO's May 31, 2007 letter setting forth costs for printing, etc., and reflecting a GPO mark up of 7% over what Record Press charged the Government.  Exhibit 8 is the Second Circuit Court of Appeals order dated August 2, 2007 denying costs to the Government in Burke's appeal.

8.      Obviously Burke jumped to the incorrect conclusion that the GPO statement on which the U.S. Attorney's office in New York based its bill of costs in Burke's New York case accurately reflected what Record Press charged the Government.  Obviously it did not, and Burke, who jumped to the wrong conclusion, never investigated the facts.  Therefore, Burke invoked this Court's jurisdiction and has, under penalties of perjury, wrongfully accused my company of a fraud – when he had the wrong facts.

#1404781 v1 \007123 \0013

3

9.     Because Record Press' bills are precisely in accordance with its contract with the Government and the Government has acknowledged that by paying Record Press, there has been no fraud and no investigation.

## **Conclusion**

10.     For these reasons, this complaint should be dismissed with prejudice, and defendant's counterclaim severed, with costs to defendant.

Dated: New York, New York
       September 29, 2008

                                                     Hugh Wilmot

Exhibit 1 to Wilmot Declaration

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,
ex rel. BRIAN BURKE, Relator
c/o Davis, Cowell & Bowe, LLP
1701 K Street NW, Suite 210
Washington, DC 20006,

        Plaintiff,

        v.

RECORD PRESS, INC.
229 West 36th Street, 8th Floor
New York, NY 10018,

        Defendant.

Case No.:

**VERIFIED COMPLAINT**

**Filed Under Seal**
pursuant to 31 U.S.C. § 3730(b)(2)

**JURY TRIAL DEMANDED**

Case: 1:08-cv-00364
Assigned To : Sullivan, Emmet G.
Assign. Date : 2/29/2008
Description: General Civil

Mark Hanna, Esq.
Joni S. Jacobs, Esq.
Keira M. McNett, Esq.
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-2620
Fax:(202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

Attorneys for Relator

## NATURE OF THE ACTION

1.  Qui Tam Relator Brian Burke ("Relator" or "Mr. Burke") brings this action in the name of the United States Government for false claims that were submitted or caused to be submitted to the United States Government by Defendant Record Press, Inc. ("Record Press" or "Defendant").

2.  This case is brought pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.,* to recover treble damages and civil penalties on behalf of the United States of America, arising from false or fraudulent claims for printing and binding services provided by Record Press to the Government Printing Office ("GPO").

## PARTIES

3.  Relator Brian Burke is a resident of New York. He became aware of Record Press's submission of false or fraudulent claims when the U.S. Attorneys' Office served him with an Itemized and Verified Bill of Costs pursuant to an action in which he was a *pro se* litigant before the U.S. Court of Appeals for the Second Circuit. Upon receiving this bill, which summarized charges to the Government for printing and binding appellate briefs and appendices, Mr. Burke investigated and discovered that Defendant was overcharging the Government nearly 10 times the rate specified by its contract with GPO.

4.  Defendant Record Press is a privately-held New York corporation specializing in printing and production of legal briefs and appendices for submission to state and federal courts. Its annual sales revenue is approximately $4.7 million.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confer jurisdiction to this Court over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

2

6.  This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a) because Record Press has submitted and continues to submit bills to the GPO office in this jurisdiction, and acts prohibited by 31 U.S.C. § 3729 occurred in this judicial district.

7.  Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one act proscribed by 31 U.S.C. § 3729 occurred in this district.

8.  In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least 60 days from its filing date, and shall not be served upon the Defendant until after the Court so orders.

9.  The Court has jurisdiction over this action pursuant to 31 U.S.C. § 3730(e)(4)(A), because, to the extent that there has been a public disclosure of the information upon which the allegations of this Complaint are based, Relator is an original source of this information as defined in 31 U.S.C. § 3730(e)(4)(B). Relator possesses direct and independent knowledge of the information in this Complaint. Relator voluntarily provided the Government with his information prior to filing this action and prior to any amendments thereto, pursuant to 31 U.S.C. § 3730(e)(4).

## FACTS

10.  Record Press has a contract with the Government Printing Office ("GPO") ("the GPO contract") whereby it prints and binds appellate briefs and appendices filed by the U.S. Attorneys' Office in all criminal and civil appeals arising out of the U.S. District Court for the Southern District of New York.

11.  Record Press obtained its contract with GPO pursuant to a request for proposal (Program 2231-S) that sets forth maximum rates contractors could charge GPO for various printing and document preparation services. Under this program, the maximum price that could be charged for "collating, trimming to size and binding" briefs and appendices is $14.00 per 100 pages for a 10-copy run of the document being prepared.

3

12.    Record Press's contract with GPO incorporated the terms, conditions and specifications set forth in the request for proposal ("RFP"), and sets the cost for binding a 10-copy run of a brief or appendix at $12.50 per 100 pages.

13.    In violation of the GPO contract, Record Press has billed and continues to bill the Government the binding charge for each copy of each brief or appendix that it prepares, rather than for a 10-copy run of the document being prepared.

14.    Relator discovered Record Press's violation of the GPO contract when he was ordered to pay the U.S. Attorneys' costs for printing the Government's appendix and brief in a *pro se* action he brought against the Secretary of Commerce in the U.S. District Court for the Southern District of New York (Case No. 04-cv-7593).

15.    In that action, the U.S. Attorneys' Office filed a bill of costs that itemized the fees Record Press charged for printing the appendix and the brief. Record Press billed the Government $1,483.77 for "collating and trimming" 20 copies of a 566-page appendix. Record Press billed the Government $398.47 for "collating and trimming" 40 copies of a 76-page brief. The high charges for "collating and trimming" listed in the U.S. Attorneys' Itemized and Verified Bill of Costs prompted Mr. Burke to investigate.

16.    During his investigation, on July 5, 2007, Relator spoke on the telephone with someone at Record Press who identified himself as "Hugh" and described himself as the contract and billing contact for Record Express. Relator alleges this person was Hugh Wilmot, who is the President of Record Press.

17.    During the conversation with Relator, Mr. Wilmot explained that Record Press had been doing business with the Government for 50 years. Relator had subsequent conversations with GPO employees who likewise referred to Record Press as a long-time Government contractor.

18.    Mr. Wilmot stated to Relator that the bills Record Press submitted to GPO in Relator's litigation with the Government were in accordance with the GPO contract,

indicating that this was not an isolated incident or mistaken overbilling, but rather, that it was Defendant's standard practice with respect to its Government contracts.

19. Further investigation by the Relator confirmed that Record Press's billing practices violate the GPO contract. For example, Calvin Anderson, Chief of the Commercial Examination Section in the GPO's Office of the Controller's Procurement Accounting Division, confirmed that the binding charge must be billed only for a 10-copy run of the document, not for each copy of the document, as Record Press charged.

20. Although Relator received information from Record Press that this billing scheme is its standard practice with respect to its Government contracts, Relator does not have access to Record Press's contracts. Nor does Relator have access to Record Press's invoices for all jobs performed pursuant to its contract(s) with GPO. These documents are in the possession of the Defendant.

21. By charging GPO $12.50 per 100 pages for each brief bound, in violation of its contract with the Government, which clearly specifies that binding charges are per 10 copies, Record Press intentionally and knowingly overcharged the Government.

22. In Relator's litigation alone, Record Press overbilled the Government approximately $1,700.00, nearly ten times the amount it was authorized to charge under the GPO contract.

23. In the RFP for the one-year Record Press contract, GPO specifies that it expects to require approximately 300 orders of briefs, with an average of 40 copies of an average 40-page brief per order. The RFP specifies an estimated 150 orders of appendices, with an average of 20 copies per order of appendices ranging from 8 to 1,334 pages each.

24. Based on Mr. Wilmot's statements that it is Record Press's practice to charge the Government on a per-copy basis for binding, and applying this overcharge to GPO's estimated requirements in the RFP, Record Press overcharged the Government more than $280,000.00 in one contract year. Because Record Press is a long-time GPO

contractor, the total overbilling is likely many times greater than the one-year estimate.

## COUNT I
### (False Claims Act - Presentation of False Claims)
### [31 U.S.C. § 3729(a)(1)]

25. Relator incorporates by reference Paragraphs 1 through 24 of the Complaint as though set forth herein in full.

26. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendant Record Press has knowingly presented or caused to be presented to officers or employees of the United States Government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

## COUNT II
### (False Claims Act: Making or Using False
### Record or Statement to Cause Claim to be Paid)
### [31 U.S.C. § 3729(a)(2)]

27. Relator incorporates by reference Paragraphs 1 through 26 of the Complaint as though set forth herein in full.

28. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged, Defendant Record Press knowingly made, used, or caused to be made or used false or fraudulent records or statements, to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Relator Brian Burke requests that judgment be entered against Defendant Record Press ordering that:

1. Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

6

2. Defendant pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendant's actions;

3. Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

4. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

5. Defendant be enjoined from concealing, removing, encumbering or disposing of assets that may be required to pay the civil monetary penalties imposed by the Court;

6. Defendant disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

7. The United States and Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

Keira M. McNett

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

## REQUEST FOR TRIAL BY JURY

Relator hereby demands a trial by jury.

Respectfully submitted,

_Keira M. McNett_

Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
*mhanna@dcbwash.com*
*jjacobs@dcbwash.com*
*kmcnett@dcbwash.com*

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2008, I caused a true and correct copy of the preceding to be served via first-class mail, postage pre-paid, upon the following:

Michael B. Mukasey
Attorney General of the United States
c/o Joyce R. Branda
United States Department of Justice
Patrick Henry Building
601 D Street, NW, Room 9902
Washington, DC 20004
Telephone: (202) 307-0231

Jeffrey A. Taylor
United States Attorney
c/o Keith V. Morgan
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
Telephone: (202) 514-7566

_Keira McNett_
Mark Hanna (DC Bar 471960)
Joni S. Jacobs (DC Bar 493846)
Keira M. McNett (DC Bar 482199)
DAVIS COWELL & BOWE, LLP
1701 K Street, NW, Suite 210
Washington, DC 20006
Phone: (202) 223-1057
Fax: (202) 223-8651
mhanna@dcbwash.com
jjacobs@dcbwash.com
kmcnett@dcbwash.com

9

## RELATOR'S VERIFICATION

The undersigned, being duly sworn, deposes and says that I, Brian Burke, am the Plaintiff/Relator herein, and I have read the foregoing pleading to be filed on my behalf. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true facts as stated herein.

Dated: 1/8/08

_____
Brian Burke

Subscribed and sworn before me this _____ day of _____, 2008.

_____
Notary Public

ARTHUR GREEBLER
Notary Public, State of New York
No. 01GR4713317
Qualified in Queens County
Commission Expires October 31, 2010

Exhibit 2 to Wilmot Declaration

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Ex rel. BRIAN BURKE, | ) ) ) | Case No. 1:08-CV-00364 (EGS) |
|  | ) |  |
| Plaintiff, | ) ) | **ANSWER TO**<br>**PLAINTIFF'S VERIFIED** |
| -against- | ) ) | **COMPLAINT** |
| RECORD PRESS, INC., | ) ) |  |
| Defendant. | ) ) |  |

Defendant Record Press, Inc. ("Record Press"), by and through undersigned counsel, files this Answer to the Verified Complaint ("Complaint") by Plaintiff Brian Burke ("Burke") and states as follows:

1.      Defendant denies the allegations in paragraph 1 of the Complaint, but admits that Plaintiff alleges and purports to bring this action in the name of the United States Government.

2.      Defendant denies the allegations in paragraph 2 of the Complaint, but admits that Plaintiff alleges and purports to bring this action pursuant to the Federal False Claims Act and seeks treble damages and civil penalties.

3.      Defendant denies it submitted false or fraudulent claims and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the balance of paragraph 3 of the Complaint.

4.      Defendant denies the allegations in paragraph 4 of the Complaint but admits defendant is a privately held corporation located in New York and is a printer for Court matters.

5.      Defendant denies the allegations in paragraph 5 of the Complaint and respectfully refers all questions of law to the Court, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

6.      Defendant denies the allegations in paragraph 6 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

7.      Defendant denies the allegations in paragraph 7 of the Complaint, but admits that Plaintiff alleges that venue is proper under the cited statutes.

8.      Defendant denies knowledge or information as to the allegations in paragraph 8 that Plaintiff purportedly filed the Complaint under seal and that the Complaint had been under seal for at least 60 days and was not served until the Court so ordered.

9.      Defendant denies the allegations in paragraph 9 of the Complaint, but admits that Plaintiff alleges that jurisdiction is proper under the cited statutes.

10.     Defendant denies the allegations in paragraph 10 of the Complaint, but admits it has a contract with the U.S. Government Printing Office ("GPO") for the printing and binding of appellate briefs and appendices filed by the United States Attorney's Office for the Southern District of New York ("Contract").

11.     Defendant denies the allegations in paragraph 11 of the Complaint, but admits that it submitted a bid in response to the GPO's Request For Proposal ("RFP").

12.     Defendant denies the allegations in paragraph 12 of the Complaint, but admits that its Contract with the GPO incorporated the terms, conditions, and specifications of the RFP.

13.     Defendant denies the allegations in paragraph 13 of the Complaint, but admits that it has billed the GPO in accordance with the terms of the Contract.

14.     Defendant denies the allegations in paragraph 14 of the Complaint.

15.     Defendant denies the allegations in paragraph 15 of the Complaint, but admits that it billed the GPO for printing and binding services provided in the action entitled *Brian T. Burke v. Donald L. Evans* (Docket No. 06-1917-cv) in the United States Court of Appeals for the Second Circuit.

16.     Defendant denies the allegations in paragraph 16 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

17.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with Plaintiff.

18.     Defendant denies the allegations in paragraph 18 of the Complaint, but admits that Hugh Wilmot of Record Press spoke on the telephone with the Plaintiff.

19.     Defendant denies the allegations pertaining to Defendant's purported violation of the "GPO contract" in paragraph 19 of the Complaint, and denies knowledge or information sufficient to form a belief as to the truth of the other allegations in the same paragraph.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint, but admits that it is in possession of its invoices to and contract with the GPO.

3

21.     Defendant denies the allegations in paragraph 21 of the Complaint.

22.     Defendant denies the allegations in paragraph 22 of the Complaint.

23.     Defendant denies the allegations in paragraph 23 of the Complaint and respectfully refers the Court to the RFP for its true, complete and accurate contents.

24.     Defendant denies the allegations in paragraph 24 of the Complaint, but admits that it is a contractor of the GPO.

## ANSWERING COUNT I

25.     Defendant incorporates its responses to paragraphs 1 through 24 of the Complaint as if the same were fully set forth herein.

26.     Defendant denies the allegations in paragraph 26 of the Complaint, and respectfully refers all questions of law to the Court.

## ANSWERING COUNT II

27.     Defendant incorporates its responses to paragraphs 1 through 26 of the Complaint as if the same were fully set forth herein.

28.     Defendant denies the allegations in paragraph 27 of the Complaint, and respectfully refers all questions of law to the Court.

**Affirmative Defenses**

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because all or some of Plaintiff's claims against Defendant are barred by the applicable statute of limitations.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action due to improper and/or inconvenient venue.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff has unclean hands as a result of his acts and omissions in the matters referenced in and related to the Complaint.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff made fraudulent misrepresentations and/or omissions regarding the matters referenced in and related to the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because Plaintiff lacks standing.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred because it fails to state a claim upon which relief can be granted.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because this action is based upon a public disclosure and Plaintiff is not the original source.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by estoppel.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by laches.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint is barred and fails to state a cause of action because some or all of Plaintiff's claims are barred by the Government's knowledge. *See, e.g., United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002).

Defendant reserves the right to assert additional affirmative defenses in this action.

Wherefore, Defendant denies all allegations in the Complaint that are not specifically admitted herein, and denies that Plaintiff is entitled to any relief whatsoever.  Defendant

6

respectfully prays that the Complaint be dismissed with prejudice; that Defendant be awarded its reasonable attorneys' fees and costs; and for such other and further relief as the Court deems appropriate.

## COUNTERCLAIMS

Defendant Record Press, by and through its undersigned counsel, brings the following Counterclaims and allege as follows:

1.      The counterclaims herein are asserted by Defendant against Plaintiff Brian Burke.

2.      Jurisdiction over the counterclaims is proper in this Court under 28 U.S.C. § 1367 and venue is proper under 28 U.S.C. § 1391.

### COUNT I
### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE

3.      Defendant incorporates by reference the foregoing paragraphs of its Counterclaims as if the same were fully set forth herein.

4.      Defendant had and has a business relationship with the GPO, exemplified by Defendant's Contract with the GPO.  Based on that relationship, including the fact that the GPO awarded Defendant the Contract, there was a probability and expectancy of future economic benefit to Defendant in the form of continued expanding business with the GPO.

5.      Plaintiff knew of Defendant's relationship with GPO and its expectancy of continued expansion of business with GPO.

7

6.      Plaintiff contacted the GPO and other government agencies and falsely accused Defendant of improprieties for the purpose of harming Defendant and seeking to injure and/or end Defendant's business relationship with the GPO.

7.      As such, Defendant has been damaged by Plaintiff's willful, wanton, and intentional interference, by improper methods, with its prospective economic advantage.

WHEREFORE, Defendant seeks compensatory and punitive damages in an amount to be proved at trial.

Dated:   Washington, D.C.
         July 28, 2008

                Respectfully submitted,

                McKenna Long & Aldridge LLP

                By: /s/ William T. O'Brien
                    Jack Horan (DC Bar No. 417729)
                    William O'Brien (DC Bar No. 450891)
                    1900 K Street, NW
                    Washington, D.C.  20006
                    (202) 496-7500

                and

                Of Counsel:

                Malcolm I. Lewin
                Morrison Cohen LLP
                909 Third Avenue
                New York, New York 10022
                (212) 735-8600
                *Attorneys for Defendant*
                  *Record Press, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2008, I served the foregoing Answer to Plaintiff's

Verified Complaint via first class mail, postage prepaid on:

> Mark Hanna, Esq.
> Keira M. McNett, Esq.
> Joni S. Jacobs, Esq.
> DAVIS COWELL & BOWE LLP
> 1701 K Street, N.W., Suite 210
> Washington, D.C.  20006

> Darrell C. Valdez, Esq.
> U.S. Attorney's Office
> Judiciary Center Building
> 555 Fourth Street, N.W.
> Washington, D.C.  20530

and via the Court's Electronic Case Filing System ("ECF").

> /s/ William T. O'Brien
> William T. O'Brien

Exhibit 3 to Wilmot Declaration

CLOSED

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
### CIVIL DOCKET FOR CASE #: 1:04-cv-07593-PKC

Burke v. Evans et al                                    Date Filed: 09/24/2004
Assigned to: Judge P. Kevin Castel                      Date Terminated: 01/17/2006
Case in other court: U.S.C.A. 2nd Circuit, 06-01917     Jury Demand: Plaintiff
Cause: 42:2000e Job Discrimination (Employment)         Nature of Suit: 442 Civil Rights: Jobs
                                                        Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Brian T. Burke**                     represented by   **Brian T. Burke**
                                                        145 East 23 St.
                                                        #4-R
                                                        New York, NY 10010
                                                        PRO SE


V.

**Defendant**

**Donald L. Evans**                    represented by   **Kristin Lynn Vassallo**
*Secretary*                                             U.S. Attorney's Office, SDNY (Chambers
                                                        Street)
                                                        86 Chambers Street
                                                        New York, NY 10007
                                                        (212)-637-2822
                                                        Fax: (212)-637-2730
                                                        Email: kristin.vassallo@usdoj.gov
                                                        *LEAD ATTORNEY*


**Defendant**

**United States of Commerce**          represented by   **Kristin Lynn Vassallo**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*


| Date Filed | # | Docket Text |
|------------|---|-------------|
| 09/24/2004 | 1 | COMPLAINT against Donald L. Evans, United States of Commerce. (Filing Fee $ 150.00, Receipt Number 520560)Document filed by Brian T. Burke.(laq, ) (Entered: 09/27/2004) |
| 09/24/2004 |   | SUMMONS ISSUED as to Donald L. Evans, United States of Commerce. (laq, ) (Entered: 09/27/2004) |

| 09/24/2004 | | Magistrate Judge Andrew J. Peck is so designated. (laq, ) (Entered: 09/27/2004) |
|---|---|---|
| 10/18/2004 | 2 | ORDER REFERRING CASE TO MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for general pretrial. Referred to Magistrate Judge Andrew J. Peck. (Signed by Judge P. Kevin Castel on 10/14/04) (dg, ) (Entered: 10/21/2004) |
| 10/19/2004 | 3 | ORDER TO PRO SE PLAINTIFF TO SERVE COMPLAINT, plntf must make arrangements to have the summons and complaint promptly serve on all defts. Plntf must provide a copy of this Order (and the enclosed Rules) to deft's counsel either along with the summons and complaint or once counsel has appeared for deft. If service is not made upon the deft(s) by 1/24/05 (which is 120 days from filing of this complaint), I will recommend to Judge Castel that the action be dismissed, as further set forth in this document. (Signed by Judge Andrew J. Peck on 10/18/04) copies sent by chambers(cd, ) (Entered: 10/22/2004) |
| 11/04/2004 | 4 | SUMMONS RETURNED EXECUTED Summons and Complaint served. Donald L. Evans served on 11/1/2004, answer due 11/22/2004; United States of Commerce served on 11/1/2004, answer due 11/22/2004. Service was accepted by Julia Nuniz. Document filed by Brian T. Burke. (db, ) (Entered: 11/08/2004) |
| 11/12/2004 | 5 | ORDER RE SCHEDULING AND INITIAL PRETRIAL CONFERENCE:... If such a consent order is not filed within the time provided,... Initial Conference set for 11/19/2004 09:30 AM before Magistrate Judge Andrew J. Peck. (Signed by Judge Andrew J. Peck on 11/9/2004) copies faxed by chambers.(jsa, ) (Entered: 11/12/2004) |
| 11/19/2004 | | Minute Entry for proceedings held before Judge Andrew J. Peck: Initial Pretrial Conference held on 11/19/2004. Gov't answer due 1/5/05. Discovery due 3/31/05 (expert reports 3/1/05), mandatory disclosure due 1/14/05, Summary Judgment notice due 4/4/05, Summary Judgment motion or PTO due 4/22/05. Next status conference set for 1/18/05 at 9:30 a.m. (db, ) (Entered: 01/05/2005) |
| 11/23/2004 | 6 | Rule 16 Initial pretrial conference order; The government's answer is due January 5, 2005. All fact and expert discovery must be completed by 03/31/05. Expert reports must be served by 03/01/05. Mandatory disclosure purs to Rule 26(a), FRCP is due by 01/14/05; Each party will notify the Court by April 4, 2005 as to whether it intends to move for summary judgment. Summary judgment motions must be filed by 04/22/05; Parties are to submit a joint proposed pretrial order, in conformance with the FRCP, the Local Rules of this Court and the chamber rules of the District Judge to whom this case is assigned, by April 22, 2005, if neither party is moving for summary judgment, or 30 days after decision on the summary judgment motion. The case will be considered trial ready on 24-hours notice after the pretrial order has been submitted. A status conference will be held before the undersigned on January 18, 2005 at 9:30 a.m. in Courtromm 20D (500 Pearl Street). (Signed by Judge Andrew J. Peck on 11/22/04) copies forwarded by Chambers.(djc, ) (Entered: 11/24/2004) |
| 11/23/2004 | | Set Deadlines/Hearings: Donald L. Evans answer due 1/5/2005; United States of Commerce answer due 1/5/2005. Discovery due by 3/31/2005. Motions due by 4/22/2005. Status Conference set for 1/18/2005 09:30 AM before P. Kevin Castel. (djc, ) (Entered: 11/24/2004) |
| 12/22/2004 | | Set Deadlines/Hearings: Discovery due by 3/31/2005. Motions due by 4/22/2005. Pretrial Order due by 4/22/2005. Status Conference set for 1/18/2005 09:30 AM before Magistrate Judge Andrew J. Peck. (db, ) (Entered: 12/28/2004) |

| | | |
|---|---|---|
| 01/03/2005 | 8 | ANSWER to Complaint. Document filed by Donald L. Evans, United States of Commerce.(dle, ) (Entered: 01/06/2005) |
| 01/06/2005 | 7 | TRANSCRIPT of proceedings held on 11/19/04 before Mag. Judge Andrew J. Peck. (es, ) (Entered: 01/06/2005) |
| 01/18/2005 | | MEMORANDUM TO THE DOCKET CLERK: Status conference held January 18, 2005. Next status conference scheduled for March 1, 2005 at 9:30 a.m. (rw, ) (Entered: 03/01/2005) |
| 01/19/2005 | 9 | ORDER: Status Conference set for 3/1/2005 at 09:30 AM before Magistrate Judge Andrew J. Peck in ctrm 20D (500 Pearl Street). (Signed by Judge Andrew J. Peck on 1/18/05) Copies Mailed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 01/19/2005 | 10 | CONFIDENTIALITY ORDER: regarding procedures that will govern the handling of ?Confidential Information?. (Signed by Judge Andrew J. Peck on 1/18/05) Copies Faxed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 01/19/2005 | 11 | PRIVACY ACT ORDER: any objection to the production and use of such documents and information on the ground that they are protected by the Privacy Act is overruled. This Order is without prejudice to any other objections the parties may have to producing or using such documents and information. (Signed by Judge Andrew J. Peck on 1/18/05) Copies Faxed By Chambers.(kw, ) (Entered: 01/25/2005) |
| 02/14/2005 | 12 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 2/14/05 re: the deposition of former Secretary Evans is QUASHED (subject to reconsideration if plaintiff Burke can show good cause for the deposition). (Signed by Judge Andrew J. Peck on 2/14/05) Copies Faxed by Chambers.(db, ) (Entered: 02/16/2005) |
| 02/14/2005 | 13 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Brian T. Burke dated 2/11/05 re: the Court agrees that in cases where plaintiff's claim for emotional distress is, as the cases call it, "plain vanilla", there will not be discovery of medical/psychological records. The Court accepts plaintiff's representation of no mental health treatment and limits plaintiff's proof at trial to plain vanilla emotional distress. However, because plaintiff also claims disability (visual accuity), he must produce (or provide releases for) all medical records re: his vision/visual accuity. (Signed by Judge Andrew J. Peck on 2/14/05) (db, ) (Entered: 02/17/2005) |
| 02/15/2005 | 14 | ENDORSED LETTER addressed to Magistrate Judge Peck from Brian T. Burke dated 2/14/2005 re: requests abjuration of request for all employment records. The request is denied. (Signed by Judge Andrew J. Peck on 2/14/2005) copies faxed by Chambers.(jsa, ) (Entered: 02/17/2005) |
| 02/16/2005 | 15 | ENDORSED LETTER addressed to Maqgistrate Judge Andrew J. Peck from Brian T. Burke dated 2/16/05 re: treating this as a request for reconsideration, it is DENIED. While it is true Evans is former head of the agency, thereis no allegation he has unique or personal information not available from lower level supervisor. (Signed by Judge Andrew J. Peck on 2/16/05) Copies Faxed by Chambers.(db, ) (Entered: 02/22/2005) |
| 02/16/2005 | 16 | ENDORSED LETTER addressed to Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 2/15/05 re: if plaintiff Burke does not properly respond to the outstanding interrogatories, etc. and do Rule 26(a) mandatory disclosure, before his deposition, then the defendant will be allowed a 2nd day of deposition if necessary. |

| | | |
|---|---|---|
| | | Other sanctions also may apply for failure to do Rule 26(a) mandatory disclosures - including precluding plaintiff from producing any witnesses except himself, etc. Ms. Vassallo is to FedEx this Order to Mr. Burke. (Signed by Judge Andrew J. Peck on 2/16/05) Copies Faxed by Chambers.(db, ) (Entered: 02/22/2005) |
| 02/22/2005 | 18 | MOTION to Compel Attendance at Deposition and to Quash Deposition Subpoena. Document filed by Brian T. Burke. (cd, ) (Entered: 03/02/2005) |
| 02/23/2005 | 17 | TRANSCRIPT of proceedings held on January 18, 2005, 9:30 a.m. before Judge Andrew J. Peck. (dt, ) (Entered: 02/23/2005) |
| 02/24/2005 | 19 | ORDER terminating 18 Motion to Compel; The court adheres to its prior rulings quashing the deposition of former Secretary Evans. If plaintiff wants to depose the Dept. of Commerce, he can seek the deposition of the Dep't pursuant to Rule 30(b)96) or he can depose a more "junior" supervisor; plaintiff's deposition shall go forward. The motion to quash as to it is denied . (Signed by Judge Andrew J. Peck on 2/23/05) (dle, ) (Entered: 03/02/2005) |
| 03/01/2005 | | Minute Entry for proceedings held before Judge Andrew J. Peck : Status Conference held on 3/1/2005. Next status conference set for 3/18/05 at 9:30 a.m. (db, ) (Entered: 03/03/2005) |
| 03/02/2005 | 20 | NOTICE of appeal to District Court Judge. Document filed by Brian T. Burke. (kw, ) (Entered: 03/09/2005) |
| 03/11/2005 | 23 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court for an order purs. to FRCP 33 & 34 & LCR 26.3 & 33.3 of USDC for the Southern District, compelling attendance of Carlos M. Gutierrez Sec. of Commerce & Charles L. Kincannon Director Bureau of Census, and/or upholding objections to defts. interrogatory on pltff.. Document filed by Brian T. Burke. Copies of Appeal of Magistrate Judge Decision to District Court mailed to Attorney(s) of Record: Kristin L. Vassallo, AUSA. (pr, ) (Entered: 03/22/2005) |
| 03/16/2005 | 21 | LETTER addressed to Judge Castel from AUSA Kristin L. Vassallo dated 3/15/2005 re: Response to plaintiff's motion, dated March 11, 2005, which seeks review of an oral decision of Magistrate Judge Peck. Document filed by Donald L. Evans, United States of Commerce.(D'Agostino, Andrew) (Entered: 03/16/2005) |
| 03/17/2005 | 22 | ENDORSED LETTER addressed to Magistrate Judge Peck from Kristin L. Vassallo dated 3/16/2005 re: Plaintiff Burke is to reimburse the Gov't $125.00 for the missed deposition reporter's fee by 3/22/2005. Burke is to appear at defense counsel's office on 3/22/2005 at 10:00am for his deposition. If he fails to appear, his case will be dismissed, and or monetary or other sanctions will be immposed. Any other issues will be resolved at the 3/18/2005 conference. Copy faxed to counsel for defendant and mailed regular and certified mail to Brian T. Burke by chambers. (Signed by Judge Andrew J. Peck on 3/17/2005) (jsa, ) (Entered: 03/21/2005) |
| 03/18/2005 | | Minute Entry for proceedings held before Judge Andrew J. Peck : Status Conference held on 3/18/2005. Parties to contact if any discovery disputes. (db, ) (Entered: 03/25/2005) |
| 03/22/2005 | | Copy of Notice of Appeal to District Court Judge Ommibus Motion. Document filed by Brian T. Burke. (pr, ) (Entered: 03/22/2005) |

| 03/24/2005 | | MEMO ENDORSEMENT on re: 20 Notice (Other) filed by Brian T. Burke. I decline to set aside or modify the Order of February 23, 2005. I have examined Judge Peck's Order and the papers on which it was based. I agree that plaintiff has not given an adequate basis to examine former Secretary Evans There is no showing that he has any personal knowledge of the basis for plaintiff's claims or that another individual's testimony would not adequately suffice. The order is neither clearly erroneous nor contrary to law Rule 72(a) Fed.R.Civ.P. So Ordered. (Signed by Judge P. Kevin Castel on 3/22/2005) Copies Mailed by chambers.(D'Agostino, Andrew) (Entered: 03/24/2005) |
| 03/24/2005 | 24 | MEMO ENDORSEMENT in re: 23 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, I decline to modifiy Magistrate Judge Peck's rulings regarding the depositions of Secretary Gutierrez and Director Kincannon and overuling the plaintiff's objection to defendant's interrogatories and document requests. Plaintiff has not demonstrated an adequate need for the depositions of those government officials. The interrogatories and dockets requests are reasonable. The Magistrate Judge's Rulings are neither clearly erroneous nor contrary to law. (Signed by Judge P. Kevin Castel on 3/22/2005) Copies Mailed by chambers.(D'Agostino, Andrew) (Entered: 03/24/2005) |
| 03/28/2005 | 25 | APPEAL OF MAGISTRATE JUDGE DECISION to District Court from 24 Memo Endorsement. Document filed by Brian T. Burke. Copies of Appeal of Magistrate Judge Decision to District Court mailed to Attorney(s) of Record: Kristin L. Vassallo. Affidavit of Brian T. Burke along with Exhibit and Affirmation of service are attached. (tp, ) (Entered: 03/30/2005) |
| 03/28/2005 | 26 | MOTION for Extension of Time to Complete Discovery in the Interest of Justice. Document filed by Brian T. Burke. Return Date set for 4/6/2005 09:30 AM. (jmi, ) (Entered: 04/01/2005) |
| 03/29/2005 | 28 | MOTION to Compel Deposition & Extend Discovery. Document filed by Brian T. Burke. Return Date set for 4/6/2005 09:30 AM. (jco, ) (Entered: 04/06/2005) |
| 03/30/2005 | 27 | MEMO ENDORSEMENT on (COURTESY COPY)Motions terminated: 26 MOTION for Extension of Time to Complete Discovery filed by Brian T. Burke. Discovery due by 4/15/2005. Summary Motions due by 4/29/2005. No further extensions are likely. (Signed by Judge Andrew J. Peck on 3/29/05) (sac, ) (Entered: 04/06/2005) |
| 04/04/2005 | 29 | ORDER denying 28 Motion to Compel Request to again extend discovery is denied. The Court has extended it to 4/15/2005. Plaintiff may not depose defense counsel. Defense counsel has represented that they are working out the 30 (b)(6) depo if it is amicably resolved, plaintiff may renew the application.Copies faxed by chambers to Kristin Vassallo and mailed to Brian T. Burke regular and certified by chambers.. (Signed by Judge Andrew J. Peck on 3/31/2005) (jsa, ) Modified on 4/6/2005 (jsa, ). (Entered: 04/06/2005) |
| 04/04/2005 | 31 | LETTER addressed to Chief Magistrate Judge Andrew J. Peck from Kristin L. Vassallo dated 3/30/05 re: Reponse to Plaintiff's Motion, dated March 29, 2005, which seeks an order (1) compelling the Dept. of Commerce to appear at a deposition on April 6, 2005; and (2) extending teh discovery period in this action. Document filed by Donald L. Evans, United States of Commerce.(ps, ) (Entered: 04/08/2005) |
| 04/07/2005 | 30 | TRANSCRIPT of proceedings held on 3/1/05 before Judge Andrew J. Peck. (lma, ) (Entered: 04/07/2005) |

| | | |
|---|---|---|
| 04/15/2005 | 32 | ENDORSED LETTER addressed to Judge Peck from Kristin L. Vassallo dated 4/14/05 re: Government's intention to move for summary judgment, request for a 2 week extension of time in which to do so and an extension for discovery. The Court will not further extend the discovery deadline. SJ motion extended to 5/13/2005 - no further extensions. To be fair to plaintiff Burke, his time to file opposition papers is 6/3/2005, and the gov't's reply is due 6/3/2005 (Signed by Judge Andrew J. Peck on 4/14/05) Copies sent by Chambers.(yv, ) (Entered: 04/19/2005) |
| 05/04/2005 | 33 | ENDORSED LETTER addressed to Judge Andrew J. Peck from Kristin L. Vassallo dated 5/3/05 re: Counsel for the Government writes to request permission to submit a summary judgment brief in excess of the 25-page limitation. The motion will be before Judge Castel, and your will need to address this request to him. So Ordered. (Signed by Judge Andrew J. Peck on 5/3/05) (jco, ) (Entered: 05/05/2005) |
| 05/06/2005 | 34 | ENDORSED LETTER addressed to Judge Castel from AUSA Kristin L. Vassallo dated 5/5/2005 re: Requesting an additional fifteen pages in order to brief its motion for summary judgment. Application for 40 pages is granted. Plaintiff may have 40 pages in response and defendant may have 25 pages in reply. (Signed by Judge P. Kevin Castel on 5/5/05) Copies mailed by Chambers.(D'Agostino, Andrew) (Entered: 05/06/2005) |
| 05/13/2005 | 35 | NOTICE of to Pro Se Litigant Opposing Motion for Summary Judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 36 | RULE 56.1 STATEMENT. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 37 | DECLARATION of David Brown in Support of the Government's Motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 38 | DECLARATION of Patricia Valle in Support of the Government's motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 39 | MEMORANDUM OF LAW in Support of defendants' motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 40 | DECLARATION of Kristin L. Vassallo to provide documents to the Court in connection with the defendants' motion for summary judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 05/17/2005) |
| 05/13/2005 | 49 | MOTION for Summary Judgment. Document filed by Donald L. Evans, United States of Commerce. (djc, ) (Entered: 04/24/2006) |
| 05/17/2005 | | CASE NO LONGER REFERRED to Magistrate Judge Andrew J. Peck. Reason: Discovery closed - summary judgment motion pending. (rag, ) (Entered: 05/19/2005) |
| 05/25/2005 | 41 | TRANSCRIPT of proceedings held on 03/18/05 before Judge Andrew J. Peck. (es, ) (Entered: 05/25/2005) |
| 06/06/2005 | 42 | CROSS MOTION for Summary Judgment purs. to Rule 56 of FRCP. Document filed by Brian T. Burke. Return Date set for 6/16/2005 09:30 AM. (ae, ) (Entered: 06/09/2005) |
| 06/10/2005 | 44 | SUPPLEMENTAL DECLARATION of Kristin L. Vassallo. Document filed by Donald L. Evans, United States of Commerce. (jmi, ) (Entered: 06/15/2005) |

| 06/15/2005 | 43 | REPLY MEMORANDUM OF LAW in Support re: 42 MOTION for Summary Judgment.. Document filed by Donald L. Evans, United States of Commerce. (jmi, ) (Entered: 06/15/2005) |
| 01/12/2006 | 45 | ORDER; for the reasons set forth in this order, defendant's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment in favor of defendants on all claims. (Signed by Judge P. Kevin Castel on 1/12/06) (kco, ) (Entered: 01/12/2006) |
| 01/12/2006 | | Transmission to Judgments and Orders Clerk. Transmitted re: 45 Order, to the Judgments and Orders Clerk. (kco, ) (Entered: 01/12/2006) |
| 01/17/2006 | 46 | CLERK'S JUDGMENT in favor of defendants as against plaintiff, granting defendants' motion for summary judgment, dismissing the complaint and closing the case. (Signed by J. Michael McMahon, Clerk on 1/13/06) (jf, ) (Entered: 01/17/2006) |
| 01/19/2006 | | Mailed notice of Right to Appeal re: 46 Clerk's Judgment to Pro Se Litigant(s): Brian T. Burke and to Attorney(s) of Record: Kristin Lynn Vassallo. (lma, ) (Entered: 01/19/2006) |
| 03/16/2006 | 47 | NOTICE OF APPEAL from 46 Clerk's Judgment. Document filed by Brian T. Burke. Filing fee $ 255.00, receipt number E 573169. Copies of Notice of Appeal mailed to Attorney(s) of Record: A.U.S.A. (tp, ) (Entered: 04/19/2006) |
| 04/19/2006 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 47 Notice of Appeal. (tp, ) (Entered: 04/19/2006) |
| 04/19/2006 | | Transmission of Notice of Appeal to the District Judge re: 47 Notice of Appeal. (tp, ) (Entered: 04/19/2006) |
| 04/20/2006 | 48 | Appeal Record Sent to USCA (Index). Notice that the Original index to the record on Appeal for 47 Notice of Appeal filed by Brian T. Burke, 3 Copies of the index, Certified Clerk Certificate and Certified Docket Sheet were transmitted to the U.S. Court of Appeals. (tp, ) (Entered: 04/20/2006) |
| 04/20/2006 | | Appeal Record Sent to USCA (File). Indexed record on Appeal Files for 47 Notice of Appeal filed by Brian T. Burke, were transmitted to the U.S. Court of Appeals on 4/21/06. (tp, ) (Entered: 04/20/2006) |
| 05/05/2006 | | USCA Case Number 06-1917 from the U.S.C.A. 2nd Circuit assigned to 47 Notice of Appeal filed by Brian T. Burke. (tp, ) (Entered: 05/22/2006) |
| 10/15/2007 | 50 | MANDATE of USCA (Certified Copy) as to 47 Notice of Appeal filed by Brian T. Burke USCA Case Number 06-1917-cv. Ordered, Adjudged and Decreed that the judgment of the District Court is AFFIRMED. Catherine O'Hagan Wolfe, Clerk USCA. Issued As Mandate: 10/10/2007. (nd) (Entered: 10/15/2007) |
| 10/15/2007 | | Transmission of USCA Mandate/Order to the District Judge re: 50 USCA Mandate,. (nd) (Entered: 10/15/2007) |
| 11/19/2007 | | Appeal Record Returned. Indexed record on Appeal Files for 25 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, Appeal Record Sent to USCA - File, Transmission of USCA Mandate/Order to District Judge, 23 Appeal of Magistrate Judge Decision to District Court, filed by Brian T. Burke, 50 USCA Mandate, USCA Case Number 06-1917, returned from the U.S. Court of Appeals. (tp) (Entered: 12/05/2007) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/23/2008 12:11:28 | | |
| PACER Login: | rp0118 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:04-cv-07593-PKC |
| Billable Pages: | 6 | Cost: | 0.48 |

Exhibit 4 to Wilmot Declaration

# 06-1917-cv

*To Be Argued By:*
KRISTIN L. VASSALLO

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 06-1917-cv

BRIAN T. BURKE,

*Plaintiff-Appellant,*

—v.—

DONALD L. EVANS, SECRETARY,
UNITED STATES DEPARTMENT OF COMMERCE,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

MICHAEL J. GARCIA,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for Defendants-Appellees.*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2822

KRISTIN L. VASSALLO,
SARAH S. NORMAND,
  *Assistant United States Attorneys,*
        *Of Counsel.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 06-1917-cv

---

BRIAN T. BURKE,

Plaintiff-Appellant,

– v. –

DONALD L. EVANS, SECRETARY,[*]
UNITED STATES DEPARTMENT OF COMMERCE,

Defendants-Appellees.

---

## BRIEF FOR DEFENDANTS-APPELLEES

---

### Preliminary Statement

Brian T. Burke ("plaintiff") appeals pro se from a judgment of the United States District Court for the Southern District of New York (Hon. P. Kevin Castel, J.) entered on January 17, 2006, granting summary judgment in favor of defendants Carlos Gutierrez and the United States Department of Commerce (collectively, "defendants" or the "Government") and dismissing plaintiff's

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Carlos M. Gutierrez, who succeeded Donald Evans as the Secretary of Commerce, should be substituted as defendant-appellee in this case.

complaint.  (DA 560).  Plaintiff brought suit pursuant to Title
VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.
("Title VII"), and the Rehabilitation Act, 29 U.S.C. §§ 701 et
seq., alleging that the Census Bureau discriminated against him
on the basis of his national origin, religion, sex, and
disability, and retaliated against him for his Equal Employment
Opportunity ("EEO") activity, when he was not assigned
enumeration work after May 6, 2000.

Hired in March 2000 to take part in the 2000 Census,
plaintiff was informed at the time he applied that the job was
temporary and would terminate if work or funds ran out.
Plaintiff received training and work assignments on thirteen days
in March, April, and May 2000.  Thereafter, plaintiff, like many
other enumerators in Manhattan, received no further work because
a higher-than-expected percentage of residents responded to the
census surveys by mail, and there consequently was not enough
work to go around.  On June 24, 2000, the anticipated expiration
date of his employment, plaintiff was officially terminated, due
to the lack of available work.

Dissatisfied with the temporary nature of his employment,
plaintiff speculates, without any competent evidence, that the
Census Bureau's decision to terminate him resulted from

───────────────

    Citations to the Appendix for Defendants-Appellees appear
herein as "DA _," with the relevant page numbers inserted.

2

discrimination on account of his national origin, religion, sex,
and disability, and retaliation for his EEO activity.  The
district court granted summary judgment to the Government with
respect to each of plaintiff's claims, and dismissed plaintiff's
complaint.

The district court's judgment should be affirmed.  Plaintiff
failed to establish a <u>prima facie</u> case of discrimination because
he did not demonstrate that he is disabled within the meaning of
the Rehabilitation Act, or that an adverse employment action took
place under circumstances giving rise to an inference of
discrimination.  Further, plaintiff failed to rebut the Census
Bureau's legitimate, non-discriminatory reason for not assigning
him work.

Plaintiff's retaliation claim likewise was properly
dismissed.  Plaintiff did not exhaust his retaliation claim
during the administrative process, nor establish a nexus between
his lack of work and any protected EEO activity, nor show that
the Census Bureau's legitimate, non-retaliatory justification was
a pretext for retaliation.

Finally, plaintiff vaguely challenges various discovery
rulings made by the magistrate judge.  Plaintiff's discovery
claims are barred because he either did not assert them to the
magistrate judge in the first instance, or failed to seek review
of the magistrate judge's rulings by the district judge.  Even if

plaintiff has not waived appellate review of the discovery rulings mentioned in passing in his brief, each of them was well within the magistrate judge's discretion, and should be affirmed.

## Issues Presented for Review

1.    Whether the district court properly dismissed plaintiff's discrimination claims, where plaintiff failed either to establish a _prima facie_ case of sex, national origin, religion, or disability discrimination, or to rebut the Census Bureau's legitimate, non-discriminatory reason for not assigning him work after May 6, 2000.

2.    Whether the district court properly dismissed plaintiff's retaliation claim, where plaintiff did not exhaust the claim during the administrative process, he cannot establish a nexus between any adverse action and his protected EEO activity, and he failed to rebut the Census Bureau's legitimate, non-retaliatory justification for not assigning him work.

3.    Whether this Court should disturb the magistrate judge's discovery rulings, where plaintiff failed either to raise his claims in the first instance to the magistrate judge or to object to the magistrate's rulings, and where none of the discovery rulings alluded to in plaintiff's appellate brief was an abuse of discretion.

**Statement of Facts**

**A.   The Decennial Census**

The Census Bureau, an agency within the Department of
Commerce, is responsible for conducting the Decennial Census,
which, each decade, counts every individual living in the United
States.  (DA 239).  To conduct the 2000 Census, the Census Bureau
opened 520 local census offices ("LCOs") and hired people for
more than 860,000 positions across the United States.  (DA 240).
Each person hired to work in the 2000 Census was informed that
his or her job was temporary, that there was no guarantee of work
once he or she was trained, and that he or she could be
terminated at any time for lack of funds or work.  (DA 250).  Of
these temporary employees, a majority were hired to work as
enumerators, the people responsible for locating households and
conducting interviews with individuals responding to the census.
(DA 240).  Applicants for enumerator positions were selected
based on the scores they received on a written test, their
geographic locations, and their hours of availability.  (Id.).

The 2000 Census, like all Decennial Censuses, was comprised
of several distinct phases.  (Id.). In February and March 2000,
census questionnaires were mailed to all United States
households.  (DA 240-41).  Although most households in the United
States mailed back the census questionnaires, some did not
respond, which required the Census Bureau to hire temporary

5

enumerators to visit each non-responding household and interview
a knowledgeable household member. (DA 241, 364). The operation
during which enumerators conducted these personal interviews was
called Nonresponse Followup ("NRFU"). (DA 241). The number of
enumerators required for NRFU operations was inversely
proportional to the number of questionnaires completed and
returned on Census Day; that is, the more questionnaires
returned, the fewer non-responding households, and, consequently,
the fewer enumerators needed to visit non-responding households
during NRFU operations. (Id.).

Staffing the Decennial Census presented a number of
difficulties, including a high rate of employee turnover and a
very short time frame in which to complete a great deal of work.
(DA 242). To address these issues, the Census Bureau engaged in
"frontloading" -- hiring more workers than ultimately would be
needed to complete the work. (DA 242, 284, 298-99).

Once hired, enumerators received paid training for specific
census operations, after which they might or might not receive
actual census work. (DA 241). Following a training segment,
each enumerator was assigned to a "crew" based on the area in
which the enumerator lived. (Id.). The individual in charge of
the crew, the crew leader, was responsible for, among other
things, distributing assignments based on the availability of the
enumerator, the specific area (or "census block") in which the

6

enumerator lived, and the amount of work that had to be completed.  (Id.).  Generally, crew leaders gave enumeration assignments (particularly NRFU assignments) to enumerators living in the same census block as the assignments, because doing so minimized travel time and because an enumerator living in the neighborhood would be more familiar with the people residing there.  (DA 241-42, 272-73).

Whether an enumerator received work also depended on when he or she was hired and assigned to a crew:  if an enumerator was assigned to a crew that already had been working together for some time, he or she would be assigned work only if one of the original crew members were discharged or became unavailable.  (DA 242).  This practice of using enumerators as "spares" helped ensure that the pace of work would not be interrupted if a crew member dropped out, and allowed the Census Bureau to meet its deadlines.  (Id.).

The Census Bureau adhered to its policy of frontloading when it came time to hire employees for the 2000 Census in Manhattan. (Id.).  Historically, Manhattan had a very low census questionnaire response rate, consistently averaging approximately 40 percent.  (Id.).  As a result, Manhattan typically required enough enumerators to visit approximately 60 percent of households in the borough.  (Id.).  In previous Decennial Censuses, the Census Bureau had been forced to bring in

7

enumerators from all over the country to conduct NRFU operations in New York City.  (Id.).

Anticipating a similarly low response rate for the 2000 Census, the Census Bureau implemented its frontloading policy, ultimately hiring 1.5 to 2 times as many enumerators as were necessary to count Manhattan households.  (DA 243).  The Census Bureau hired this many enumerators based on its expectation that Manhattan's questionnaire response rate would remain approximately 40 percent, requiring the majority of households to be interviewed by enumerators during NRFU operations.  (Id.).

Due to a highly successful advertising campaign, Manhattan's rate of response to the 2000 census questionnaire far exceeded expectations, in some areas reaching 70 to 80 percent.  (Id.).  Instead of having a majority of households requiring enumeration, in many areas, there were far fewer households that needed to be visited during NRFU.  (Id.).  Coupled with the fact that the Census Bureau had hired 1.5 to 2 people for every expected enumerator position required, this much-higher-than-expected response rate meant that many people who were hired and trained for NRFU operations ultimately did not receive work.  (Id.).  Many of the people hired as NRFU enumerators thus became "spares," and their services were not required unless another enumerator in their crew quit, failed to appear for work, or did not perform up to standard.  (Id.).

B.    **Plaintiff's Application for Employment as an Enumerator**

On January 10, 2000, plaintiff, an Irish-American man of Catholic faith, applied for temporary employment as an enumerator for the 2000 Census.  (DA 96-97, 303-06).  At the time he applied, plaintiff knew that the job of enumerator was a temporary position.  (DA 97).

On March 13, 2000, plaintiff was hired by the Census Bureau as an enumerator and given a "not-to-exceed" or appointment expiration date of April 29, 2000.  (DA 162).  Before commencing work, plaintiff read and signed several documents, including a "Temporary Excepted Service Employment Agreement for the 2000 Decennial Census Staff," in which he acknowledged:

> This job is strictly <u>temporary</u>.  Census operations are
> short.  This appointment <u>cannot be made permanent</u>.  You
> may be released from service with the Census Bureau
> before the not-to-exceed date for this appointment if
> work or funds are no longer available.  You will have
> <u>no commitment</u> from the Census Bureau for another
> position.

(DA 97-98, 310-13 (emphasis in original)).

In addition, plaintiff received and reviewed several handbooks, including the Field Nonsupervisory Census Employee Handbook, which similarly provided:

> You are appointed to a time limited temporary
> appointment with a specific Not-to-Exceed (NTE) or
> expiration date.  You may be released from service with
> the Census Bureau before the NTE date for this

9

appointment if work or funds are no longer available.
The expiration date of your appointment does not
guarantee the availability of work or your services.

(DA 100, 250).

## C.  Plaintiff's Employment with the Census Bureau

Plaintiff, who lived within the area covered by LCO 2233 in
Manhattan, began working at that office on March 13, 2000.  (DA
98, 102, 315).  Over the next several weeks, from March 13, 2000
to April 1, 2000, plaintiff completed, and was paid for, 3.5 days
of training and 3 full days of regular (i.e., non-training) work.
(DA 104-06, 315-340).  On April 18, 2000, plaintiff's employment
as an enumerator was terminated for lack of work.  (DA 106-07,
350).  As plaintiff explained, "they were gearing up for the
nonresponse followup . . . and apparently within that time
period, there was a slack in the need for personnel."  (DA 107).

Two weeks later, on May 1, 2000, plaintiff was rehired to
take part in NRFU, and given a new not-to-exceed date of June 24,
2000.  (DA 107-08, 352).  Thereafter, from May 1, 2000 to May 6,
2000, plaintiff completed, and was paid for, six 4-5 hour
training sessions.  (DA 108-09, 341-46).  Plaintiff did not

receive any regular work or training after May 6, 2000.˙  (DA 109).

   · According to plaintiff, following his training session on May 6, 2000, he was assigned to the crew overseen by David Brown. (DA 109, 114, 120).  At that time, plaintiff claimed, Brown gave him and another man, William Sansom, "a voicemail [number] and said there would be plenty of work, that we would be in contact with him through his voicemail."  (DA 109).  Plaintiff alleged that although he called Brown approximately five times at that number, Brown never called him back.  (DA 109-10).

   In the weeks following May 6, 2000, plaintiff called and visited LCO 2233 to inquire about the possibility of work. (Id.).  On several occasions, plaintiff spoke with Field Operations Supervisor ("FOS") Jeffrey Lewis,˙˙ who informed plaintiff that there was no additional work available for him. (DA 110, 115, 172-73).  According to plaintiff, he asked Lewis to be put on another crew, but Lewis refused.  (DA 115).

---

   ˙ Four other enumerators who started on the same day as plaintiff had similar experiences.  Faye Levine, William Sansom, and Anthony Gardiner did not work past May 2, May 3, and May 6, 2000, respectively.  (DA 357-59).  Likewise, Carolyn Taranto, who worked a total of ten days in March and April 2000, received no assignments after attending training in early May 2000.  (DA 356).

   ˙˙ As a "floating" field operations supervisor, Lewis assisted other FOSs, but did not supervise crew leaders.  (DA 166-67).  Nor did Lewis directly assign work to enumerators; that job was handled by crew leaders.  (DA 168-69).

11

Brown did not recall plaintiff and did not remember if plaintiff was assigned to his crew. (DA 63). Based on the dates of plaintiff's training in May 2000, however, Brown believed he already had a crew of enumerators in place before plaintiff would have been assigned to his crew. (Id.). Because Brown had no problems with any of the enumerators already on his crew, and there were more enumerators available than were needed to complete the NRFU work, Brown believed that plaintiff did not receive work because the enumerators already assigned to the crew were able to handle all the work he had to assign them. (Id.).

On June 24, 2000, plaintiff's not-to-exceed date, the Census Bureau officially terminated plaintiff for lack of work. (DA 111, 354).

## D.   Plaintiff's Discrimination and Retaliation Claims

Plaintiff claims that he was denied work as an enumerator on account of his national origin, religion, sex, disability, and prior EEO activity. (DA 86, 96).

### 1.   Plaintiff's Allegations of National Origin and Religious Discrimination

Plaintiff's claim that he was denied work on account of his national origin and religion is based on the purported comments of two enumerators who also were not given work, William Sansom and Anthony Gardiner, and a crew leader, Kim Sweeney. (DA 86, 111, 117, 120, 129). According to plaintiff, he "believe[d] that" either Sweeney or Gardiner told him that David Brown "may

12

have used an epithet for people of Irish background," but
plaintiff did not specify the "epithet."  (DA 120-21).  Plaintiff
never personally heard Brown or Lewis make any derogatory remarks
about Irish people.  (DA 121).  At his deposition, Brown
testified that he had never used epithets to describe people of
Irish descent, and "never would."  (DA 514).

Plaintiff also testified at his deposition that he heard
"[o]ne of the people in [his Census Bureau] group" speculate that
a drunk homeless man "must be Irish" or remark that the homeless
man "maybe . . . needed some more of that Wild Irish Rose."  (DA
121-22).  Plaintiff denied knowing who made the alleged comment.[.]
(DA 122).  Plaintiff did not consider the alleged comment
evidence of discrimination against him.  (Id.).  In fact,
plaintiff did not even consider the alleged comment disparaging:
"We laughed, it wasn't even anything that I would be bothered
by."  (Id.).

Plaintiff further alleges that Anthony Gardiner told him
that he "had information that he was a witness to or that someone
he knew was a witness to" that led him to believe that David

_____

[.]   Despite this testimony, plaintiff later submitted, in
opposition to the Government's motion for summary judgment, an
unsworn letter to the Government's counsel in which he stated
that "upon . . . information and belief" and "personal knowledge
and information obtained after plaintiff's deposition . . . [and]
David Brown's deposition," "David Brown is the individual
referred to on pages 167 through 170 of plaintiff's deposition,"
thus apparently alleging that Brown made the asserted comment
regarding the homeless person.  (DA 383).

13

Brown "wanted people of certain backgrounds, and he was going to have less people of other backgrounds." (DA 122-23). However, plaintiff could not remember or relate what Gardiner told him or what information Gardiner claimed to have. (Id.). Plaintiff further claims that William Sansom, Kim Sweeney, and crew leader Edward Thompson suggested to him that Brown may have not given plaintiff work because of plaintiff's national origin, but none of these individuals provided any basis for this alleged suggestion. (DA 124-25).

Plaintiff offers no other evidence for his allegation that he was discriminated against on the basis of his Irish heritage. (DA 131). He asserts that the same evidence that shows discrimination on the basis of national origin also supports his claim of religious discrimination. (DA 129, 131).

## 2.   Plaintiff's Allegations of Sex Discrimination

Plaintiff's claim of sex discrimination is premised on his discovery, on his apartment door, of a note labeled "Census 2000 Notice of Visit," which stated, "My name is Gail," and provided a telephone number. (DA 118-19, 129, 192). By plaintiff's account, he "believe[d]" he called the number and spoke with a woman he "assume[d] . . . was Gail." (DA 119). Although plaintiff surmised that "Gail" worked under David Brown based on the fact that she came to his home to enumerate, plaintiff does not know this for certain. (DA 129-30). Other than the notice

14

from "Gail," plaintiff has no other evidence to support his belief that he was discriminated against on the basis of sex. (DA 130-31).

### 3.   Plaintiff's Allegations of Disability Discrimination

Plaintiff allegedly suffers from photophobia, a condition that makes his eyes "much more sensitive to light than . . . most people," and requires him to wear tinted glasses. (DA 132). According to plaintiff, when he wears tinted glasses, "it's an absolute remedy"; he has "no problems at all" seeing, walking, working, or carrying out manual tasks. (DA 133-34).

Plaintiff's claim that the Census Bureau discriminated against him on account of disability is based on an alleged conversation with Lewis's supervisor and Thompson, both of whom purportedly "threw . . . out" his photophobia as a possible reason why he was not given work. (DA 130-31). Plaintiff also allegedly spoke with Gardiner and Sansom, who "thought that maybe [Brown or Lewis] had a problem with [plaintiff's] disability." (DA 132). Plaintiff testified that the basis for this speculation was Gardiner's and Sansom's "information and belief and life experience about people," but he could not identify any other reasons for their conjecture. (Id.).

Plaintiff did not recall ever talking to Brown or Lewis about his photophobia. (DA 133-34). Brown did not know that plaintiff suffered from any disability. (DA 63).

**4.   Plaintiff's Allegations of Retaliation**

Plaintiff also contends that the Census Bureau retaliated against him because he complained about his allegedly discriminatory treatment.  (DA 134-35).  On May 26, 2000, after he stopped receiving enumeration work, plaintiff first contacted the Census Bureau's EEO Office regarding his lack of work.  (DA 135, 196).

Plaintiff did not have any personal knowledge as to whether Lewis or Brown was aware of his EEO activity.  (DA 135).  Indeed, he thought it was "very unlikely" that he told Brown that he had contacted the EEO office, and he did not recall having such a conversation with Lewis.  (Id. ).  Plaintiff speculated that "there might have been some conversation between management and one or both of [Brown and Lewis about the EEO complaint,] but not by [him]."  (Id.).

**E.   Plaintiff's Administrative Complaint**

On July 4, 2000, plaintiff filed an administrative complaint with the Department of Commerce, alleging that he had been denied work on the basis of his race, color, religion, sex, national origin, age, and disability.  (DA 113, 200-03).  Plaintiff's administrative complaint did not contain any allegations of retaliation.  (DA 200-03).

On January 23, 2004, an administrative law judge dismissed plaintiff's administrative complaint in its entirety.  (DA 204-

16

13).  On June 25, 2004, the Equal Employment Opportunity

Commission ("EEOC"), Office of Federal Operations, affirmed the

dismissal of plaintiff's administrative complaint.  (DA 215-17).

**F.   Proceedings in District Court**

On September 24, 2004, plaintiff filed a complaint in

federal district court, alleging that he had been discriminated

against on the basis of his religion, national origin, and

disability.ˑ (DA 10-17).  Over the next several months,

plaintiff and defendants engaged in substantial discovery, with

plaintiff serving multiple discovery requests and ultimately

taking the depositions of four current and former Census Bureau

employees.  (DA 3-6, 19-58, 163-81, 437-535).

On May 13, 2005, the Government moved for summary judgment.

(DA 60-61).  In a memorandum and order dated January 12, 2006,

---

ˑ Although the complaint alleged discrimination under the
Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C.
§§ 12112-12117, the federal government is not subject to suit
under that statute.  See 42 U.S.C. § 12111(5)(b); Rivera v.
Heyman, 157 F.3d 101, 103 (2d Cir. 1998).  However, in light of
plaintiff's pro se status, the district court construed the
complaint as asserting claims under the Rehabilitation Act, 29
U.S.C. § 791 et seq., which does apply to federal employees.  (DA
536 n.1 (citing Rivera, 157 F.3d at 103)).  Additionally, while
plaintiff stated in his complaint that he suffered discrimination
on the basis of his "race . . . i.e., . . . being an Irish-
American" (DA 12), he clarified at his deposition that he is
claiming national origin discrimination, not race or color
discrimination.  (DA 94-96).  Indeed, plaintiff withdrew his
claims of race and color discrimination during the administrative
process.  (DA 95, 220).

the district court granted the Government's motion in all respects, and dismissed plaintiff's complaint.˙ (DA 536-59).

With respect to plaintiff's claims of discrimination based on sex, religion, and national origin, the district court concluded that plaintiff had failed to establish a prima facie case because his proffered evidence -- which consisted of "largely . . . vague recollections of conversations with third parties and unsupported conclusions drawn from documents produced by defendants" -- did not demonstrate "circumstances giving rise to an inference of discrimination." (DA 545-46). The court noted that, while plaintiff testified that either Gardiner or Sansom told him that David Brown "may have used an epithet for people of Irish background," plaintiff explicitly denied ever hearing Brown or Lewis make any disparaging remarks about Irish people. (DA 546). Even if such a remark had been made, the court concluded, it would not support an inference of discrimination. (Id. (citing Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001))).

The court further held that plaintiff's testimony about the homeless man and the alleged comment referring to that person did not support an inference of discrimination because (1) plaintiff

---

˙ The court held, as a threshold matter, that the only proper defendant in a Title VII or Rehabilitation Act case brought by a federal employee is the head of the relevant agency. (DA 536 n.2). The Court accordingly dismissed plaintiff's claims against the Department of Commerce. (Id.).

18

testified that he did not know who made the comment and did not
consider it evidence of discrimination; (2) plaintiff could not
rely on his belated, unsworn letter stating that Brown had made
the comment, and contradicting his deposition testimony, to
create an issue of fact; and (3) in any event, such a stray
remark could not prove a claim of discrimination.  (DA 546-47).
The court further concluded that plaintiff's "vague recollections
of conversations in which third parties are alleged to have made
admittedly unsubstantiated suggestions of discriminatory intent"
constituted inadmissible hearsay, and were thus insufficient to
make out a prima facie case of discrimination.  (DA 547-48).

The court determined that plaintiff's observation of other
enumerators working after May 6, 2000 and the "notice of visit"
form from "Gail" did not establish a prima facie case of
discrimination because plaintiff offered no evidence concerning
the specific characteristics of anyone working after May 6, 2000,
and could not show that "Gail" was similarly situated to him.
(DA 548-50).  The court also concluded that plaintiff had not
made out a prima facie case of disability discrimination because,
taking into account plaintiff's corrective lenses, no reasonable
jury could find that plaintiff was disabled within the meaning of
the Rehabilitation Act.  (DA 551-52).

Although the court concluded that plaintiff had failed to
establish a prima facie case of discrimination, the court

19

nonetheless considered whether the Government had proffered a
legitimate, non-discriminatory reason for plaintiff's lack of
work, and concluded that it had.   (DA 552-54).   Citing the
declarations of Patricia Valle and David Brown, the court held
that the Government had shown by undisputed evidence that
plaintiff did not receive work after May 6, 2000 "simply because
there was not enough work to go around."   (DA 553).
Specifically, the Census Bureau's policy of frontloading, coupled
with the higher-than-expected response rate, resulted in 1.5 to 2
times as many enumerators being hired than were necessary to
complete the census, and plaintiff's lack of work in May 2000
resulted from the fact that Brown already had a crew in place by
that time and did not encounter any problems requiring any of the
crew members to be replaced.   (Id.).

Addressing plaintiff's contentions, the court noted that
plaintiff merely alleged that the Valle and Brown declarations
constituted "purjury [sic]" unsupported by "actual evidence."
(DA 554).   Plaintiff's conclusory allegations, the court held,
were insufficient to rebut the Government's proffered legitimate,
non-discriminatory reason for his lack of work.   (Id.).   The
court further concluded that a document showing that LCO 2233
closed on September 30, 2000, after plaintiff's termination date,
"does not establish that there was, in fact, enumeration work

20

available up through that date, and does not provide any evidence of discrimination." (DA 554-55).

With respect to plaintiff's retaliation claim, the court held, first, that plaintiff failed to exhaust this claim administratively because he did not include it in his EEO complaint. (DA 555-58). The court concluded that the retaliation claim was not "reasonably related" to the discrimination claims because it arose before the administrative complaint was filed and could not reasonably be expected to "fall within the scope of the EEOC investigation" with respect to the discrimination charges that were made. (DA 557 (citing <u>Deravin v. Kerik</u>, 335 F.3d 195, 200-01 (2d Cir. 2003)).

Next, the court held that, even if plaintiff had exhausted the claim, he failed to make out a <u>prima facie</u> case of retaliation because he did not show any causal connection between his initial contact with the EEO office on May 26, 2000, and either his lack of work after May 6, 2000, or his official termination on June 24, 2000. (DA 558-59). Finally, the court concluded that, "[e]ven were a <u>prima facie</u> case somehow to be divined from plaintiff's submissions to the court," he failed to rebut the Government's proffered legitimate, non-retaliatory justification, for the same reasons discussed with respect to the discrimination claims. (DA 559).

This appeal followed.

21

Exhibit 5 to Wilmot Declaration

GPO Form 910
(R 8-01) P.57021-4
Part 1
ORIGINAL

### U.S. GOVERNMENT PRINTING OFFICE
### Printing Procurement Department
# BID

All bids are subject to GPO Publication 310.2, Contract Terms (Rev. 6-01) which is incorporated by reference, and the representations and certifications on the reverse of part one of this GPO Form 910.

Shipment(s) will be made from: City _New York City_ , State _New York_

(The city(ies) indicated above will be used for evaluation of transportation charges when shipment f.o.b. contractor's city is specified. If no shipping point is indicated above, it will be deemed that the bidder has selected the city and state shown below in the address block and the bid will be evaluated and the contract awarded on that basis. If shipment is not made from evaluation point, contractor will be responsible for any additional shipping costs incurred.)

PROGRAM NO. _2231-S_          (BIDDER TO ATTACH SCHEDULE OF PRICES TO THIS BID FORM)

or

JACKET NO._____

BID _____

Additional _____ Rate _____

Discounts are offered for prompt payment as follows:_____ percent, _____ calendar days.
See Provision 12 "Discounts" in GPO Contract Terms (Pub. 310.2).

Bidder hereby acknowledges amendment(s) number(ed) _____

In compliance with the above, the undersigned agrees, if this bid is accepted within __90__ calendar days (60 calendar days unless a different period is inserted by the bidder) from the date for receipt of bids, to furnish the specified items at the price set opposite each item, delivered at the designated point(s), in exact accordance with specifications.

| Notice: Failure to provide a 60 day bid acceptance period may result in expiration of your bid prior to award. |

**COMPANY SUBMITTING BID**

Company _Record Press, Inc._

Address _229 West 36th 8th Floor_

City _New York_ State _NY_ Zip _10018_

GPO Contractor Code (if known)_____

Telephone Number _212-619-4949_

**PERSON AUTHORIZED TO BID**

Name _Hugh A. Wilmot, Jr._

Title _President_

Signature _Hugh A. Wilmot, Jr._

Date _10/16/06_

Facsimile Number _212-608-3141_

Contracting Officer Review_____ Date_____ Certifier _____ Date _____
                              (initials)                                    (initials)

# Representations and Certifications

Exception to the certifications may render your bid nonresponsive. Submission of your bid without statement of except
shall constitute certification of the six items.

**REPRESENTATIONS.**

R-1. Small Business. By submission of a bid, the bidder represents that the bidder
is a small business concern, unless the bid contains an affirmative representation that
the bidder is not a small business concern.

R-2. Small Disadvantaged Business Concern. By submission of a bid, the bidder
represents that the bidder is not a small disadvantaged business concern, unless the
bid itself contains an affirmative representation that the bidder is a small disadvantaged
business concern.

R-3. Women-Owned Small Business Concern. By submission of a bid, the bidder
represents that the bidder is not a women-owned small business concern, unless the
bid itself contains an affirmative representation that the bidder is a women-owned small
business concern.

**CERTIFICATIONS.**

C-1. Covenant Against Contingent Fees. Submission of a bid without statement of
exception shall constitute certification.

(a) The contractor warrants that no person or agency has been employed or retained
to solicit or obtain a contract upon an agreement or understanding for a contingent fee,
except a bona fide employee or agency. For breach or violation of this warranty, the
Government shall have the right to annul the contract without liability or, in its discretion,
to deduct from the contract price or consideration or otherwise recover, the full amount
of the contingent fee.

(b) "Bona fide agency" means an established commercial or selling agency, main-
tained by a contractor for the purpose of securing business, that neither exerts nor pro-
poses to exert improper influence to solicit or obtain Government contracts nor holds
itself out as being able to obtain any Government contract or contracts through improp-
er influence.

"Bona fide employee" means a person, employed by a contractor and subject to the
contractor's supervision and control as to time, place, and manner of performance, who
neither exerts nor proposes to exert improper influence to solicit or obtain Government
contracts nor holds out as being able to obtain any Government contract or contracts
through improper influence.

"Contingent fee" means any commission, percentage, brokerage, or other fee that is
contingent upon the success that a person or concern has in securing a Government
contract.

"Improper influence" means any influence that induces or tends to induce a
Government employee or officer to give consideration or to act regarding a Government
contract on any basis other than the merits of the matter.

C-2. Buy American Certification. Except as may be listed with the bid itself, the
bidder certifies with the submission of a bid that each end product is a domestic end
product (as defined in clause 37 "Buy American Act" in Contract Clauses), and that com-
ponents of unknown origin have been considered to have been mined, produced, or
manufactured outside the United States. Any exception listed with the bid itself must list
both the excluded end products and the country of origin of each.

C-3. Clean Air and Water. Submission of a bid without statement of exception shall
constitute certification.

(Applicable if the bid or offer exceeds $100,000 or the Contracting Officer has deter-
mined that orders under an indefinite quantity contract in any year will exceed $100,000,
or a facility to be used has been the subject of a conviction under the Clean Air Act (42
U.S.C. 7413 (c) (1)) or the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) and
is listed by EPA, or is not otherwise exempt.)

(a) Any facility to be utilized in the performance of the proposed contract has not
been listed on the Environmental Protection Agency List of Violating Facilities.

(b) The Contracting Officer will be promptly notified, prior to award, of the receipt of
any communication from the Director, Office of Federal Activities, Environmental
Protection Agency, indicating that any facility which he/she proposes to use for the per-
formance of the contract is under consideration to be listed on the EPA List of Violating
Facilities.

(c) Bidder will include substantially this certification, including this paragraph (c), in
every nonexempt subcontract.

C-4. Certificate of Independent Price Determination. Submission of a bid without
statement of exception shall constitute certification.

(a) The offeror certifies that—

(1) The prices in the offer have been arrived at independently, without, for the
purpose of restricting competition, any consultation, communication, or agreement with
any other offeror or competitor relating to(i) those prices; (ii) the intention to submit an
offer; or (iii) the methods or factors used to calculate the prices offered.

(2) The prices in the offer have not been and will not be knowingly disclosed by
the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in
the case of a sealed bid solicitation) or contract award (in the case of a negotiated solic-
itation) unless otherwise required by law; and

(3) No attempt has been made or will be made by the offeror to induce any other
concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that
the signatory—

(1) Is the person in the offeror's organization responsible for determining the
prices being offered in the bid or proposal, and that the signatory has not participated
and will not participate in any action contrary to subparagraphs (a) (1) through (a) (3) of
this provision; or

(2)(i) Has been authorized, in writing, to act as agent for the following principals
in certifying that those principals have not participated, and will not participate in any
action contrary to subparagraphs (a) (1) through (a) (3) of this provision [insert full name
of person(s) in the offeror's organization responsible for determining the prices offered
in the bid or proposal, and the title of his or her position in the offeror's organization];

(ii) As an authorized agent, does certify that the principals named in subdivision

(b)(2)(i) of this provision have not participated, and will not participate, in any action
trary to subparagraphs (a)(1) through (a)(3) of this provision; and

(iii) As an agent, has not personally participated, and will not participate, ir
action contrary to subparagraphs (a)(1) through (a)(3) of this provision.

(c) If the offeror deletes or modifies subparagraph (a)(2) of this provision, the
or must furnish with its offer a signed statement setting forth in detail the circumsta
of the disclosure.

C-5. Certification Regarding Debarment, Suspension, Proposed Debarm
and other Responsibility Matters (Jan. 1999). By submission of a bid—

(a)(1) The offeror certifies, to the best of its knowledge and belief, that—

(i) The offeror and/or any of its principals-

(A) Are not presently debarred, suspended, proposed for debarmen
declared ineligible for the award of contracts by any Federal agency;

(B) Have not, within a 3-year period preceding this offer, been convicte
or had a civil judgment rendered against them for: commission of fraud or a cri
offense in connection with obtaining, attempting to obtain, or performing a p
(Federal, state, or local) contract or subcontract; violation of Federal or state ant
statutes relating to the submission of offers; or commission of embezzlement, theft
gery, bribery, falsification or destruction or records, making false statements, tax
sion, or receiving stolen property; and

(C) Are not presently indicted for, or otherwise criminally or civilly charge
a governmental entity with commission of any of the offenses enumerated in subdiv
(a)(1)(i)(B) of this provision.

(ii) The offeror has not, within a three-year period preceding this offer, hac
or more contracts terminated for default by any Federal agency.

(2) "Principals," for the purposes of this certification, means officers; directors;
ers; partners; and, persons having primary management or supervisory responsib
within a business entity (e.g., general manager; plant manager; head of a subsi
division or business segment, and similar positions).

This Certification Concerns a Matter Within the Jurisdiction of an Agency o
United States and the Making of a False, Fictitious, or Fraudulent Certification
Render the Maker Subject to Prosecution Under Section 1001, Title 18, United S
Code.

(b) The offeror shall provide immediate written notice to the Contracting Officer
any time prior to contract award, the offeror learns that its certification was erron
when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists w
necessarily result in withholding of an award under the solicitation. However, the c
cation will be considered in connection with a determination of the offeror's respor
ity. Failure of the offeror to furnish a certification or provide such additional inform
as requested by the Contracting Officer may render the offeror non-responsible.

(d) Nothing contained in the foregoing shall be construed to require establishme
a system of records in order to render, in good faith, the certification required by (
graph (a) of this provision. The knowledge and information of an offeror is not req
to exceed that which is normally possessed by a prudent person in the ordinary c
of business dealings.

(e) The certification in paragraph (a) of this provision is a material representat
fact upon which reliance was placed when making award. If it later determined that
offeror knowingly rendered an erroneous certification, in addition to other reme
available to the Government, the Contracting Officer may terminate the contract re
ing from the solicitation for default.

C-6. Certification of Nonsegregated Facilities (Jan. 1999). Submission of
without statement of exception shall constitute certification.

(a) "Segregated facilities," as used in this provision, means any waiting rooms,
areas, rest rooms and wash rooms, restaurants and other eating areas, time cl
locker rooms and other storage or dressing areas, parking lots, drinking fountains, r
ation or entertainment areas, transportation, and housing facilities provided for em
ees, that are segregated by explicit directive or are in fact segregated on the bas
race, color, religion, or national origin because of habit, local custom, or otherwise

(b) By submission of an offer, the offeror certifies that it does not and will not r
tain or provide for its employees any segregated facilities at any of its establishm
and that it does not and will not permit its employees to perform their services a
location under its control where segregated facilities are maintained. The offeror ag
that a breach of this certification is a violation of the Equal Opportunity clause in the
tract.

The offeror further agrees that (except where is has obtained identical cert
tions from proposed subcontractors for specific time periods) it will-

(1) Obtain identical certifications from proposed subcontractors before the a
of subcontracts under which the subcontractor will be subject to the Equal Opport
clause;

(2) Retain the certifications in the files; and

(3) Forward the following notice to the proposed subcontractors for specific time
ods):

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF
## REQUIREMENT FOR CERTIFICATION OF
## NONSEGREGATED FACILITIES

A certification of Nonsegregated Facilities must be submitted before the awar
subcontract under which the subcontractor will be subject to the Equal Opport
clause. The certification may be submitted either for each subcontract or for all sub
tracts during a period (i.e., quarterly, semiannually, or annually).

Note: The penalty for making false statements in offers is prescribed in 18 U.S
1001.

Specifications by IFL
Program 2231-S FORMERLY 1272-S
Issue date

CPI

### U.S. GOVERNMENT PRINTING OFFICE

### PHILADELPHIA , PA.

### GENERAL TERMS, CONDITIONS, AND SPECIFICATIONS

For the Procurement of

Appeals Briefs

as requisitioned from the U.S. Government Printing Office (GPO) by the

U.S. Department of Justice

Single Award

The term of this contract is for the period

beginning Date of Award (November 1,2006) and ending October 31, 2007
with an option for renewal from November 1, 2007 and ending October 31, 2008
with a second option for renewal from November 1, 2008 and ending October 31, 2009
with a third option for renewal from November 1, 2009 and ending October 31, 2010
and with a fourth option for renewal from November 1,2010 and ending October 31, 2011

OPTION TO EXTEND THE CONTRACT TERM: The Government may extend the term of this contract by written notice to the contractor not later than 30 days before the contract expires. If the Government exercises an option, the extended contract shall be considered to include this clause. The duration of this contract, including the exercise of any options under this clause, shall not exceed 5 years.

Notwithstanding the above paragraph, at the request of the Government, the term of any contract resulting from this solicitation may be further extended for such period of time as may be mutually agreeable to the GPO and the contractor.

BID OPENING: Bids shall be publicly opened at 2:00 p.m., prevailing Philadelphia, PA time, on October 18,2006

RECOVERED MATERIALS PROGRAM: The Government Printing Office is promoting the use of recovered materials in its contracts to the maximum extent practicable, provided all specification requirements are met. Offerors are encouraged to supply paper and paper products that contain recovered materials even in the absence of a specific solicitation provision or contract clause requiring such materials.

RESTRICTION ON LOCATION OF PRODUCTION FACILITIES: All production facilities used in the manufacture of the product(s) ordered under this contract, in Category 1, must be located within the borough of Manhattan south of 59th Street to the Battery and East and West to the rivers.

Any bidder intending to use production facilities outside this area should furnish information, with the bid, which will on its face demonstrate ability to meet the schedule requirements. The determination by the Government of the acceptability of this information in no way relieves the successful bidder of the responsibility for compliance with these schedule requirements.

BIDDERS, PLEASE NOTE: These specifications have been extensively revised; therefore, all bidders are cautioned to familiarize themselves with all provisions of these specifications before bidding.

SEE MANDATORY PROCUREMENT INTEGRITY REQUIREMENTS ATTACHED

For information of a technical nature call Pamela Lewis (215) 364-6465 (No collect calls).

## SECTION I.- GENERAL TERMS AND CONDITIONS

GPO CONTRACT TERMS: Any contract which results from this Invitation for Bid will be subject to the applicable provisions, clauses, and supplemental specifications of GPO Contract Terms (GPO Pub. 310.2, effective December 1, 1987 (Rev. 9-88)) and GPO Contract Terms, Quality Assurance Through Attributes Program (GPO Pub. 310.1, effective May 1979 (revised December 1992)).

QUALITY ASSURANCE LEVELS AND STANDARDS: The following levels and standards shall apply to these specifications:

Product Quality Levels:
    (a) Printing Attributes -- Level IV.
    (b) Finishing Attributes -- Level IV.

Inspection Levels (from ANSI/ASQC Z1.4):
    (a) Non-destructive Tests - General Inspection Level I.
    (b) Destructive Tests    - Special Inspection Level S-2.

Specified Standards: The specified standards for the attributes requiring them shall be:

| Attribute | Specified Standard |
|---|---|
| P-7.  Type Quality and Uniformity | Average type dimension in publication or camera copy |

SUBCONTRACTING: Subcontracting will not be permitted

EXTENSION OF CONTRACT TERM: At the request of the Government, the term of any contract resulting from this solicitation may be extended for such period of time as may be mutually agreeable to the GPO and the contractor.

DEFINITION OF RECOVERED MATERIALS IN PAPER PRODUCTS:

Waste Paper (when used in high grade bleached printing and writing papers) means any of the following "recovered materials":

    (1) Postconsumer materials such as:

        (a) Paper, paperboard, and fibrous wastes from retail stores, office buildings, homes, and so forth, after they have passed through their end usage as a consumer item, including: Used corrugated boxes, old newspapers; old magazines; mixed waste paper; tabulating cards, and used cordage; and

        (b) All paper, paperboard, and fibrous waste that enter and are collected from municipal solid waste; and

    (2) Manufacturing, forest residues, and other wastes such as:

        (a) Dry paper and paperboard waste generated after completion of the papermaking process (that is, those manufacturing operations up to and including the cutting and trimming of the paper machine reel into smaller rolls or rough sheets) including envelope cuttings, bindery trimmings, and other paper and paperboard waste, resulting from printing, cutting, forming, and other converting operations; bag, box, and carton manufacturing wastes; and butt rolls, mill wrappers, and rejected unused stock; and

        (b) Finished paper and paperboard from obsolete inventories of paper and paperboard manufacturers, merchants, wholesalers, dealers, printers, converters, or others.

    (3) "Mill broke" is specifically excluded from the definition of waste paper. Mill broke means any paper waste generated in a paper mill prior to completion of the papermaking process.

MAINTENANCE OF RECORDS ON RECOVERED MATERIALS IN PAPER PRODUCTS: The contractor shall maintain manufacturer/mill accounting and record summaries on the fiber weight content used as feedstock, for purposes of Government audit, that will verify (i) the contractors certification of the minimum waste paper, post- consumer

recovered materials, or recovered materials (cotton/linen) content, as applicable, used in performance of the contract, (ii) that the paper and paper products are in compliance with the specification requirements, and (iii) the paper is manufactured in accordance with the Environmental Protection Agency (EPA) Guideline for Federal Procurement of Paper and Paper Products Containing Recovered Materials, 40 CFR Part 250, whether the products are manufactured by the contractor or another paper mill. The contractor, if not the manufacturer, shall obtain this information from the paper manufacturer. The contractor shall maintain, and make available to the Government, these documents for one year after the expiration of the contract. Nothing in this clause shall excuse the contractor from furnishing the specified paper.

ECONOMIC PRICE ADJUSTMENT: The prices set forth in this contract shall be adjusted in accordance with the provisions of this clause, provided that, in no event will prices be revised to exceed the maximum permissible under any law existing as of the date of the contract or as may be hereafter promulgated.

Price adjustment period: For the purpose of this clause, the program years shall comply with the Contract Term clause. There shall be no price adjustment for orders placed during the first program year of this contract.

Price adjustment: The prices shall be adjusted on the basis of the "Consumer Price Index For All Urban Consumers - Commodities Less Food, Seasonally Adjusted," published monthly in the CPI Detailed Report by the Department of Labor, Bureau of Labor Statistics, in the following manner:

(1)    The contract price of orders placed during the adjusted period (excluding reimbursable postage or transportation costs) shall be adjusted by the percentage increase or decrease in the average, seasonally adjusted Consumer Price Index For All Urban Consumers - Commodities Less Food (seasonally adjusted) as follows: An index shall be calculated by averaging the 12 seasonally adjusted months ending 3 months prior to the expiration of the first period of the contract. This average is then compared with the average index for the 12-month period ending 3 months prior to the beginning of the contract, called the base index. The percentage increase or decrease by comparing these two indexes shall be applied to the contractor's invoices for orders placed during the price adjustment period.

(2)    The Government will notify the contractor in writing of the percentage increase or decrease to be applied to any invoices to be submitted for orders subject to price adjustment in accordance with this clause. Such percentage will be determined from the published index as set forth above. The contractor shall apply the percentage increase or decrease against the total price of the invoice less reimbursable postage or transportation costs. Any applicable discounts will be calculated on the basis of the invoice price as adjusted.

ASSIGNMENT OF JACKETS, PURCHASE AND PRINT ORDERS: A GPO jacket number will be assigned and a purchase order issued to the contractor to cover work performed. The purchase order will be supplemented by an individual "Print Order" for each job placed with the contractor. The print order, when issued, will indicate the quantity to be produced and any other information pertinent to the particular order.

PREAWARD SURVEY: In order to determine the responsibility of the prime con- tractor or any subcontractor, the Government reserves the right to conduct a preaward survey or to require other evidence of technical, production, mana-gerial, financial, and similar abilities to perform, prior to the award of a contract.

PRIOR TO AWARD: **A meeting will be held at the U.S. Attorney's Office, prior to actual award, to go over the provisions of the contract and establish initial contact with the Agency.**

**The Government may require, prior to award, the production of a brief as submitted by the Department to check contractor conformance with schedule and quality requirements.**

PAYMENT: The contractor shall submit a copy of their billing to.:

U.S. Department of Justice, Appeals Unit

For Criminal Briefs                          For Civil Briefs

U.S. Department of Justice                   U.S. Department of Justice
One St. Andrew's Plaza, Room 844             86 Chambers Street, 3rd Floor
New York, NY 10007                           New York, NY 10007

After review and approval submit vouchers to: Comptroller, Stop FMCE, Office of Financial Management, U.S. Government Printing Office, Washington, D.C. 20401.

NOTE:      ON EACH ORDER: One copy of the print order with a copy of contractor's billing must be sent to the U.S. Government Printing Office, New York Regional Procurement Office, 928 Jaymore Road Suite A-190; Southampton, PA 18966 ATTN: Program Section.

PAYMENT BY ELECTRONIC FUNDS TRANSFER (EFT)

Public Law 104-134 requires that payments made under a contract or purchase order must be made electronically.

Companies (contractors) doing business with GPO should complete Standard Form 3881 (ACH Vendor/Miscellaneous Payment Enrollment Form) and submit it to the U.S. Government Printing Office, Examination and Billing Branch (FMCS), Washington, DC 20401.

SF-3881 is available from FMCS by calling (202) 512-0992or 0993 FAX (800) 245-5476 (no collect calls). Changes in company or financial institution information presently on file should be submitted to the same office.

Contractors that do not have an account at a financial institution or authorized payment agent must certify to such circumstances, in writing, to the Assistant Comptroller, Accounting Division, FMCS. The acceptance of these certificates by GPO will terminate on January 1, 1999, when all contractors will be paid through EFT.

LIMITATION OF PERFORMANCE AND CONTRACTOR OBLIGATIONS: Funds are available for performance of this contract for the first program period only.  The amount of funds at award is not considered sufficient for performance required for any program year other than the first program year. When additional funds are available for the full requirements for the next succeeding program year, the Contracting Officer shall, not later than 60 calendar days before the expiration of the program year for which performance has been funded (unless a later day is agreed to), so notify the contractor in writing.  Notification that funds are not available shall effect cancellation of the contract.

The Government is not obligated to the contractor for any amount over requirements for which funds have been made available and as obligated by each print order.

The contractor is not obligated to incur costs for the performance required for any program year after the first unless and until written notification is received from the Contracting Officer of an increase in availability of funds. If so notified, the contractor's obligation shall increase only to the extent contract performance is required for the additional program year for which funds have been made available.

If this contract is terminated under the "Termination for Convenience of the Government" clause, "total contract price" in that clause means the amount available for performance of this contract, as provided for in this clause. The term "Work in Process" in that clause means the work under the program year requirements for which funds have been made available.  If the contract is terminated for default, the Government's rights under this contract shall apply to the entire multiyear requirements.

Notification to the contractor of an increase or decrease in the funds available for performance of the contract under another clause (e.g. the "Option" or "Changes" clause) shall not constitute the notification required by the first paragraph of this clause.

This procedure shall apply for each successive program year.

ORDERING: Items to be furnished under the contract shall be ordered by the issuance of print orders by the Government. Orders may be issued under the contract from Nov. 1, 2006 through Oct. 31,2007. All print orders issued hereunder are subject to the terms and conditions of the contract. The contract shall control in the event of conflict with any print order. A print order shall be "issued" for purposes of the contract, when it is either deposited in the U.S. Postal Service mail or otherwise furnished to the contractor in conformance with the schedule.

REQUIREMENTS:  This is a requirements contract for the items and for the period specified herein. Shipment/delivery of items or performance of work shall be made only as authorized by orders issued in accordance with the clause entitled "Ordering". The quantities of items specified herein are estimates only, and are not purchased hereby. Except as may be otherwise provided in this contract, if the Government's requirements for the items set forth herein do not result in orders in the amounts or quantities described as "estimated", it shall not constitute the basis for an equitable price adjustment under this contract.

Except as otherwise provided in this contract, the Government shall order from the contractor all the items set forth which are required to be purchased by the Government activity identified on page 1.

The Government shall not be required to purchase from the contractor, requirements in excess of the limit on total orders under this contract, if any.

Orders issued during the effective period of this contract and not completed within that time shall be completed by the contractor within the time specified in the order, and the rights and obligations of the contractor and the Government respecting those orders shall be governed by the terms of this contract to the same extent as if completed during the effective period of this contract.

If shipment/delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that shipment/delivery may be specified under this contract, and if the contractor will not accept an order providing for the accelerated shipment/delivery, the Government may procure this requirement from another source.

The Government may issue orders which provide for shipment/delivery to or performance at multiple destinations.

Subject to any limitations elsewhere in this contract, the contractor shall furnish to the Government all items set forth herein which are called for by print orders issued in accordance with the "Ordering" clause of this contract.

## SECTION 2.- SPECIFICATIONS

SCOPE:   These specifications cover the production of appeals briefs and appendices requiring such operations as copy pickup, composition and makeup from department supplied diskette(s), preparation of indexes on some orders, printing, binding, packing, distribution and return of government furnished materials

TITLE: Appeals Briefs and Appendices

FREQUENCY OF ORDERS:  Approximately 300 Briefs and 150 Appendices

BRIEFS—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 200 copies per order with an average of 40 copies per order. Approximately 10 to 132 pages plus cover per order with an average of 40 pages per order Approximately 1 to 20 pages of index or table of contents per order.

APPENDICES—QUANTITY AND NUMBER OF PAGES: Approximately 10 to 40 copies per order with a average of 20 copies per order. Approximately 8 to 1334 pages per order plus cover per order.

GOVERNMENT TO FURNISH: typewritten manuscript copy with computer diskettes or the Government will send copy by modem. Contractor must have the ability to receive by 56-k modem, E-mail or the Internet. Software program WordPerfect 8.0 or later will be used at the Government's discretion. Camera copy for text of Appendices and occasionally for Briefs.

Contractor must have the equipment compatible for use with the above software program and must have sufficient back-up equipment.

Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover, trim to finished size and bind.

Identification markings such as register marks, ring folios, rubber stamped jacket numbers, commercial identification marks of any kind, etc., except GPO imprint, form number, and revision date, carried on copy or film, must not print on finished product.

CONTRACTOR TO FURNISH: All materials and operations, other than those listed under "Government to Furnish," necessary to produce the product(s) in accordance with these specifications.

COMPOSITION: The entirety of each category of composition (text, tabular and display) must be identical throughout the products ordered under these specifications.

Composition must be computer output via laser printer, imagesetter or by photocomposition.

Output resolution for laser printers will be 300 to 625 dots per inch and imagesetters will be will be 1,200 to 3,500 dots per inch.

Photocomposition includes all typesetting product by photographically creating the characters on sensitized film or paper.

Type Page Size: For Briefs, approximately 25 x 43 picas plus folio, facing pages can be one or two lines long or short to accommodate make up and page breaks.

Typefaces and Sizes: The contractor is required to furnish the following:

Cover: 12 to 72 point Century and Spartan Heavy.
Text, Index, Table of Contents, and Footnotes: 12 point Century with italic, bold, and small caps.
Display: 14 point Spartan Heavy.

Composition will be required on covers, table of contents, and text of Briefs and covers and table of contents of Appendices. Camera copy will be furnished for text of Appendices and occasionally for a percentage of text for Briefs.

No alternate typefaces will be allowed; however, manufacturers' generic equivalents will be accepted for the above typefaces. Each bidder shall list in the bid the name of the generic equivalent typeface(s) and composing machine to be used.

The GPO reserves the right to require samples of any generic equivalent typefaces offered if it is deemed necessary in order to determine the suitability of the offered typefaces.

The contractor must hold all repro for 60 days after delivery for possible use in reprints. After 60 days it may be disposed of.

FILMS/REPRODUCIBLES: The contractor must make all films/reproducibles required.

PROOFS: During the normal workday the contractor must deliver one set of page proofs and any revised page proofs. The contractor must also be able to transmit proofs and receive corrected proofs by facsimile.

On occasion, representatives of the government will read proofs at the contractor's plant. A suitable work place will be provided by the contractor.

The contractor will be responsible for performing all necessary proofreading to ensure that the proofs are in conformity with the copy submitted.

Page reader's proofs must be clean on white paper, free of ink smudges, with all images clearly legible. All proofs must be collated in sets, numbered sequentially, and have a one-inch clear margin on all sides. Proofs must be identified with the jacket number, program number, print order number, and proof date, at least 1/2" from the type area. The contractor's firm name must not appear on any proofs.

Page and Revised Page Proofs: Proofs must be uniform in size and contain a single page to a sheet. When pages contain space allowance for illustrations, an identifying illustration number must be marked in the space allowed. Tables on one set of proofs must be completely ruled.

If any contractor's errors are serious enough in the opinion of the GPO to require revised proofs, the revised proofs are to be provided at no expense to the Government. No extra time be allowed for this reproofing; such operations must be accomplished within the original production schedule allotted in the specifications.

The contractor must not print prior to receipt of an "OK to print." Contractor will receive OK by phone or by facsimile.

STOCK/PAPER: The specifications of all paper furnished must be in accordance with those listed herein or listed for the corresponding JCP Code numbers in the "Government Paper Specification Standards No. 10" dated July 1994.

All text paper used in each copy must be of a uniform shade. All cover paper must have the grain parallel to the spine.

Text: White Antique Book, grammage 67 g/m$^2$ (basis weight: 45 lbs per 500 sheets, 25 x 38"), equal to JCP Code A100.

Cover: White and Colored (usually, but not limited to, Red, Gray, Green, and Blue) Vellum-Finish Cover, grammage 175 g/m$^2$ (basis weight: 65 lbs per 500 sheets, 20 x 26"), equal to JCP Code L20.

Occasional orders may require the use of pressure sensitive cover stock (same as listed above) for the correction of minor errors, stock must have permanent adhesive. Stock to be equal to "Starliner" by Mactac with special permanent adhesive or Fasson "Crack 'n Peel" Plus with super permanent adhesive.

PRINTING: Print head to head in black ink. All orders may be printed by electro-static copying or by printing with direct image plates provided that the quality levels are maintained.

INK: If lithographic ink is used in the performance of this contract, the ink shall contain not less than the following percentages of vegetable oil: sheet- fed and forms ink, 20 percent.

For Appendices, the contractor will be required to mechanically number the pages. This shall be accomplished by a numbering machine consisting of 1 or 2 letters followed by up to 4 digits. All characters are to be 3/16" or 1/4" high. The numbered text is then used as camera copy.

MARGINS: Briefs: 1" on all sides.

BINDING: Perfect- or adhesive-bind products: Gather contractor printed and/or Department supplied printed material, perfect- or adhesive-bind with separate wraparound glued-on paper cover, and trim three sides. Covers trim flush.

PACKING: Pack in shipping containers. Each shipping container must not exceed 45 pounds when fully packed.

LABELING AND MARKING (Package and/or Container label): Reproduce shipping container label from furnished repro, fill in appropriate blanks and attach to shipping containers.

DISTRIBUTION: Deliver f.o.b. destination to the following addresses:

| | |
|---|---|
| U.S. Department of Justice | U.S. Department of Justice |
| One St. Andrew's Plaza | 86 Chambers Street , 3rd Floor |
| New York, NY 10007 | New York, NY 10007 |

INSIDE PICKUP AND DELIVERY TO ROOM NUMBER SPECIFIED IS REQUIRED.

There will be one additional address in Manhattan.

Complete addresses and quantities will be furnished with the print orders.
All expenses incidental to returning materials, submitting proofs, and furnishing sample copies must be borne by the contractor.

RETURN OF GOVERNMENT FURNISHED MATERIAL, ETC: The contractor shall within 10 days of delivery of each brief, return to the Department the corrected version (i.e., the version as printed) of each brief on 3.5" diskette. This corrected version (hereinafter "corrected version file") shall be in WordPerfect 8.0 or higher as directed by the Government.

Also .pdf file(s) in Acrobat 3.0 Reader for use in CD-ROM production, files must be identical to the printed version from contractor's application program files, e.g., using Macintosh platform, QuarkXPress, Adobe PageMaker, etc. or using Windows platform, QuarkXPress, Adobe PageMaker, Adobe FrameMaker, etc.

Required formatting of the corrected version file: Justification shall be Full or Left; Base Font shall be Courier; Line Spacing shall be one; paragraphs shall be separated by 2-points or more leading between lines and 6-points or more between paragraphs (tabular or spaced first-line indentations are permissible); lines within paragraphs shall end with Soft Returns, not Hard Returns; block quotations shall be left/right indented paragraphs; footnote markers in text and footnotes shall be in standard WordPerfect format.

Impermissible Formatting: Character font codes other than the Base Font shall be removed; center Justification codes shall be removed; other formatting codes added during the conversion process, if any, other than as required above, shall be removed.

SCHEDULE: Adherence to this schedule must be maintained. Contractor must not start production of any job prior to receipt of the individual print order (GPO Form 2511). No definite schedule for pickup of material can be predetermined. Furnished material and proofs must be picked up from and delivered to the addresses under DISTRIBUTION.

It should be noted that the performance period specified by the Government consists of contract  workdays Monday through Friday, from 9:00 a.m. to approximately 10:00 p.m..

The Contractor may be required to work on up to 4 briefs or appendices (up to 100 pages per order) in one day and maintain work schedules.

Contractor will be notified for pick up of initial copy and/or diskette(s) or Government will notify contractor that copy will be sent by modem as set forth below.

## BRIEFS

Regular Schedule (non-Overtime): Contractor will be required to pickup copy and diskettes or be available to receive copy by electronic means between the hours of 9:00am to 12:00pm and to process copy and deliver typeset page proofs (up to 100 pages per brief) back to the agency within 4 hours.

Contractor will be required to pick up corrected page proofs or receive by facsimile during contract workday hours, make corrections and deliver (or facsimile) corrected set of page proofs back to the Department within one (1) hours of receipt.

Additional changes may be made by the agency up to 4 additional times per brief and the Contractor must turnaround each change within 30 minutes of receipt of change/

After receiving "OK to print," contractor will print, bind, and deliver 40 copies (up to 100 pages per brief) within 2 hours.

In the event that the contractor is responsible only for printing the cover and binding the brief, in one of two format, a copy of the text of the brief shall be provided by the Department to the contractor. After receiving the text of the brief and an "OK to print," the contractor shall make the requisite copies of the text of the brief and bind and trim to size and deliver 40 copies within 2 hours. Trim sizes will either be 8-1/2 x 11" or 6-1/8 x 9-1/4

## APPENDICES

Regular Schedule (Non-Overtime): The contractor will be required to pick up copy, typeset cover and table of contents, number pages, print, and deliver 20 copies of up to 500 pages.

This should be a 2-step process:
 1) Contractor prepares a "dummy" appendix (no cover or table of contents), just numbered pages in a temporary binding. This should take no more than 24 hours.
 2) When appendix is in final form (including cover and table of contents), contractor is given "OK" to print. Deliver 20 copies of up to 500 pages within 4 hours.

If receipt of material, from the Government, occurs such that contractor cannot perform above schedule during normal workday hours, contractor will perform such work during the following workday or on overtime if overtime is authorized by the Government.

**NOTE: Overtime shall apply to any work performed after 10:00pm or on weekends or Federal Holidays resulting from delays caused by the agency. No overtime payment will be paid because of contractor's failure to meet the schedule..**

**Overtime Schedule: When the Government requires that work be performed Monday thru Friday after 10:00pm Saturdays, Sundays, and Federal holidays, in order to meet delivery requirements, overtime payments will be paid for at the hourly overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices". Contractor and agency must agree on the number of hours of overtime necessary to complete the job and this must be shown on the print order or attachment. No overtime will be paid if proof of agreement on the number of hours is not attached to the print order.**

**CONTRACTORS PLEASE NOTE: CONTRACTOR MAY NOT REFUSE TO WORK OVERTIME.**

SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

For each brief and/or appendix prepared by the Contractor with respect to which a request is made by the Government, the Contractor shall, in a manner consistent with the requirements of the United States Court of Appeals for the Second Circuit, serve two copies of the brief and/or 1 copy appendix on each party designated by the Government and timely file in the Court of Appeals the original and the appropriate number of copies of the brief and/or appendix. Service will generally be by mail, but personal service may be required. Absent a request by the Government that a particular brief and/or appendix be served and filed by the Contractor, the Contractor shall deliver to the Government the number of copies of the brief and/or appendix specified in the print order form.

If personal service is required, and the party is located more than 25 miles from the contractor's office, the Government will pay actual charges at cost without mark-up.

## SECTION 3.- DETERMINATION OF AWARD

The Government will determine the lowest bid by applying the prices offered in the "Schedule of Prices" to the following units of production which are the estimated requirements to produce 12 months orders under this contract. These units do not constitute, nor are they to be construed as, a guarantee of the volume of work which may be ordered for a like period of time.

OVERTIME PAYMENTS: Orders requiring production on Saturdays, Sundays, Federal holidays, or Monday thru Friday after 10:00pm in order to meet delivery requirements will be paid for at the overtime rate in accordance with the contractor's offered hourly rate in the "Schedule of Prices".

All other orders will be placed with the required schedule and paid for at the basic prices offered.

It is estimated that 15% of the orders placed on this contract will require an overtime schedule and,

The following item designations correspond to those listed in the "Schedule of Prices".

CATEGORY 1

I. (a)(1)   310
    (2)    170
   (b)     106
   (c)   10106
   (d)     318
   (e)   15780
   (f)   34234
   (g)    2052
   (h)     200
   (i)       0
   (j)      50

II. (a)    1,327
    (b)   165,996
    (c)(1)    10
      (2)     0
    (d)  14

III. (a)    255
     (b)    348
     (c)    255

IV  100

## SECTION 4.- SCHEDULE OF PRICES

SUBMISSION OF OFFERS AND EVALUATION: The offer shall be based upon supplying paper that meets or exceeds the minimum percentage of waste paper as required by this solicitation. By submission of an offer, offerors are certifying that the paper to be supplied contains at least the minimum percentage specified. This certification concerns a matter within the jurisdiction of an agency of the United States, and the making of a false, fictitious, or fraudulent certificate on may render the maker subject to prosecution under Title 18, United States Code, Section 1001. he Government reserves the right to require proof of such certification prior to first delivery and thereafter as may be otherwise provided for under the provisions of the contract.

Bids offered are f.o.b. destination.

Prices must include the cost of all required materials and operations for each item listed in accordance with these specifications.

Bidder must make an entry in each of the spaces provided. Contractor must submit a price for all items. A No Charge or a No Bid may be cause for your bid to be declared nonresponsive. Bids submitted with any obliteration, revision, or alteration of the order and manner of submitting bids, may be declared nonresponsive.

Bids submitted with NB (No Bid) or blank spaces for an item may be declared nonresponsive.

The Contracting Officer reserves the right to reject any offer that contains prices for individual items of production (whether or not such items are included in the Determination of Award) that are inconsistent or unrealistic in regard to other prices in the same offer or to GPO prices for the same operation if such action would be in the best interest of the Government.

All vouchers submitted to the GPO shall be based on the most economical method of production.

Fractional parts of 10 will be prorated at the per 10 rate.

Prices must be submitted for the entire term of the contract and bids qualified for a lesser period will not be considered.

(Initials)

I.      COMPOSITION AND PAGE MAKEUP:

(a) Cover pages:

    (1) Brief (6-1/8 x 9-1/4")..................per page............$ _10.00_

    (2) Appendix (8-1/2 x 11")..................per page............$ _10.00_

(b) Text page: Contractor set from manuscript copy.....per page....$ _10.00_

(c) Text page: Department supplied diskette(s)..per page............$ _5.50_

(d) Remake of pages due to editorial changes....per page............$ _3.50_

(e) Page proofs..................................per page............$ _.25_

(f) Authors alterations* (flat charge for access
to file). Offer must include, and a charge
will be allowed for, locating each deletion,
change or addition in the file..............per alteration......$ _.25_

    *Alterations may consist of the addition or deletion of one or more words or phrases (groups of words within a single sentence), these will be considered as one alteration. The maximum charge allowable for author's alterations on any one page shall be an amount equal to the cost of setting that page from manuscript copy.

(g) Insertion of reference page numbers on
Table of Contents or Index from edited
page proofs................................per line............$ _.25_

(h) Return to the Department the corrected version
(i.e., the version as printed) of each brief
on 3.5" diskette. This corrected version
(hereinafter "corrected version file") shall
be in WordPerfect 6.1.......................per diskette.......$ _1.75_

(i) .pdf file production using Acrobat 3.0 Reader
for use in CD-ROM production, files must be
identical to the printed version of text....per page............$ _5.50_

(j) Diskette for .pdf file(s) above.............each................$ _1.75_

_____
(Initials)

II.   COMPLETE PRODUCT: Prices offered shall include the cost of all required materials and operations (EXCEPT Items I. and III.) necessary for the complete production and distribution of the product listed in accordance with these specifications.

### NOTE: RUNNING RATE IS PER 10 COPIES

Running Per
10 Copies

Includes makeready if required:

(a) Complete cover (wraparound)...........................$ _6.00_

(b) Text per page......................................... ..........$ _.35_

(c) Pressure sensitive cover stock (up to 8-1/2 x 11"):

   (1) White...................per 100 leaves......$ _12.50_

   (2) Colored.................per 100 leaves......$ _12.50_

(d) Collating, trimming to size and binding   per 100 pages  $ _12.25_

III. SERVICE AND FILING OF BRIEFS AND APPENDICES BY CONTRACTOR: At Government's Option:

(a) Filing brief and any appendices or attachments
   at court and on one party.....................................$ _50.00_

(b) Each additional service.......................................$ _0.00_

( c) Electronic filing of Briefs ...........................$ _50.00_

IV. OVERTIME PAYMENTS:

Hourly rate for work performed after 10:00pm on weekdays,
Saturday, Sunday and Federal Holidays......per hour..............$ _95.00_

It is estimated that 15% of the orders placed on this contract will require an overtime schedule .

SECTION 4.- TYPEFACES: If manufacturers generic equivalent typefaces are proposed, the bidder must list on the line of the same number as the preferred typeface, the name of the equivalent typeface and composing machine to be used.

Preferred Typefaces:

1. Century

2. Spartan Heavy

| Manufacturers Generic Equivalent Typefaces | Name of Composing Machine |
| --- | --- |
| 1._____ | _____ |
| 2._____ | _____ |

BIDDERS NAME AND SIGNATURE: Fill out and return Two (2) copies of all pages in "Section 4.- Schedule of Prices", initial or sign each in the space provided and submit with GPO Form 910, "Bid". Do not enter bid prices on GPO Form 910. NOTE: The schedule of prices will prevail in instances where prices are inadvertently entered on GPO Form 910.

Bidder_____

_____
(City - State)

By_____
(Signature and title of person authorized to sign this bid)

_____
(Person to be contacted)            (Telephone Number)

The contractor is cautioned not to perform any operation(s) or produce any product(s) for which a price has not been offered under the contract. Further, the contractor is not to accept print orders which are outside the scope of the contract. If such orders are placed, contractor is to notify GPO New York immediately. Failure to do so may result in nonpayment.

| ITEM NO. | DESCRIPTION | BASIS OF | AWARD | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK UNIT RATE | NEW YORK COST | NEW YORK UNIT RATE | NEW YORK COST | CONTRACT UNIT RATE | CONTRACT COST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | |
| a | COVER PAGE & SPINE | | | | | | | | | | |
| 1 | BRIEF (8-1/8 X 8-1/4") | PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 6.50 | 2,015.00 | 6.50 | 2,015.00 |
| 2 | APPENDIX (8-1/2 X 11") | PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 6.50 | 1,105.00 | 6.50 | 1,105.00 |
| b | TEXT PAGE: MANUSCRIPT COPY | PER PAGE | 106 | 10.00 | 1,060.00 | 10.00 | 1,060.00 | 7.00 | 742.00 | 7.00 | 742.00 |
| c | TEXT PAGE: SUPPLIED DISK | PER PAGE | 10108 | 7.90 | 79,837.40 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | 40,424.00 |
| d | REMAKE OF PAGES | PER PAGE | 318 | N/C | | N/C | | N/C | | N/C | |
| e | PAGE PROOFS | PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 0.20 | 3,158.00 | 0.20 | 3,158.00 |
| f | AUTHOR'S ALTERATIONS | PER ALTERATION | 34234 | 0.25 | 8,558.50 | | 984.00 | | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS | PER PAGE | 2052 | 0.20 | 410.40 | N/C | | N/C | | N/C | |
| h | RETURN TO THE DEPT. CORRECTED VERSION OF EACH BRIEF | PER UNIT | | N/C | | N/C | | N/C | | N/C | |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 | PER DISKETTE | 200 | N/C | | N/C | | N/C | | N/C | |
| j | READER FOR USE IN CD-ROM | PER PAGE | 60 | 0.25 | | 5.00 | 300.00 | 5.00 | | 5.00 | |
| j | DISKETTE FOR PDF FILE ABOVE | EACH | | 1.50 | | 1.50 | 75.00 | N/C | | N/C | |
| II | COMPLETE PRODUCT | | | | | | | | | | |
| a | COMPLETE COVER | PER 10 COPIES | 1327 | 3.00 | 3,981.00 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | 5.50 | 7,298.50 |
| b | TEXT PER PAGE | PER 10 COPIES | 165996 | 0.50 | 82,998.00 | 0.30 | 49,798.80 | 0.20 | 33,199.20 | 0.20 | 33,199.20 |
| c | PRESSURE SENSITIVE COVER STOCK | PER PAGE | | N/C | | N/C | | N/C | | N/C | |
| d | WHITE | PER 100 LEAVES | 10 | N/C | | 12.00 | | N/C | | N/C | |
| 1 | COLOR | PER 100 LEAVES | | N/C | | 12.00 | | N/C | | N/C | |
| 2 | COLLATING, TRIMMING TO SIZE AND BINDING | PER 100 PAGE | 14 | 8.50 | 91.00 | 12.00 | 168.00 | 5.00 | 70.00 | 5.00 | 70.00 |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | |
| a | FILING BRIEF AND ANY APPENDICES OR ATTACHMENT'S AT COURT AND ON ONE PARTY | EACH | 255 | 20.00 | 5,100.00 | 50.00 | 12,760.00 | N/C | | N/C | |
| b | EACH ADDITIONAL SERVICE | | 348 | N/C | | N/C | | N/C | | N/C | |
| c | ELECTRONIC FILING OF BRIEFS EACH | | 255 | | | 30.00 | 7,650.00 | N/C | | N/C | |
| IV | OVERTIME PAYMENT | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS | PER HOUR | 100 | 150.00 | 15,000.00 | 95.00 | 9,500.00 | 70.00 | 7,000.00 | 70.00 | 7,000.00 |
| | CONTRACTOR TOTALS | | | | $205,187.40 | | $147,323.20 | | $88,008.70 | | $88,009.70 |
| | DISCOUNT | | | | | | | 7.00% | | | $1,760.19 |
| | DISCOUNTED TOTALS | | | | $205,187.40 | | $147,323.20 | | $86,248.51 | | $88,009.70 |

Exhibit 6 to Wilmot Declaration



# RECORD ✦ PRESS INC.
Decades of Experience    Cutting Edge Technology
*Since 1945*
229 West 36th Street, New York, NY 10018

Phone (212) 619-4949    Fax (212) 608-2141
Federal I.D. Number 13-565...

# INVOICE #A71700

Refer To Invoice # with Payment

SOLD TO:

**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
| --- |
| 12/22/2006 |
| CUSTOMER PHONE |
| 202 512-0816 |
| CUSTOMER FAX |
| |

| PURCHASE ORDER No. | PRINT ORDER No. | Due Date | NET TER... | ACCT... | PROGRAM No. | JOB NUMBER |
| --- | --- | --- | --- | --- | --- | --- |
| | B0601 | 1/21/2007 | Net 30 | H | | 18092C |

**Burke v Evans**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
| --- | --- | --- | --- |
| | RE: Brian T. Burke v Donald L. Evans | | |
| | Docket No. 06-1917-cv / Print Order # 65213 | | |
| | For printing and binding 40 copies of the above Brief for | | |
| | Defendants-Appellees: | | |
| | | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00 |
| 40 | Covers Printed @ $0.60 Per Cover | 0.60 | 24.00 |
| 3,040 | 76 Pages Text Printed x 40 Copies @ $0.035 Per Page | 0.035 | 106.40 |
| 3,040 | Collating, Trimming to Size and Binding Charge 3040 | 0.1225 | 372.40 |
| | Pages @ $12.25 Per 100 Pages | | |
| 1 | Party Served and Filed @ | 50.00 | 50.00 |
| 1 | Electronic Filing and Service of Brief @ | 30.00 | 30.00 |
| | | | 592.80 |
| | Postage @ | 7.10 | 7.10 |

| | |
| --- | --- |
| SUBTOTAL | $599.90 |
| TAX (0.0%) | $0.00 |
| TOTAL | $599.90 |
| MONEY ON ACC'T | $-599.90 |
| BALANCE DUE | $0.00 |

## Thank you for your business.



# Record ✦ PRESS INC.
Decades of Experience    Cutting Edge Technology
*Since 1945*

**229 West 36th Street, New York, NY 10018**

Phone (212) 619-4949    Fax (212) 608-3141
Federal I.D. Number 13-565...

## INVOICE #A71701

Refer To Invoice # with Payment

**SOLD TO:**
**COMPTROLLER-STOP FMCE (SD)**
**OFFICE OF FINANCIAL MANAGEMENT**
**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON, DC 20401**

| INVOICE DATE |
|---|
| 12/22/2006 |
| **CUSTOMER PHONE** |
| 202 512-0816 |
| **CUSTOMER FAX** |

| PURCHASE ORDER No. | PRINT ORDER No. | Due Date | NET TER... | ACCT... | PROGRAM No. | JOB NUMBER |
|---|---|---|---|---|---|---|
| | B0601 | 1/21/2007 | Net 30 | H | | 18093C |

**Burke v Evans**

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | RE: Brian T. Burke v Donald L. Evans | | |
| | Docket No. 06-1917-cv / Print Order # 65212 | | |
| | For printing and binding 20 copies of the above Appendix | | |
| | for Defendants-Appellees: | | |
| 1 | Typeset Cover @ $10.00 Per Page | 10.00 | 10.00 |
| 566 | Pages Text x 1 Proof Copy @ $0.25 Per Page | 0.25 | 141.50 |
| 20 | Covers Printed @ $0.60 Per Cover | 0.60 | 12.00 |
| 53 | Page Numbers Inserted in Table of Contents @ $0.25 | 0.25 | 13.25 |
| 11,320 | 566 Pages Text Printed x 20 Copies @ $0.035 Per Page | 0.035 | 396.20 |
| 11,320 | Collating, Trimming to Size and Binding Charge 11,320 | 0.1225 | 1,386.70 |
| | Pages @ $12.25 Per 100 Pages | | |
| 1 | Text Page @ $10.00 Per Page | 10.00 | 10.00 |
| | | | 1,969.65 |

| | |
|---|---|
| **SUBTOTAL** | $1,969.65 |
| **TAX (0.0%)** | $0.00 |
| **TOTAL** | $1,969.65 |
| **MONEY ON ACC'T** | $-1,969.65 |
| **BALANCE DUE** | $0.00 |

## Thank you for your business.

Exhibit 7 to Wilmot Declaration

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
------------------------------------------------- x

BRIAN BURKE,                              :

          Plaintiff-Appellant,      :

          v.                         :     06-1917-cv

DONALD L. EVANS, SECRETARY,               :     ITEMIZED AND VERIFIED
UNITED STATES DEPARTMENT OF               :     BILL OF COSTS
COMMERCE,                                 :

          Defendants-Appellees. :

------------------------------------------------- x

      Counsel for defendants-appellees Donald L. Evans and the United

States Department of Commerce (collectively, "defendants-appellees"),

respectfully submit, pursuant to Rule 39 of the Federal Rules of Appellate

Procedure, the within bill of costs and request that the Clerk prepare an itemized

statement of costs taxed against plaintiff-appellant and in favor of defendants-

appellees for insertion in the mandate.

| | |
|---|---:|
| Docketing Action | $ 0.00 |
| Costs of printing appendix (necessary 20 copies) | $ 2136.36 |
| Costs of printing brief (necessary 30 copies) | $ 419.95 |
| Costs of printing reply brief | $ 0.00 |
| TOTAL | $ 2556.31 |

      Pursuant to 28 U.S.C. § 1924, the above costs are correct and were

necessarily incurred in the litigation of this action for printing work actually and

necessarily performed, as shown by Exhibits A and B attached hereto, which is a true copy of the print orders and invoices relating to the printing of defendants-appellees' appendix and brief, respectively.  Annexed hereto as Exhibit C is an explanation of the difference between the amount of the Exhibit B and the amount for which defendant-appellee seeks costs.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on:   New York, New York
               June 21, 2007


KRISTIN L. VASSALLO
Assistant United States Attorney

- 2 -

**GPO 2511** *Desktop* **Print Order**

| Department | Req. No. | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|
| Southern District | 7-00141 | 12-08-2006 | B-0601 | 65212 |

| Contractor | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|
| Appeals Brief/Appendices | 604-066 | | 12-18-2006 |

| Title | Object Class | State Code | Contractors Code | Program No. |
|---|---|---|---|---|
| Brian Burke V. Evans (06-1917) | 24:00 | 310 | 73951 | 2231-S |

**Proofs**

| Type of proof required | Sets | Days Gov't will hold | Furnished Electronic Media | | BAC | Quantity |
|---|---|---|---|---|---|---|
| Gallery | X | | | Qty: ___ | 4410-KD | 20 |
| Page | 20 | | | Qty: ___ | Quality Level **IV** | Trim Size **8 1/2 x 11** |

| Materials Furnished to Contractor | | | | | |
|---|---|---|---|---|---|
| Manuscript | Halftones | Line Illus. | Camera Copy | Negatives | Other |
| X | | | | | |

| Text Stock | Cover Stock | No. of Text Pages (including blanks) | Fold-in Stock | Strip-ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | | Cover Ink | Text Ink | Cover Prints 1 2 3 4 | Fold-ins/Forms | | Negatives from | Negatives from camera copy |
|---|---|---|---|---|---|---|---|---|
| Face | Back | Black | Black | X | Face only | Face & Back | Electronic media | |

**Binding**

| | | |
|---|---|---|
| Saddle | Paste on Fold | Band Units of |
| F U/LC | Trim 4 Sides | Shrinkwrap Units of |
| Side | Perf on Fold | Perf off fold |
| Perfect | Tab seal | Fold to: |
| Other | | |

Drill ___ holes _____ in diameter on _____ side _____ inches C. to C.

Center of holes _____ inches from _____ edge of sheet

Pads of _____ sheets/sets each. Pad on the _____ side. Chipboard required

Pack _____ Per shipping container.        Pallets required.

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

Defendant Appellee's Appendix
(2004V03846)

OE 4054 __ 24 4
2537 ___ 12/06 ___

_____ __ 12/06 ___

5/7/0

Appeals Brief
86 Chambers Street (SDNY)

| Specifications written by: John Ellwood | Sold by: _____ | Typed by: _____ | Date sent to contractor 12/08/2006 |
|---|---|---|---|

*Additional Shipping Instructions for Supt. of Docs. copies.*

_____ US Government Printing Office–M/F: "Depository" _____
Depository Receiving Section
44 H St., NW, Loading Dock            Item _____
Washington, DC 20401

_____ Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked. File Copies

_____ US Government Printing Office–M/F: "Sales" Req. _____
Documents Warehouse
8610 Cherry Lane    M/F: "Subscription Stock" Req. _____
Laurel, MD 20707

Individual Printed Mailing Containers are Required

Stock No. _____
Sub. ID No. _____
ISBN No. _____

(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must contain Stock No., Sub. ID No. and ISBN No. as indicated.)



**U.S. GOVERNMENT PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7th  Floor
New York, NY  10004

Dear Sir:

The following information is furnished in response to your
request for a cost to the Government for 20 copies of Print Order
65212 Jacket 604-066.

<u>COMPOSITION CHARGE</u>

| Qty: | | Amount |
|---|---|---|
| 1 | Text Page(s) | 10.70 |
| | Combination Pages | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| 53 | Index/Table of Contents: | 14.18 |
| 566 | Page Proofs: | 151.41 |
| | Pages Remake | |
| | Manuscript | |

<u>PRINTING AND ASSEMBLY APPENDIX/RECORD</u>

| | | Unit Price | Amount |
|---|---|---|---|
| 20 | Cover Page Per Unit | .64 | 12.80 |
| 11320 | Text Page Per Unit | .04 | 452.80 |
| 1 | Collating & Trimming | 1483.77 | 1483.77 |
| | Total | | 2136.36 |

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

**GPO 2511** *Desktop* **Print Order**

| Department | Req. No. | | Date | Purchase Order No. | Print Order No. |
|---|---|---|---|---|---|
| Southern District | 7-00141 | | 12-08-2006 | B-0601 | 65213 |

| Contractor | | Jacket No. | Estimated Cost | Ship/Delivery Date |
|---|---|---|---|---|
| Appeals Brief/Appendices | | 604-066 | | 12-18-2006 |

| Title | Object Class | State Code | Contractors Code | Program No. |
|---|---|---|---|---|
| Brian Burke V. Evans (06-1917) | 24:00 | 310 | 73951 | 2231-S |

**Proofs**

| Type of proof required | Sets | Days Gov't. will hold | Furnished Electronic Media | BAC | Quantity |
|---|---|---|---|---|---|
| Gallery | X | | | 4410-KD | 40 |
| | | | Qty: ___ | Quality Level | Trim Size |
| Page | 40 | | Qty: ___ | IV | 8 1/2 x 11 |

| Materials Furnished To Contractor | | | | | | |
|---|---|---|---|---|---|---|
| Manuscript | Halftones | Line Illus. | Camera Copy | Negatives | Other | |
| X | | | | | | |

| Text Stock | Cover Stock | No. of Text Pages (including blanks) | Fold-In Stock | Strip-Ins |
|---|---|---|---|---|
| White Antique Paper | 45 lbs Vellum 65 lbs | | | |

| Four Color Process Printing | | Cover Stock | Text Ink | Cover Prints | | | | Fold-Ins/Forms | | Negatives from | Negatives from |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Face | Back | Black | Black | 1 | 2 | 3 | 4 | Face only | Face & Back | Electronic media | camera copy |
| | | | | X | | | | | | | |

**Binding**

| | | | | |
|---|---|---|---|---|
| Saddle | Paste on Fold | Band Units of | Drill ___ holes ___ in diameter on _____ side _____ inches C. to C. |
| I ULC | Trim 4 Sides | Shrinkwrap Units of | Center of holes _____ inches from _____ edge of sheet |
| Side | Perf on Fold | Pan off fold | Pads of _____ sheets/sets each. Pad on the _____ side. Chipboard required |
| Perfect | Tab seal | Fold to: | Pack _____ Per shipping container. _____ Pallets required. |
| Other | | | |

Instructions and Distribution:

Return all Government furnished materials and/or negs. to:

**Defendant Appellee's Red Brief**
**(2004V03846)**

_____ OE-9054    241
PCF 2538 on copy  12/06

_certify that goods or services covered on this memorandum have arrived in good condition_

Date received:  12/06

_[signature]_  Date 5/7/07

Appeals Brief
86 Chambers Street (SDNY)

| | | Date sent to contractor |
|---|---|---|
| Specifications written by: John Ellwood  _[signature]_ Sold by: _____ Typed by: _____ | | 12/08/2006 |

***Additional Shipping Instructions for Supt. of Docs. copies.***

US Government Printing Office–M/F: "Depository" _____
Depository Receiving Section
44 H St., NW, Loading Dock            Item _____
Washington, DC 20401

Library of Congress
Anglo-American Acquisitions Division
Government Documents Section
101 Independence Ave., SE
Washington, DC 20540-4172
Marked: File Copies

US Government Printing Office–M/F: "Sales" Req. _____
Documents Warehouse
8610 Cherry Lane     M/F: "Subscription Stock" Req. _____
Laurel, MD 20707
Individual Printed Mailing Containers are Required

Stock No. _____

Sub. ID No. _____

ISBN No. _____

(Shipping labels for Supt. of Docs. "Sales" or "Subscription" copies must
contain Stock No., Sub. ID No. and ISBN No. as indicated.)



**U.S. GOVERNMENT
PRINTING OFFICE**
KEEPING AMERICA INFORMED

May 31, 2007

United States Attorney
Civil Clerk's Office
Attn: John Ellwood
33 White Hall St., 7ᵗʰ Floor
New York, NY  10004

Dear Sir:

The following information is furnished in response to your
request for a cost to the Government for 40 copies of Print Order
65213 Jacket 604-066.

<u>COMPOSITION CHARGE</u>

| Qty: | | Amount |
|---|---|---|
| | Text Pages: | |
| | (Text & Footnotes): | |
| 1 | Cover: | 10.70 |
| | Index/Table of Contents: | |
| | Page Proofs: | |
| | Pages Remake: | |
| | Manuscript: | |

<u>PRINTING AND ASSEMBLY (BRIEFS)</u>

| | | Unit Price | Amount |
|---|---|---|---|
| 40 | Cover Pages Per Unit | .64 | 25.60 |
| 3040 | Text Page Per Unit | .04 | 121.60 |
| 1 | Collating & Trimming | 398.47 | 398.47 |
| | Total | | 556.37 |

Page 2

I trust this information will serve your needs. If you require additional information, please contact me on (202) 512-1197.

Sincerely,

AKIKO Z. WARD
Customer Service Controller
(Office of the Customer Service Controller)

Total Allowable Cost of Printing Brief

Composition

| | |
|---|---|
| Text pages | |
| Cover | $ 10.70 |
| Index/Table of Contents | |
| Page Proofs | _____ |
| Subtotal for Composition: | $ 10.70 |

Printing and Assembly (based on 40 copies of cover page and text pages)

| | |
|---|---|
| Cover page    ($25.60 x 3/4) | $  19.20 |
| Text pages    ($121.60 x 3/4) | $  91.20 |
| Collating & Trimming ($398.47 x 3/4) | $ 298.85 |
| Subtotal for Printing and Assembly: | $ 409.25 |

| | |
|---|---|
| Total Cost of Printing Brief | $ 419.95 |
| ($10.70 + 409.25) | |

Although the contract between this Office and its printer provides for a minimum run of forty copies, this Court's decision in Furman v. Cirrito, 782 F.2d 353, 356 (2d Cir. 1986), provides that printing costs for thirty copies of the brief are properly deemed taxable costs. Therefore, the "Cover Page Per Unit" and "Text Page Per Unit" charges under the heading "PRINTING AND ASSEMBLY (BRIEFS)" on the invoice contained in Exhibit B are discounted accordingly as set forth above.

The item listed on the invoice under the heading "COMPOSITION CHARGE," however, constitutes composition costs associated with setting the necessary type that remain the same regardless of how many copies are actually printed. It is therefore fully reimbursable under 28 U.S.C. § 1920(3).

## CERTIFICATE OF SERVICE

KRISTIN L. VASSALLO, an Assistant United States Attorney for the

Southern District of New York, hereby certifies that on June 21, 2007 I caused a

copy of the Itemized and Verified Bill of Costs to be served by Federal Express

upon the following:

Brian T. Burke
145 E. 23rd Street, Apt. 4R
New York, New York 10010


Dated: New York, New York
      June 21, 2007

                            KRISTIN L. VASSALLO
                            Assistant United States Attorney

Exhibit 8 to Wilmot Declaration

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

HON. DENNIS JACOBS
Chief Judge

CATHERINE O'HAGAN WOLFE
Clerk

Before:

Hon. Ralph K. Winter,
Hon. Barrington D. Parker,
          *Circuit Judges,*
Hon. Louis F. Oberdorfer,[*]
          *District Judge.*

BURKE v. EVANS                                    Docket No. 06-1917-cv

## ORDER

IT IS HEREBY ORDERED that the Appellees' itemized and verified bill of costs and the Appellant's opposition are construed as a motion to deny costs, and so construed, the motion to deny costs is GRANTED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, Clerk
by

Elizabeth Duwe
Motions Staff Attorney

AUG   2 2007
Date

---

[*]The Honorable Louis F. Oberdorfer, Judge of the United States District Court for the District of Columbia, sitting by designation.

Exhibit B to Lewin Declaration

# MorrisonCohen LLP

Malcolm I. Lewin
(212) 735-8625
mlewin@morrisoncohen.com

August 1, 2008

**Via Facsimile and By First Class Mail**
**(202) 223-8651**

Mark Hanna, Esq.
Davis, Cowell & Bowe, LLP
1701 K Street, NW
Suite 210
Washington, D.C. 20006

      Re:    United States of America, ex rel. Brian Burke v. Record Press, Inc.
              (1:08cv 364 U.S. District Court, D.C.)

Dear Mr. Hanna:

      We represent Record Press, Inc. ("Record Press"), which has been named by your client as defendant in the referenced action.

      Pursuant to Federal Rule of Civil Procedure 11(c)(1), we hereby give notice that we will file a Rule 11 Motion on behalf of Record Press on or shortly after August 28, 2008 if you do not withdraw the Verified Complaint ("Complaint") in the referenced action which you filed in the U.S. District Court for the District of Columbia on February 29, 2008, and recently served on Record Press, following the government's election to decline intervention.

      Enclosed are three documents referred to and relied on in your Complaint (verified by Mr. Burke as true to his own knowledge, not alleged on information and belief) demonstrating that the allegations in the Complaint have no basis in fact and were made, we believe, without the investigation Rule 11 requires. These documents are the Request for Proposals ("RFP") and Record Press' two bills.

      Among the errors in your Complaint which are directly refuted by the documents to which your complaint refers and relies on, are the following:

      1.     Complaint paragraph 11 states, incorrectly, that the maximum price to be charged for collating, trimming to size and binding briefs and appendices is $14.00 per hundred pages for a 10 copy run. (The "Running Per 10 Copies" caption applies, obviously, to the two, subsequently listed line-items: "Complete cover" and "Text per page." Charges for "Collating, trimming to size and binding" are listed as "per 100 pages" which means exactly what it says.) The documents relied on in your Complaint (and enclosed with this letter) show that the price for collating, trimming to size and binding briefs, per hundred pages, is $12.25 (or .01225 per page) and this is restated and confirmed in the chart on the last page of the enclosed RFP entitled "Basis of Award." This is what

MorrisonCohen LLP

Mark Hannah, Esq.
August 1, 2008
Page 2

Record Press billed as is shown in the enclosed invoice number A71700 which your client no doubt received.

2.      Complaint paragraph 12 alleges, again incorrectly, that the RFP cost for binding a 10 copy run of a brief or appendix is $12.50 for 100 pages (or 0.1225 per page). The RFP does not provide a separate binding charge. Neither does Record Press' bill.

3.      Complaint paragraph 13 alleges, again incorrectly, that "[i]n violation of the GPO contract" Record Press has billed and still bills the GPO "the binding charge for each copy of each brief or appendix that it prepares, rather than for a 10-copy run of the document being prepared." The charges relating to a "10-copy run" referred in the Complaint is found in Section II of the RFP and as seen, refers only to "Complete Cover" and "Text Per Page." Again, this is confirmed on the "Basis of Award" page, in the RFP enclosed.

4.      Complaint paragraph 15 claims, incorrectly, that Record Press billed the government $1,483.77 for collating and trimming 20 copies of a 566 page appendix. Your client had that bill for some time and he should have been able to read it correctly. Complaint paragraph 14 claims that Mr. Burke made his "discoveries" when he as the losing party in his action against the Government in the U.S. District Court, Southern District of New York and again in the Second Circuit Court of Appeals, was ordered to pay the U.S. Attorney's costs, etc. Record Press' invoice number A71701, enclosed, referring to the printing and binding of the appendix, states that for 11,320 pages, the charge for collating, trimming to size and binding, at $12.25 per hundred pages was $1,386.70, not $1,483.77. Again, Record Press' bill is consistent with the RFP.

5.      Paragraph 15 of the Complaint also alleges incorrectly that Record Press billed the Government $398.47 for collating and trimming 40 copies of a 76-page brief. In fact, Record Press' enclosed invoice, #A71700, states that the charge for collating, trimming to size and binding 3,040 pages (40 copies of a 76 page brief, also consistent with the RFP at $12.25 per hundred pages), is $372.40. The simple and appropriate expedient of comparing the two bills of Record Press with the GPO's RFP, all of which documents are referred to and relied on and are stated to provide the basis for your Complaint, demonstrates that the Complaint lacks merit.

If the Complaint is not withdrawn, we will ask the Court to dismiss it and also to order you or your client to pay a monetary sanction, including but not limited to the fees and other costs incurred by our client in preparing and filing the Rule 11 and dismissal motions.

Very truly yours,

Malcolm I. Lewin

Enclosures

cc:     William O'Brien, Esq.
        Darrell C. Valdez, Esq.,
            Asst. U.S. Attorney

#1360397 v1 \007123 \0013

Exhibit C to Lewin Declaration

# DAVIS, COWELL & BOWE, LLP

Counselors and Attorneys at Law

**Washington, DC**

1701 K Street, NW, Suite 210
Washington, DC 20006
202.223.2620
Fax 202.223.8651

George R. Murphy (DC)
ael T. Anderson (DC, CA, MA, NV)
Mark Hanna (DC, VA, MI, NJ)
lus J. Stephens (DC, MD, OH, PA)
Joni S. Jacobs (DC, CA, NV, AZ)
Keira M. McNett (DC, CA)

**San Francisco**

595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
zabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
ael T. Anderson (CA, NV, DC, MA)
Kristin L. Martin (CA, HI, NV)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA, NV)
Winifred Kao (CA, DC)
Sarah Varela (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)
J. Thomas Bowen (CA, NV)
Mark Brooks (TN)

**Boston**

8 Beacon Street, 4th Floor
Boston, Massachusetts 02108
617.227.5720
Fax 617.227.5767

ael T. Anderson (CA, NV, DC, MA)

**New Jersey**

1389 Broad Street
Clifton, New Jersey 07013
973.916.0999
Fax 973.916.0906

Mark Hanna (DC, VA, MI, NJ)

**McCracken, Stemerman**
**& Holsberry**

D S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

August 6, 2008

***Via Facsimile (212-735-8708) and First Class Mail***

Malcolm I. Lewin, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022-4784

Re:   United States, ex rel. Burke v. Record Press, Inc.
(U.S. District Court, D.C. 1:08cv364)

Dear Mr. Lewin:

I write in response to your letter of August 1. It was unnecessary for you to engage us on this in the form of a Rule 11 letter, but nevertheless, we reply here to the issues you have raised.

As you know, the core of the Relator's claim is based on an interpretation of the plain language of what we understand to be Record Press's contract with GPO. Specifically, the Relator has alleged -- and you admit in your letter -- that Record Press charges the Government per 100 pages for "collating, trimming to size and binding" rather than per 100 pages ***per 10-copy run***, as the plain language of the RFP appears to specify at page 14 of Record Press's bid.

We have never previously seen the chart you provided, which you claim supports your interpretation of the contract as limiting the "per 10 copies" specification to line items II(a) and (b) and excluding lines (c) (cover stock) and (d) (collating, trimming to size and binding).

In your letter, you refer to this chart as the "last page of the enclosed RFP." However, this chart does not in fact appear to be a part of the RFP. The RFP appears to end on "Page 15 of 15," which contains the signature block; whereas this chart is marked as "Page 1 of 1," indicating that it is a separate document. Can you provide us with more information about the source of this chart? Is it an attachment to the RFP? Is it a part of some other document? When and where was it created? Did GPO create this chart?

DAVIS, COWELL & BOWE, LLP

Malcolm I. Lewin, Esq.
August 6, 2008
Page 2

Clearly, the primary issue is whether the following terms of the bid on page 14 of the RFP apply to charges for "collating, trimming to size and binding": "RUNNING RATE IS PER 10 COPIES" and "Running Per 10 Copies." You assert that it does not apply. Can you provide us with any other support for this interpretation in addition to the chart discussed above?

With respect to the minor errors in the Complaint regarding the rate ($12.25 rather than $12.50) and the total amounts billed by Record Press ($1,386.70 rather than $1,483.77 and $372.40 rather than $398.47), the Relator did not previously have copies of either Record Press's bid or the original invoices submitted by Record Press. The Relator was relying on a copy of the blank RFP and the statements of charges submitted by the US Attorneys' Office as attachments to its Motion for Costs. These statements of charges were generated by GPO, and unbeknownst to the Relator at the time the Complaint was filed, they included GPO's 7% surcharge, which accounts for these errors in the Complaint. We are certainly willing to correct these minor errors with an amended complaint if it is necessary.

We look forward to hearing from you regarding our questions above, and we are available to further discuss any of the issues involved in this case.

Sincerely,

*Mark Hanna*

Mark Hanna

MH: kmm

cc:    William O'Brien, Esq.
       Assistant U.S. Attorney Darrell C. Valdez

Exhibit D to Lewin Declaration

# MorrisonCohen LLP

Malcolm I. Lewin
Partner
(212) 735-8625
mlewin@morrisoncohen.com

August 8, 2008

<u>Via Fax (202) 223-8651 and Mail</u>
Mark Hanna, Esq.
Davis, Cowell & Bowe, LLP
1701 K Street, NW
Suite 210
Washington, DC 20006

Re: <u>Burke v. Record Press, Inc.</u>

Dear Mr. Hanna:

I have your August 6 2008 letter described as responding to mine of August 1 2008.

The second paragraph of your letter is incorrect in assuming my knowledge.

While this is neither the time nor the place to engage in a dialogue (nor did I solicit one in my August 1, 2008 letter) or answer questions which should have been fully addressed before you sued, I will, as a courtesy answer, noting that my August 1 2008 letter stands.

At best, I believe you and your client simply misread a very clear contract (while ignoring the actual bills of Record Press) and I do not believe there is anything open, as you wrote, for interpretation. The chart that I sent you is part of the RFP as prepared by the government.

It is neither my role nor my inclination to explain the clear RFP language when you sued on that document, based on a verified representation of actual knowledge, and, pursuant to Rule 11, properly investigated.

I do not believe your pleading errors are "minor." I believe they, too, undercut your complaint, in view of your belated conclusion that neither you nor your client had the very bills on which you based your claim. Likewise, errors are not "minor" when they are used to extrapolate into a fraud claim and resulted from your now admitted failure to see Record Press' actual bills.

Very truly yours,

Malcolm I. Lewin

cc:    William O'Brien, Esq.
       Darrell C. Valdez, Esq.
          Assistant U.S. Attorney

#1396870 v1 \099999 \0001