**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------------X

UNITED STATES OF AMERICA      :     Case No.  1:08-CV-00364(EGS)(DAR)

Ex rel.BRIAN BURKE           :     **AFFIDAVIT &**

     145 East 23rd St. #4R       :     **MEMORANDUM of LAW**

     New York, NY 10010       :    **OMNIBUS MOTION to**

     212-614-8515             :    **DISMISS COUNTERCLAIM**

           Plaintiff, pro se      :

                     :

           against,         :

     RECORD PRESS         :     **Jury demand**

           Defendant,       :

-------------------------------------------------------------X

SS: I declare under penalty of perjury that the forgoing is true and correct. Executed on February 17, 2011 ,_____/S/_____, (Brian Burke), Relator in this Action,

### PRELIMINARY STATEMENT

Plaintiff/Counterclaim Defendant Notices the Court & Opposing Party that same is proceeding Pro Se, a.k.a Propria Persona for all purposes related to said Counterclaim.  "In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. *Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92,* enacted by the First Congress and signed by President Washington one day before the *Sixth Amendment [422 U.S. 806, 813]*  was proposed, provided that "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of . . . counsel . . . ."The right is currently codified in *28 U.S.C. 1654.* " *Faretta v. California 422 US 806 (1975),*

### MOTION FOR JOINDER & STAY

Movant respectfully requests Joinder of Claim & CounterClaim (Fed. R. Civ. P. 18(a)) for purposes of single Order/Decision by Court only, for reasons of Judicial Economy and in the

interest of Justice and all Parties. This is due to now two related pending Motion(s) to Dismiss. This would necessitate a Stay until instant Motion is fully briefed.

### Motion for CM/ECF Password

Petitioner/Counterclaim Defendant request leave to file future documents, reply etc., electronically, under LCvR 5.4(b)(2). "A pro se party may obtain a CM/ECF password from the Clerk with leave of Court.  Whether leave of Court should be granted is within the discretion of the judge to whom the case is assigned.  To obtain leave of Court, the pro se party must file a written motion entitled "Motion for CM/ECF Password," describing the party's access to the internet and confirming the capacity to file documents and receive the filings of other parties electronically on a regular basis.  If leave of Court is granted, the pro se party must complete the CM/ECF training provided by the Clerk to all electronic filers before the Clerk issues a CM/ECF password. "

Movant has all proper equipment necessary , including Adobe Acrobat, and has filed electronically in the Second Circuit and uses PACER. This Relief would be in the best interest of all Parties and Court. Petitioner Requests admission of of Instant Pleading by ECF, which can be performed by Mr. King, who will get this copy by PDF attached to email, from account briantburke@gmail.com.

### Movant requests Court construe Pleadings liberally.

"The court must construe the pleadings liberally, Pro se litigants' court submissions are to be construed liberally and held to less stringent standards than submissions of lawyers.  If the court can reasonably read the submissions, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with rule requirements. *Boag v. MacDougall, 454 U.S. 364, 102 S.Ct. 700, 70 L.Ed.2d 551 (1982); Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*(quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972);  McDowell v. Delaware State Police, 88 F.3d 188, 189 (3rd Cir. 1996); United States v. Day, 969 F.2d 39, 42 (3rd Cir. 1992)*(holding pro se petition cannot be

held to same standard as pleadings drafted by attorneys); *Then v. I.N.S., 58 F.Supp.2d 422, 429 (D.N.J. 1999)*.

The courts provide pro se parties wide latitude when construing their pleadings and papers. When interpreting pro se papers, the Court should use common sense to determine what relief the party desires. *S.E.C. v. Elliott, 953 F.2d 1560, 1582 (11th Cir. 1992)*. See also, *United States v. Miller, 197 F.3d 644, 648 (3rd Cir. 1999)* (Court has special obligation to construe pro se litigants' pleadings liberally); *Poling v. K.Hovnanian Enterprises, 99 F.Supp.2d 502, 506-07 (D.N.J. 2000)*.

Defendant has the right to submit pro se briefs on appeal, even though they may be in artfully drawn but the court can reasonably read and understand them. See, *Vega v. Johnson, 149 F.3d 354 (5th Cir. 1998)*. Courts will go to particular pains to protect pro se litigants against consequences of technical errors if injustice would otherwise result. *U.S. v. Sanchez, 88 F.3d 1243 (D.C.Cir. 1996)*.

Moreover, "the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." *Bonner v. Circuit Court of St. Louis, 526 F.2d 1331, 1334 (8th Cir. 1975) (quoting Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974))*. Thus, if this court were to entertain any motion to dismiss this court would have to apply the standards of *White v. Bloom*. Furthermore, if there is any possible theory that would entitle the Plaintiff to relief, even one that the Plaintiff hasn't thought of, the court cannot dismiss this case."

## Motion For Jury Trial

Counterclaim Defendant requests Jury Trial for all aspects of Counterclaim. Plaintiff requested Jury Trial in Complaint and waived same only for Bifurcated Proceedings (Claim, not Counterclaim) that took place on February 14, 2011, in front of Magistrate Judge Deborah A. Robinson. It is agreed between Relator & Mr. King esq. that he will not be representing Relator with regard to Counterclaim. Case law requires representation in Qui Tam cases, as we are suing in the name of the United States. Plaintiff understands that Record press is not

Counterclaiming against the United States (other than for the False Claim at question) but Petitioner individually, thus the right to self representation and Jury Trial. Petitioner requests Counterclaim be regulated by LCvR 72.2 & 72.3 but not, at this time, LCvR 73.3.

## Motion *In Limine I*

Movant, as an admitted whistle-blower, is quite saddened to have to inform the Court of Perjury (*TITLE 18 PART I  CHAPTER 79  § 1621*) as well as likely Subornation of same (*18 U.S.C.A. § 1622).*  Mr. Adgerson, to whom Relator would like to apologize for any misspelling of name in Complaint etc., has, unfortunately, availed himself of this unlawful practice. Mr King has informed me this is his first case wherein a witness has performed this on a material issue.  On July 5, 2007, date of stipulated to conversation with witness, the other Party to the conversation declared under Oath in Second Circuit Pleading "Plaintiff reported to Lloyd Rawls of GPO's Inspector General Office on July 5, 2007 that fraud was being committed by Record Press against the GPO, U.S. Attorney's Office, U.S. Taxpayers and, potentially, plaintiff. They are charging the government, et. al., exactly TEN TIMES the correct amount for "collating & trimming" than allowed in said 2231-S contract. This was ascertained in conversation with Calvin Aderson, Fiscal Manager at GPO." *att.*.

The U.S. Attorney's Office, whether it investigated or not, chose not to dispute this Opposition, despite every reason to do so, thus stipulating to same. The Second Circuit granted Relator's Relief based on this Contemporaneous Account. Now years later, via recovered memory?, Witness Adgerson  places before the Court an entirely different account of our conversation. This is the Perjury, intended to Obstruct Justice (*TITLE 18 PART I  CHAPTER 73*) for the People.  This Perjury consisted mainly of two parts; First the Canard (lie) about Relator's misrepresentation, which is intended to defame and attack personal credibility and/or the People's case, Second the more harmful, and even more nonsensical, Lie/Perjury about what was said to Petitioner about the Running Rate (Per 10 Copies) application to the issue at hand, Line D. First the misrepresentation never happened, other than in the testilying of witness.

Petitioner spoke to at least a dozen employees of GPO that day and there was no allegation of misrepresentation. Why Adgerson? Because he would not have given the information otherwise? Is it the GPO's position they only work for and serve 'Their' Contractors(Sullivan's Testimony), or who pays them, the People and Congress? No, because it did not happen. Counterclaim Defendant understands the Court would prefer not to rule on a "He said he said" that was not recorded. Petitioner's statement(s) on the Record since the day of the conversation have been consistent. More importantly, for triers of fact, Mr. Adgerson's version **COULD NOT HAVE HAPPENED**. There was absolutely NO WAY Movant could have gleaned information about the Running Rates application to Line D otherwise.  Mr Adgerson was represented, by his boss, as the Chief Contract Person on this matter and was quite helpful. He had the Contract/RFP and Relator had the Invoices (albeit including GPO's 7% "Profit" on the False Claim, which presumably informs their credibility on deciding whether same occurred).  As Plaintiff stated, repeatedly, under oath, and without ever seeing 2231-S, Mr Adgerson was asked why the "binding costs" were so high, when other costs were quite competitive. He stated emphatically that it was because the $12.25 (he actually said $12.50, an amount including GPO's 'tip', leading to this whistle-blower using that figure in that days Opposition and FCA Complaint) "per 100 pages" applied to the Running Rate (10), i.e. per 1,000 pages. He was quite adamant & vociferous and stated how clear it is. He said that the words "Note: RUNNING RATE IS PER 10 COPIES" was in bold, capitalized, underlined and repeated. He stated clearly that Running Rate applied to all lines in paragraph II.  Clearly, years later, in planning defense of instant FCA Case it was seen that this position by the senior Contract Supervisor/Manager would be fatal. Thus the obvious Subornation. Who Suborned Mr. Adgerson, admittedly, Relator can only guess at this time, but it it clearly a circumscribed group with incentive to do same. How was it done, we have either Gold or Lead, i.e. Consideration or Extortion/Threat. Was he forced to retire, was his pension threatened, or charges/discipline dangled? Speculation ripe for Investigation by appropriate Authorities without a Conflict of Interest. Movant requests Striking, prospectively &

retrospectively, of said Perjury and for a Referral by Court for appropriate entity to investigate

Perjury, Subornation & Conspiracy to Perform same, Obstruction of Justice & Conspiracy to

Perform same and Conspiracy to Defraud the United States. Petitioner believe qualified Hearsay

Exceptions would be controlling here under Fed.R. Ev. 801(d)(1) & (2)(B),(C)(E).

### Motion *In Limine II*

   Movant Requests the Court Strike, Prospectively & Retrospectively, all Testimony/Evidence by

Mr. Sullivan related to any unsupported testimony regarding "industry practice", Record Press's

need for "profit", whether any specific price points result in same or, in fact any testimony/

evidence which would or could be admitted by an Expert Witness, such as Mr. Gocial. Mr.

Sullivan, however much time he worked at GPO (which Counterclaim Defendant Stipulates to) he

was not certified, or asked to be considered as an expert witness. Even as a fact witness, his

testimony/evidence is Prejudicial and potentially incorrect (see above regarding Mr. Adgerson's

Subornation). This witness acknowledged no prior discussion or "meeting of minds" or in fact any

Ex Post Facto (to 2231-s signing/bids) conversation regarding 2231-s and proper invoicing Vis-à-

vis Record Press. Movant Stipulates it is "GPO"s, or at least Mr. Sullivan's, Testimony that Record

Press invoiced the correct amount, or at least that 'his contractor' could use the money to go

toward their profit, which he apparently prefers the government/Taxpayer guarantee.

### Motion *In Limine III*

    Petitioner acknowledges a conflict regarding instant Motion to Strike various "Spreadsheets"

in Case. While clearly a 'statement against interest' by Record Press, it was not explicitly made a

part of the 2231-s Contract, whether attached or not, or produced later.  Non-movant clearly

profers these documents as Dispositive, and they may very well be correct. Defendant, like the

Wizard behind the curtain, or the naked Emperor, would prefer the Court view the section of the

document(s) they deem important. The Court must instead, in order to obtain the Truth(Veritas)

Justice and Remedy for the abused Taxpayer, rely and deconstruct the relevant part of the

'spreadsheets'. It is not disputed that Respondent has attempted to parse the most irrelevant part

(s) of these documents and has run panicking from the actual numbers in said exhibits.

Defendant clearly state that because the relevant lines, undisputed, say, respectively, IIa

COMPLETE COVER    PER 10 COPIES ; IIb TEXT PER PAGE     PER 10 COPIES and skipping,

for now IIc,; IId COLLATING, TRIMMING TO SIZE AND BINDING     PER 100 PAGE,  the case is

over. Slamdunk. Problem. The actual numbers do not agree with Defendant's theory. As Mr.

Wilmont basically eschewed and distanced himself and his firm from this 'dispositive' document,

and Relator doesn't blame him, and only acknowledged "reviewing" same on the stand,

presumably ex post facto and on advise of Counsel, Relator would request using otherwise

irrelevant testimony by Mr. Sullivan, the only individual with apparent knowledge about same.

Mr. Sullivan was asked about the highly relevant "BASIS OF AWARD". These numbers came

right out of the 2231-S contract.  Witness claimed these numbers derived from a former contract

and are used, very importantly, to compare various bids and find lowest competent bider, in the

interest of the Taxpayer/People, as required. Excellent, and fully within their Fiduciary duty to us

Taxpayers. But there's that little problem within this 'dispositive' document. The numbers do not

come within magnitudes of agreeing with Defendant's, or for that matter, Mr. Sullivan's, spin on

what the Contract 'actually' says. It may disappoint the Court to have to state that this 'best'

document which is allegedly exculpatory for Defendant also bars Relator's version. An

assumption was made by Relator & Mr. Adgerson(pre Perjury) and Murphy Anderson LLP and

Mr. King and Mr Gocial that Record Press is at least allowed to charge something for line IId in

cases such as the admitted invoices. According to the 'dispositive' 'spreadsheet' Mr. Sullivan, and

presumably Defendant's Counsel, support, this is incorrect. The argument as to whether 'PER10

COPIES' RUNNING RATE apply to line IId maybe all but moot and the Court maybe ruling on the

incorrect issue. Instead, according to the 'spreadsheet'/'dispositive' Exhibit and the Contract the

issue is should Record Press be invoicing at all under IId in circumstances such as *Burke v.*

*Evans.* Relator contends that Defendant acted with intent, but nevertheless, this hurdle is not

required for FCA. Relator requests only this 'dispositive' document make sense, and it does.

Honing in on the three most relevant lines, we start with IIa. COMPLETE COVER PER 10 COPIES. and the "BASIS OF AWARD" 1327, from the Contract. Mr. Sullivan suggested we multiply 1327 times "PER 10 COPIES", i.e 13,270 books. Then we have Record Press's Bid/Offer of $6.00 per ten rap-around covers and the entirely correct amount, under both parties Theories, of $7,962.00. Excellent. Next IIb we have and TEXT PER PAGE PER 10 COPIES with a "BASIS OF AWARD" of 165,996, i.e. 1,659,960 pages. and the Bid/Offer of $.35. PER 10 COPIES to get $58,098.60. Entirely correct and consistent with all parties Theories. As IIc was not part of the admitted invoices, we will skip for now. Saving the best for last we have the penultimate line, IId COLLATING, TRIMMING TO SIZE AND BINDING          PER 100 PAGES. "BASIS OF AWARD" is 14? and from the 2231-S Contract. Mr. Sullivan stated, under oath, that these are actual numbers from a previous contract, that they are used to find the lowest cost competent bidder, and further that they should be and were? used to direct successful bidders as to correct billing & invoice practice, in order to presumably conform with the False Claims Act and not 'Overbill'. Upon questioning by Mr. King, Mr. Sullivan stated this "BASIS OF AWARD" of 14*[SIC]* should be multiplied by the stated "PER 100 PAGES" in order to arrive at 1400 pages?*[SIC]*. This number would be consistent with their theory. Ours would be 14,000 pages*[SIC]*. Regardless, let's move on. Multiplying 1400 (their theory) by $12.25 and dividing(again) by PER 100 PAGES and multiplying by $12.25 equals the correct $171.50. With Plaintiff's theory, you would multiply 14 by 1,000 (i.e. PER 10 COPIES, PER 100 PAGES=1,000) and by the admitted accepted bid/offer of $12.25 per? divided again by 1,000 to equal 171.50. In other words, both theories result in an equality, i.e. correct answer. If Relator were to be so bold as to supply implied algebraic definition, we have for IId 14x pages  X $12.25 divided by x = $171.50. The problem is that x can be either 100(defendant's position) or 1,000(Relators/Taxpayers) and we have gotten no closer to the Truth(Veritas), or assisting the Court in deciding Case. So what is x, 100 or 1,000? Well, let's compare to the above lines for some Truth, as presumably the number of bindings should conform to the number of books. We have, as stipulated to, 13,270 books. 14,000 comes a lot

closer to 13,270 than 1,400, but admittedly not identical. A rounding error perhaps, or were there some additional bindings in another category? Problem, Mr. Sullivan stated , under oath that the 1,400 was pages? and not books, which according to lines IIa & IIb average 125 pages for both Appendices and Briefs. Instead, according to agreement, we have 1,659,960 pages, an entirely reasonable number.  How do we fit 1400 bound pages into 1,659,960 pages and 13,270 books, or for that matter 14,000 pages. We cannot.  Occam's Razor (i.e. the simplest explanation that explains all the facts) suggests our answer. IId has nothing to do with IIa or IIb. Record Press is allowed to bill for/through line IIa and IIb **OR** IId but not both. Let us go back to the 2231-S contract and page 6 paragraph 8 which states 'Occasionally the Government will supply pre-printed 8-1/2 x 11" pages which the contractor will be required to collate, typeset a cover trim to finished size and bind. "  This is what IId is for, and not the usual order created from PDF or CD, if the 'spreadsheets' are correct. They were proffered by defense and are a statement against interest. Of course, under the only rational interpretation of the 'spreadsheet' Record Press was not allowed to charge the Government at all in the vast majority of invoices. In our original theory in Complaint, Defendant charged 10 times too much for line IId but were certainly allowed to bill something. Either way, they charged the People/Taxpayer at least $500,000 too much over the non-statutorily limited time span for IId. The 'overbilling' is just slightly larger under this axiom conforming with both the 'spreadsheet'(s), i.e. previous billing practice, and 2231-S.

Being so bold as to anticipate Defendant's likely and most logical defense, and hoping the court does not view this as a Straw Man, let us throw out all the numbers on line 11d, and assume Contractor is allowed to charge on line IId for all "TEXT PER PAGE", as is now Record Press practice. If we plug in the numbers on lines IIa &IIb, which appear entirely correct and logical, into the now blank IId, we get a magnitude of difference in this "Old Bid/bill/contract/ spreadsheet".  Back to the "new" line IId we have a "BASIS OF AWARD" of either 1,659x(Relator version) or 16,599x(Defendant's)pages. First, with 16599.6x wherein x is 1,000(PER 10 COPIES X PER 100 PAGES) times 12.25 and divided again by 1,000= $20,334.5. With Defendant's Straw

Man? we have $203,349.51. This "correct" and consistent number, if we accept record press's

position that they are allowed to charge under IIa, IIb & IId simultaneously would more than

double Record Press's Bid/Invoice/Payment, if the winning bider/Contractor. But they would lose

as their bid would be substantially higher.  Other potential contractors bid less than half Record

Press's $12.25 per 1,000 or per 100 pages. Two bid $5.00 and one bid $6.50. Another contractor

would have won the bid. Thus, under any possible theory they are either violating the FCA or not

the Contractor.

### MOTION TO DISMISS COUNTERCLAIM

Petitioner Requests of Court Dismissal of Counterclaim with Prejudice, under Fed. R. Civ.

P. 12(b)(6) & (c) and/or Fed R. Civ. P. 56 and/or Fed. R. Civ. P. 9 and/or Fed. R. Civ. P. 11as

appropriate. In addition, Collateral Estoppel, i.e.  Issue Preclusion, and/or Res Judicata and/or

Double Jeopardy as previously decided within Defendant's Rule 11 Motion. Counterclaim

Defendant request Court construe instant Request for Relief as an Anti-SLAPP (Strategic Lawsuit

Against Public Participation) Motion, see *Godin v. Schenks, et. al. 134 (First Circuit).*  In addition,

Petitioner would point out both Parties are residents of New York State and covered by anti -

SLAPP laws  *N.Y. Civ. Rights Law §§ 70-a, 76-a  & N.Y. C.P.L.R. §§ 3211(g), 3212(h).* Petitioner,

pro se contends that in order to defend against Counter-Claim, an emphasis on the underlying

case merits is in order. As can be seen by Defendant's filings and testimony, a classic

Government Knowledge Defense is being attempted. See THE GOVERNMENT KNOWLEDGE

DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES

NOT SOUND AS SWEET Author MICHAEL J. DAVIDSON *45 Idaho L. Rev. 41. Att. "* The

Development of the Government Knowledge Defense In 1986, in addition to eliminating the

government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element,

making it clear that the United States need not prove specific intent in order to establish that the

defendant acted knowingly when it submitted a false claim or statement to the United States. ...

Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented

false cost allocation information to the United States to obtain an Army Corps of Engineers

contract. ... The contractor in this scenario is still attempting to defraud the United States, and that

fact remains unchanged even when the contracting officer or some other relevant

acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler

had rejected the position that only a contracting officer's knowledge was relevant for purposes of

determining whether a defendant had acted knowingly. ... For purposes of this defense, the

legally relevant authority extends beyond that possessed by contracting officers to other

procurement officials "with authority to act under the contract." ... **Significantly, government**

**employees, including procurement officials, lack the authority to waive fraudulent conduct. ...**

Further, contractors will be held responsible for knowing the limitations on the authority of

government contracting officials when such limitations were contained in published laws or

regulations. .." "By the plain terms of the FCA's statutory language, the scienter requirement is

that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729

(a)(3), (a)(4) and (a)(5). Currently, the FCA defines "knowing" and "knowingly" to "mean that a

person, with respect to information--(1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information . . . ."  In other words, the "defendant must 'know' that a claim

or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2)

act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity."

The United States, or a relator acting on its behalf, is not required to prove that the defendant

acted with the specific intent to defraud. See *United States ex rel. Hagood v. Sonoma County*

*Water Agency.* ""*/t*]hat the relevant government officials know of the falsity is not in itself a

defense."  In short, the court found evidence of government knowledge potentially relevant to the

FCA's scienter element, but not to the issue of falsity". """Protection of the public fisc requires that

those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]

hose who deal with the Government are expected to know the law and may not rely on the

conduct of Government agents contrary to law."

"The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States. Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government." MICHAEL J. DAVIDSON 45 IDAHO L. REV. 41*att.*

"Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense.  The government must both know of, and approve, the particular claim before it is submitted. The opinions of other circuit courts appear to have adopted a similar standard.  Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots."

"Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct.  See *United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956)* ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); see also *United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002*) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); *United States ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995)* ("[A] government officer cannot authorize a contractor to violate federal regulations."); *United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978)* (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. See *CIBINIC, NASH & NAGLE, supra note 150, at 48* ("[I]llegal

actions cannot be ratified because officials lack the authority to enter into illegal agreements."); cf.

*Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007)* (noting that authority

is a prerequisite to ratification). Accordingly, the FCA is violated when a contractor submits a false

claim even when the contractor informs the government of the claim's falsity before submission.

*United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995)* ("Defendants

knowingly caused false claims to be presented and that, after the government became aware of

the underlying scheme, it continued to pay claims only because it had already become

contractually bound to make those payments as a result of the defendant's fraudulent course

of conduct.").

Further, once false claims are received, a contracting officer may not modify the contract, or

take other action, to waive past false claims. The Federal Acquisition Regulation (FAR) also

contains express limitations on contracting officer authority when a claim is suspected to be false

or tainted by fraud. Pursuant to FAR 33.210(b), the contracting officer has no authority to settle,

compromise, pay or adjust "any claim involving fraud.*" Nat'l Wholesalers, 236 F.2d at 950*; see

also *United States ex rel. McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at \*2

(10th Cir. 1993)* (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous

fraud by [contractor]."). Similarly, section 605(a) of the Contract Disputes Act removes any

authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim

involving fraud." This statutory restriction on agency heads extends downward to subordinate

agency procurement officials.

The falsity of the claim is measured at the time it is submitted to the United States.

Accordingly, a necessary prerequisite to any defense based on government knowledge of the

falsity is that the relevant government officials knew of the challenged conduct before the false

statement or claim was presented to the United States. Several courts have recognized this

limitation on a government knowledge defense. *United States v. Southland Mgmt. Corp., 326 F.

3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring)* ("In principle, it would seem that

the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz, 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006)* (applying the defense to California's FCA). Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented. Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims. The following FCA case illustrates this point. In *United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).,* the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army. The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis. Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators. Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators. Additionally, the contractor submitted seventeen invoices for payment. Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators.

Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators. Subsequently,

the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen invoices submitted prior to the contracting officer having learned of the mislabeling. The district court found for the defendants, determining in part that the regulators were "equals" and that the contracting officer had the authority to resolve contract disputes, which he had done here. On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted.  Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made."  Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy." The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."

   Given the strong merits of the instant underlying case Defendant has no lawful grounds to prosecute its SLAPP Counterclaim, as this Court has previously ruled.  This attempt additionally violates Petitioners First Amendment (Petition the Government for redress of grievances, Freedom of Speech, Due Process, ruinous fines, double jeopardy etc. ) and in this capacity petitioner contends Record Press is performing as a State Actor. See *Shelley v. Kraemer, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948)*, ruling that racially discriminatory restrictive covenants affecting real estate were unenforceable in state courts, because any such enforcement would amount to state action in contravention of the Fourteenth Amendment. Groups of homeowners used restrictive covenants to prevent the sale or rental of their homes to African Americans, Jews, and other minorities. A restriction was included in their real estate deeds forbidding such sale or rental. Until 1948 this form of private discrimination was thought to be legal because the state was not involved.  In *Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S. Ct. 856, 6 L. Ed. 2d 45 (1961)*, the Court found state action when a state agency leased property to a restaurant that refused to serve African Americans. It stated that state action in support of discrimination exists when there is a "close nexus" between the functions of the

state and the private discrimination. "

## STATEMENT OF MATERIAL FACTS

It is acknowledged that Defendant Record Press holds, and has held Contractor status as winning bidder on contract 2231-S with the Government Printing Office to print Briefs & Appendix for SDNY US Attorney's Office. It is agreed that Record Press is charging the correct amount on the line II(b) "Text Per Page" "Per 10 Copies" $.35 and II(a) "Complete Cover" "Per 10 Copies" $6.00. We have at issue, whether, within four corners of the contract, the line(s) RUNNING RATE PER 10 COPIES apply to line II(d) Collating, trimming to size and binding per 100 pages $ 12.25. We now, in addition, have documents, the spreadsheets, which indicate Record Press, or any other winning contractor, should not be charging on line II(d) at all, other than in rare circumstances, such as preprinted documents or writs of certiorari, which require 'Pressure Sensitive Cover Stock' and substantial trimming.

Mr. Gocial's attached Expert Report is included as a Material Statement of Facts and is Subsumed within instant Motion to Dismiss by designation.

A plain reading of the four corners of contact 2231-S leads one to conclude that winning contractor must charge the People no more than $12.25 per 10 Running Rate Copies Per 100 Pages, i.e. per 1000 pages for relevant line II(d). Record Press chose to ignore clear **NOTE: RUNNING RATE IS PER 10 COPIES** and again above all bid lines in section II "Running Per 10 Copies"

## MOTION TO ADD AFFIRMATIVE DEFENSE

Counterclaim Defendant requests leave of the Court to add Affirmative Defense and/or Claim. Upon Information & Belief, Petitioner is informed that Record Press has been involved in Bid-Rigging. This is a violation of the  Sherman Antitrust Act, 2/30/1890, ch. 647, 26 Stat. 209, 15 U.S.C. § 1–7 See *att.*. The Conspiratorial parties, atypically, were not otherwise lawfully competing printers, but Record Press and one or more employees, or former employees, of G.P.O..  Acknowledging the Plausibility standard under *Bell Atlantic Corp. v. Twombly, 550 U.S.*

*544 (2007),* Petitioner offers the following evidence. First, for economy see above Motion(s) *In Limine.*

Second, Start with 2231-S. As Stipulated, one party contends the relevant line IId should be read as "Per 10 Copies, Per 100 Pages", and the other "Per Copy, Per 100 Pages".  Why not Write that? Is it to create Plausible Deniability? We shall see. Record Press contends it has been contracting with GPO for 30 years and in existence for 65, to which Petitioner Stipulates. In this time a Company and/or its Officers would presumably make many friends. Not a crime. Defendant acknowledges bidding on 2231-S and for years at questions, winning same. There could be no OverCharge/False Claim/Fraud without winning same. How to do so? Craft, or have crafted, a contract to "fit your needs" as potential Contractor. You want to make an unnatural rate of return, a.k.a. 'profit', but still win bid. How? Create, or have drafter create, a 'special gimmick' that only you and GPO insider(s) know(s). Virtually an act of genius, this 2231-s attempts the all but impossible. To dissuade legitimate bidders from correctly bidding their interest, due to this secret or trick, and losing the bid. Of course us taxpayers also lose out. Record Press won its bid by unlawful insider knowledge and/or conspiracy. We have on the II(d) line the now famous "Basis of Award" of 14*[sic]*. Defendant, with its insider knowledge, bids more than double the other bidders on this, to other bidders, trivial line. On the 'major' lines II(a) & II(b) it bids competitively.  As Record Press acknowledged under Oath, their "Profit" existed on that line only with their bid. If the other bidders had the "secret' of the bid, that the vast majority of the revenue would ensue on that line (if II(d) is per 100 pages but not per 10 copies per 100 pages **AND** they are allowed by their insider friends to charge II(d) for magnitudes greater pages & books than stated in RFP) they would bid appropriately, i.e. like Record Press. Another bidder who divined the scam would bid even higher on line II(d), why not $15 or $20, and only slightly lower on lines II(a) & II(b) such as $.32 per ten pages text per page. They would beat Defendant and Conspirator(s) at their own game. That winning bidder would have even more "Profit" and win the rigged bid. Didn't happen because the other bidders are not in on the scam. Why share when you

can keep all the ill gotten gains for yourself?

It's nice to have friends. Record Press charged GPO, who charged DOJ, i.e current and future Taxpayers, $70 per binding for a book of 283 'leaves' (566 double sided pages). Binding and pages had the appearance of a smallish phone book. If The Yellow Pages were charged $70 for a binding that cost $.01 of glue, or less, they would go broke. If the People were charged $12.25 per book per 100 pages for binding alone for printing the Federal Budget the United States would go (more) broke. Of course, there was not one scintilla even one other GPO printer, or the GPO itself, ever charged this 'Kings Ransom' for binding glue, which should be deemed inculpatory. On July 5, 2007, Petitioner contacted FedEx Kinko's, whom the SDNY US Attorney's Office has a contract with, and asked what they charge for 'perfect' binding. They quoted a price of $4 per book for small orders and up to 50% off ($2) for larger orders, for any number of pages. They charge $.07 'text per page' for small orders with up to 50% off for large ($.035 same as Record Press).

## CONCLUSION

For the aforesaid reasons, Relator/Counterclaim Defendant Pray Motions be granted by Court, in the interest of justice, and for all other Relief the Court may deem Just and Appropriate.

DATED: February 17, 2011

/S/
-----------------------------------------------------------
BRIAN T. BURKE, Relator/Counterclaim
Defendant
145 east 23rd street #4R
New York, NY 10010
(212) 614-8515
briantburke@gmail.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

------------------------------------------------------------X

UNITED STATES OF AMERICA  :  Case No.  1:08-CV-00364(EGS)(DAR)
Ex rel.BRIAN BURKE      :
 145 East 23rd St. #4R    :
 New York, NY 10010    :

 212-614-8515     : **ORDER & DECISION**
    Plaintiff, pro se  :
          :
    against,   :

  RECORD PRESS    :
    Defendant,  :

------------------------------------------------------------X

   It is the Opinion of the Court that Relator/Counterclaim Defendant's Omnibus Motion to

Dismiss Counterclaim with Prejudice be granted in all parts. In addition, this Court Denies

Defendant's Oral post Trial Motion to Dismiss in all parts.

      SO ORDERED

        _____

Dated:

| ITEM NO. | DESCRIPTION | | BASIS OF AWARD | NEW YORK | | NEW YORK | | NEW YORK | | CONTRACT | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | UNIT RATE | COST | UNIT RATE | COST | UNIT RATE | COST | UNIT RATE | COST |
| a. | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | |
| | COVER PAGE | | | | | | | | | | |
| 1 | BRIEF (8-1/8 X 9-1/4") | PER PAGE | 310 | 9.00 | 2,790.00 | 10.00 | 3,100.00 | 6.50 | 2,015.00 | 6.50 | 2,016.00 |
| 2 | APPENDIX (8-1/2 X 11") | PER PAGE | 170 | 9.00 | 1,530.00 | 10.00 | 1,700.00 | 6.50 | 1,105.00 | 6.50 | 1,105.00 |
| b | TEXT PAGE: MANUSCRIPT COPY | PER PAGE | 106 | 10.00 | 1,060.00 | 10.00 | 1,060.00 | 7.00 | 742.00 | 7.00 | 742.00 |
| c | TEXT PAGE: SUPPLIED DISK | PER PAGE | 10106 | 7.90 | 79,837.40 | 4.00 | 40,424.00 | 4.00 | 40,424.00 | 4.00 | 40,424.00 |
| d | REMAKE OF PAGES | PER PAGE | 318 N/C | | | 3.00 | 954.00 N/C | | N/C | | |
| e | PAGE PROOFS | PER PAGE | 15780 | 1.00 | 15,780.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 | 0.20 | 3,156.00 |
| f | AUTHOR'S ALTERATIONS | PER ALTERATION | 34234 N/C | | | 0.25 | 8,558.50 | | N/C | | N/C |
| g | INSERTION OF REFERENCE PAGE NUMBERS PER LI... | | 2052 N/C | | | 0.20 | 410.40 N/C | | N/C | | N/C |
| h | RETURN TO THE DEPT, CORRECTED VERSION OF EACH BRIEF PER DISKETTE | | 200 N/C | | | 1.50 | 300.00 N/C | | N/C | | N/C |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 READER FOR USE IN CD-ROM PER PAGE | | 0.25 | | | 5.00 | 75.00 N/C | 5.00 | | 5.00 | |
| j | DISKETTE FOR PDF FILE ABOVE EACH | | 50 N/C | | | | | | N/C | | N/C |
| II | COMPLETE PRODUCT | | | | | | | | | | |
| a | COMPLETE COVER PER 10 COPIES | | 1327 | 3.00 | 3,981.00 | 5.50 | 7,298.50 | 5.50 | 7,298.50 | 5.50 | 7,298.50 |
| b | TEXT PER PAGE PER 10 COPIES | | 166998 | 0.50 | 82,966.00 | 0.30 | 49,788.80 | 0.20 | 33,199.20 | 0.20 | 33,199.20 |
| c | PRESSURE SENSITIVE COVER STOCK PER 100 LEAVES | | | | | | | | | | |
| | WHITE | | 10 N/C | | | 12.00 | 120.00 N/C | | N/C | | N/C |
| 2 | COLOR PER 100 LEAVES | | N/C | | | 12.00 | N/C | | N/C | | N/C |
| d | COLLATING, TRIMMING TO SIZE AND BINDING PER 100 PAGE | | 14 | 6.50 | 91.00 | 12.00 | 168.00 | 5.00 | 70.00 | 5.00 | 70.00 |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | |
| a | FILING BRIEF AND ANY APPROCESS OR ATTACHMENTS AT COURT AND ON ONE PARTY | | 255 N/C | 20.00 | 5,100.00 | 50.00 | 12,750.00 N/C | | N/C | | N/C |
| b | EACH ADDITIONAL SERVICE | | 345 N/C | | | N/C | | | N/C | | N/C |
| c | ELECTRONIC FILING OF BRIEFS EACH | | 255 | N/C | | 30.00 | 7,650.00 N/C | | N/C | | N/C |
| IV | OVERTIME PAYMENT | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 12:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS PER HOUR | | 100 | 150.00 | 15,000.00 | 95.00 | 9,500.00 N/C | | N/C | | N/C |
| | CONTRACTOR TOTALS | | | | $205,187.40 | | $147,023.20 | | $88,009.70 | | $88,009.70 |
| | DISCOUNT | | | | | | | 2.00% | $1,760.19 | | |
| | DISCOUNTED TOTALS | | | | $205,187.40 | | $147,023.20 | | $86,249.51 | | $88,009.70 |

Page 1 of 1

Program No. 2231-S Term 11/01/06 To 10/31/07
TITLE: APPEALS BRIEFS

| ITEM NO. | DESCRIPTION | BASIS OF AWARD | (Contr #1 - E4) RECORD PRESS NEW YORK UNIT RATE | COST | (Contr #2 - G4) CURRENT CONTRACTOR UNIT RATE | COST | (Contr #3 - I4) UNIT RATE | COST | (Contr #4 - K4) UNIT RATE | COST | (Contr #5 - M4) UNIT RATE | COST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I | COMPOSITION AND PAGE MAKEUP | | | | | | | | | | | |
| a | COVER PAGE | | | | | | | | | | | |
| 1 | BRIEF (6-1/8 X 9-1/4") PER PAGE | 310 | 10.00 | 3,100.00 | 10.00 | 3,100.00 | | | | | | |
| 2 | APPENDIX (8-1/2 X 11") PER PAGE | 170 | 10.00 | 1,700.00 | 10.00 | 1,700.00 | | | | | | |
| b | TEXT PAGE: MANUSCRIPT COPY PER PAGE | 106 | 10.00 | 1,060.00 | 10.00 | 1,060.00 | | | | | | |
| c | TEXT PAGE: SUPPLIED DISK PER PAGE | 10106 | 5.50 | 55,583.00 | 4.00 | 40,424.00 | | | | | | |
| d | REMAKE OF PAGES PER PAGE | 318 | 3.50 | 1,113.00 | 3.00 | 954.00 | | | | | | |
| e | PAGE PROOFS PER PAGE | 15780 | 0.25 | 3,945.00 | 0.20 | 3,156.00 | | | | | | |
| f | AUTHOR'S ALTERATIONS PER ALTERATION | 34234 | 0.25 | 8,558.50 | 0.25 | 8,558.50 | | | | | | |
| g | INSERTION OF REFERENCE PAGE NUMBERS PER LI... | 2052 | 0.25 | 513.00 | 0.20 | 410.40 | | | | | | |
| h | RETURN TO THE DEPT. CORRECTED VERSION OF EACH BRIEF PER DISKETTE | 200 | 1.75 | 350.00 | 1.50 | 300.00 | | | | | | |
| i | PDF FILE PRODUCTION USING ACROBAT 3.0 READER FOR USE IN CD-ROM PER PAGE | | 6.80 | | 6.00 | | | | | | | |
| j | DISKETTE FOR PDF FILE ABOVE. EACH | 50 | 1.75 | 87.50 | 1.50 | 75.00 | | | | | | |
| II | COMPLETE PRODUCT | | | | | | | | | | | |
| a | COMPLETE COVER PER 10 COPIES | 1327 | 6.00 | 7,962.00 | 5.50 | 7,298.50 | | | | | | |
| b | TEXT PER PAGE PER 10 COPIES | 165996 | 0.35 | 58,098.60 | 0.30 | 49,798.80 | | | | | | |
| c | PRESSURE SENSITIVE COVER STOCK | 10 | 12.50 | 125.00 | 12.00 | 120.00 | | | | | | |
| 1 | WHITE PER 100 LEAVES | | 12.50 | | 12.00 | | | | | | | |
| 2 | COLOR PER 100 LEAVES | | 12.50 | | 12.00 | | | | | | | |
| d | COLLATING, TRIMMING TO SIZE AND BINDING PER 100 PAGE | 14 | 12.25 | 171.50 | 12.00 | 168.00 | | | | | | |
| III | SERVICE AND FILING OF BRIEFS | | | | | | | | | | | |
| a | FILING BRIEF AND ANY APPENDICES OR ATTACHMENTS AT COURT AND ON ONE PARTY | 255 | 50.00 | 12,750.00 | 50.00 | 12,750.00 | | | | | | |
| b | EACH ADDITIONAL SERVICE | 348 | 30.00 N/C | | N/C | | | | | | | |
| c | ELECTRONIC FILING OF BRIEFS EACH | 256 | 30.00 | 7,680.00 | 30.00 | 7,680.00 | | | | | | |
| IV | OVERTIME PAYMENT | | | | | | | | | | | |
| a | HOURLY RATE FOR WORK PERFORMED AFTER 10:00PM ON WEEKDAYS, SATURDAY, SUNDAY AND FEDERAL HOLIDAYS PER HOUR | 100 | 95.00 | 9,500.00 | 85.00 | 8,500.00 | | | | | | |
| | CONTRACTOR TOTALS | | | $172,297.10 | | $147,023.20 | | | | | | |
| | DISCOUNT | | | | | | | | | | | |
| | DISCOUNTED TOTALS | | | $172,297.10 | | $147,023.20 | | | | | | |

This document is available in two formats: this web page (for browsing content) and PDF (comparable to original document formatting). To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

# Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For

## *An Antitrust Primer*

This primer briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion.

## Introduction [1]

American consumers have the right to expect the benefits of free and open competition — the best goods and services at the lowest prices. Public and private organizations often rely on a competitive bidding process to achieve that end. The competitive process only works, however, when competitors set prices honestly and independently. When competitors collude, prices are inflated and the customer is cheated. Price fixing, bid rigging, and other forms of collusion are illegal and are subject to criminal prosecution by the Antitrust Division of the United States Department of Justice.

In recent years, the Antitrust Division has successfully prosecuted regional, national, and international conspiracies affecting construction, agricultural products, manufacturing, service industries, consumer products, and many other sectors of our economy. Many of these prosecutions resulted from information uncovered by members of the general public who reported the information to the Antitrust Division. Working together, we can continue the effort to protect and promote free and open competition in the marketplaces of America.

This primer contains an overview of the federal antitrust laws and the penalties that may be imposed for their violation. It briefly describes the most common antitrust violations and outlines those conditions and events that indicate anticompetitive collusion so that you might better identify and report suspicious activity.

## Federal Antitrust Enforcement

Enacted in 1890, the Sherman Act is among our country's most important and enduring pieces of economic legislation. The Sherman Act prohibits any agreement among competitors to fix prices, rig bids, or engage in other anticompetitive activity. Criminal prosecution of Sherman Act violations is the responsibility of the Antitrust Division of the United States Department of Justice.

Violation of the Sherman Act is a felony punishable by a fine of up to $10 million for corporations, and a fine of up to $350,000 or 3 years imprisonment (or both) for individuals, if the offense was committed before June 22, 2004. If the offense was

committed on or after June 22, 2004, the maximum Sherman Act fine is $100 million for corporations and $1 million for individuals, and the maximum Sherman Act jail sentence is 10 years. Under some circumstances, the maximum potential fine may be increased above the Sherman Act maximums to twice the gain or loss involved. In addition, collusion among competitors may constitute violations of the mail or wire fraud statute, the false statements statute, or other federal felony statutes, all of which the Antitrust Division prosecutes.

In addition to receiving a criminal sentence, a corporation or individual convicted of a Sherman Act violation may be ordered to make restitution to the victims for all overcharges. Victims of bid-rigging and price-fixing conspiracies also may seek civil recovery of up to three times the amount of damages suffered.

## Forms of Collusion

Most criminal antitrust prosecutions involve price fixing, bid rigging, or market division or allocation schemes. Each of these forms of collusion may be prosecuted criminally if they occurred, at least in part, within the past five years. Proving such a crime does not require us to show that the conspirators entered into a formal written or express agreement. Price fixing, bid rigging, and other collusive agreements can be established either by direct evidence, such as the testimony of a participant, or by circumstantial evidence, such as suspicious bid patterns, travel and expense reports, telephone records, and business diary entries.

Under the law, price-fixing and bid-rigging schemes are per se violations of the Sherman Act. This means that where such a collusive scheme has been established, it cannot be justified under the law by arguments or evidence that, for example, the agreed-upon prices were reasonable, the agreement was necessary to prevent or eliminate price cutting or ruinous competition, or the conspirators were merely trying to make sure that each got a fair share of the market.

### *Price Fixing*

Price fixing is an agreement among competitors to raise, fix, or otherwise maintain the price at which their goods or services are sold. It is not necessary that the competitors agree to charge exactly the same price, or that every competitor in a given industry join the conspiracy. Price fixing can take many forms, and any agreement that restricts price competition violates the law. Other examples of price-fixing agreements include those to:

- Establish or adhere to price discounts.

- Hold prices firm.

- Eliminate or reduce discounts.

- Adopt a standard formula for computing prices.

- Maintain certain price differentials between different types, sizes, or quantities of

products.

- Adhere to a minimum fee or price schedule.

- Fix credit terms.

- Not advertise prices.

In many cases, participants in a price-fixing conspiracy also establish some type of policing mechanism to make sure that everyone adheres to the agreement.

### *Bid Rigging*

Bid rigging is the way that conspiring competitors effectively raise prices where purchasers — often federal, state, or local governments — acquire goods or services by soliciting competing bids.

Essentially, competitors agree in advance who will submit the winning bid on a contract being let through the competitive bidding process. As with price fixing, it is not necessary that all bidders participate in the conspiracy.

Bid rigging also takes many forms, but bid-rigging conspiracies usually fall into one or more of the following categories:

**Bid Suppression**: In bid suppression schemes, one or more competitors who otherwise would be expected to bid, or who have previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the designated winning competitor's bid will be accepted.

**Complementary Bidding:** Complementary bidding (also known as "cover" or "courtesy" bidding) occurs when some competitors agree to submit bids that either are too high to be accepted or contain special terms that will not be acceptable to the buyer. Such bids are not intended to secure the buyer's acceptance, but are merely designed to give the appearance of genuine competitive bidding. Complementary bidding schemes are the most frequently occurring forms of bid rigging, and they defraud purchasers by creating the appearance of competition to conceal secretly inflated prices.

**Bid Rotation:** In bid rotation schemes, all conspirators submit bids but take turns being the low bidder. The terms of the rotation may vary; for example, competitors may take turns on contracts according to the size of the contract, allocating equal amounts to each conspirator or allocating volumes that correspond to the size of each conspirator company. A strict bid rotation pattern defies the law of chance and suggests collusion is taking place.

**Subcontracting:** Subcontracting arrangements are often part of a bid-rigging scheme. Competitors who agree not to bid or to submit a losing bid frequently receive subcontracts or supply contracts in exchange from the successful low bidder. In some schemes, a low bidder will agree to withdraw its bid in favor of the next low bidder in exchange for a lucrative subcontract that divides the illegally obtained higher price

between them.

Almost all forms of bid-rigging schemes have one thing in common: an agreement among some or all of the bidders which predetermines the winning bidder and limits or eliminates competition among the conspiring vendors.

### *Market Division*

Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies.

## Detecting Bid Rigging, Price Fixing, And Other Types Of Collusion

Bid rigging, price fixing, and other collusion can be very difficult to detect. Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. However, suspicions may be aroused by unusual bidding or pricing patterns or something a vendor says or does.

### *Bid or Price Patterns*

Certain patterns of bidding or pricing conduct seem at odds with a competitive market and suggest the possibility of collusion:

### Bids

- The same company always wins a particular procurement. This may be more suspicious if one or more companies continually submit unsuccessful bids.

- The same suppliers submit bids and each company seems to take a turn being the successful bidder.

- Some bids are much higher than published price lists, previous bids by the same firms, or engineering cost estimates.

- Fewer than the normal number of competitors submit bids.

- A company appears to be bidding substantially higher on some bids than on other bids, with no apparent cost differences to account for the disparity.

- Bid prices drop whenever a new or infrequent bidder submits a bid.

- A successful bidder subcontracts work to competitors that submitted unsuccessful

bids on the same project.

- A company withdraws its successful bid and subsequently is subcontracted work by the new winning contractor.

## Prices

- Identical prices may indicate a price-fixing conspiracy, especially when:

- Prices stay identical for long periods of time.

- Prices previously were different.

- Price increases do not appear to be supported by increased costs.

- Discounts are eliminated, especially in a market where discounts historically were given.

- Vendors are charging higher prices to local customers than to distant customers. This may indicate local prices are fixed.

### *Suspicious Statements or Behavior*

While vendors who collude try to keep their arrangements secret, occasional slips or carelessness may be a tip-off to collusion. In addition, certain patterns of conduct or statements by bidders or their employees suggest the possibility of collusion. Be alert for the following situations, each of which has triggered a successful criminal antitrust prosecution:

- The proposals or bid forms submitted by different vendors contain irregularities (such as identical calculations or spelling errors) or similar handwriting, typeface, or stationery. This may indicate that the designated low bidder may have prepared some or all of the losing vendor's bid.

- Bid or price documents contain white-outs or other physical alterations indicating last-minute price changes.

- A company requests a bid package for itself and a competitor or submits both its and another's bids.

- A company submits a bid when it is incapable of successfully performing the contract (likely a complementary bid).

- A company brings multiple bids to a bid opening and submits its bid only after determining (or trying to determine) who else is bidding.

- A bidder or salesperson makes:

- Any reference to industry-wide or association price schedules.

- Any statement indicating advance (non-public) knowledge of competitors' pricing.

- Statements to the effect that a particular customer or contract "belongs" to a certain vendor.

- Statements that a bid was a "courtesy," "complementary," "token," or "cover" bid.

- Any statement indicating that vendors have discussed prices among themselves or have reached an understanding about prices.

### *A Caution About Indicators of Collusion*

While these indicators may arouse suspicion of collusion, they are not proof of collusion. For example, bids that come in well above the estimate may indicate collusion or simply an incorrect estimate. Also, a bidder can lawfully submit an intentionally high bid that it does not think will be successful for its own independent business reasons, such as being too busy to handle the work but wanting to stay on the bidders' list. Only when a company submits an intentionally high bid because of an agreement with a competitor does an antitrust violation exist. Thus, indicators of collusion merely call for further investigation to determine whether collusion exists or whether there is an innocent explanation for the events in question.

### Conditions Favorable To Collusion

While collusion can occur in almost any industry, it is more likely to occur in some industries than in others. An indicator of collusion may be more meaningful when industry conditions are already favorable to collusion.

- Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.

- The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

- The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.

- Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.

- Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting

employment from one company to another.

- Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

## What You Can Do

Antitrust violations are serious crimes that can cost a company hundreds of millions of dollars in fines and can send an executive to jail for up to ten years. These conspiracies are by their nature secret and difficult to detect. The Antitrust Division needs your help in uncovering them and bringing them to our attention.

If you think you have a possible violation or just want more information about what we do, contact the Citizen Complaint Center of the Antitrust Division:

**E-mail:** _antitrust.complaints@usdoj.gov_

**Phone:** 1-888-647-3258 (toll-free in the U.S. and Canada) or 1-202-307-2040

**Address:**

Citizen Complaint Center
Antitrust Division, U.S. Dept. of Justice
950 Pennsylvania Ave. NW, Suite 3322
Washington, DC 20530

---

## FOOTNOTES

1. This Primer provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. No limitations are hereby placed on otherwise lawful investigative and litigation prerogatives of the Department of Justice.



LEXSEE 45 IDAHO L. REV. 41

Copyright (c) 2008 Idaho Law Review
Idaho Law Review

2008

45 Idaho L. Rev. 41

**LENGTH:** 14916 words

ARTICLE: THE GOVERNMENT KNOWLEDGE DEFENSE TO THE CIVIL FALSE CLAIMS ACT: A MISNOMER BY ANY OTHER NAME DOES NOT SOUND AS SWEET

**NAME:** MICHAEL J. DAVIDSON*

**BIO:**

> * B.S., U.S. Military Academy, 1982; J.D., College of William & Mary, 1988; LL.M. (Military Law), The Army's Judge Advocate General's School, 1994; LL.M. (Government Procurement Law), George Washington University (GWU) School of Law, 1998; S.J.D., GWU, 2007. The author is a federal attorney. The opinions contained in this article are those of the author and do not reflect the position of any federal agency or the United States Government.

**SUMMARY:**
 ... A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. ... Citing several dated cases, the court pointed out that " b ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." ... Hagood In Hagood, a qui tam relator brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. ... The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct. ... The Tenth Circuit noted that the court in Butler had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly. ... For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement officials "with authority to act under the contract." ... Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct. ... Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. ... Finding the regulators satisfactory, the Army's Contracting Officer accepted them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators.

**TEXT:**

I. INTRODUCTION

The Civil False Claims Act  n1 (FCA) serves as the United States Government's preeminent tool for addressing fraud.  n2 The FCA's application  has expanded beyond its initial focus on defense procurement fraud to embrace most federally funded government programs.  n3 The largest recoveries under the FCA are currently obtained in health care fraud cases.  n4 As a fraud fighting tool, the FCA has proven extremely successful, at least in terms of the fraud-related monetary recoveries. Since 1986, the United States has recovered more than $ 20 billion under the FCA.  n5

In response to the government's aggressive use of the FCA, the defense bar has developed several defenses to FCA claims.  n6 One such defense that has enjoyed a measure of success is the inappropriately named "government knowledge defense." The government knowledge defense is a misnomer to the extent the term implies that government knowledge of alleged wrongdoing, by itself, affords a complete defense to an FCA lawsuit. Indeed, the scope of the defense is much narrower. To the extent knowledge of wrongdoing by government officials constitutes a defense at all, such knowledge serves as a defense to the FCA's scienter element; that is, the alleged misconduct was not committed knowingly. In other words, the defendant could not have knowingly violated the FCA because the government knew about the conduct and authorized it, either explicitly or tacitly; or, at the very minimum, the defendant reasonably believed that the government was aware of, and in agreement with, the challenged conduct.

This article will examine the government knowledge defense, reviewing its development and examining its present state. Part II first provides an overview of the FCA. Part III then examines the development of the defense, distinguishing between the pre-1986 jurisdictional bar generated by government knowledge of misconduct and the post-1986 development of what has become known as the government knowledge defense. The article posits that the modern government knowledge defense traces its lineage to the Ninth Circuit's seminal decision in *United States ex rel. Hagood v. Sonoma County Water Agency.*  n7 Reviewing reported decisions, Part IV discusses the defense as it has developed into its modern form and attempts to articulate the defense's basic elements. Although the FCA has been applied to address fraud in the vast  majority of federally funded programs, this article will focus primarily on its application to government contracts.

II. HISTORICAL BACKGROUND OF THE FALSE CLAIMS ACT

The False Claims Act was enacted during the Civil War as a statutory tool to combat widespread fraud found among defense contractors.  n8 The Union Army reported instances of being charged multiple times for the same horse, finding "boots made of cardboard rather than leather," n9 and discovering sawdust substituted for gunpowder in ammunition crates and muskets in rifle crates.  n10 Civil War contractors had billed the United States "for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." n11 In its original form, the FCA allowed private persons to initiate lawsuits  n12 and provided for both criminal and civil penalties, but Congress eventually removed the FCA's criminal component and placed it elsewhere.  n13

Except for brief flurries of activity associated with America's entry into war, with concomitant increases in defense spending and defense contractor fraud, the FCA was infrequently used.  n14 However, during the early 1980s, federal agencies reported a steady increase in fraud investigations. The Department of Defense (DoD) reported that it conducted 2311 such investigations in 1984.  n15 The following year, the DoD Inspector  General "testified that 45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses." n16 Further, the Department of Justice reported to Congress that, within the proceeding year, it had achieved convictions of four major defense companies and had indicted another.  n17

The procurement fraud scandals of the early 1980s gave rise to various legislative initiatives designed to strengthen the government's ability to deal with rampant fraud within the defense industry, n18 including significant revisions to the FCA.  n19 The 1986 amendments increased the maximum penalty from $ 2000 to $ 10,000 and provided for treble damages,  n20 added "reverse false claims" n21 and anti-retaliation provisions,  n22 eliminated the exclusion for

members of the armed forces,  n23 clarified the scienter element  n24 and the standard of proof,  n25 and lengthened the statute of limitations.  n26

In its current form, the FCA provides for civil liability against any person who engages in one of seven forms of misconduct.  n27 The most common FCA causes of action are submitting a false claim and making or using false records to support a false claim.  n28

An FCA action may be brought initially by either the United States or by an individual on behalf of the United States.  n29 When suit is brought by an individual (a relator), the case is known as a qui tam.  n30 "The basic idea [behind a qui tam suit] is that a private citizen with personal knowledge of such fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail."  n31 The United States may assume control over a qui tam lawsuit or it may decline to intervene and permit the relator to pursue the case.  n32

A defendant found to have violated the FCA may be held liable for treble damages and a civil penalty of $ 5500 to $ 11,000 per false claim.  n33 FCA damages "typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'"  n34 Additionally, recovery of penalties is not dependent upon the United States proving actual damages.  n35 In successful qui tam cases, the relator is entitled to a share of the government's recovery. This share may range up to thirty percent of the amount the United States recovers, depending upon the relator's contribution to the successful resolution of the case.  n36

### III. THE DEVELOPMENT OF THE GOVERNMENT KNOWLEDGE DEFENSE

#### A. Demise of the Government Knowledge Jurisdictional Bar

Prior to 1986, government knowledge of the factual basis for a qui tam suit served as a jurisdictional bar to potential relators.  n37 This bar reflected Congress's efforts during World War II to eliminate parasitic lawsuits.  n38 Such lawsuits were being brought "'by parties having no information of their own to contribute, but who merely plagiarized information in indictments returned to the courts, newspaper stories or congressional investigations.'"  n39 The FCA's prior government knowledge provision had been strictly interpreted so as to "preclud[e] any *qui tam* suit based on information in the Government's possession, despite the source."  n40 Some courts have precluded qui tam lawsuits based on information in the government's possession even when the relator was the source of that information. n41 Corrupt contractors found an unintended safe harbor. As one legal treatise noted: "Defense contractors seeking to avoid liability or governmental officials who resented *qui tam* actions were almost always able to find some Government official somewhere who had *some* knowledge of the fraudulent activities involved."  n42

Believing that such a draconian jurisdictional bar could lead to inequitable results  n43 and seeking to encourage potential relators to bring suit,  n44 Congress eliminated the jurisdictional bar and instead substituted a public disclosure standard: "[A] *qui tam* suit will be barred only if it is based on information that was 'publicly disclosed' at various hearings,  in certain types of reports, or by the media."  n45 Under this standard, "[i]nformation that the government 'has,' but that was never publicly disclosed, does not bar a *qui tam* suit."  n46

In the event of a public disclosure, the qui tam relator's action is not barred so long as the relator was the original source of the information giving rise to the lawsuit.  n47 The "original source" requirement is jurisdictional.  n48 The FCA defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under [the FCA] which is based on the information."  n49

The prior government knowledge-based jurisdictional bar and the current government knowledge defenses are analytically distinct concepts. The former focused on the government's knowledge of the fraud to preclude the relator from bringing suit;  n50 the latter focuses on the effect the government's knowledge has on the defendant's mental state in order to determine if the defendant acted knowingly.  n51 Further, the earlier jurisdictional language was removed from the FCA in 1986  n52 and replaced with the public disclosure/original source language found in § 3730(e)(4).  n53

Accordingly, to the extent that the possession of information forming the basis of a relator's FCA lawsuit served as a jurisdictional bar, that form of government knowledge defense no longer exists. However, "[o]nce public disclosure became the linchpin of the jurisdictional scheme, the effect of government knowledge on the viability of an FCA claim was thrown to the courts to decide." n54

B. A Phoenix Rises from the Ashes: The Development of the Government Knowledge Defense

In 1986, in addition to eliminating the government knowledge-based jurisdictional bar, Congress clarified the FCA's scienter element, making it clear that the United States need not prove specific intent in order to establish that the defendant acted knowingly when it submitted a false claim or statement to the United States. n55 In doing so, Congress intended to reach "the increasingly familiar 'ostrich-like' conduct of corporate officers, who had been able to insulate themselves from FCA liability for false claims submitted by unwitting subordinates." n56

By the plain terms of the FCA's statutory language, the scienter requirement is that the defendant acted knowingly for all FCA claims except those enumerated in sections 3729(a)(3), (a)(4) and (a)(5). n57 Currently, the FCA defines "knowing" and "knowingly" to "mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ." n58

In other words, the "defendant must 'know' that a claim or statement is false or fraudulent, that is, he must (1) have actual knowledge that it is false, (2) act in deliberate ignorance of its truth or falsity or (3) act in reckless disregard of its truth or falsity." n59 The United States, or a relator acting on its behalf, is not required to prove that the defendant acted with the specific intent to defraud. n60

1. *Boisjoly:* A Failed First Attempt

The first reported post-1986 amendment case to address the government knowledge defense was *Boisjoly v. Morton Thiokol, Inc.* n61 In *Boisjoly,* an engineer working for the defendant filed a qui tam following the Challenger disaster, alleging that Morton Thiokol provided NASA with defective solid rocket motors (SRM), n62 that the defendant's role in the launch decision constituted a false claim, and that the company requested and received a bonus from NASA despite the shuttle disaster and the company's failure to meet contract specifications. n63

The court granted the defendant's motion to dismiss the first cause of action, noting that the complaint itself indicated that NASA knew of the alleged SRM defects. n64 Citing several dated cases, n65 the court pointed out that "[b]ecause FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." n66 The court then posited, "only if the government gets something less than or different from that which it expected can it be  said to have suffered the kind of injury necessary to invoke FCA liability." n67 The court held "that if the complaint itself alleges that the government knew of those very facts or characteristics which allegedly make the claim false, no claim has been stated." n68

Further, the court determined that the remaining causes of action did not state an FCA claim. n69 The court found that the defendant had certified the safety of the SRMs only after disclosing its concerns to NASA and after being pressured by the government to submit the certification. n70 The court held that such "circumstances are simply not the kind against which the FCA is meant to protect" and "negate[] any element of falsity or fraud that might otherwise exist." n71

With respect to that portion of the opinion addressing the government knowledge defense, the court's decision has been criticized n72 and effectively overruled to the extent *Boisjoly* suggests that government knowledge constitutes an absolute defense. n73 In *Shaw v. AAA Engineering & Drafting, Inc.,* the United States Court of Appeals for the Tenth Circuit specifically rejected the notion that government knowledge constituted an absolute defense to an FCA case. n74 Instead, the court noted that "there may still be occasions when the government's knowledge of or cooperation with a

contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." n75 Further, as subsequent case law has shown, government knowledge may serve as a defense to the FCA's scienter element, rather than to the falsity of the claim. n76

2. *Hagood:* The Ninth Circuit Sets the Standard

The seminal and most often cited case to address the government knowledge defense since the 1986 amendments to the FCA is *United States ex rel. Hagood v. Sonoma County Water Agency.* n77 Indeed, the *Hagood* decision has been cited with approval by several circuit courts, including the Second, n78 Sixth, n79 Seventh, n80 and Tenth, n81 by the U.S. Court of Federal Claims, n82 and by district court decisions in other circuits. n83

a. *Hagood*

In *Hagood,* a *qui tam* relator n84 brought suit alleging that the water agency had presented false cost allocation information to the United States to obtain an Army Corps of Engineers contract. n85 The district court dismissed the suit "for failure to state a claim for which relief could be granted." n86

The district court believed that Hagood's complaint was "essentially self-contradictory" because it both alleged that the water agency had committed fraud and that "'the high government officials responsible for taking the action' knew of the facts that made the complaint false." n87 Further, the district court found that Hagood failed to sufficiently plead fraudulent intent for purposes of Fed. R. Civ. P. 9(b) and that the government's knowledge of the alleged falsity made it "impossible to say that the government had suffered the kind of injury necessary to impose liability under the False Claims Act." n88 Elaborating, the district court mused, "it is difficult to see how any damages to the United States are caused by false statements when officials, with full knowledge of the falsity of the statements, proceed to take an action depriving the government of funds notwithstanding the false statements." n89

On appeal, the United States Court of Appeals for the Ninth Circuit reversed and remanded. n90 The appellate court found that Hagood's complaint was not self-contradicting. n91 Reviewing the FCA's requirement that the alleged misconduct be knowing, the court noted that the scienter element required more than mere negligence or innocent mistake but did not require the government to prove specific intent to deceive. n92 In terms of intent, the United States had to establish "the knowing presentation of what is known to be false." n93

With respect to government knowledge of the falsity, the court acknowledged that such knowledge could be "highly relevant"; it could "show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n94 However, the court also posited that government knowledge did not alone provide an absolute defense--"[t]hat the relevant government officials know of the falsity is not in itself a defense." n95 In short, the court found evidence of government knowledge potentially relevant to the FCA's scienter element, but not to the issue of falsity. n96

The court left the question of whether government knowledge may preclude an award of damages unanswered. n97 However, the court pointed out that the United States need not prove damages in order to recover penalties and costs, suggesting that even if government knowledge provided a causal defense against an award of damages, such knowledge did not insulate the defendant from the imposition of penalties. n98

Finally, the court rejected an estoppel defense. Reiterating the well-established law that "estoppel will not lie against the United States 'on the same terms as any other litigant,'" under the facts alleged in this case, the court posited that "[t]he defendant's 'inability to retain money that it should never have received in the first place' is not the kind of detrimental reliance that justifies estoppel against the government." n99 Finding that Hagood's allegations constituted a valid cause of action, the court further admonished: "'Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law . . . . [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.'" n100

b. *Hagood's* Progenies: *Wang & Butler*

The Ninth Circuit's decisions in *Wang* and *Butler* amplified its original decision in *Hagood*. In *Wang ex rel. United States v. FMC Corp.,* n101 a qui tam relator, who had alleged that FMC defrauded the United States on four defense contracts including a contract involving a lightweight howitzer, unsuccessfully appealed the district court's grant of summary judgment to FMC. n102 In support of his claim, Wang alleged "that FMC's engineering work was of 'low quality,' and that the design for the lightweight howitzer was 'faulty.'" n103 Wang's sole piece of evidence to support his allegations concerning the howitzer contract was an FMC "lessons learned" memorandum written after the contract had been cancelled. n104 Significantly, "all of the issues discussed in the memorandum were first raised and considered in meetings with the Army." n105

Analyzing the FCA's scienter requirement, the court noted that the Army knew about "FMC's mistakes and limitations, and that FMC was open with the government about them . . . ." n106 Accordingly, the court opined that Wang's evidence was insufficient to survive summary judgment, the memorandum suggesting only "that while FMC might have been groping for solutions, it was not cheating the government in the effort." n107 To be knowingly false, there must be something more than a mere scientific untruth, there must be "a lie." n108

Following *Wang,* the Ninth Circuit again addressed the issue of government knowledge in an FCA case. In *United States ex rel. Butler v. Hughes Helicopter, Inc.,* n109 a qui tam relator, who alleged that the defendant had made false statements and submitted false claims "related to several aspects of the testing of the avionics and navigation subsystems" of the Apache attack helicopter, appealed an adverse directed verdict. n110 At trial, the defendant argued, in relevant part, that Army technical representatives approved deviations from the required specifications and that Army technical representatives were also present during relevant equipment tests. n111 As part of its findings of fact, the district court noted "the Army's knowledge of and access to the modifications in the testing of the subsystems . . . ." n112 Further, the district court's decision relied on its conclusion that the Army and defendant enjoyed a "pattern of cooperation" in which "information flowed freely," and "all information upon which [Butler] bases his case was not only available to the Army, but in the Army's possession." n113

On appeal, Butler did not challenge the district court's findings of fact, but instead argued "that the *wrong* Army personnel knew, that is, that only a contracting officer had the power to modify a government contract to allow the deviations the Army allowed in the testing." n114 The court first noted that government knowledge is not an automatic defense to an FCA action and that courts must evaluate the significance of such knowledge on a case-by-case basis. n115 Relying on *Hagood* and *Wang,* the court then determined that the scope of its review focused on the evidence "that [the defendant] and the Army had so completely cooperated and shared all information during the testing that [the defendant] did not 'knowingly' submit false claims," in which case the court would affirm the directed verdict. n116 With respect to the government knowledge defense, the court did not directly confront Butler's argument, but instead found that test changes were discussed between the defendant and Army representatives, that Army technical representatives knew of and approved these changes, and, accordingly, that the allegedly noncompliant test could not have been a "knowingly false statement[]." n117

IV. THE CURRENT STATE OF THE DEFENSE

The vast majority of cases have determined that government knowledge is not an absolute defense to an FCA action. n118 In other words, the mere fact that government officials know of the falsity does not, standing alone, constitute a defense. n119 While relevant, "the Government's knowledge is . . . not necessarily dispositive . . . ." n120 The significance of the government's knowledge is determined on a case by case basis. n121

Since the 1986 FCA amendments, several courts have addressed the government knowledge defense, providing an emerging, but sufficiently well defined, body of law to map out the parameters of this defense. In order for government knowledge of defendant's alleged wrongdoing to serve as a defense to an FCA action, the defendant must satisfy several elements. First, the defendant can use the government's knowledge of his conduct to defend against the FCA's scienter

element to establish that he did not knowingly commit a violation of the FCA. Second, the defendant must establish that the government had knowledge of the specific conduct that forms the basis of the FCA claim. Third, the defendant cannot merely show that someone in the government had knowledge of the challenged conduct; rather, the defendant must prove that a relevant government official was aware of the challenged conduct and approved it, either explicitly or tacitly. Finally, the defendant must also prove that the relevant government official had knowledge of the specific conduct at issue *before* the defendant presented a claim.

A. Defendant's Scienter Was Affected

The courts have applied the government knowledge defense to the scienter element of the FCA.  n122 As originally explained by the United States Court of Appeals for the Ninth Circuit in *Hagood,* the requisite intent in an FCA case is "the knowing presentation of what is known to be false." n123 Accordingly, "[t]hat the relevant government officials know of the falsity is not in itself a defense." n124 "[T]he knowledge possessed by officials of the United States may be . . . relevant. . . . [to] show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth." n125 The focus of the defense is not on what the government knew; rather, the defense focuses on whether the defendant acted knowingly, examining the effect of the government's knowledge on the defendant.

Interpreting the FCA to provide an absolute defense based on government knowledge of the specific falsity at issue, without a concomitant effect on the defendant's mental state, would lead to absurd results. To illustrate, assume that a contractor knowingly submits a false claim--indeed does so with the specific intent to defraud the United States--but a federal employee learns of the falsity unbeknownst to the corrupt contractor, either before or after the claim is submitted. Is the claim any less false, or was it submitted any less knowingly, merely because someone in the government became aware of it? The answer, of course, is no.  n126 Nor does the answer change if the federal employee who  discovers the falsity is the cognizant contracting officer.  n127 The contractor in this scenario is still attempting to defraud the United States, and that fact remains unchanged even when the contracting officer or some other relevant acquisition official discovers the misconduct.

In *Shaw v. AAA Engineering & Drafting Inc.,*  n128 the United States Court of Appeals for the Tenth Circuit rejected a government knowledge defense based on knowledge of misconduct provided to the government by the qui tam relator, who had formerly been employed by the defendant. While still an employee of the defendant, Shaw reported certain environmental misconduct to the government's Quality Assurance Evaluator, who in turn relayed the information to the contracting officer.  n129 In rejecting the defense the court posited:

> Assuming some level of government knowledge would negate the intent requirement under the FCA as a matter of law, the level of government knowledge in the present case does not do so. It was the plaintiff, Shaw, and not the individual defendants or other AAA employees, who told the government about the failure to practice silver recovery.  n130

The unsuitability of government knowledge as an absolute defense is highlighted further when the knowledgeable federal employee is not merely a passive recipient of information, but instead is a participant in a scheme to defraud the United States.  n131 Clearly, the defendant should not escape liability merely because it found a willing participant--a coconspirator--within the government.

Additionally, an FCA defendant should not benefit if someone from the government learns of the falsity and simply does nothing about it. The Seventh Circuit has held that mere governmental acquiescence is insufficient to sustain a government knowledge defense.  n132 The government  must both know of, and approve, the particular claim before it is submitted.  n133 The opinions of other circuit courts appear to have adopted a similar standard.  n134 Unless that person is someone with the requisite level of authority and approves or otherwise indicates to the defendant that its conduct is permissible, then the defendant's scienter remains unaffected. Additionally, "mere acquiescence would preclude FCA liability any time a government employee and a defendant were in cahoots."  n135

Even though the government has not affirmatively approved a particular claim or its underlying factual basis when such is in contention, apparently some courts have imposed a less demanding standard that permits the defense when government knowledge is coupled with acquiescence.  n136 Such a standard would seem defensible so long as the defendant could establish that the particular facts and circumstances surrounding the government's receipt of relevant information, and subsequent acquiescence, reasonably affected the defendant's mental state. In those jurisdictions adopting such a standard, the critical focus would remain on the defendant's scienter, that is, did the defendant knowingly submit a false claim.

B. Specific Falsity at Issue

In order for government knowledge to serve as a defense, the United States must also have known of the specific falsity at issue. Both the Fifth and Seventh Circuits have posited: "'[I]f the government knows and approves of *the particulars* of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.'"  n137 Other courts applying the defense have  articulated a similar standard n138 or have noted that the specific falsity at issue was known to the government.  n139 Logically, this element should be met if the defendant has fully disclosed all relevant facts leading up to the presentment of a claim, or followed the government's specific instructions when presenting the claim, such that it is apparent that the government knew and approved of the defendant's course of action.  n140 Under this standard, it is insufficient that the Government becomes aware of contractual or programmatic irregularities not amounting to fraud or becomes aware of other, unrelated fraud.

C. Relevant Government Officials

Merely establishing that someone within the government possessed knowledge of the defendant's wrongdoing does not, by itself, satisfy this element of the government knowledge defense. Albeit few cases have squarely addressed the issue, several opinions have suggested a limitation on the defense, requiring that the knowledge be possessed by relevant government employees.  n141 Other court opinions applying the defense, but not addressing the relevant pool of government officials, have noted complete or extensive knowledge by the government of the alleged misconduct, n142 suggesting that this limited body of relevant or responsible  officials also had the requisite knowledge. If such a limitation did not exist, then a defendant could escape liability simply by finding someone within the government who possessed some knowledge of the challenged conduct, regardless of that person's authority or relationship with the underlying program or activity.

The United States Court of Appeals for the Tenth Circuit was one of the few courts to directly address this issue in the federal procurement context. In *United States ex rel. Stone v. Rockwell International Corp.,*  n143 the Tenth Circuit reviewed a challenge to the district court's jury instruction, "charging the jury that they could consider the knowledge of all 'government employees with authority to act under the contract.'"  n144 Noting that the instruction had not limited the jury's consideration of knowledge possessed only by the government's contracting officers, but rather that such authority extended to "a broader range of individuals," the appellate court held that the district court's instruction was not in error.  n145

Further, the court rejected the appellant's argument that upholding the lower court's jury instruction would conflict with *United States ex rel. Butler v. Hughes Helicopters, Inc.*  n146 The Tenth Circuit noted that the court in *Butler* had rejected the position that only a contracting officer's knowledge was relevant for purposes of determining whether a defendant had acted knowingly.  n147 Instead, the Ninth Circuit had included "technical representatives" within the pool of relevant government officials.  n148

As the *Stone* decision correctly indicates, for purposes of this defense, the legal significance of the government's knowledge in the federal  procurement context is linked to the authority of the employee in possession of the information. That authority does not reside with all employees merely because they are somehow associated with the procurement; nor, on the other hand, is such authority embodied solely in the contracting officer. For purposes of this defense, the legally relevant authority extends beyond that possessed by contracting officers to other procurement

officials "with authority to act under the contract."  n149

Unfortunately the courts have failed to provide a clear standard for determining relevant officials--those with the requisite level of authority--specifically for purposes of the government knowledge defense. However, although the two bodies of law are not synonymous, established principles of general federal procurement law addressing the authority of federal acquisition officials to bind the government offer guidance for FCA cases. Under these legal principles, application of the government knowledge defense should be limited to knowledge possessed by government employees acting with actual contractual authority, depending upon the facts of the case.  n150

1. Actual Authority, Express or Implied, Is Required

As a general rule, the United States is bound only by the conduct of its employees acting with actual authority. n151 Similarly, as a general rule in the procurement context, "[o]nly persons with contracting authority can bind the Government." n152 In the procurement context, cognizant contracting officers have actual authority to bind the government.  n153  Once they receive the requisite grant of authority, contracting officers may "enter into, administer, or terminate contracts and make related determinations and findings."  n154 Further, contracting officers possess authority "to execute contract modifications on behalf of the Government."  n155

Limits on the contracting officer's authority are provided to that official in writing and such limitations are known, or readily subject to determination, by contractors and other federal officials. Contracting officers are appointed in writing with a Certificate of Appointment (called a "warrant") containing any limitations on their authority.  n156 Information concerning the limitations on the contracting officer's authority is readily available to the public.  n157 Indeed, some contracting officers even post their warrants on their office wall for contractor review.  n158

Contracting officers may delegate portions of their authority to other government employees.  n159 Accordingly, with respect to federal procurements, the "relevant" pool of actors for the government knowledge defense should normally include the contracting officer overseeing the particular contract, who usually possesses the "authority to enter into, administer, or terminate contracts and make related determinations and findings."  n160 Also, the relevant pool could include those subordinate contracting officials whom the contracting officer expressly delegates actual authority to perform various contracting functions.  n161 Typical government officials falling into this category may include the Administrative  Contracting Officer (ACO),  n162 Terminating Contracting Officer (TCO),  n163 and certain "formally designated representatives who act on behalf of the Government during contract administration."  n164 Such representatives could include the "contracting officer representative (COR), contracting officer technical representative (COTR), Government Technical Representative (GTR), or Government Technical Evaluator (GTE)."  n165

For contractors, authority issues may become confusing in federal procurements because they frequently deal with government employees with varying levels of authority, who may possess titles or exercise related duties that suggest a greater level of authority.  n166 As one treatise notes:

Within contracting offices, personnel with official-sounding titles such as contract specialist, negotiators, and administrators work for contracting officers and handle the day-to-day contracting activity of the government, but such personnel generally do not have authority to order additional work or to commit the government by virtue of their position. Contractors are expected to recognize this lack of authority. n167

In order to provide relief to contractors, various courts and boards have relied on the court-created theory of "implied" actual authority to bind the United States.  n168 Accordingly, in some limited circumstances, "[t]he authority of a Government official . . . may . . . arise from 'implied actual authority.'"  n169 A government employee may be found to possess the "implied authority to bind the Government in contract 'when such authority is considered to be an integral part of the duties assigned to [the] government employee.'"  n170 In this context "integral" means "'essential  or 'necessary to form a whole.'"  n171 However, implied authority only exists when *some* authority has been properly

delegated to a government employee.  n172 A government procurement official lacking any actual authority, cannot be deemed to possess implied actual authority.  n173

Significantly, government employees, including procurement officials, lack the authority to waive fraudulent conduct.  n174 Accordingly, the FCA is violated when a contractor submits a false claim even when the contractor informs the government of the claim's falsity before submission.  n175 Further, once false claims are received, a contracting officer may not modify the contract, or take other action, to waive past false claims.  n176

The Federal Acquisition Regulation (FAR) also contains express limitations on contracting officer authority when a claim is suspected to be false or tainted by fraud. Pursuant to FAR 33.210(b), the contracting  officer has no authority to settle, compromise, pay or adjust "any claim involving fraud." n177 Similarly, section 605(a) of the Contract Disputes Act removes any authority from the head of an agency "to settle, compromise, pay, or otherwise adjust any claim involving fraud." n178 This statutory restriction on agency heads extends downward to subordinate agency procurement officials.  n179

However, the fact that a contracting officer, or other authorized procurement official, resolved a bona fide pre-claim dispute that later forms the basis of an FCA lawsuit may give rise to a triable issue.  n180 Although they may not waive false or fraudulent claims, contracting officers may resolve legitimate contract disputes.  n181 Indeed, as a matter of policy, the federal government encourages resolution of contractual disputes at the contracting officer level. n182 As one court explained this distinction: "[T]he fact of a settlement, while not dispositive, is relevant insofar as it supports an inference that the defendant was involved in a contract dispute with the government, not that a government officer knew of a fraud and nonetheless decided to settle." n183

2. Knowledge and the Duty to Inquire

A second, significant body of law exists placing a duty of inquiry on a contractor when dealing with the United States. This duty is rooted in the unique status of the United States as a sovereign and draws upon  the legal principle that persons are charged with constructive knowledge of published laws and regulations.  n184 As the United States Supreme Court has admonished: "'Men must turn square corners when they deal with the Government . . . .'" n185

Within the realm of federal procurement law, courts have placed the burden on contractors to ensure that they are "dealing with a Government employee with contracting authority." n186 Further, contractors will be held responsible for knowing the limitations on the authority of government contracting officials when such limitations were contained in published laws or regulations. n187 Additionally, when the limitations on delegations of authority are expressly made known to contractors by including authority limitations as contract clauses, contractors will be held to those limitations.  n188

Various courts have applied the "square corners" rule to the FCA.  n189 Further, the legislative history from the 1986 amendments to the FCA reflects a congressional desire that a duty of inquiry be placed on contractors who deal with the government.  n190 Furthermore, the FCA's legislative history indicates that the Act's "knowing" definition reflects, at least in part, the constructive knowledge standard.  n191 The incorporation of a constructive knowledge standard into the FCA was  designed to place at least a limited duty of inquiry upon the defendant in order "to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries that would alert him that false claims are being submitted." n192

Given the existence of this body of law, with its application to both federal procurement law concerning the authority of federal acquisition officials and to the FCA, any government knowledge defense must also be scrutinized to determine if the defendant contractor knew, or should have known, of the authority limitations on the government official alleged to possess knowledge of contractor wrongdoing. Clearly, if the FCA defendant has actual knowledge of such limitations because of contractual clauses articulating the authority of the government's officials, then federal employees falling outside the scope of those clauses should not constitute relevant officials for purposes of this defense.

Similarly, if contractual authority limitations are contained in publicly available statutes or regulations (for example, FAR), then the contractor should be charged with the constructive knowledge of those limitations and the defense should fail. Finally, some form of limited duty of inquiry should be placed on the contractor to determine the authority of the government official with whom the contractor is providing information.

### 3. Timing Does Matter

The falsity of the claim is measured at the time it is submitted to the United States.  n193 Accordingly, a necessary prerequisite to any defense based on government knowledge of the falsity is that the relevant government officials knew of the challenged conduct *before* the false statement or claim was presented to the United States. Several courts have recognized this limitation on a government knowledge defense.  n194  Although not directly addressing the issue, other cases applying the government knowledge defense contain fact patterns in which the government was aware of the challenged conduct before a claim was presented.  n195

Such a temporal requirement is consistent with the basic premise underlying the defense--that the contractor did not knowingly engage in misconduct because it believed the government knew of its conduct and approved, either explicitly or tacitly. Also, this prerequisite to the government knowledge defense is consistent with the authority limitations placed on the contracting officer, as well as any other potentially relevant government official that a contractor may reasonably expect to deal with during a federal procurement. As noted earlier, government procurement officials cannot waive or ratify false or fraudulent claims.  n196

The following FCA case illustrates this point. In *United States v. National Wholesalers,*  n197 the defendant was awarded a contract to provide 6000 proprietary Delco-Remy vehicle regulators to the Army.  n198 The bid proposal permitted either Delco-Remy regulators or "equals," but National Wholesalers offered to provide the actual Delco-Remy regulators, and the contract was awarded on that basis.  n199 Unable to provide conforming Delco-Remy regulators, the defendant manufactured its own regulators--which the district found to be equal to the brand regulators--but then printed and affixed false Delco-Remy labels to the regulators.  n200

Unaware of the mislabeling, the Army accepted seventeen shipments of the mislabeled parts, for a total of 4086 regulators.  n201 Additionally, the contractor submitted seventeen invoices for payment.  n202 Upon discovering the contractor's misconduct, the Army issued a "stop order" on future deliveries and tested the manufactured regulators. n203 Finding the regulators satisfactory, the Army's Contracting Officer accepted  them as "equal" to the Delco-Remy regulators, and the contractor furnished the remaining regulators.  n204

Subsequently, the United States Attorneys Office filed suit under the False Claims Act, based on the seventeen invoices submitted prior to the contracting officer having learned of the mislabeling.  n205 The district court found for the defendants, determining in part that the regulators were "equals" and that the contracting officer had the authority to resolve contract disputes, which he had done here.  n206

On appeal, the United States Court of Appeals for the Ninth Circuit reversed. The court determined that the time to test the falsity of a claim is the date when it is submitted.  n207 Accordingly, "every one of the invoices prior to [when the contracting officer learned of the mislabeling] was false when made."  n208 Further, although the contracting officer has the authority to modify a contract, a retroactive modification under such circumstances was "void as against public policy."  n209 The court continued: "In such palming off as we have here we do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."  n210

### V. CONCLUSION

As one federal court has correctly noted, the government knowledge defense is "inaptly-named."  n211 The fact that someone in the government possessed knowledge of the misconduct that forms the basis of a False Claims Act lawsuit, by itself, does not constitute a legal defense. Depending upon the circumstances, government knowledge may be highly relevant evidence to negate the FCA defendant's scienter. In other words, government knowledge may

establish that the defendant did not act knowingly, that it did not act with actual knowledge, in deliberate ignorance, or with reckless disregard.

The modern-day government knowledge defense developed slowly in the wake of the 1986 amendments to the False Claims Act. Beginning with the seminal case of *United States ex rel. Hagood v. Sonoma County Water Agency,* n212 the courts have gradually defined the defense's contours and criteria. The vast majority of cases have held that government  knowledge may serve as a defense to the FCA's knowing scienter element. Further, the courts require that a relevant government official possess knowledge of the specific falsity at issue before the defendant presents a claim and approve of that conduct. Although not fully mature, the government knowledge defense is sufficiently well developed to provide courts and practitioners with solid guideposts for applying it in FCA litigation.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
GovernmentsState & Territorial GovernmentsClaims By & AgainstLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsJurisdictional BarLabor & Employment LawEmployer LiabilityFalse Claims ActCoverage & DefinitionsQui Tam Actions

**FOOTNOTES:**

n1 31 U.S.C. §§ 3729-3733 (2000).

n2 United States *ex rel.* Roby v. Boeing Co., 302 F.3d 637, 641 (6th Cir. 2002) ("The FCA has since become the primary means by which the Government combats and deters fraud."); Ron R. Hutchinson, *The Government's Audit and Investigative Powers over Commercial Item Contracts and Subcontracts,* 27 PUB. CONT. L.J. 263, 286 (1998) ("The Civil False Claims Act is the Government's primary vehicle for pursuing civil fraud . . . .").

n3 JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS 1-3 (Supp. 1999) ("combating fraud in virtually every program involving federal funds").

n4 Press Release, U.S. Dep't of Justice, Justice Department Recovers $ 2 Billion for Fraud Against the Government in FY 2007; More Than $ 20 Billion Since 1986 (Nov. 1, 2007), http://www.usdoj.gov/opa/pr/2007/November/07_civ_873.html.

n5 *Id.*

n6 *See, e.g.,* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 768-74 (N.D. Tex. 2002) (addressing several defenses).

n7 929 F.2d 1416 (9th Cir. 1991).

n8 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273 ("The False Claims Act was adopted in 1863 and signed into law by President Abraham Lincoln in order to combat rampant fraud in Civil War defense contracts."); *see also* United States *ex rel.* Wilkins v. N. Am. Constr. Corp., 173 F. Supp. 2d 601, 619 (S.D. Tex. 2001) ("The False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government.").

n9 JAMES B. HELMER, JR., ANN LUGBILL, & ROBERT C. NEFF, JR., FALSE CLAIMS ACT: WHISTLEBLOWER LITIGATION §2-4, at Inside America's Biggest Defense Scandal 28 (2d ed. 1999).

n10 *Id.;* ANDY PASZTOR, WHEN THE PENTAGON WAS FOR SALE 11 (1995).

n11 United States v. McNinch, 356 U.S. 595, 599 (1958).

n12 S. REP. NO. 99-345, at 10 ("The original False Claims Act also contained a provision allowing private persons, or 'relators,' to bring suit under the act.").

n13 BOESE, *supra* note 3, at 1-10 n.27. False claims are now prosecuted criminally pursuant to 18 U.S.C. § 287. *Id.*

n14 *See* John P. Robertson, *The False Claims Act,* 26 ARIZ. ST. L.J. 899, 901 (1994) ("[T]he Act lay essentially dormant until World War II broke out and fraud on the government by defense contractors increased."); *see* BOESE, *supra* note 3, at 1-11 ("There are few reported [FCA] decisions prior to 1930."); *Id.* at 1-14 ("The dramatic increases in government spending during and after World War II triggered an upsurge in the number of FCA cases brought by the Government; the number of such cases rose again during the military buildup of the Vietnam War . . . .").

n15 S. REP. NO. 99-345, at 2 ("up 30 percent from 1982"). The Department of Health and Human Services also reported a significant increase in entitlement program fraud. *Id.*

n16 *Id.*

n17 *Id.* at 2-3.

n18 In 1986, Congress also passed the Anti-Kickback Act, 41 U.S.C. §§ 51-58 (2000), a prohibited employment statute, 10 U.S.C. § 2408 (2006), and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812 (2000). *See* Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 786 n.17 (2000) ("PFCRA was designed to operate in tandem with the FCA. . . . [and was] enacted at virtually the same time as the FCA was amended in 1986 . . . its scope is virtually identical to that of the FCA."). For a discussion of the prohibited employment statute, see generally Michael J. Davidson, *10 U.S.C. § 2408: An Unused Weapon in the Procurement Fraud Wars,* 26 PUB. CONT. L.J. 181 (1997).

Additionally, in 1986 the FBI initiated a major investigation into defense procurement fraud, known as Operation Ill Wind. Dick Thornburgh, *Foreword, Sixth Survey of White Collar Crime,* 28 AM. CRIM. L. REV. 383, 385-86 (1991). By April 1991, the government had achieved convictions of twenty-seven of the largest defense contractors for defrauding the United States. *Id.* at 386. Similar investigative efforts by the Defense Criminal Investigative Service generated an increase in procurement fraud-related convictions, "with 283 convictions in 1990 alone." *Id.*

n19 *See* S. REP. NO. 99-345, at 2.

n20 *Id.* at 17. The earlier version of the FCA provided for double damages. *Id.*

n21 *Id.* at 18; *see* 31 U.S.C. § 3729(a)(7). A reverse false claim is a claim "to avoid a payment to the government." S. REP. NO. 99-345, at 18.

n22 *Id.* at 13 ("afforded protection from retaliation for his actions"); *see also* 31 U.S.C. § 3730(h).

n23 S. REP. NO. 99-345, at 18. The military exclusion, which had existed since 1863, was removed because Congress believed "that military code remedies [were] inadequate to ensure full recoveries for fraudulent acts by servicepersons and such persons should therefore not be exempt from False Claims Act coverage." *Id.* at 15.

n24 *Id.* at 20-21; *see also* BOESE, *supra* note 3, at 1-16 ("[T]he 1986 Amendments resolved this dispute [concerning the meaning of the statutory requirement that the person act knowingly] by explicitly eliminating the need to prove specific intent to defraud.").

n25 S. REP. NO. 99-345, at 7. Previously, some courts "required that the United States prove a violation [of the FCA] by clear and convincing, or even clear, unequivocal and convincing evidence . . . ." *Id.* In 1986, Congress clarified the standard of proof as being a preponderance of the evidence. *Id.* at 13, 30-31. *See also* 31 U.S.C. §

3731(c) ("In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence.").

n26 S. REP. NO. 99-345, at 8 ("[T]he subcommittee added a modification of the statute of limitations to permit the Government to bring an action within 6 years of when the false claim is submitted (current standard) or within 3 years of when the Government learned of a violation, whichever is later."); *see also* 31 U.S.C. § 3731(b).

n27 31 U.S.C. § 3729(a)(1-7).

n28 *See generally id.* § 3729(a)(1), (2).

n29 31 U.S.C. § 3730(a), (b).

n30 Vt. Agency of Natural Res. v. United States *ex rel.* Stevens, 529 U.S. 765, 768 (2000). *"Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Id.* n.1. However, "[i]n practice, the phrase means 'an action under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" United States v. Kitsap Physicians Servs., 314 F.3d 995, 997 n.1 (9th Cir. 2002) (quoting Bryan Garner, A DICTIONARY OF MODERN LEGAL USAGE 728 (2d Ed. 1995)).

n31 United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1016 (7th Cir. 1999).

n32 *Vt. Agency of Natural Res.,* 529 U.S. at 769. Under either scenario, the relator normally receives a share of the government's recovery. *Id.* at 769-70; 31 U.S.C. § 3730(d) (2000).

n33 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(9) (2008).

n34 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 304 (6th Cir. 1998) (quoting United States *ex rel.* Marcus v. Hess, 317 U.S. 537, 549 (1943)).

n35 *See Kitsap Physicians Servs.,* 314 F.3d at 1002; Varljen v. Cleveland Gear Co., 250 F.3d 426, 429 (6th Cir. 2001) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages."); United States *ex rel.* Bettis v. Odebrecht Contractor of Cal., Inc., 297 F. Supp. 2d 272, 278 (D.D.C. 2004) ("even

if the government has suffered no loss").

n36 31 U.S.C. § 3730(d). Further, the court may award reasonable expenses, attorney's fees and costs to the relator to be paid by the defendant. *Id.*

n37 *See* United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 n.5 (4th Cir. 2002); United States *ex rel.* Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1181 (D. Colo. 2001) (citing 31 U.S.C. § 3730(b)(4) (1982) (current version at 31 U.S.C. § 3730(b)(4) (2000)). In contrast, "[t]he government itself, of course, could still bring suit for such a violation; only private parties were barred from seeking recovery." United States *ex rel.* Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999).

n38 HELMER, LUGBILL & NEFF, *supra* note 9, § 2-5, at 36, 39, § 2-6(b)(2), at 46; *see also* SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 8 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

n39 CLAIRE M. SYLVIA, THE FALSE CLAIMS ACT: FRAUD AGAINST THE GOVERNMENT § 27, at 47 (Andrea G. Nadel et al. eds.) (2004) (quoting United States v. Burmah Oil Co., 558 F.2d 43, 46 n.1 (2d Cir. 1977).

n40 S. REP. NO. 99-345, at 12; *see also* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992) ("Courts read the amended Act as prohibiting all *qui tam* suits where the government already possessed the information, even where the relator had independently uncovered fraud against the government and the government knew of that fraud only because the relator had been decent enough to tell the government about it.").

n41 SYLVIA, *supra* note 39, §29, at 53.

n42 HELMER, LUGBILL & NEFF, *supra* note 9, §2-5, at 40.

n43 S. REP. NO. 99-345, at 12-13.

n44 *Id.* at 8 ("encourage assistance from the private citizenry").

n45 United States *ex rel.* Cantekin v. Univ. of Pittsburgh, 192 F.3d 402, 408 (3d Cir. 1999) (citing 31 U.S.C. §

3730(e)(4)(A) (1994)). The public disclosure must have occurred "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A).

n46 *Cantekin,* 192 F.3d at 408.

n47 *Id.* at 408-09; *see also* 31 U.S.C. § 3730(e)(4)(A) ("unless . . . the person bringing the action is an original source of the information").

n48 Rockwell Int'l Corp. v. United States, 549 U.S. 457,   , 127 S. Ct. 1397, 1406 (2007).

n49 31 U.S.C. § 3730(e)(4)(B).

n50 *See* Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1419 (9th Cir. 1992); SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 12 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5277 ("That jurisdictional bar . . . has been applied only to private *qui tam* suits, and not those suits taken over by the Government.").

n51 United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ."); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519 (10th Cir. 2000).

n52 *Shaw,* 213 F.3d at 534 ("language was removed in 1986"); *Hagood,* 929 F.2d at 1420 ("language disappeared from the statute with the 1986 amendments").

n53 31 U.S.C. § 3730(e)(4).

n54 United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995), *aff'd* 168 F.3d 1013 (7th Cir. 1999)); *see also Butler,* 71 F.3d at 326 ("The 1986 amendments eliminated this language, however, leaving open what would be the effect of government knowledge of the facts underlying a suit.").

n55 *See* S. REP. NO. 99-345, at 7.

n56 *Lamers,* 998 F. Supp. at 987 (citing S. REP. NO. 99-345, at 7); *see also* S. REP. NO. 99-345, at 7 ("Currently, in judicial districts observing an 'actual knowledge' standard, the Government is unable to hold responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates."); *id.* at 21 ("[T]he constructive knowledge definition attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted."); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149, 1153 (W.D. Mo. 2000) ("The purpose of this particular definition of 'knowing' was to avoid the claimants who bury their heads in the sand and purposefully submit in ignorance a false claim.").

n57 31 U.S.C. § 3729(a)(3) (conspiring to defraud); *id.* § 3729(a)(4) (intending to defraud by delivering less property than in the defendant's possession); *id.* § 3729(a)(5) (intending to defraud by making or delivering a receipt certifying receipt of property "without completely knowing that the information on the receipt is true"); *see also* HELMER, LUGBILL & NEFF., *supra* note 9, § 3-15, at 110 ("With the exception of claims brought under 31 U.S.C. § 3729(a)(3), (a)(4), and (a)(5), the [FCA's] only 'scienter' requirement is a 'knowing violation.'").

n58 31 U.S.C. § 3729(b).

n59 United States *ex rel.* Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002); *see also* United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995) ("[T]he government need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth." (citing United States v. Foster Wheeler Corp., 316 F. Supp. 963, 967 (S.D.N.Y. 1970))).

n60 31 U.S.C. § 3729(b); *see also* United States *ex rel.* Quirk v. Madonna Towers, Inc., 278 F.3d 765, 767 (8th Cir. 2002) ("No proof of specific intent to defraud the government is required." (citing 31 U.S.C. § 3729(b))).

n61 706 F. Supp. 795 (D. Utah 1988).

n62 *Id.* at 799. A government commission that investigated the Challenger disaster attributed the cause of the explosion to a gas leak in a joint's seal, which was located between two portions of one of the solid rocket motors. *Id.* at 798. The plaintiff's employment for Morton Thiokol involved work with the solid rocket motors. *Id.* at 799.

n63 *Id.* at 803. In addition to his *qui tam,* Boisjoly pursued unsuccessfully several statutory and common law claims. *Id.* at 799-807.

n64 *Id.* at 809-10.

n65 *Id.* at 809 (citing United States v. Fox Lake State Bank, 366 F.2d 962, 965 (7th Cir. 1966); Woodbury v. United States, 232 F. Supp. 49, 54-55 (D. Or. 1964), *modified,* 359 F.2d 370 (9th Cir. 1966); and United States v. Schmidt, 204 F. Supp. 540 (E.D. Wis. 1962)). Although proceeding under different legal theories, the courts relied on the government's knowledge to rule in favor of the FCA defendants. *Fox Lake State Bank,* 366 F.3d at 965-66 (applying an estoppel theory); *Woodbury,* 232 F. Supp. at 54-55 (finding no intent to defraud); *Schmidt,* 204 F. Supp. at 544 (finding no intent to commit fraud or violate the FCA). Although these pre-1986 cases are of limited applicability because of the changes in the law, they and others like them provided an equitable rationale similar to that reflected in the modern government knowledge defense. *See* United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("[T]he equitable rationale behind the defense has an impressive pedigree in this circuit." (discussing *Schmidt,* 204 F. Supp. at 540; *Fox Lake State Bank,* 366 F.2d at 962)).

n66 *Boisjoly,* 706 F. Supp. at 809.

n67 *Id.*

n68 *Id.* at 810.

n69 *Id.*

n70 *Id.* at 810-11.

n71 *Id.* at 811.

n72 *See* United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("We agree that *[Boisjoly]* is an unreliable guide." (agreeing with United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991))); *Hagood,* 929 F.2d at 1421 (9th Cir. 1991) *("Boisjoly* may be defensible on its facts; its dicta are an unreliable guide."); *cf.* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993) ("This court discerns several problems with *Boisjoly.").*

n73 *See* Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534-35 (10th Cir. 2000).

n74 *Id.* at 534 ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense . . . .").

n75 *Id.*

n76 *See infra* note 119 and accompanying text.

n77 929 F.2d 1416 (9th Cir. 1991).

n78 United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) ("[W]e agree with *Hagood."*).

n79 Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001).

n80 United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 544-45 (7th Cir. 1999).

n81 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000).

n82 *See* Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 59 (1993).

n83 *See* United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States *ex rel.* Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888-89 (D. Md. 1995); X Corp. v. Doe, 816 F. Supp. 1086, 1094 (E.D. Va. 1993).

n84 The United States declined to intervene in the case beyond moving to dismiss certain individual defendants. United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1418 (9th Cir. 1991) ("Hagood proceeded as the sole plaintiff . . . .").

n85 *Id.*

n86 *Id.*

n87 *Id.*

n88 *Id.* The district court relied on reasoning under similar facts in *Boisjoly v. Morton Thiokol, Inc.,* 706 F. Supp. 795, 808-10 (D. Utah 1988).

n89 *Hagood,* 929 F.2d at 1419 (internal quotation marks omitted).

n90 *Id.* at 1422.

n91 *Id.* at 1420.

n92 *Id.* at 1422. Further, the court noted that in order for the defendant "[t]o take advantage of a disputed legal question . . . [it could] be neither deliberately ignorant nor recklessly disregardful." *Id.* at 1421.

n93 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981).

n94 *Id.*

n95 *Id.*

n96 *See* BOESE, *supra* note 3, at 2-78 ("The 'government knowledge' defense to 'falsity' was dealt a further blow by the Ninth Circuit's first decision in *[Hagood]."). Id.*

n97 *Hagood,* 929 F.2d at 1421 ("It may be, as the district court observed, that no damages were suffered when officers of the United States knowledgeably decided to proceed with the contract.").

n98 *Id.* ("No damages need be shown in order to recover the penalty." (citing Rex Trailer Co. v. United States,

45 Idaho L. Rev. 41

350 U.S. 148, 153 n.5 (1956))).

n99 *Id.* at 1421-22 (quoting Heckler v. Cmty. Health Servs., 467 U.S. 51, 60, 61 (1984)).

n100 *Id.* at 1422 (quoting *Heckler,* 467 U.S. at 63).

n101 975 F.2d 1412 (9th Cir. 1992).

n102 *Id.* at 1414.

n103 *Id.* at 1421.

n104 *Id.* at 1416.

n105 *Id.* The memorandum "was part of a dialogue with the Army." *Id.* at 1421.

n106 *Id.*

n107 *Id.*

n108 *Id.* Hardly the model of clarity, the court's use of the concept of a scientifically untrue statement was equated with "scientific error[]" or a scientific theory not fully embraced within the scientific community, as opposed to an outright falsehood, one that was morally wrong. *Id.; see* United States *ex rel.* Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("[M]ere disagreements over scientific opinion, methodology, and judgments do not amount to claims under the FCA." (citing *Wang Chen-Cheng,* 975 F.2d at 1420-21)).

n109 71 F.3d 321 (9th Cir. 1995).

n110 *Id.* at 324, 325.

45 Idaho L. Rev. 41

n111 *Id.* at 325.

n112 *Id.*

n113 *Id.* at 326 (alteration in original).

n114 *Id.*

n115 *Id.*

n116 *Id.* at 328.

n117 *Id.* at 329.

n118 Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("[G]overnment knowledge of a contractor's wrongdoing is no longer an automatic defense." (citing United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1420 (9th Cir. 1991); 31 U.S.C. §§ 3729-3733 (2000))); *see also* Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001) ("[E]ven the government's knowledge of a fraud does not necessarily absolve a contractor from liability under the FCA." (citing *Hagood,* 929 F.2d at 1421)); United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood,* which "expressly rejected the contention that government knowledge of the falsity of a claim automatically bars an FCA action") citing *Hagood,* 929 F.2d at 1416)); United States *ex rel.* Longhi v. Lithium Power Techs., Inc., 513 F. Supp. 2d 866, 883-84 (S.D. Tex. 2007); United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 294 (D.D.C. 2004) ("[T]he government's knowledge, while perhaps not a complete defense, is not 'irrelevant.'"); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); United States *ex rel.* Milam v. Regents of Univ. of Cal., 912 F. Supp. 868, 888 (D. Md. 1995) ("not an absolute defense" (citing Kriendler, 985 F.2d at 1156-57)).

n119 *Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981))); *see also* United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("[I]f the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims." (citing *Kriendler,* 985 F.2d at 1156)); JOHN CIBINIC, JR. & RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS 168-69 (3d ed. 1998) ("[T]he fact that the germane Government officials knew of a claim's falsity is not a defense." (citing *Hagood,* 929 F.2d 1416)).

n120 United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) (citing *Kriendler,* 985 F.2d at 1156; *Hagood,* 929 F.2d at 1421).

n121 *See* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326 (9th Cir. 1995) ("[C]ourts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed.").

n122 *See generally* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 262-63 (5th Cir. 2007) (finding Lockheed did not act knowingly); United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("[The government's] knowledge . . . bears on whether the defendants had the requisite intent under the Act." (citing United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002))); *Becker,* 305 F.3d at 289 ("can negate the scienter required for an FCA violation" (citing United States v. Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002))); *Shaw,* 213 F.3d at 534; *Kriendler,* 985 F.2d at 1157; *Hagood,* 929 F.2d at 1421)); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir. 2002) ("cast doubt on whether he 'knowingly' submitted a false claim" (citing *Butler,* 71 F.3d at 326-27)), *rev'd in part on other grounds,* 549 U.S. 457 (2007); *Shaw,* 213 F.3d at 534 ("[Contractor may not] possess the requisite state of mind" (citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("cannot be said to have knowingly presented a fraudulent or false claim" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999); Hindo v. Univ. of Health Scis./Chicago Med. Sch., 65 F.3d 608, 613-14 (7th Cir. 1995))); *Kriendler,* 985 F.2d at 1156, 1157 ("may show that the contractor has not 'knowingly' submitted a false claim" (citing *Hagood,* 929 F.2d at 1421)); *Hagood,* 929 F.2d at 1421 ("Such knowledge may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth."); *Longhi,* 513 F. Supp. 2d at 883 ("can rebut scienter"); *Bettis,* 297 F. Supp. 2d at 294 ("serves to negate a finding of scienter"). *But cf. Costner,* 317 F.3d at 887 (noting that government knowledge may also serve as a defense to the FCA's materiality element).

n123 929 F.2d at 1421.

n124 *Id.* (citing United States v. Ehrlich, 643 F.2d 634, 638-39 (9th Cir. 1981)).

n125 *Id.*

n126 *See* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682-83 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

45 Idaho L. Rev. 41

n127 *Id.* at 682.

n128 213 F.3d 519 (10th Cir. 2000).

n129 *Id.* at 527. The contract required AAA to provide equipment to remove trace silver from the photography development process and to properly dispose of various chemicals in compliance with federal standards. *Id.* Instead, AAA managers directed that the chemicals be deposited in the drain, and various employees complied with that directive. *Id.* When questioned by government contracting officials, AAA management was evasive about meeting their environmental contractual obligations until the Air Force Office of Special Investigations closed AAA's main photography laboratory. *Id.* at 527-28.

n130 *Id.* at 534.

n131 *See Southland Mgmt. Corp.,* 326 F.3d at 682 n.9 (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the claimant was colluding with the government employee to submit a false claim . . . ." (citing *Durcholz,* 189 F.3d at 544-45)).

n132 *Durcholz,* 189 F.3d at 546.

n133 *Id.* at 545; *see also* United States *ex rel.* Tyson v. Amerigroup Ill., Inc., No. 02 C-6074, 2005 WL 3111972, at *6 (N.D. Ill. Oct. 21, 2005) ("The Court of Appeals' conjunctive phrasing--'if the government knows *and* approves'--would appear to have been purposeful and intended to signal that mere knowledge alone of illegality would not enable those who defraud the government from being able to draw a conjurer's circle around their illegality and insulate themselves from condign punishment.").

n134 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003); United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002); *see also* Am. Contract Servs. v. Allied Mold & Die, Inc., 114 Cal. Rptr. 2d 773, 779-80 (Cal. Ct. App. 2001).

n135 United States *ex rel.* Tyson v. Amerigroup Ill., Inc., 488 F. Supp. 2d 719, 730 (N.D. Ill. 2007) (citing United States *ex rel.* Asch v. Teller, Levit & Silvertrust, P.C., No. 00-C-3289, 2004 WL 1093784, at *3 (N.D. Ill. May 7, 2004)).

n136 *See Southland Mgmt. Corp.,* 326 F.3d at 682 (noting that in many cases government knowledge and acquiescence "was 'highly relevant' to show that the contractor did not submit payment claims in deliberate

ignorance or reckless disregard of their truth or falsity" (citation omitted)). However, for this position the court in *Southland* cited *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). *Id.* A fair reading of that opinion fails to reveal the articulation of any such definitive standard. *See Hagood,* 929 F.2d at 1421.

n137 United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs., Co., 491 F.3d 254, 263 (5th Cir. 2007) (emphasis added) (quoting *Durcholz,* 189 F.3d at 545); *accord Tyson,* 488 F. Supp. 2d at 729-30.

n138 *See* United States *ex rel.* Englund v. Los Angeles County, No. Civ. S-04-282-LKK/JFM, 2006 WL 3097941, at *8 (E.D. Cal. Oct. 31, 2006) ("when responsible government officials have been fully apprised of all relevant information" (citing United States *ex rel.* Lamers v. City of Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999))).

n139 *See, e.g.,* United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326, 328 (9th Cir. 1995) (noting that the government knew and approved the specific testing method at issue); X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) ("X Corp. *disclosed* to the government that computer equipment supplied under the MASC contract might contain remanufactured components."); Boisjoly v. Morton Thiokol, Inc., 706 F. Supp. 795, 810 (D. Utah 1988) ("informed NASA . . . of these concerns and their basis").

n140 *See infra* note 142 and accompanying text.

n141 *Hagood,* 929 F.2d at 1421 ("relevant government officials"); United States *ex rel.* Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007) ("[N]o violation exists where relevant government officials are informed of the alleged falsity . . . ."); United States v. Fiske, 968 F. Supp. 1347, 1352 (E.D. Ark. 1997); *see also* United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 115 Fed. App'x 127, 128 (4th Cir. 2004) ("the OSC officials responsible for managing their contracts"); United States *ex rel.* Grynberg v. Praxair, Inc., 207 F. Supp. 2d 1163, 1178 (D. Colo. 2001) ("known to and approved by the responsible government authorities"); United States *ex rel.* Durcholz v. FKW, Inc., 997 F. Supp. 1143, 1156 (S.D. Ind. 1998) ("many, if not all, of the relevant Navy officials did know"), *aff'd,* 189 F.3d 542 (7th Cir. 1999); United States *ex rel.* Lamers v. City of Green Bay, 998 F. Supp. 971, 988 (E.D. Wis. 1998) ("responsible government officials"), *aff'd,* 168 F.3d 1013 (7th Cir. 1999); CIBINIC & NASH, *supra* note 119, at 168 ("germane Government officials knew"); *cf.* United States *ex rel.* Kriendler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1156 (2d Cir. 1993) (concurring with *Hagood).*

n142 United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 289 (4th Cir. 2002) ("DOE's *full knowledge* of the material facts underlying any representations implicit in Westinghouse's conduct negates any knowledge that Westinghouse had regarding the truth or falsity of those representations." (emphasis added)); Shaw v. AAA Eng'g & Drafting, Inc., 213 F.3d 519, 534 (10th Cir. 2000) ("Nevertheless, there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is *so extensive* that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA."

(citing *Butler,* 71 F.3d at 327; Wang Chen-Cheng *ex rel.* United States v. FMC Corp., 975 F.2d 1412, 1421 (9th Cir. 1992)) (emphasis added)); *Wang Chen-Cheng,* 975 F.2d at 1421 ("FMC was open with the government . . . ."); United States v. Prabhu, 442 F. Supp. 2d 1008, 1030 (D. Nev. 2006) ("complied with Government instructions regarding the claims" (citing 31 U.S.C. § 3729(b) (2000))); United States *ex rel.* Werner v. Fuentez Sys. Concepts, Inc., 319 F. Supp. 2d 682, 685 (N.D.W. Va. 2004) ("full knowledge of the defendants' billing practices" by the "Coast Guard officials responsible for handling the contracts"), *aff'd,* 115 F. App'x 127 (4th Cir. 2004); United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., 297 F. Supp. 2d 272, 297 (D.D.C. 2004) *("fully aware* of and approved of the way that defendant calculated its claims for progress payments" (emphasis added)).

n143 282 F.3d 787, 812 (10th Cir. 2002), *rev'd in part on other grounds,* 549 U.S. 457 (2007).

n144 *Id.*

n145 *Id.* & n.11. The court appeared to suggest that this broader range of individuals included "certain authorized representatives of the Contracting Officer acting within the limits of their authority as delegated by the Contracting Officer." *Id.* n.11.

n146 71 F.3d 321 (9th Cir. 1995); *Stone,* 282 F.3d at 812 n.12.

n147 *See Stone,* 282 F.3d at 812 n.12 *("Butler* rejected the argument that for purposes of determining whether the defendant 'knowingly' submitted a false claim to the Government, only contracting officers' knowledge is relevant.").

n148 *Id.*

n149 *Id.* at 812 n.11.

n150 Under agency law, there exists the concept of "apparent" authority. "An agent has 'apparent' authority . . . where the principal has held out the agent as having such authority or has permitted the agent to represent that he has such authority." United States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991). However, in government procurement law, the United States cannot be bound under the theory of apparent authority. JOHN CIBINIC, JR., RALPH C. NASH, JR. & JAMES F. NAGLE, ADMINISTRATION OF GOVERNMENT CONTRACTS 31 (4th ed. 2006) ("Recognizing the importance of effective government control over the conduct of its agents, the courts and boards have rejected the apparent authority rule, holding that *actual authority* is required to bind the government."); *see also* Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006) (noting that apparent authority is insufficient to bind the government); Am. Anchor & Chain Corp. v.

United States, 331 F.2d 860, 861-62 (Ct. Cl. 1964) (noting that conduct of employee with apparent authority binds a contractor, but only actual authority of a government employee will bind the United States).

n151 Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947); Starflight Boats v. United States, 48 Fed. Cl. 592, 597-98 (2001); *see also* Ralph C. Nash & John Cibinic, *Contracting Authority of Government Employees: Handle with Care!,* in 12 NASH AND CIBINIC REPORT 9, P50, at 138 (1998) ("The rule is clear that the Government is only bound by the acts of its employees that are within the scope of their *actual authority.")* [hereinafter NASH & CIBINIC REPORT].

n152 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n153 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007); *see* CIBINIC, NASH & NAGLE, *supra* note 150, at 31 ("Contracting officers have the sole authority to legally bind the government to contracts and contract modifications."); *see also* 48 C.F.R. § 1.601(a) (2007) ("Contracts may be entered into and signed on behalf of the Government only by contracting officers."). The Federal Acquisition Regulation is contained in 48 C.F.R. Chapter 1. Contracting officers' authority "flows from the head of the agency." CIBINIC, NASH & NAGLE, *supra* note 150, at 33.

n154 48 C.F.R. § 1.602-1(a).

n155 *Id.* § 43.102(a).

n156 *Id.* § 1.603-3(a); *see also id.* § 1.602-1(a) (requiring clear written instructions concerning the limits of their authority); NASH & CIBINIC REPORT, *supra* note 151, P50, at 138 ("The scope of a CO's authority can generally be found by looking at the internal document granting the authority.").

n157 48 C.F.R. § 1.602-1(a) ("Information on the limits of the contracting officers' authority shall be readily available to the public and agency personnel.").

n158 NASH & CIBINIC REPORT, *supra* note 151, P50, at 141.

n159 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1344 (Fed. Cir. 2007) ("When authorized, the contracting officer may delegate some of its authority to certain designated representatives, who act on behalf of the government during contract administration." (citing CIBINIC, NASH & NAGLE, *supra* note 150, at 39)).

n160 48 C.F.R. § 1.602-1(a); *see also id.* § 2.101(b). However, contracting officers may bind the government only to the extent that authority has been delegated to them to do so. *Id.* § 1.602-1(a).

n161 The contracting officer may delegate authority to his/her authorized representatives. *Id.* § 2.101(b); *see also* CIBINIC, NASH & NAGLE, *supra* note 150, at 37 (contracting officers may be granted authority to appoint subsidiary contracting officers or other representatives).

n162 The ACO is a type of contracting officer that administers a contract after it has been awarded. 48 C.F.R. § 2.101(b). Contracting officers who award the contract are known as procuring contracting officers (PCO) who may also retain some or all authority for administering the contract. CIBINIC, NASH & NAGLE, *supra* note 150, at 37. Indeed, "[a] single contracting officer may be responsible for duties in any or all of these areas." 48 C.F.R. § 2.101(b) (referring to the procuring, administration, and termination of a contract).

n163 The TCO is a type of contracting officer who settles terminated contracts. 48 C.F.R. § 2.101(b).

n164 CIBINIC, NASH & NAGLE, *supra* note 150, at 39.

n165 *Id.*

n166 *Id.* at 30-31. Government employees other than contracting officers may be delegated authority to perform various contract-related functions. *Id.* at 31.

n167 *Id.* at 33.

n168 *Id.* at 43.

n169 Real Estate Technical Advisors, Inc., 03-1 B.C.A. (CCH) P32,074 at 158,507 (A.S.B.C.A. Nov. 18, 2002).

n170 Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 120 (2006) (alteration in original) (quoting H. Landau & Co. v United States, 886 F.2d 322, 324 (Fed. Cir. 1989)); *see also* Brunner v. United States, 70 Fed. Cl. 623, 640-41 (2006); Real Estate Technical Advisors, Inc., 03-1 B.C.A. P32,074, at 158,507; CIBINIC, NASH & NAGLE, *supra* note 150, at 44.

n171 Confidential Informant v. United States, 46 Fed. Cl. 1, 7 (2000) (quoting Roy v. United States, 38 Fed. Cl. 184, 189 (1997)).

n172 CIBINIC, NASH & NAGLE, *supra* note 150, at 43; *see also Brunner,* 70 Fed. Cl. at 641 ("This implied authority to contract must be based upon 'at the least, some limited, related authority.'" (citing Cal. Sand & Gravel, Inc., v. United States, 22 Cl. Ct. 19, 27 (1990))).

n173 *See* Starflight Boats v. United States, 48 Fed. Cl. 592, 599 (2001) ("Although Brian was involved in the administration of this contract, a person with no actual authority can not acquire actual authority 'through the court-made rule of implied actual authority.'" (quoting Cal. Sand & Gravel, Inc., 22 Cl. Ct. at 27)).

n174 *See* United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956) ("[W]e do not believe that the Congress ever intended that contracting officers should have the power to vitiate the False Claims statute."); *see also* United States v. Cushman & Wakefield, Inc., 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."); United States *ex rel.* Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 223 (D. Md. 1995) ("[A] government officer cannot authorize a contractor to violate federal regulations."); United States v. Cripps, 460 F. Supp. 969, 973-74 (E.D. Mich. 1978) (stating that a federal employee who urges someone to defraud the government acts ultra vires). Because they lack the authority to waive fraud, acquisition officials cannot "ratify" such conduct. *See* CIBINIC, NASH & NAGLE, *supra* note 150, at 48 ("[I]llegal actions cannot be ratified because officials lack the authority to enter into illegal agreements."); *cf.* Winter v. Cath-DR/Balti Joint Venture, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (noting that authority is a prerequisite to ratification).

n175 *Mayman,* 894 F. Supp at 223 ("A contractor who tells a government contracting officer that a claim is false still violates the statute when the false claim is submitted." (citing United States *ex rel.* Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 2001))); *Cripps,* 460 F. Supp. at 973 ("To the extent that defendant is urging that someone at HUD authorized him to engage in this conduct to defraud HUD and submit false claims and derive a benefit therefrom, such assertion even if true is no defense to plaintiff's [FCA] claim."); *cf. Hagood,* 929 F.2d at 1421 ("That the relevant government officials know of the falsity is not in itself a defense." (citing United States v. Ehrlich, 643 F.2d, 638-39 (9th Cir. 1981))); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 442 (E.D.N.Y. 1995) ("Defendants knowingly caused false claims to be presented and that, after the government became aware of the underlying scheme, it continued to pay claims only because it had already become contractually bound to make those payments as a result of the defendant's fraudulent course of conduct.").

n176 *Nat'l Wholesalers,* 236 F.2d at 950; *see also* United States *ex rel.* McCray Sanitation Serv. v. Midwest Container Co., 7 F.3d 1046, at *2 (10th Cir. 1993) (unpublished table decision) ("[Contracting agency cannot] 'ratify' any previous fraud by [contractor].").

n177 48 C.F.R. § 33.210(b) (2007).

n178 41 U.S.C. § 605(a) (2000).


n179 *See* United States v. United Techs. Corp., No. 5:92-CV-375 (EBB), 1996 WL 653620, at *2 (D. Conn. Oct. 11, 1996) ("The statute's restriction on the authority of agency heads should be read as encompassing their subordinates."); *cf. Contract Disputes Act of 1978,* S. REP. NO. 95-1118, at 19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5253 ("[I]t is not the intent of this section to authorize Agency heads, contracting officers, or agency boards to settle or compromise claims independent of their legal or contractual merits . . . .").


n180 *See* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 455 n.21 (6th Cir. 2005) ("[Government knowledge may be] used to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement . . . ."); United States *ex rel.* Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2d Cir. 1993) ("In some cases, the fact that government officials knew of the contractor's actions may show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'").


n181 48 C.F.R. § 33.210 (noting that contracting officers are authorized to resolve and decide contractual claims).


n182 48 C.F.R. § 33.204 ("The Government's policy is to try to resolve all contractual issues in controversy by mutual agreement at the contracting officer's level.").


n183 United States *ex rel.* Bettis v. Odebrecht Contractors of Cal., Inc., 297 F. Supp. 2d 272, 294 (D.D.C. 2004); *cf.* United States *ex rel.* Stebner v. Stewart & Stephenson Servs., Inc., 144 F. App'x 389, 394 (5th Cir. 2005) (applying government knowledge defense when "the Government negotiated contract modifications in response to the well-documented corrosion problem.").


n184 *See* Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citing Federal Register Act, ch. 417, sec. 7, 49 stat. 500, 502 (1935))); Nobles v. Rural Cmty. Ins. Servs., 303 F. Supp. 2d 1292, 1303 (M.D. Ala. 2004) ("[charged] with notice of the provisions in the Code of Federal Regulations" (citing *Merrill,* 332 U.S. at 384-85)); *In re* Doe I, 969 F. Supp. 561, 563 (D. Ariz. 1996).


n185 *Merrill,* 332 U.S. at 385 (quoting Rock Island, Ark. & La. R.R. Co. v. United States, 254 U.S. 141, 143 (1920)).

n186 NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 (citation omitted).


n187 Brunner v. United States, 70 Fed. Cl. 623, 644 (2006) ("[P]ublicly-accessible laws or regulations can limit the contracting authority that would otherwise be implied by a government agent's related powers, for potential contractors are on notice of such restrictions."); NASH & CIBINIC REPORT, *supra* note 151, P50, at 139 ("Agency regulations may also contain limitations on authority and such regulations will be binding on contractors if they are published.").


n188 Winter v. Cath-Dr/Balti Joint Venture, 497 F.3d 1339, 1346 (Fed. Cir. 2007) ("[C]ould not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract.") (emphasis omitted).


n189 United States *ex rel.* Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 n.4 (6th Cir. 1998) ("[T]he 'square-corners' rule applies fully in the False Claims Act context." (citing United States v. Aerodex, Inc., 469 F.2d 1003, 1007 (5th Cir. 1972))); *but cf.* United States *ex rel.* A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc., 400 F.3d 428, 446 (6th Cir. 2005) (holding that the "natural tendency" standard was proper for determining whether a false statement was material under the FCA).


n190 SENATE JUDICIARY COMMITTEE, FALSE CLAIMS AMENDMENTS ACT OF 1986, S. REP. NO. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272 ("But the Committee does believe the civil False Claims Act should recognize that those doing business with the Government have an obligation to make a limited inquiry to ensure the claims they submit are accurate.").


n191 *Id.* at 14-15, 17, 21.


n192 *Id.* at 21; *see also* Crane Helicopter Servs., Inc. v. United States, 45 Fed. Cl. 410, 433 (1999) ("[The FCA's knowing standard was designed to address] 'the 'ostrich-like' refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know'" and to reach "those who ignore obvious warning signs.") (citation omitted).


n193 United States v. Nat'l Wholesalers, 236 F.2d 944, 950 (9th Cir. 1956).


n194 *See* United States *ex rel.* Costner v. United States, 317 F.3d 883, 887 (8th Cir. 2003) ("'If the government knows and approves of the particulars of a claim for payment *before* that claim is presented . . . .'" (emphasis added) (alteration omitted) (quoting United States *ex rel.* Becker v. Westinghouse Savannah River Co., 305 F.3d 542, 543 (7th Cir. 1999))); United States *ex rel.* Stone v. Rockwell Int'l Corp., 282 F.3d 787, 811 (10th Cir.

2002) ("The defendant . . . may be able to cast doubt on whether he 'knowingly' submitted a false claim by showing that the Government itself was already aware of the facts underlying the FCA claim when the allegedly fraudulent claim was submitted." (citing United States *ex rel.* Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 326-27 (9th Cir. 1995))); United States *ex rel.* Durcholz v. FKW, Inc., 189 F.3d 542, 545 (7th Cir. 1999) ("before [the] claim is presented"); *see also* United States *ex rel.* Laird v. Lockheed Martin Eng'g & Sci. Servs. Co., 491 F.3d 254, 263 (5th Cir. 2007) ("before that claim is presented" (citing *Durcholz,* 189 F.3d at 545)); United States *ex rel.* Humphrey v. Franklin-Williamson Human Servs., Inc., 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) ("before [the] claim is presented") citing *Durcholz,* 189 F.3d. at 545)); United States *ex rel.* Maxwell v. Kerr-McGee Chem. Worldwide, LLC, No. 04-CV-01224-PSF-CBS, 2006 WL 2869515, at *16 (D. Colo. Oct. 6, 2006); *cf.* United States v. Southland Mgmt. Corp., 326 F.3d 669, 682 n.9 (5th Cir. 2003) (en banc) (Jones, J., concurring) ("In principle, it would seem that the government's knowledge of a false claim would not be an effective defense . . . if the government's knowledge came 'too late in the process'" (quoting *Durcholz,* 189 F.3d at 544-45)); United States v. Shasta Servs., Inc., 440 F. Supp. 2d 1108, 1113-14 (E.D. Cal. 2006) (applying the defense to California's FCA).


n195 *See, e.g., Becker,* 305 F.3d at 287-89; X Corp. v. Doe, 816 F. Supp. 1086, 1093 (E.D. Va. 1993) (finding government notification in defendant's proposal).


n196 *See supra* notes 173, 175, and accompanying text.


n197 236 F.2d 944 (9th Cir. 1956).


n198 *Id.* at 945.


n199 *Id.* at 945-96.


n200 *Id.* at 946.


n201 *Id.* at 946 & n.3.


n202 *Id.* at 948.


n203 *Id.* at 946.

n204 *Id.* at 946, 948.

n205 *Id.* at 948.

n206 *Id.* at 949-50. The district court also erroneously determined that the contract permitted "equals." *Id.* at 949.

n207 *Id.* at 950.

n208 *Id.*

n209 *Id.*

n210 *Id.*

n211 United States *ex rel.* Gudur v. Deloitte Consulting LLP, 512 F. Supp. 2d 920, 932 (S.D. Tex. 2007).

n212 929 F.2d 1416 (9th Cir. 1991).

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

-------------------------------------------------------X

UNITED STATES OF AMERICA                  :          Case No.  1:08-CV-00364(EGS)(DAR)
Ex rel.BRIAN BURKE                                      :
   145 East 23rd St. #4R                          :
   New York, NY 10010                              :

   212-614-8515                                          : **CERTIFICATE OF SERVICE**
         Plaintiff, pro se                     :
                         :
         against,                             :

RECORD PRESS                                         :
         Defendant,                          :

-------------------------------------------------------X


I_____/S/_____ declare under penalty of perjury that the forgoing is

true and correct. , I served a copy of AFFIDAVIT & MEMORANDUM OF LAW OMNIBUS MOTION

TO DISMISS COUNTERCLAIM & attached Exhibits by Overnight Mail or email on the following

parties:  (1) William T. O'Brien esq. McKenna Long & Aldridge llp 1900 K street, N.W.
Washington D.C. 20006 , by Overnight Mail
(2)Darrell C. Valdez esq. U.S. Attorney's Office Judiciary Center Building 555 Fourth Street
Washington D.C. 20530 by Overnight Mail
(3)Tyler Jay King, by Email to tyler@tylerjayking.com

Dated February 20, 2011                                   _____/S/_____