UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIAN BURKE,                         :   Civil Action No. 08-364
            Plaintiff               :
                                    :
v.                                  :   February 14, 2011
                                    :   MORNING SESSION
RECORD PRESS, INC.,                  :
                                    :
            Defendant               :   10:04 a.m.
. . . . . . . . . . . . . . . . :   . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
MORNING SESSION
BEFORE THE HONORABLE MAGISTRATE JUDGE DEBORAH A. ROBINSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff:              TYLER J. KING
                                 1420 N Street, NW
                                 Suite 706
                                 Washington, DC 20005
                                 (202) 436-2641


 For the Defendant:              JOHN WILLIAM LOMAS
                                 WILLIAM T. O'BRIEN
                                 MCKENNA LONG & ALDRIDGE LLP
                                 1900 K Street, NW
                                 Washington, DC 20006
                                 (202) 496-7183


 For Interested Party            DARRELL C. VALDEZ
 The United States:              U.S. ATTORNEY'S OFFICE
                                 Judiciary Center Building
                                 555 Fourth Street, NW
                                 Washington, DC 20530
                                 (202) 307-2843


 Court Reporter:                 REBECCA STONESTREET, RPR, CRR
                                 Official Court Reporter
                                 Room 6511, U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 354-3249


 Proceedings reported by machine shorthand, transcript produced
 by computer-aided transcription.

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| HUGH WILMOT | | | | |
| By Mr. King | 17 | -- | -- | -- |
| By Mr. Lomas | -- | 48 | -- | -- |
| | | | | |
| CALVIN ADGERSON | | | | |
| By Mr. King | 60 | -- | -- | -- |
| By Mr. Lomas | -- | 74 | -- | -- |

## E X H I B I T S

| NUMBER | ADMITTED |
|--------|----------|
| PLAINTIFF | |
| A | 19 |
| C | 27 |
| D | 37 |

**P R O C E E D I N G S**

1          COURTROOM CLERK:  Civil case number 08-364, United

2    States ex rel Brian Burke versus Record Press, Inc.  Counsel for

3    Mr. Burke and relator, Tyler J. King; for Record Press,

4    William T. O'Brien, John William Lomas; we have the paralegal,

5    Valerie Lam, and we have Mr. Wilmot.  He's also a witness.  This

6    is here for a bench trial.

7          THE COURT:  Good morning to all of you.  Is everyone

8    ready to proceed?

9          MR. KING:  Yes, Your Honor.

10          THE COURT:  Now, just so the record is clear, although

11    when the case was called there was a reference to Mr. Burke on

12    behalf of the United States, the record reflects that the

13    United States has not -- or determined not to proceed with

14    respect to this matter.  So Mr. Burke is proceeding on his own

15    behalf against the defendant Record Press.

16          Now, Mr. O'Brien or Mr. Lomas, let me ask you to please

17    identify the individuals seated at the table by name, please.  I

18    think only the last name have been mentioned.  You referred to

19    someone assisting in a paralegal capacity?

20          MR. LOMAS:  Yeah, that's Ms. Valerie Lam, who's here

21    with us, assisting in a paralegal capacity.  And then

22    Mr. Hugh --

23          THE COURT:  L-A-M-B?

24          MR. LOMAS:  L-A-M.

1          THE COURT:  L-A-M, very well.  Thank you very much.

2          MR. LOMAS:  And then Mr. Hugh Wilmot, W-I-L-M-O-T, is

3     here on behalf of the defendant Record Press.

4          THE COURT:  Is Mr. Wilmot an officer of Record Press?

5          MR. LOMAS:  Yes, Your Honor.  He's the president of

6     Record Press.

7          THE COURT:  Very well.  Thank you very much.  I assume

8     it is the case that you still intend to elicit testimony from

9     Mr. Wilmot.  Is that correct?

10         MR. LOMAS:  Yes, Your Honor, that's correct.

11         THE COURT:  Very well.  Is there any objection,

12    Mr. King, to Mr. Wilmot's presence at the table in his capacity

13    as an officer of the corporation?

14         MR. KING:  No, Your Honor.  And Mr. Burke also intends

15    to elicit testimony from Mr. Wilmot.

16         THE COURT:  Very well.  Thank you very much.

17         We will proceed then with the bench trial.  The Court

18    notes that both parties, Mr. Burke and Record Press, have

19    consented to proceed before this court.  I do thank you very

20    much for the inconvenience associated with moving from courtroom

21    four.  I believe you were told that the technical equipment that

22    you requested was not available at this time in courtroom four.

23         So I believe we are ready to proceed.  And I am

24    prepared, as I indicated, to allow each side to make a statement

25    in the nature of an opening statement, as you would if a jury

1    were present.

2            Mr. King, we will of course hear from you first.  And

3    before you proceed, may I ask whether the gentleman seated on

4    the front row on your side of the courtroom is a witness.

5            MR. KING:  That's Mr. Gocial, the expert.

6            THE COURT:  Well, I believe it is appropriate for

7    Mr. Gocial to wait outside in one of the witness rooms, then --

8            MR. KING:  With all due respect, Your Honor --

9            THE COURT:  -- since Mr. Gocial is not a party.

10   Mr. Wilmot is in a slightly -- I said slightly.  I should have

11   said a dramatically different posture, inasmuch as he is an

12   officer of the corporate defendant.

13           MR. KING:  That's true, Your Honor.  At the same time,

14   Mr. Gocial is Mr. Burke's expert, and it's important for

15   Mr. Gocial as the expert to be able to hear the testimony that's

16   given here today, so that in the event that the testimony is

17   relevant to his opinions, he's able to also observe and see what

18   kind of testimony is given.

19           He's reviewed all of the record of this case.  And if

20   he were another fact witness, I could understand that he may be

21   required to leave the courtroom, but he's an opinion -- his

22   testimony is on opinion, he's an expert witness, and his

23   observing of other people's testimony is important to whether or

24   not he can still testify as to what his opinion would be.

25           So, for example, it may be that certain testimony is

1    given that I might want to question Mr. Gocial on.  And if he's

2    not present in order to hear that testimony, I would have no

3    opportunity to ask him about whether or not that testimony

4    affects his opinions.

5            THE COURT:  The Court's intention is to enforce the

6    rule on witnesses.  If you wish to be heard, Mr. O'Brien or

7    Mr. Lomas, I will certainly hear from you.  The Court was not

8    aware that this was an issue that would arise.  Do you wish to

9    be heard?

10            MR. LOMAS:  Thank you, Your Honor.  As we discussed at

11   the January 31, 2011 status conference, Mr. Gocial, the expert

12   witness here, is testifying purely on the amount of damages

13   assuming liability.  It's a very narrow scope of testimony, and

14   Your Honor limited that testimony to just two invoices.  So it's

15   the amount of damages with respect to two invoices.

16            And the claim in this case is also a very narrow one.

17   It is whether or not this per-10-copy running rate should apply

18   to a line item in the contract between Record Press and the

19   Government Printing Office.

20            So the amount of damages, the calculation is a very

21   simple one.  There's no need, Your Honor, for Mr. Gocial to hear

22   testimony of witnesses concerning liability or so forth, since

23   the opinion is purely based on an assumption of liability, and

24   just simply applying the contract in the way that Mr. Burke

25   alleges it should have been applied.

1          THE COURT:  Very well.  Thank you, Mr. Lomas.  The

2   Court intends to enforce the rule on witnesses.  Mr. Gocial is a

3   witness, and the Court will require Mr. Gocial to wait in a

4   witness room or elsewhere in the courthouse until it is time for

5   his testimony to be elicited.

6          Mr. Gocial, the deputy clerk of court will escort you

7   to a comfortable place.  You are not confined there, of course.

8   We will just ask you to perhaps regard that as your home base

9   until it is time for your testimony to be taken.  She will also

10  tell you where the cafeteria is, where I believe there might

11  still be at least beverage service until lunchtime.  Thank you

12  very much.

13          (OFF THE RECORD.)

14          THE COURT:  We will certainly indicate that I have no

15  objection whatsoever to your having your phone, in hopes that

16  that will be sufficient for you to retrieve it.

17          MR. LOMAS:  Your Honor, if I may.

18          THE COURT:  Yes.

19          MR. LOMAS:  I would like to point out, we do have two

20  additional witnesses that are in the courtroom from the

21  Government Printing Office.

22          THE COURT:  I did not realize that the others were

23  witnesses.  I recognize Mr. Valdez on the front row as an

24  Assistant U.S. Attorney.  He is not a witness --

25          MR. LOMAS:  Correct.

1          THE COURT:  -- and has no role other than that of a

2     spectator, so he may stay.  But the two individuals to whom you

3     referred should accompany Ms. Miller, who just left.

4          MR. LOMAS:  And actually, with respect to Mr. Valdez,

5     Your Honor, Mr. Valdez has requested that when the Government

6     Printing Office witnesses take the stand, that he be permitted

7     to sit in the well to -- if necessary, to protect the witnesses

8     during their examinations.  I wanted to pass that request on to

9     you, Your Honor.

10         THE COURT:  The Court will hear that at the time we

11    reach that point.

12         MR. LOMAS:  Thank you, Your Honor.

13         THE COURT:  When I say, "hear that," I mean hear that

14    request.

15         MR. LOMAS:  Thank you.

16         THE COURT:  I mistakenly indicated that two individuals

17    were leaving.  Actually, there are three.  You're coming back,

18    I'm sorry -- you're leaving?

19         MR. LOMAS:  Your Honor, the third individual is

20    Mr. Potter, the counsel for the Government Printing Office.  He

21    will not be a witness, but is here on behalf of them.

22         THE COURT:  Very well.  Thank you.

23         Now, are there any other preliminary matters before we

24    turn our attention to opening statements?  Any other preliminary

25    matters on behalf of the plaintiff, Mr. King?

 1           MR. KING:  No, Your Honor.

 2           THE COURT:  Very well.  Mr. King, we'll hear your

 3   opening statement.

 4           MR. KING:  Good morning, Your Honor.

 5           THE COURT:  Good morning.

 6           MR. KING:  Thank you for your time today.  Mr. Burke is

 7   a relator in a False Claims Act case.  This case is brought

 8   under 31 USC 3729(A), relating to claims that are knowingly --

 9   false claims that are knowingly presented.

10           The evidence is going to show clearly that the invoices

11   submitted by Record Press to the GPO constitute false claims

12   under the False Claims Act because Record Press knowingly

13   submitted them, and those invoices contained charges which were

14   not allowed for in the contract.

15           The defense may try to confuse or complicate this case

16   by what the GPO thinks or says, but the fact is that the

17   evidence will show that Record Press had no knowledge of the

18   GPO's understanding, and that the government knowledge defense,

19   to the extent that they may try to implicate it, is not at issue

20   here.  Because the simple fact is that Record Press had no

21   reason to believe that the contract should mean anything other

22   than what it says.  And the evidence will clearly show what the

23   contract says.  Thank you, Your Honor.

24           THE COURT:  Thank you very much, Mr. King.

25           Mr. Lomas or Mr. O'Brien?  Mr. Lomas.

1          MR. LOMAS:  Thank you, Your Honor.  This is a simple

2     case concerning a single line item price term:  Collating,

3     trimming to size, and binding, from a single contract between

4     Record Press and the United States Government Printing Office.

5          Record Press and the United States Government Printing

6     Office are in full agreement that the price for collating,

7     trimming to size, and binding is $12.25; that no per-10-copy

8     running rate applies to that price, that there has been no

9     overcharging, and there is no fraud.

10          Your Honor, you're going to see a copy of the contract

11     today, and you may see it up here on the screen in a moment.

12     And you're going to hear testimony about this contract and the

13     particular line item -- the single line item that is at issue:

14     The collating, trimming to size, and binding line item.

15          If you see on your screen, you're to going to see,

16     there is that line item, II(D), "collating, trimming to size,

17     and binding," and it clearly indicates on this contract $12.25

18     per 100 pages.  Again, that is the only line item that is at

19     issue.

20          Now, there are two invoices from Record Press that are

21     in this case.  They're related to a case that Mr. Burke had

22     filed against the Secretary of Commerce.  His case was dismissed

23     and brought up on appeal, and the -- and he lost his appeal.

24     And the government had appellate briefs and appendices printed

25     for that appeal, and Record Press printed those briefs, and

1    Record Press invoiced the GPO for those briefs.

2            We're going to pull up a copy of the first invoice in

3    this case.  And again, there's a line item here for collating,

4    trimming to size, and binding, and you'll see that here on the

5    screen.  And the word outlines here the price:  $12.25 per

6    100 pages, the contract price.

7            Then we'll show the second invoice from Mr. Burke's

8    case.  And here it is again:  The collating, trimming to size,

9    and binding charge, explicitly stated on the contract, $12.25

10    per 100 pages.

11            Now, Your Honor, the price in the contract and the

12    amounts that Record Press charged on these invoices don't appear

13    in the complaint because Mr. Burke filed his fraud claim without

14    seeing the Record Press contract and the Record Press invoices.

15    Nevertheless, Mr. Burke disagrees with the Government Printing

16    Office and Record Press that the contract price is $12.25 per

17    100 pages.

18            Now, you're also going to see, Your Honor, a

19    spreadsheet in this case, and the spreadsheet is on this screen.

20    This spreadsheet was sent by the Government Printing Office to

21    prospective vendors such as Record Press, along with the

22    invitation for bids on this contract, meaning that the vendors

23    would have had this spreadsheet in their hand when they received

24    the Government Printing Office's request for their submission of

25    a bid.

1          Now, you're going to hear testimony today about this

2     spreadsheet, and you're going to hear that on the left side of

3     this sheet are the line items that are in the request for bid.

4     And the focus here is going to be on this set of line items

5     right here (indicating), that you can see on your screen.  And

6     this, again, here is where you see the collating, trimming to

7     size, and binding line item, which again is the only line item

8     that is involved in this case.  And right under there it says,

9     "per 100 pages," indicating to prospective vendors that the

10    price should be per 100 pages.

11         Now, Mr. Burke alleges that a per-10-copy running rate

12    should apply.  You can see in line items A and B that a

13    per-10-copy running rate applies only to complete cover and text

14    per page.

15         So again, this is the spreadsheet that comes to a

16    vendor such as Record Press before they even make their bid on

17    this contract.

18         Now again, Your Honor, we're here today because a

19    stranger to the contract, Mr. Burke, the relator, filed this

20    qui tam lawsuit, again without seeing the Record Press contract,

21    without seeing the Record Press invoices.  And the typical

22    relator in a qui tam false claim suit contemplated by that

23    statute is a whistleblower with some sort of insider knowledge:

24    A government employee, or a former government employee, or a

25    current or former employee of a government contractor who is

1    aware of some sort of wrongdoing.  Mr. Burke will admit today

2    that he has never been an employee of the Government Printing

3    Office, nor Record Press, certainly not a party to the contract,

4    and had no involvement in the formation of the contract.

5           Now, the Court is going to hear from the alleged victim

6    in this case, the Government Printing Office.  And the Court is

7    going to hear that the Government Printing Office reviewed

8    Burke's allegations, and reviewed those documents that Burke

9    didn't review before filing this case:  The Record Press

10   contract and the Record Press invoices.  And the Government

11   Printing Office confirmed, again, that Record Press was charging

12   the correct contract price of $12.25 per 100 pages, and that

13   there was no overcharging and no fraud.

14          The Court is going to hear that today from a senior

15   level manager at the GPO who has been at the GPO for more than

16   30 years and has 30 years of experience in the printing

17   industry, and another 34-plus-year veteran of the GPO, who had

18   responsibility for reviewing printing bidder contracts and

19   invoices to make sure that they were properly paid.

20          And again, this is a fraud case, so there's an

21   allegation that Record Press is lying to the Government Printing

22   Office.  So Mr. Burke has to show that the invoices are false,

23   that Record Press overcharged for collating, trimming to size,

24   and binding, because the contract price is not the $12.25 per

25   100 pages that is the GPO and Record Press say it is.

1          Then the second element he has to show is the knowing

2     element, the knowledge of falsity.  It's not that they knew that

3     they were charging $12.25 per 100 pages, it's that they knew

4     that that was the wrong amount.  Mr. King has to show that

5     Record Press knew it was the wrong amount to charge because they

6     knew that a per-10-copy running rate should have applied.

7          Then the third thing that Mr. King has to show is

8     materiality.  The False Claims Act law requires -- as all fraud

9     cases, requires that it would have made a difference.  It needed

10    to make a difference here.  The behavior would have changed.

11         Now, with respect to the first element, falsity,

12    fundamental contract law says a contract means what the parties

13    to the contract say it means.  And again, you're going to hear

14    today, from both the Government Printing Office and Record

15    Press, that they agree on the contract price of $12.25 per

16    100 pages.

17         And there's a quote that we may pull up on the screen

18    here from a case that I think captures this in the False Claims

19    Act context.  It says, "If both the contractor and the

20    government interpret the contract one way throughout the

21    contract's history, it's unthinkable that the contractor's

22    billings which follow this common interpretation could

23    constitute a false claim."

24         Now, the Court is going to hear today from three

25    witnesses who will confirm that Government Printing Office and

1    Record Press have always understood that the contract price is

2    $12.25 per 100 pages.  You hear Mr. Wilmot's name earlier.

3    Mr. Wilmot is going to testify on behalf of Record Press.  He's

4    going to talk about how his 65-year-old company that he is with,

5    Record Press, that has been contracting with the government for

6    more than 30 years, has supplied a bid to the Government

7    Printing Office in response to this request for bid.  And that

8    bid for that line item was $12.25 per 100 pages.  And there was

9    no 10-copy running rate applied to that price when Record Press

10   submitted its bid.

11        Mr. Wilmot will testify that if it did apply, that

12   Record Press would actually be losing money on this contract.

13   So -- to show it's unreasonable.  And Mr. Record Press (sic)

14   will testify that Record Press continues to this day to be the

15   vendor for the GPO for appellate briefs under this contract;

16   that the contract was renewed; that the price term is exactly

17   the same, $12.25 per 100 pages; and that the government

18   continues to accept, approve, and pay those invoices.

19        I mentioned earlier that you were going to hear from a

20   34-year veteran of the GPO with experience in reviewing

21   contracts and invoices.  That's Mr. Calvin Adgerson, who will

22   testify today.  And Mr. Adgerson will confirm, again, that the

23   GPO reviewed Burke's claims and found they had no merit, because

24   the contract price is the $12.25 per 100 pages.

25        And then the Court will also hear from

1    Mr. Tom Sullivan, who is a senior level manager at the GPO, who

2    is responsible for all of the GPO's procurement of printing

3    contracts from vendors such as Record Press.  And he will

4    confirm that he personally reviewed Burke's claims, reviewed the

5    Record Press contract, reviewed the Record Press invoices, and

6    confirmed that there was no fraud, no overcharging.  Because

7    Record Press charged the amount that both GPO and Record Press

8    understood the contract price.  Mr. Sullivan will be testifying

9    about that spreadsheet that I told you earlier about that shows

10   to prospective vendors how the line items should be priced.

11         Now, that's the falsity issue.  Then Mr. Burke also has

12   to get over the knowledge element, which means he has to show

13   that Record Press knew that the contract price was wrong that

14   they were charging, knew that the price was actually not $12.25

15   per 100 pages.  He has to show that the government and

16   Record Press' understanding of that price term was unreasonable,

17   their own price term was unreasonable.  And again, the same

18   evidence that we've just discussed will preclude any finding of

19   knowledge.

20         And then finally, with respect to the materiality

21   element, that Mr. King will have to show that it would make a

22   difference.  But the government -- as I said, Your Honor, you're

23   going to hear testimony today that the government and

24   Record Press have continued on to this day, even after reviewing

25   and seeing and knowing about Mr. Burke's claims, that they

1    continue to operate as normal because the contract price is

2    $12.25 per 100 pages.

3            So the GPO renewed the contract, and Record Press

4    continues to operate under that contract, continues to submit

5    invoices with that price, and the GPO continues to accept and

6    approve those payments because that's what they agreed.

7            Thank you, Your Honor.

8            THE COURT:  Very well.  Thank you very much, Mr. Lomas.

9            Mr. King, you may call your first witness.

10           MR. KING:  Plaintiff calls Mr. Wilmot.

11           THE COURT:  Mr. Wilmot, good morning.

12           THE WITNESS:  Good morning, Your Honor.

13           THE COURT:  Let me ask you to please face the deputy

14   clerk to be sworn, and then have a seat on the witness stand.

15               (Oath administered by Courtroom Deputy.)

16           THE COURT:  Please have a seat.

17           THE WITNESS:  Thank you.

18           THE COURT:  Mr. King, you may proceed.

19           MR. KING:  Thank you, Your Honor.

20       **(HUGH WILMOT, PLAINTIFF witness, having been duly sworn,**

21                     **testified as follows:)**

22                     **DIRECT EXAMINATION**

23   BY MR. KING:

24   Q.  Mr. Wilmot, can you please state your name and your address

25   for the record?

1    A.  Hugh Wilmot, Junior.  48 Prince Street, Hastings on Hudson,

2    New York, 10706.

3    Q.  And Mr. Wilmot, what is your position with Record Press?

4    A.  I am the president of Record Press.

5    Q.  And how long have you been the president of Record Press?

6    A.  Since 2003.

7    Q.  And before that, were you also an employee of Record Press?

8    A.  No, I was not.

9    Q.  Okay.  Did you work for Record Press in a different capacity

10   before being president?

11   A.  Record Press was a client of my firm.

12   Q.  Okay.  Mr. Wilmot, I'm marking a document as Plaintiff's

13   Exhibit A.

14          MR. KING:  Your Honor, may I approach the witness?

15          THE COURT:  Yes, you may.

16   BY MR. KING:

17   Q.  Mr. Wilmot, I'm handing you a document, Plaintiff's

18   Exhibit A.

19          Mr. Wilmot, do you recognize this document?

20   A.  Yes, I do.

21   Q.  And what is the document?

22   A.  This is the bid from the U.S. Government Printing Office.

23   Q.  And is that your signature on the document, if you would

24   look to the signature page?

25   A.  Yes, it is.

1  Q.  Was that document made at or near the time of the contract

2  with the GPO?

3  A.  Yes, it was.

4  Q.  And was it made by a person with knowledge of the contract?

5  A.  Could you please rephrase your question?

6  Q.  Was the contract made by a person with knowledge of the

7  contract?

8         MR. LOMAS:  Your Honor, we'll stipulate to this being

9  admissible, if that's one of the questions.

10         THE COURT:  Mr. King, given the stipulation that

11  Plaintiff's Exhibit A is admissible, and further, given my

12  understanding that the questions you're asking now have to do

13  with trying to demonstrate that it's admissible, I'm prepared to

14  admit Plaintiff's Exhibit A without objection.  So you may

15  proceed to the questions you have regarding the substance of the

16  contract.

17         And the record will reflect that Plaintiff's Exhibit A

18  is admitted without objection.

19         (PLAINTIFF EXHIBIT A was moved into evidence.)

20  BY MR. KING:

21  Q.  Mr. Wilmot, if you look to the last page of that document,

22  it's Bates number RP 69.

23  A.  (Witness complies.)

24  Q.  Do you see --

25         THE COURT:  Mr. King, my copy does not have RP 69.  The

1    last page that I have has RP 68.  Is there a page that's become

2    misplaced?

3            MR. KING:  Yes, there is, Your Honor.

4            THE COURT:  Thank you.  I'll ask you, Mr. Wilmot, do

5    you have the page that is designated RP 000069?

6            THE WITNESS:  I do, Your Honor.

7            THE COURT:  Very well.  Thank you, Mr. King.  You may

8    proceed.

9    BY MR. KING:

10   Q.  Do you recognize that spreadsheet?

11   A.  Yes, I do.

12   Q.  Do you recall in your deposition that you stated that you

13   had never seen that spreadsheet prior to entering into the

14   contract?

15           MR. LOMAS:  Objection, Your Honor.  I don't believe

16   he's established any inconsistency to bring up the prior

17   statement.

18           MR. KING:  I'm sorry, what was the objection?

19           THE COURT:  Let me ask you to come back to the podium,

20   please.  I believe I heard you, Mr. Lomas, but I want to be

21   certain that Mr. King heard you and that the court reporter is

22   able to hear.

23           MR. LOMAS:  Thank you.  It sounded like Mr. King was

24   referring to prior deposition testimony, but he hasn't shown any

25   inconsistent statement or anything, any basis.  So it's hearsay.

1          So I just wanted to object to the question about the

2     prior testimony.  Thank you.

3          THE COURT:  Mr. King?

4          MR. KING:  Well, the first question was whether or not

5     Mr. Wilmot recognizes this spreadsheet.  He answered that he did

6     recognize this spreadsheet; however, in his deposition he

7     testified that -- he testified differently regarding his

8     knowledge of this spreadsheet.

9          THE COURT:  Well, the Court will sustain the objection

10    for the reasons which the objection embodied.  In other words,

11    at this time there has been no basis for the attempt to impeach

12    the witness with any prior statement.

13          And before we proceed, let me apologize to all of you

14    for the noise.  I assure you that I am able to hear, but I

15    believe on one side of us there is construction under way.  I

16    apologize for the disruption.  I think if we all keep our voices

17    up, we'll have an accurate record of our proceedings.

18    Unfortunately, there is virtually nothing that I can do about

19    the noise.

20    BY MR. KING:

21    Q.  Mr. Wilmot, did you review the spreadsheet before making

22    this contract?

23    A.  Yes, I did.

24    Q.  Okay.  Do you recall that in your deposition you provided

25    testimony that's the opposite of what you're testifying to

1   today?

2   A.  I do not recall that.

3   Q.  Mr. Wilmot, I'm marking Plaintiff's Exhibit B.

4         Actually, I'm going to hold off on Plaintiff's

5   Exhibit B for the time being.

6         THE COURT:  Very well.

7   BY MR. KING:

8   Q.  Mr. Wilmot, if I could draw your attention to the page in

9   Exhibit Number A that is marked RP 66.  Actually, Mr. Wilmot, if

10  you could look through the contract and indicate to me on which

11  page Roman numeral II appears.  Mine appears to be an incomplete

12  copy.  Do you have RP 67 in your copy?

13  A.  I do.

14  Q.  You do.  Okay.

15        MR. KING:  Your Honor, do you have RP 67 in your copy?

16        THE COURT:  I do.

17  BY MR. KING:

18  Q.  Okay.  If you look at Roman numeral II, do you see there the

19  reference to the running rate?

20  A.  I do.

21  Q.  Okay.  And are you familiar with what a running rate is?

22  A.  Yes, I am.

23  Q.  Okay.  And what is a running rate?

24  A.  A running rate is essentially, in a bidding process or to a

25  particular printer, is the amount of copies that a particular

1   pricing is going to be based on.

2   Q.  Okay.  And in this case, what amount of copies does the

3   running rate refer to?

4   A.  For line items "Complete cover, wraparound," the price is

5   six dollars for a running rate of 10 copies, along with the text

6   per page of $0.35.

7   Q.  And I'm sorry, could you repeat?  What amount of copies does

8   the running rate refer to?

9   A.  10 copies.

10  Q.  Okay.  Did Record Press ever issue invoices pursuant to this

11  contract that called for a number of copies less than 10?

12  A.  I believe we have, yes.

13  Q.  All right.  Do you recall whether or not any of your --

14  okay.

15          MR. KING:  Your Honor, I have RP 70 through RP 2351.

16  I'm handing these to Mr. Wilmot.

17          MR. LOMAS:  Your Honor, we object.

18          MR. KING:  May I approach the witness, Your Honor?

19          THE COURT:  Before you do, I will hear the objection.

20  Mr. Lomas?

21          MR. LOMAS:  Thank you, Your Honor.  At the status

22  conference on January 31st, we narrowed this, for purposes of

23  today, to two invoices.  And what Mr. King is about to hand the

24  witness is hundreds of invoices.

25          THE COURT:  Thank you, Mr. Lomas.  I believe your

1    statement, just so we have a clear record -- Mr. King, you

2    indicated that the stack begins with RP 00 -- what is the first

3    number?

4            MR. KING:  70, Your Honor.

5            THE COURT:  -- 70 through RP 02, and then a three-digit

6    number.  In other words --

7            MR. KING:  That's right, 2351.

8            THE COURT:  And are those consecutive pages in between

9    70 and 2361?

10           MR. KING:  More or less, Your Honor.

11           THE COURT:  And can we describe the stack as a stack

12   that is perhaps a little less than a foot tall?

13           MR. KING:  Yes, Your Honor.

14           THE COURT:  Now, what is your response to Mr. Lomas'

15   contention that when we were last in court the Court ordered

16   that at issue here -- the invoice at issue would be confined

17   to -- invoices at issue are confined to two?

18           MR. KING:  Well, Your Honor, I understood that the

19   issue was whether or not these other invoices are going to be

20   admitted into evidence.  And we agreed that the two invoices to

21   be admitted into evidence were the two that were specific to

22   Mr. Burke's work.

23           These invoices are not intended to be entered into

24   evidence; the invoices are simply going to be offered to

25   Mr. Wilmot while he's testifying, to help him refresh his memory

1    as to whether or not any of the charges -- any of the invoices

2    that Record Press submitted pursuant to this contract were for

3    an amount of copies less than 10.

4         THE COURT:  Well, because Mr. Wilmot has not indicated

5    that his recollection is exhausted, the Court will not permit

6    you to show him the stack of invoices for the purpose of

7    refreshing his recollection.

8         MR. KING:  Well then, Your Honor, I would suggest that

9    the invoices be presented to impeach the witness because they

10   contradict his testimony.  It's a very essential fact to this

11   case of whether or not there's ever an invoice for less than

12   10 copies.

13        THE COURT:  Well, the witness has not indicated that

14   his recollection is exhausted, so you may proceed with the

15   question.  And indeed, there was no objection to the question,

16   as I recall.

17   BY MR. KING:

18   Q.  Mr. Wilmot, would you be surprised if the thousands of

19   invoices that are sitting on the table here all are for an

20   amount of copies greater than 10?

21        MR. LOMAS:  Objection, Your Honor, to the relevance of

22   the question.

23        MR. KING:  May I respond, Your Honor?

24        THE COURT:  What is your response to the relevance

25   objection, Mr. King?

1          MR. KING:  This fact of whether or not any of the

2     invoices have a request for an amount of copies less than 10 is

3     an essential fact related to whether or not the contract that

4     calls for the running rate of 10 would imply that the running

5     rate applies to these invoices.  And now the idea is that

6     somehow the running rate does not apply to one of these line

7     items.

8          But the fact is that if the running rate, as Mr. Wilmot

9     testified to, is used for a particular quantity of copies, and

10    if every single invoice is for a number of copies greater than

11    10, then it's very important for the evidence and for the

12    testimony to reflect that fact.

13         THE COURT:  The Court will sustain the objection.  It

14    may be that at some later point there will be some relevance to

15    the question.  At this time it is not relevant, given the most

16    recent orders that the Court entered with respect to the issues

17    in the case and the evidence which would be admitted.

18         So I will suggest that you turn your attention to the

19    questions regarding the two invoices which are plainly

20    admissible.

21         MR. KING:  Okay.

22    BY MR. KING:

23    Q.  Let's move to the invoices.  Mr. Wilmot, I'm marking

24    Plaintiff's Exhibit C.

25         MR. KING:  Your Honor, may I approach the witness?

1          THE COURT:  Yes.

2    BY MR. KING:

3    Q.  Mr. Wilmot, I'm handing you Exhibit C.  Thank you.

4          MR. KING:  Would the parties stipulate to the

5    admissibility of Plaintiff's Exhibit C?

6          MR. LOMAS:  Yes, Your Honor.

7          THE COURT:  Thank you, Mr. Lomas.  Plaintiff's

8    Exhibit C will be admitted without objection.

9          (PLAINTIFF EXHIBIT Number C was moved into evidence.)

10   BY MR. KING:

11   Q.  Mr. Wilmot, if you look at the first line item of this

12   invoice -- could you just state for the record the invoice

13   number on this document?

14   A.  Record Press invoice number A 71700.

15   Q.  And under the description of this invoice, how would -- do

16   you recognize what this invoice was for?

17   A.  Yes, I do.

18   Q.  And what was it for?

19   A.  This invoice was for the production of 40 copies of a

20   defendant appellee's brief in the Burke v. Evans matter.

21   Q.  Just to be clear, does the invoice not say that it's for

22   20 copies?

23   A.  No, it does not.

24         MR. KING:  Your Honor, do you have 71700 or 71701?

25         THE COURT:  What I have is A 71701.  That is what you

1    handed to Ms. Miller.

2         MR. LOMAS:  Excuse me, Your Honor.  I believe the

3    witness has a different one.  The stipulation was on the

4    assumption that we have a copy of what the witness was handed,

5    but I don't believe that's been the case.  I believe we need to

6    fix that.

7         MR. KING:  Yes, Your Honor, I believe I handed the

8    witness the next invoice.  So if I could just take a look at

9    what I handed the witness?

10        THE COURT:  Of course.

11        MR. KING:  Thank you.

12        All right.  I'm removing the label for Plaintiff's

13   Exhibit C -- or actually, I'm marking it out with my pen here,

14   and then I'm handing Mr. Wilmot another document marked

15   Plaintiff's Exhibit C, which is 71701, which is the document

16   that Your Honor is holding, also marked as Plaintiff's

17   Exhibit C.

18        THE COURT:  Very well, thank you.  Is that what you

19   have, Mr. Lomas, 71701?

20        MR. LOMAS:  That's right, yes, Your Honor.  Thank you.

21        THE COURT:  Very well.  Thank you.  With the

22   substitution, Mr. Lomas and Mr. O'Brien, may the exhibit still

23   be admitted without objection?

24        MR. LOMAS:  Yes, Your Honor.

25        THE COURT:  Very well.

1    BY MR. KING:

2    Q.  Following along on your description of the 40 copies, do you

3    see there the first line item, can you describe what this line

4    item refers to?

5    A.  The first line item is the typeset cover charge at $10 per

6    page.

7    Q.  And does that correspond to a line item in the contract?

8         THE COURT:  Before that question is answered, I will

9    note that the copy that I have refers to printing and binding of

10   20 copies.  Did you indicate in your question, Mr. King, that

11   the invoice was for 40 copies?

12        MR. KING:  I'm sorry, Your Honor.  Do you have 71701?

13        THE COURT:  I do.  But I note that under description,

14   the third -- I'm reluctant to say line, because I realize that

15   has some significance for the evidence in the case.  But I'm

16   using the word "line" loosely.  Mine reads, quote, "For printing

17   and binding 20 copies of the above appendix," closed quote.

18   BY MR. KING:

19   Q.  And Mr. Wilmot, your copy also says that?

20   A.  My copy reads, "For printing and binding 20 copies of the

21   above appendix for defendant appellees."

22   Q.  And you're looking at invoice A 71701?

23   A.  That is correct.

24   Q.  I am now looking at 71701 as well, and I do show 20 copies.

25        THE COURT:  Very well.  I believe in your question you

1    said 40.

2              MR. KING:  I did.  And I misspoke, Your Honor.

3              THE COURT:  Very well.  Thank you.

4              MR. KING:  Thank you, Your Honor.

5    BY MR. KING:

6    Q.  Does that line item number one correspond to a line item in

7    the contract, Mr. Wilmot?

8              MR. LOMAS:  Objection.  Vague with respect to the line

9    item one.

10             THE COURT:  Just so the record is clear, would you mind

11   reading, Mr. King, the item to which you refer?

12             MR. KING:  When I refer to line item one in the

13   invoice, I'm referring to the typeset cover at $10 per page.

14   BY MR. KING:

15   Q.  Does that correspond to a line item in the contract?

16   A.  Yes, it does.

17   Q.  And which line item in the contract does it refer to?

18   A.  On RP 66, Roman numeral I, item A 2.

19   Q.  And did you apply the running rate to -- on the invoice, did

20   you apply the running rate to this line item for typeset cover

21   at $10 per page?

22             MR. LOMAS:  Objection.  Vague with respect to "running

23   rate."

24             THE COURT:  May I ask you to rephrase your question,

25   please, Mr. King?

1   BY MR. KING:

2   Q.  Mr. Wilmot, did you apply the running rate that's indicated

3   in the Plaintiff's Exhibit A to the line item typeset cover at

4   $10 per page in the invoice?

5   A.  That's not applied.

6   Q.  I'm sorry?

7   A.  No, that's not applied.

8   Q.  It's not applied.

9        Going on to the next line item, "pages text times

10  one proof copy at $0.25 per page," what does this charge refer

11  to?

12  A.  This charge is indicated on RP 66 as page proofs per page at

13  $0.25.

14  Q.  Mr. Wilmot, does this -- then your testimony is that this

15  line item, "Pages text times one proof copy at $0.25 per page,"

16  corresponds to a line item in Plaintiff's Exhibit A, and that

17  line item is Roman numeral IIA?

18        MR. LOMAS:  Objection, Your Honor.  I believe that

19  mischaracterizes the testimony.

20        THE COURT:  Sustained.

21  BY MR. KING:

22  Q.  Mr. Wilmot, does this line item, "Pages text times one proof

23  copy at $0.25 per page," correspond to a line item in

24  Plaintiff's Exhibit A, the contract?

25  A.  Yes, it does.

1    Q.  And which line item does it correspond to?

2    A.  On RP 66, Roman numeral I, item E.

3    Q.  Going down to the next line item, "Covers printed at $0.60

4    per cover," what is involved in this particular line item?

5            MR. LOMAS:  Objection.  Vague.

6            THE COURT:  Is your question, Mr. King, to which entry

7    in the contract it corresponds?  That appeared to be the form of

8    the question regarding the first two items.  Or was your

9    question different?

10           MR. KING:  No, Your Honor, the question is the same.

11   BY MR. KING:

12   Q.  Does this line item correspond to a line item in Plaintiff's

13   Exhibit A?

14   A.  Yes, it does.

15   Q.  And what line item does it refer to?

16   A.  RP 67, Roman numeral II, line item A, II(A).

17   Q.  Does the invoice apply the running rate to this particular

18   line item, "Covers printed at $0.60 per cover"?

19   A.  Your question again?

20   Q.  Does the invoice apply the running rate?

21   A.  The invoice applies the running rate to this particular line

22   item, yes.

23   Q.  Going to the next line, "Page numbers inserted in table of

24   contents" at $0.25, what line item in the contract does this

25   line item in the invoice refer to?

1  A.  This line item is referenced on RP 66, Roman numeral I,

2  item G.

3  Q.  G.  And is the running rate applied to this line item?

4  A.  It does not.

5  Q.  Moving on to the next line item in the invoice, "566 pages

6  text printed times 20 copies at .035 per page."

7          What line item in the contract does this line item in

8  the invoice refer to?

9  A.  This item is referenced on RP 67, Roman numeral II, item B.

10  Q.  Is the running rate applied to this line item in the

11  invoice?

12  A.  Yes, the running rate is applied to this line item.

13  Q.  Going on to the next line, "Collating, trimming to size, and

14  binding charge, 11,320 pages at $12.25 per 100 pages," what line

15  item in the contract does this line item in the invoice refer

16  to?

17  A.  This line item is referenced on RP 67, item II(D).

18  Q.  Does the invoice apply the running rate to this line item?

19  A.  No, it does not.

20  Q.  The next line, "Text page at $10 per page," what line item

21  in the contract does this line item in the invoice refer to?

22  A.  This is referenced on RP 66, Roman numeral I, item B.

23  Q.  And is the running rate applied to this line item in the

24  invoice?

25  A.  No, it does not.

1    Q.  Mr. Wilmot, am I characterizing your testimony correct, that

2    of all of the line items in this invoice that correspond to a

3    line item under Roman numeral I of the contract, that

4    Record Press does not apply the running rate?

5    A.  That's correct.

6    Q.  Is it also correct that, under Roman numeral II of the

7    contract, Record Press charges the running rate for some line

8    items, but doesn't charge it for line item D as reflected in the

9    invoice?

10    A.  I'm sorry, could you rephrase your question?

11    Q.  Based on the testimony that you gave, doesn't your testimony

12    reflect the fact that with respect to the charges arising from

13    Roman numeral II in the contract, Record Press charges the

14    running rate for all line items, but then does not charge the

15    running rate for D?

16        MR. LOMAS:  Objection.  I think that mischaracterizes

17    the testimony with respect to "all."  It was unclear -- and it's

18    also vague with respect to "all."

19    BY MR. KING:

20    Q.  All right.  Let me try one more time.  Mr. Wilmot, your

21    testimony that you just gave regarding the charges in the

22    invoice, does your testimony reflect the fact that, with respect

23    to the charges arising from Roman numeral number II in the

24    contract, Record Press' invoices charge the running rate for

25    some line items, but then do not charge the running rate for

1    line item D?

2    A.  Consistent with Record Press' invoice, Record Press charges

3    the running rate for line items "Complete cover" and "Text per

4    page," which is on RP 67, Roman numeral II, A and B, items A and

5    B.

6    Q.  Mr. Wilmot, does Record Press charge the running rate for

7    all of the line items in Roman numeral number II?

8    A.  No, it does not.

9    Q.  Does Record Press follow that pattern of not charging the

10   running rate to Roman numeral II(D) for all of its invoices?

11   A.  That's correct.

12   Q.  Mr. Wilmot, you testified earlier that Record Press will

13   perform work for invoices on jobs that are less than 10 copies.

14   Is this one of those jobs?  How many copies are invoiced on this

15   job?

16        MR. LOMAS:  Object to the preface of the things that

17   mischaracterize his prior testimony.

18        THE COURT:  Well, as phrased, the question is compound

19   because there was a question, which was not answered, and a

20   second one was asked.  So let me ask you to ask a single

21   question, Mr. King.

22        MR. KING:  Okay.

23   BY MR. KING:

24   Q.  How many copies does the invoice charge for?

25   A.  Referencing Record Press' invoice A 71701, the description

1  in this invoice charges for 20 copies of an appendix for

2  defendant appellees in the Burke v. Evans matter.

3  Q.  So how would you apply the running rate of per-10 copies to

4  this invoice?

5          MR. LOMAS:  Objection.  Vague.

6          THE COURT:  Are you able to answer the question,

7  Mr. Wilmot?

8          THE WITNESS:  If asked again.

9          THE COURT:  Could you repeat your question, please,

10 Mr. King.

11 BY MR. KING:

12 Q.  Given an invoice that charges for 20 copies, and a running

13 rate that provides for per-10 copies, how would you apply the

14 running rate to this particular invoice?

15         MR. LOMAS:  Objection.  Vague, with respect to...

16         THE COURT:  Are you able to answer the question,

17 Mr. Wilmot?

18         THE WITNESS:  Yes, I am.

19         THE COURT:  Very well.  The objection is overruled.

20 A.  This invoice is billed consistently with the contract.

21 BY MR. KING:

22 Q.  Well, Mr. Wilmot, my question was how you apply the running

23 rate of per-10 copies to a job that requires 20 copies to be

24 made.

25 A.  For the line items requiring 10 copies, in this particular

1    case covers and text per page, the price is adjusted accordingly

2    for a running rate of 10 copies.

3         In this instance, the cover is adjusted to be for $0.60

4    as an item price; for text per page, with a quantity of 11,320

5    in total of a 560-page document, the price is adjusted to be

6    .035, which represents an adjustment for the running rate of

7    10 copies.

8    Q.  Let's go to the next invoice.  Mr. Wilmot, I'm marking a

9    document Plaintiff's Exhibit D.

10        MR. KING:  May I approach the witness, Your Honor?

11        THE COURT:  You may.

12   BY MR. KING:

13   Q.  Mr. Wilmot, do you recognize this document?

14   A.  Yes, I do.

15   Q.  And what invoice does this refer to?

16   A.  This document is Record Press' invoice A 71700.

17        MR. KING:  Do you stipulate to its admission?

18        MR. LOMAS:  Yes.  Your Honor, we stipulate to the

19   admission of this exhibit.

20        THE COURT:  Thank you, Mr. Lomas.  Plaintiff's

21   Exhibit D, the invoice A 71700, will be admitted without

22   objection.

23        (PLAINTIFF EXHIBIT D was moved into evidence.)

24   BY MR. KING:

25   Q.  Generally speaking, Mr. Wilmot, how do you describe the work

1    that this invoice refers to, the particular job, if you will?

2    A.   This invoice is for printing and binding 40 copies of the

3    above brief for the defendant appellees in the Burke v. Evans

4    matter, as noted.

5    Q.   If you go to the first line item of this invoice, which is

6    "Typeset cover at $10 per page," does that correspond, like the

7    other invoice, to line item, in the contract, Roman numeral I,

8    A2?

9    A.   No, it does not.

10   Q.   It does not.  What line item in the contract does this line

11   item in the invoice, "Typeset cover at $10 per page," refer to?

12   A.   Referencing RP 66, Roman numeral I, line item A1.

13   Q.   A1.  Thank you.

14           And does the invoice apply the running rate to this

15   line item?

16   A.   No, it does not.

17   Q.   Moving on to the next line item, "Covers printed at $0.60

18   per cover," what line item in the contract does this line item

19   in the invoice refer to?

20   A.   Referencing RP 67, Roman numeral II, item A.

21   Q.   And does the invoice charge the running rate for this line

22   item?

23   A.   Consistent with the contract, it does.

24   Q.   The next line item, "76 pages text printed at 40 copies"

25   at .035 per page on the invoice, what line item from the

1    contract does that refer to?

2    A.  Referencing RP 67, Roman numeral II, item B.

3    Q.  Does the invoice apply the running rate to this line item?

4    A.  Yes, it does.

5    Q.  The next line item, "Collating, trimming to size, and

6    binding," charge 3,040 pages at $12.25 per 100 pages.

7            What line item in the contract does this line item

8    refer to?

9    A.  Referencing RP 67, Roman numeral II, line item D, as in

10   David.

11   Q.  Does the invoice charge the running rate for this line item?

12   A.  No, it does not.

13   Q.  Then again, your testimony is that the invoice does not

14   charge the running rate for line items in the contract that fall

15   under Roman numeral I?

16   A.  That is correct.

17   Q.  And now with respect to Roman numeral II of the contract,

18   Record Press charges the running rate for II(A) and B, but does

19   not charge the running rate for II(D)?

20   A.  That is correct.

21   Q.  Mr. Wilmot, why doesn't Record Press charge the running rate

22   for D, but does charge it for all the other line items under II?

23           MR. LOMAS:  Objection.  There's an assumption there

24   that no foundation has been laid for.

25           THE COURT:  The objection is overruled.

1   A.  Can you please re-ask the question?

2   BY MR. KING:

3   Q.  Yes.  Why does Record Press not charge the running rate for

4   D, but does charge it for all the other line items under II?

5   A.  With respect to the contract, referencing page RP 67, it's

6   clearly written there, "Per 100 pages."  In addition to that,

7   RP 69 lists clearly what is required in the bidding process as

8   to what rate is to be applied for the line items.

9   Q.  You're referring to the GPO spreadsheet?

10  A.  RP 69, that's correct, yes.

11  Q.  Well, if we're going to be looking at Record Press 69, the

12  GPO spreadsheet, can I draw your attention to the column for

13  "Basis of award"?  What does "basis of award" refer to?

14  A.  The basis of award is a quantity issued by the GPO as an

15  indication of what they will use in their internal accounting to

16  determine who the winner of the contract is.

17  Q.  Okay.  And if you look under the column for "Record Press,"

18  you see that the corresponding number for Record Press for that

19  particular line item, II(D), is what?

20  A.  Referencing that column on the unit rate for II(D), I read

21  $12.

22  Q.  All right.  Now if you go to the column for the cost under

23  "Record Press," and you follow it down to that line item for

24  II(D), what is your cost?

25  A.  The cost is $168.

1    Q.  All right.  Now if you go back to -- stay in the same column

2    under "Record Press," and go to the line item for II(B).  What

3    is the cost there?

4    A.  Reading text per page per 10 copies, the cost here is

5    $49,798.80.

6    Q.  Okay.  Mr. Wilmot, would you agree that $168 is a much

7    smaller number than $49,798.80?

8    A.  Yes.

9    Q.  Yes.  If you go back to Plaintiff's Exhibit D, which is your

10   invoice, and you look at the corresponding charges, would you

11   agree that the line item II(D) is now a much greater number than

12   line item II(B)?  In the invoice, the number corresponding to

13   line item II(D) is what for the amount?

14   A.  II(D), okay, on this invoice is $372.40.

15   Q.  And the line item referring to II(B), that amount is what?

16   A.  Referencing RP 69 on the spreadsheet?

17   Q.  No, the invoice.  Stay on the invoice, please.

18   A.  Okay.  $106.40.

19   Q.  Now, isn't it fair to say that the line item II(D) in the

20   invoice is much greater than line item II(B) in the invoice?

21           MR. LOMAS:  Objection.  Vague and argumentative.

22           THE COURT:  Sustained.

23   BY MR. KING:

24   Q.  Mr. Wilmot, can you compare the -- okay.  Under

25   Record Press 69, the amount for Record Press that corresponds to

1  line item II(D) is greater than or less than the amount for

2  II(B)?

3  A.  The invoice is less than what's listed in RP 69.

4  Q.  No, Mr. Wilmot.  My question is -- just look at RP 69.

5  A.  Okay.

6  Q.  The line item for II(D) corresponding to Record Press is

7  less than or greater than II(B)?

8  A.  II(D) is less than II(B).

9  Q.  Okay.  Now if you look in the invoice, line item II(D).  Is

10  it also less than II(B), or is it greater than II(B)?

11  A.  Okay.  Text per page here is -- $106.40 is less than

12  $372.40, collating.

13  Q.  So Mr. Wilmot, your testimony, then, is that -- well, first

14  of all, you said that you looked at this spreadsheet before you

15  made this contract with GPO?

16  A.  That's correct.

17          MR. KING:  One moment, Your Honor.

18          THE COURT:  Certainly.

19          MR. KING:  Your Honor, may I approach the witness?

20          THE COURT:  Yes.

21  BY MR. KING:

22  Q.  Mr. Wilmot, I'm handing you Plaintiff's Exhibit B.

23  Mr. Wilmot, do you recognize this document?

24          MR. LOMAS:  We object to the relevance of this

25  document.  This appears to be a contract for 1272 S, and the

1    claim in the complaint is based solely on the contract that

2    we've been speaking about earlier, program 2231 S.

3              THE COURT:  In other words, this is for a different

4    contract other than the contract which governs the two invoices?

5    Is that your objection?

6              MR. LOMAS:  Yes, Your Honor.  That's right.

7              THE COURT:  Mr. King?

8              MR. KING:  Your Honor, as I argued before, the action

9    at issue in this case is not one particular contract.  The

10   action has to do with an unlawful billing practice, which is the

11   failure to apply the running rate to this particular line item

12   in the contract.  And the contract that's marked as Plaintiff's

13   Exhibit B is the predecessor contract to Plaintiff's Exhibit A.

14   It is in fact identical, and Mr. Wilmot can certainly testify to

15   its authenticity.

16             THE COURT:  The Court will not permit the use of

17   Exhibit B, since it is the case that Exhibit A, which has

18   already been admitted into evidence, is the contract which

19   governs the two invoices which are at issue.  So I will ask you

20   to retrieve Exhibit B, please.

21             If this is a convenient time for the parties to take a

22   brief recess, perhaps we can take a 10-minute recess now, and

23   then continue until we break for lunch.

24             MR. KING:  Thank you, Your Honor.

25             THE COURT:  Very well.  I will ask you to step down,

1    Mr. Wilmot.  You have not completed your testimony, you remain

2    under oath, and you may not discuss either the testimony you've

3    already given or any anticipated testimony with anyone:

4    Counsel, the parties, anyone else.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  Very well.  Thank you, and we'll resume in

7    about 10 minutes.

8              (Recess taken at 11:26 a.m.).

9              THE COURT:  Now, Mr. Wilmot, I'll ask you to please

10   return to your seat on the witness stand.

11             Thank you.  Mr. King, you may continue.

12             MR. KING:  Thank you, Your Honor.

13             Your Honor, if I could just address the decision to

14   withdraw Plaintiff's Exhibit B, which was the contract for

15   1272 S.  If you would note on the spreadsheet, the GPO

16   spreadsheet that Mr. Wilmot testified to that he reviewed in

17   entering into the contract, 2231 S, that's RP 69.

18             If you go to the top of RP 69, you'll see that the

19   spreadsheet refers to program number 1272 S.  So the testimony

20   of Mr. Wilmot, you know, the contract of 2231, you know, it

21   pulls this program, 1272 S, directly into this case.

22             THE COURT:  The Court has already ruled that Exhibit B

23   is not relevant.  The matter is confined to the two invoices

24   which are governed by A, which has already been admitted without

25   objection, and the Court has so ruled.

1         So I will ask you to continue your inquiry, please.

2    BY MR. KING:

3    Q.  Thank you again for your testimony, Mr. Wilmot.

4         So to continue on, let's just wrap up here.  To

5    reiterate your testimony, you testified earlier that you believe

6    that Record Press did run -- did perform runs of copies of less

7    than 10 copies.  You testified to that.  Correct?

8              MR. LOMAS:  Objection.

9              THE COURT:  On what ground?

10             MR. LOMAS:  Argumentative and relevance.

11             THE COURT:  Sustained.

12             MR. KING:  I'm sorry, the number of copies in the

13   invoices are not relevant?  Is that what the basis of the

14   argument is?

15             THE COURT:  The Court understands the relevance

16   objection to be that the invoices here are for either

17   20 copies - that is, invoice A 71701 - or 40 copies in A 71700.

18             MR. KING:  Okay.

19             THE COURT:  Therefore, whether other invoices were for

20   other amounts is simply not relevant.

21             MR. KING:  Okay.

22   BY MR. KING:

23   Q.  And Mr. Wilmot, you testified that the invoice charges the

24   running rate for line items II(A) and II(B) from the contracts.

25   Correct?

1        THE COURT:  Are you referring to both invoices?

2        MR. KING:  Both invoices, yes.

3   A.  Yes, the invoices are consistent with the billing of II(A)

4   and II(B).

5   BY MR. KING:

6   Q.  And the invoices, both invoices, they do not charge the

7   running rate for line item II(D)?

8   A.  Correct.  Consistent with the contract, it does not.

9   Q.  And that line item II(D), what are the words that describe

10  that line item again?

11  A.  Reading from RP 67, item II(D) reads, "Collating, trimming

12  to size, and binding per 100 pages, $12.25."

13  Q.  Okay.  And Mr. Wilmot, again, could you repeat your

14  testimony as to why Record Press does not charge the running

15  rate for collating, trimming to size, and binding, but does so

16  for A and B?

17  A.  Sure.  As listed in item II(D) on RP 67, it reads,

18  "Collating, trimming to size, and binding per 100 pages."  In

19  addition to that, RP 69 clearly indicates "Collating, trimming

20  to size, and binding per 100 page."

21  Q.  Mr. Wilmot, drawing your attention to RP 69, the numbers

22  that appear in those various cells, do they have any meaning to

23  you?

24  A.  As I testified before, the numbers reflect an internal

25  quantity listed by the GPO to determine -- to level the playing

1    field among bidders, if you will, okay, comparing apples to

2    apples, oranges to oranges.  And we determine pricing based on

3    what we produce, and the costs associated with producing that

4    product.

5    Q.  So if they do have meaning to you, how would you describe

6    that meaning?

7    A.  Consistent with my testimony before, the numbers reflected

8    there are GPO numbers reflecting the basis of award, the

9    multiples that they will use to determine what the contract

10   amount is going to total.

11   Q.  But you're testifying about what they mean to the GPO.  What

12   does their meaning to the GPO mean to you and Record Press?

13         MR. LOMAS:  Objection.  Asked and answered.

14         THE COURT:  Overruled.

15   A.  With respect to these numbers, essentially we would know

16   where our contract total is going to be.  So in this particular

17   instance, we are a bidder of $147,000.23, as compared to the

18   other bidders.  So we don't really know what the other bidders

19   are going to bid, so this will help us to see what the overall

20   number is going to be.  Okay?

21         So other than that, it does not influence what our line

22   item charge is going to be.  It is based on what we feel we can

23   produce, the rate at which we can produce and make a profit to

24   cover our expenses.

25         MR. KING:  Thank you, Mr. Wilmot.

1          Thank you, Your Honor.  No more questions.

2          THE COURT:  Very well.  Thank you very much, Mr. King.

3          Mr. Lomas or Mr. O'Brien?  Mr. Lomas, you may

4    cross-examine.

5          MR. LOMAS:  Thank you, Your Honor.

6                    **CROSS EXAMINATION**

7    BY MR. LOMAS:

8    Q.  Good morning, Mr. Wilmot.

9    A.  Good morning.

10   Q.  You said earlier you were the president of Record Press?

11   A.  That's correct.

12   Q.  How long has Record Press been in business?

13   A.  Record Press has been in business since 1945.

14   Q.  And generally what type of business is Record Press in?

15   A.  Record Press is an appellate printer; a financial and

16   commercial printer as well.

17   Q.  So what does the appellate printing entail?

18   A.  The appellate printing entails -- we're often engaged by law

19   firms, solo practitioners, or interested parties with items that

20   are on appeal.  We have a staff of six paralegals and attorneys,

21   and it's their job to interpret the guidelines of a particular

22   appellate court, and as such perfect the record and file --

23   serve and file a particular case.

24   Q.  And who does Record Press do that work for?

25   A.  It could be law firms, it could be the government, solo

1  practitioners, just any appellate...

2  Q.  And the work that is done with the government, who is that

3  contracted through?

4  A.  The Government Printing Office, GPO.

5  Q.  And how long has Record Press been contracting with the

6  Government Printing Office?

7  A.  Over 30 years.

8  Q.  Is Record Press still contracting with the Government

9  Printing Office?

10  A.  Yes, we do.

11  Q.  Mr. Wilmot, I would like to refer you back to what was

12  marked as Plaintiff's Exhibit A.  And this was the contract,

13  Record Press' contract with the GPO for program 2231 S.  Is that

14  right?

15  A.  That's correct.

16  Q.  Now, how was this contract formed?

17  A.  A request for bid is sent out by the GPO.  It arrives via

18  U.S. mail, and it is then reviewed and prepared for submission.

19  Q.  So was this the request for bid, and then Record Press

20  filled it out?

21  A.  That's correct.

22  Q.  And was there anything sent with the request for bid?

23  A.  Not in this case, other than what was required to be filled

24  out.

25  Q.  And did Record Press fill out price terms in the request for

1   bid?

2   A.  That's correct.

3   Q.  And if you flip to the last page that's marked with

4   production number RP 69, so RP 69 of Plaintiff's Exhibit A.

5   A.  That's correct.

6   Q.  You spoke about this spreadsheet earlier with Mr. King?

7   A.  Yes.

8   Q.  Was this part of the request for bid?

9   A.  This constitutes the entire package, yes.

10  Q.  When you say "this constitutes," you're talking about

11  Plaintiff's Exhibit A?

12  A.  Correct.

13  Q.  So this spreadsheet here was part of that package?

14  A.  Stapled as a part of the package.

15  Q.  So did Record Press have this spreadsheet then, before it

16  filled out the price terms?

17  A.  That's correct.

18  Q.  Now, on the left column here there looks to be line items.

19  On the left column of RP 69 of Plaintiff's Exhibit A, there's a

20  list of line items.  Is that what those are?

21  A.  Yes.

22  Q.  And are those line items in the request for bid itself?

23  A.  Yes.

24  Q.  Now, if we can focus maybe attention on the part that's just

25  under column II, or Roman numeral II, some of these line items

1    that you were discussing with Mr. King.

2         Now, could you explain what this shows with respect to

3    these line items?

4    A.  Okay.

5    Q.  Well, actually, let me refer you to II(A) for a moment, the

6    line item that says, "Complete cover."  What does the "per

7    10 copies" mean with respect to "complete cover"?

8    A.  Okay.  Essentially, we will be charging a per-10-copy rate

9    to that line item.

10   Q.  And then what does the per 10 copies mean for what's marked

11   as Roman numeral II(B), the text per page line item?

12   A.  We would be charging a per-10-copy rate for that particular

13   line item.

14   Q.  And then for the pressure-sensitive stock, II(C), and then

15   there's a Roman numeral I for white pressure-sensitive stock.

16   Is that right?

17   A.  That's correct.

18   Q.  What does the "per 100 leaves" mean for that line item?

19   A.  Our billing charge should reflect a charge of per

20   100 leaves.

21   Q.  And is that the same for the "Color" line item, which also

22   says, "per 100 leaves"?

23   A.  That is correct.

24   Q.  Then what about with respect to line item II(D), which says,

25   "Collating, trimming to size, and binding per 100 page"?

1    A.  We would be charging a rate consistent with per 100 page.

2    Q.  So did Record Press review this portion of the spreadsheet

3    before it filled out its bid for this program?

4    A.  Absolutely and always.

5    Q.  Okay.  And let me refer -- actually, if we go back to the

6    spreadsheet itself, the whole spreadsheet.  The numbers that are

7    in the spreadsheet, those aren't the numbers that Record Press

8    bid this time for this contract.  Is that right?  These are

9    older price numbers.  Is that right?

10   A.  That's correct.

11   Q.  Now, if we can go back to what's marked as RP -- production

12   number RP 67 of Plaintiff's Exhibit A.  Now, on the screen it

13   may help you, but we can blow up the line item.  Oh, it's not

14   working.  Okay.

15        If you could look under Roman numeral II, "Complete

16   product," and line D, "Collating, trimming to size, and

17   binding," do you see that line item?

18   A.  Yes, I do.

19   Q.  And what price did Record Press bid when it submitted its

20   bid to the GPO for this line item?

21   A.  $12.25.

22   Q.  What rate is that based on?

23   A.  Per 100 pages.

24   Q.  When Record Press submitted its bid for this line item, was

25   there a 10-copy running rate included in that price bid?

1    A.   No.

2    Q.   The 10-copy running rate doesn't apply to Record Press' bid?

3    A.   That's correct.

4    Q.   Now, could you please describe what type of work the

5    collating, trimming to size, and binding line item refers to?

6    A.   Collating, trimming to size, and binding involves

7    programming from the Xerox operator, to program the number of

8    copies and print them in a fashion that a voluminous record, for

9    instance, or appendix is collated and ready to be passed on to

10   the next department.

11          That next department could be the bindery, and so the

12   trimming that's involved there is cutting to size based on the

13   guidelines of that particular appellate court.

14          In addition to that, it is then moved on to the perfect

15   bindery department, and their job is to wrap a cover around the

16   printed matter and perfect bind it.  It then goes back to the

17   trimming department for actual shaving, and it is then passed on

18   to packing.

19   Q.   Now, did Record Press -- or excuse me, did the Government

20   Printing Office award this contract to Record Press?

21   A.   Yes, it did.

22   Q.   So in that process, did the GPO accept this bid that we see

23   here in this Plaintiff's Exhibit A?

24   A.   That's correct.

25   Q.   And did the GPO accept Record Press' bid for collating,

1   trimming to size, and binding, with a price of $12.25 per

2   100 pages?

3   A.  Yes, they did.

4   Q.  Did Record Press provide appellate brief printing services

5   for the GPO under this contract?

6   A.  Yes, it did.

7   Q.  How does Record Press get paid for the services that it

8   provides under this contract?

9   A.  We submit two invoices, one to Washington and one to the

10  Philadelphia GPO offices, and it is paid out of Washington.

11  Q.  So why does Record Press submit invoices to two different

12  GPO offices?

13  A.  Checks and balances by the GPO.

14  Q.  I want to refer you back to Plaintiff's Exhibit D.  Do you

15  have that in front of you?  That was the invoice that's marked

16  A 71700.  Do you see that?

17  A.  Yes.

18  Q.  Is this a Record Press invoice to the GPO?

19  A.  Yes, it is.

20  Q.  And was this invoice issued to the GPO under the contract

21  that we've talked about, Plaintiff's Exhibit A?

22  A.  That's correct.

23  Q.  Did Record Press charge for collating, trimming to size, and

24  binding in this invoice?

25  A.  Yes, it did.

1    Q.  And what was the amount -- what was the total amount that

2    Record Press charged for collating, trimming to size, and

3    binding?

4    A.  $372.40.

5    Q.  And how did Record Press determine that $372.40 was the

6    amount to charge?

7    A.  Essentially, based on 3,040 pages, times a rate of $12.25

8    per 100 pages.

9    Q.  And is that rate the contract price?

10   A.  Yes, it is.

11   Q.  Did the GPO accept this invoice and pay it?

12   A.  Yes.  It is indicated as such, paid.

13   Q.  So I want to refer you then back to Plaintiff's Exhibit C.

14   Does the invoice that I think is identified A 71701, do you see

15   that one?

16   A.  Yes, I do.

17   Q.  Is this a Record Press invoice to the GPO?

18   A.  This is a Record Press invoice.

19   Q.  Was this invoice -- excuse me, did Record Press invoice

20   this -- sorry.  Issue this invoice to the GPO pursuant to the

21   contract that's Plaintiff's Exhibit A?

22   A.  Yes, it did.

23   Q.  Did Record Press charge for collating, trimming to size, and

24   binding in this invoice?

25   A.  Yes, it did.

1    Q.   And what was the amount that Record Press charged?

2    A.   $1,386.70.

3    Q.   And how did Record Press determine that amount?

4    A.   Based on 11,320 pages, at a rate of $12.25 per 100 pages,

5    that price was determined.

6    Q.   Was that price of $12.25 per 100 pages the contract price?

7    A.   Yes, that's consistent with the contract.

8    Q.   Did the GPO accept this invoice and pay it?

9    A.   Yes, and indicated as such.

10   Q.   On this particular invoice, if a per-10-copy running rate

11   would have applied to this line item, would that have changed

12   the amount that Record Press would have charged?

13   A.   Yes.

14   Q.   By how much?

15   A.   The amount would have been reduced by 90 percent.

16   Q.   90 percent.  So if the amount for this line item had been

17   reduced by 90 percent, would Record Press be able to make money

18   on this invoice?

19   A.   Unfortunately not.

20   Q.   I want to refer you back to Plaintiff's Exhibit A if you

21   could for a moment, Mr. Wilmot, and the production page number

22   RP 54.  It's back toward the front.

23   A.   (Witness complies.)

24   Q.   Are you there?

25   A.   Yes, I am.

1    Q.  Does this page of the contract state what the term of this

2    contract is?

3    A.  Yes, it does.

4    Q.  And what was the term of this contract?

5    A.  A base year and four option years.

6    Q.  And so what was the base year?  Is that the first date here,

7    November 1st, 2006 through October 31, 2007?

8    A.  That's correct.

9    Q.  And then the four additional years, what did you refer to

10   those as?

11   A.  Option years.

12   Q.  And so who has the option to renew those years?

13   A.  The GPO.

14   Q.  Did the GPO renew Record Press' contract?

15   A.  Yes.  Twice.

16   Q.  You're aware that Mr. Burke filed this case in 2008.  Is

17   that right?

18   A.  That's correct.

19   Q.  And so did the GPO renew this contract since Mr. Burke filed

20   this case?

21   A.  Yes.  Twice.

22   Q.  Is this contract still in force today?

23   A.  Yes, it is.

24   Q.  The GPO hasn't terminated it?

25   A.  No, it has not.

1    Q.  Has the GPO ever suspended any payments on Record Press'

2    invoices under this contract?

3    A.  No, it has not.  Never.

4    Q.  Is $12.25 per 100 pages still the contract price for

5    trimming to size, collating, and binding?

6    A.  That's correct.

7    Q.  Has the GPO ever instructed Record Press to apply a

8    per-10-copy running rate to that line item?

9    A.  Never.

10   Q.  Does Record Press still provide printing services under this

11   contract to the GPO?

12   A.  Yes, it does.

13   Q.  Does Record Press still charge $12.25 per 100 pages?

14   A.  Yes, it does.

15   Q.  Does Record Press still issue those invoices reflecting that

16   to the GPO?

17   A.  Yes, it does.

18   Q.  And is that charge identified on the actual invoice for the

19   invoices?

20   A.  Yes, it does.

21   Q.  And does the GPO still pay those invoices?

22   A.  Yes, they do.

23   Q.  Has the GPO ever raised any issues with Record Press with

24   respect to this line item?

25   A.  Never.

1    Q.  Has any other government agency ever raised any issues with

2    Record Press with respect to this line item?

3    A.  Never.

4            MR. LOMAS:  Thank you.  I have no further questions.

5            THE COURT:  Thank you, Mr. Lomas.  Mr. King, do you

6    have redirect?

7            MR. KING:  No, Your Honor.

8            THE COURT:  Very well.  Thank you very much.

9            Mr. Wilmot, thank you.  You may step down.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Now counsel, I will be guided by your

12   preferences.  It is now 12:00 noon.  We can recess now for lunch

13   and reconvene at 1:15; alternatively, if you would like to take

14   20 minutes or so to begin the testimony of the next witness, you

15   may do that and then we will recess at that point.

16           What is your preference, Mr. King?

17           MR. KING:  We're going to ask to call Mr. Adgerson for

18   a short time.

19           THE COURT:  Very well.  Is he in the witness room?

20   Would one of you please be so kind as to ask him to come in?

21   Thank you.

22           MR. LOMAS:  Your Honor, while we're waiting for

23   Mr. Adgerson, I just wanted to mention that AUSA Valdez is on

24   behalf of government witnesses, and he would like to step in the

25   well when Mr. Adgerson is on the stand.

```
 1            THE COURT:  You mean, at the table with counsel?  Is
 2     that without objection, Mr. King?
 3            MR. KING:  That's without objection.
 4            THE COURT:  Very well.
 5            Good afternoon, Mr. Adgerson.  I'll ask you to please
 6     face the deputy clerk to be sworn, and then have a seat on the
 7     witness stand.
 8                (Oath administered by Courtroom Deputy.)
 9            THE COURT:  Good afternoon.
10            THE WITNESS:  Good afternoon.
11            THE COURT:  Mr. King, you may proceed.
12       (CALVIN ADGERSON, PLAINTIFF witness, having been duly sworn,
13                       testified as follows:)
14                       DIRECT EXAMINATION
15     BY MR. KING:
16     Q.  Good afternoon, Mr. Adgerson.
17     A.  Good afternoon, Mr. King.
18     Q.  Thank you for your time today.
19            Mr. Adgerson, were you employed with -- first of all,
20     do you recall ever receiving a call from Mr. Burke, the
21     plaintiff in this case?
22     A.  I do.
23     Q.  Okay.  And were you employed with the GPO at that time?
24     A.  Yes, I was.
25     Q.  And what was your position at the GPO at that time?
```

1   A.  I was the branch chief of the commercial billing section.

2   Q.  Okay.  I'm sorry, could you repeat that?

3   A.  I was the branch chief of the commercial billing and

4   examination section.

5   Q.  Commercial billing and examination section?

6   A.  Yes.

7   Q.  And what was the role of that particular department?

8   A.  We were responsible for paying commercial printing invoices,

9   and also processing non-printing invoices.

10  Q.  And so what was your role at that department with respect to

11  that department's role?

12  A.  I'm sorry, I didn't...

13  Q.  You stated your position.  My question is:  What were you

14  required to do in that position at that department?

15  A.  I was more of a managerial aspect.  I was responsible for

16  making sure that the sections functioned properly.  I had three

17  supervisors that were section chiefs that reported to me, but it

18  was more from a management perspective as far as meetings,

19  making sure that operations were functioning properly.

20  Q.  Going back to the call from Mr. Burke.  When you received

21  the call from Mr. Burke, what was the nature of Mr. Burke's

22  inquiry?

23  A.  Mr. Burke had inquired about how we were processing our

24  invoices on the 2231 contract, whether we were processing them

25  correctly; specifically in regards to the trimming, binding, and

1    collating charge.

2    Q.  And during the course of that conversation, did you

3    undertake to investigate Mr. Burke's inquiry?

4    A.  No, the only thing that I had at that time when I spoke to

5    Mr. Burke was a copy of the contract.

6    Q.  Okay.  And did you then review the contract in your

7    discussion with Mr. Burke?

8    A.  When you say review the contract, you mean to look at the

9    contract?

10   Q.  Yeah.  I mean basically, when you're on the phone with

11   Mr. Burke, do you have the contract in your hands and are you

12   looking at it as you're --

13   A.  Yes.

14   Q.  Okay.  Now, how did you respond to Mr. Burke when he called

15   you and you were reviewing the contract?

16   A.  I don't quite understand your question.  To a specific

17   question that he asked?

18   Q.  Yeah.  How did you respond to his inquiry?

19          MR. LOMAS:  Objection.  Vague.  It doesn't identify a

20   specific question.

21   BY MR. KING:

22   Q.  What did you tell Mr. Burke?

23   A.  In response to something that Mr. Burke asked me?

24   Q.  Yes.

25   A.  Specifically?

1   Q.  You said that -- you testified earlier that he -- the nature

2   of his call was in relation to billing under this particular

3   contract, and specifically this collating, trimming to size, and

4   binding, and that he was questioning this.  What did you tell

5   him?

6   A.  That I could not determine how we were billing the contract

7   at that point because I didn't have any invoices in front of me.

8   Q.  Uh-huh.  Did Mr. Burke provide you with any information

9   regarding how the contract was being charged?

10  A.  Are you referring to his interpretation of how the contract

11  was being charged, or my...

12  Q.  No, I'm referring to whether or not Mr. Burke provided you

13  any information upon which you were able to respond to him.

14  A.  Respond?  I still don't understand.  When you say "respond

15  to him," I'm trying to understand exactly:  Respond to what?

16  Q.  Mr. Burke's questioning whether or not the charges were

17  correct.

18  A.  Right.  And at that point I mentioned earlier that I did not

19  have any invoices in front of me, so that I could not tell

20  Mr. Burke how we were processing the invoices.

21  Q.  Okay.  So is it true your testimony today is that you did

22  not tell Mr. Burke whether or not Record Press was charging the

23  invoices correctly?  Should I repeat --

24  A.  Yeah, right.  My response to Mr. Burke was that we -- I

25  could not tell him how we were processing the invoices because I

1    didn't have any invoices in front of me.  I did not tell

2    Mr. Burke that we were processing the invoices incorrectly, if

3    that answers your question.

4    Q.  Uh-huh.  Did you tell Mr. Burke anything about how

5    Record Press was processing its invoices?

6    A.  Well, if I did not have any invoices, I would not know how

7    Record Press was processing their invoices.  So I couldn't tell

8    Mr. Burke how Record Press was being paid.

9    Q.  Did Mr. Burke provide you any information regarding how

10   Record Press was charging on its invoices?

11   A.  Not to my knowledge.  That I can remember that he provided

12   me physically, or just by telling me?

13   Q.  Telling you.

14   A.  Telling me?  He may have, but I don't remember him telling

15   me anything specifically about how Record Press was being paid.

16   Q.  No, but my question is not how they're being paid.  My

17   question is how they're charging.  Did he give you any

18   information upon which you were able to base an understanding of

19   what -- I'm sorry, you said that you didn't have any invoices so

20   you didn't know -- you wouldn't be able to provide some response

21   about whether or not GPO -- what GPO was doing.

22        And my question is:  Since you didn't have any invoices

23   in front of you, did Mr. Burke provide you with any information

24   from something he had that reflected what would have been on an

25   invoice?

1          MR. LOMAS:  Objection.  Leading.

2          THE COURT:  The objection is overruled.

3   A.  Not anything that I could recall that he specifically said

4   about what Record Press was being paid or how the invoices were

5   being processed.

6   BY MR. KING:

7   Q.  How did the conversation end?  You know, what was the idea

8   that was conveyed to Mr. Burke?

9          MR. LOMAS:  Objection.  Compound and...

10          THE COURT:  Sustained.  Let me ask you to rephrase your

11  question.

12          MR. KING:  Thank you, Your Honor.

13  BY MR. KING:

14  Q.  What was the result, in your estimation, of the

15  conversation?

16  A.  The result of the conversation, in my estimation, is that

17  Mr. Burke had some question as to how these invoices were being

18  processed on this contract.  And...

19  Q.  Okay.  So that's the end of that.

20          So having received this call from Mr. Burke, him

21  expressing his question about it, is your testimony today simply

22  that you did not provide him with any information?

23  A.  Provide him with information?  Yes, I provided Mr. Burke

24  with some information.

25  Q.  Okay.  What information did you provide Mr. Burke?

1    A.  I provided Mr. Burke information to contact the contracting

2    officer if he had questions about contract interpretation.  If

3    he was questioning about how we were billing, I could not

4    provide him with any information at that time because I did not

5    have copies of invoices in front of me.

6    Q.  Did you provide Mr. Burke with any information about what

7    the contract said?

8    A.  About what the contract said as far as?

9    Q.  Its terms.

10   A.  Its terms?  We may have discussed, you know, the contract

11   terms.  You know, at no point did I tell Mr. Burke that we were

12   processing these invoices incorrectly.

13   Q.  Uh-huh.  So what kinds of contract terms -- if you can

14   recall, what kind of contract terms did you provide information

15   to Mr. Burke about?

16   A.  Well, as I said, Mr. Burke had inquired about this one

17   specific line item, the collating, binding, and I think there's

18   one other process that's involved there.  But that specific line

19   item.

20   Q.  What information did you provide to Mr. Burke about that

21   line item?

22   A.  That I didn't know if we were processing -- or how our

23   office was processing that particular line item because I did

24   not have any invoices in front of me.

25   Q.  Okay.  Thank you.  But I'm just trying to narrow in on:  Did

1   you provide Mr. Burke any information about what the contract

2   said with respect to that line item?

3   A.  With regards to what it said?

4   Q.  That's right.  The term of the contract.

5   A.  The term?  I'm not understanding when you say "the term."

6   Q.  The collating, trimming to size, and binding, which is that

7   work that you're referring to, which is the subject matter of

8   your conversation, that refers to a particular line item in the

9   contract.  Correct?

10  A.  That's correct.

11  Q.  Did you provide Mr. Burke with any information regarding

12  what that contract said regarding that line item?

13  A.  None other than what was on that specific line item, that

14  that charge would be 12 -- I think $12.25 per hundred.

15  Q.  Okay.  Did you provide any information to Mr. Burke

16  regarding the running rates in the contract?

17  A.  None other than what the line item that I just referred to,

18  what I just said.

19  Q.  So is it possible to answer that in a yes or no?  Did you

20  give him information -- did you provide Mr. Burke with

21  information from the contract about the running rate, yes or no?

22  A.  For that specific line item?

23  Q.  Well, let's do it one step at a time.  At all?

24  A.  At all, yes.  For that specific item, yes.

25  Q.  Well, okay.  Let me just back up because it is a bit of a

1    compound question.  And we're stepping in front of and in back

2    of each other.

3           Did you provide Mr. Burke any information at all about

4    the running rate in the contract, yes or no?

5    A.  Yes.

6    Q.  What did you tell him about the running rate in the

7    contract?

8    A.  When Mr. Burke inquired about that particular rate, or about

9    the contract, he inquired as to if we were processing these

10   invoices correctly.  He had a concern about how we were

11   processing these invoices.

12          My response to Mr. Burke was that I did not know how we

13   were processing these invoices because I did not have copies of

14   invoices this front of me.

15   Q.  What did you tell Mr. Burke about the running rate?

16   A.  Which running rate?

17   Q.  Is there more than one running rate?

18   A.  Yes, there are multiple line items on the contract.

19   Q.  Okay.  You said that you did provide Mr. Burke with

20   information about a running rate.  What information about the

21   running rate did you provide him?

22   A.  That at that -- that particular running rate, if we're

23   talking about the collating, trimming, and binding, that that

24   rate, as it was listed on the contract, is per hundred at the

25   rate that was listed.

1    Q.  Are you saying that you told Mr. Burke that the running rate

2    applied to collating, trimming to size, and binding at the

3    per-100 rate?

4    A.  Yes.

5           MR. LOMAS:  Objection.  Vague.  I'm sorry, I just want

6    to object to that as vague.  I'm not sure the witness

7    understands what running rate he's referring to, because he's

8    not clarifying which running rate.

9           THE COURT:  Let me ask you to rephrase your question

10   then, Mr. King, since Mr. Adgerson said there is more than one

11   running rate.

12   BY MR. KING:

13   Q.  Did you tell Mr. Burke that the running rate applied to the

14   line item for the collating, trimming to size, and binding at

15   the per-100-page rate?

16          MR. LOMAS:  Same objection.

17          THE COURT:  The objection is overruled.

18   A.  Are you referring to the rate that's listed on that line

19   item?

20   BY MR. KING:

21   Q.  I mean, I'm just asking the question.  The question is:  Did

22   you tell Mr. Burke that the running rate --

23   A.  For that line item, for trimming, collating, and binding --

24   there's multiple rates in the contract.  Are you referring to

25   the rate for trimming, collating, and binding?  If you're

1  referring to that rate, yes, I told Mr. Burke that that was per

2  hundred at the rate that was listed next to that line item.

3  Q.  Okay.  Now, there is a running rate.  The words "running

4  rate" are used in the contract.  Right?

5  A.  Yes.

6  Q.  Okay.  And when I asked you if you referred to the running

7  rate in your talk with Mr. Burke, I'm referring to the running

8  rate that's indicated by the words "running rate" in the

9  contract.

10      So is your testimony still that when you told Mr. Burke

11  about the running rate, you were referring to the term in the

12  contract that actually uses the words "running rate"?

13  A.  The word -- are you specifically talking about the word

14  "running"?

15  Q.  The words, the actual words "running rate."

16  A.  Right.  And as I said before, you have different line items

17  that have rates.  You have multiple line items that have rates.

18  Q.  Okay.  But those rates, it seems like now you're calling

19  those running rates.

20  A.  Those processes require an operation.  So when you look at a

21  contract and you have specific processes, then we refer to those

22  as actual running rates if it involves a process that...

23  Q.  Okay.  So your testimony is that, when you told Mr. Burke

24  about the running rates, that you weren't necessarily referring

25  to the running rate that's indicated by the words "running

1   rate"; that you're also referring to other rates that don't

2   necessarily correspond to the words "running rate"?  Is that

3   your testimony?

4           MR. LOMAS:  Objection.  Vague.

5           THE COURT:  Sustained.

6   BY MR. KING:

7   Q.  I'm just going to have to back it up a little bit again.

8   I'm sorry this is taking too long.

9           You testified that you told Mr. Burke about a contract

10  term that related to a running rate.  Correct?

11  A.  I testified that I told Mr. Burke about a line item for a

12  rate for trimming, collating, and binding at the per-100 cost.

13  Q.  Okay.  When you spoke to Mr. Burke, did you use the words

14  "running rate"?

15  A.  That was almost four years ago.  I don't remember

16  specifically using the word "running rate."  I can't tell you

17  that.

18  Q.  So as far as you're aware right now, you're not sure whether

19  or not you discussed a quote/unquote "running rate" with

20  Mr. Burke?

21          MR. LOMAS:  Objection.  Mischaracterizes testimony.

22          THE COURT:  Sustained.

23  BY MR. KING:

24  Q.  Is your testimony today that you might not have used the

25  words "running rate" when you spoke to Mr. Burke?

1   A.  You say might not have used?  Again, we're talking

2   approximately four years ago, so I could not specifically tell

3   you whether I used the word "running" or did not use the word

4   "running."  I just don't remember that.

5   Q.  So it's true that you might not have said that?

6       THE COURT:  Might not have said?  Let me ask you to ask

7   a complete question, please, since it is not clear what the

8   term, quote, "that," closed quote, refers to.

9   BY MR. KING:

10  Q.  It's true that you might not have used the words "running

11  rate" when you spoke to Mr. Burke?

12  A.  In regards to a specific, or just the word, period?  Again,

13  it's been four years, and I don't remember, or I can't

14  specifically say that, when I discussed that particular line

15  item that was in question, that I used the word "running."  I

16  don't remember.

17  Q.  In your investigation and analyzing the contract to respond

18  to Mr. Burke's questions, did you look at the GPO spreadsheet

19  for this particular job?

20      MR. LOMAS:  Objection.  Foundation.  Mischaracterizes

21  testimony.  Foundation with respect to the investigation

22  analysis.

23      THE COURT:  Will you rephrase your question, please,

24  Mr. King?

25  BY MR. KING:

1  Q.  When you were on the phone with Mr. Burke and you were

2  addressing his question, you said that you did have the contract

3  with you.  Correct?

4  A.  That's correct.

5  Q.  And did you just happen to have that contract in front of

6  you when he called?  Or did you, you know, take an effort to

7  pull up the contract when he called?

8  A.  No, the contract was actually physically brought to me.

9  Mr. Burke had spoken to one of my supervisors, and she

10  transferred the call to me and she brought the contract up.

11  Q.  Okay.  And did you also have a GPO spreadsheet that

12  corresponded to this contract?

13  A.  I had the prices.  I don't recollect whether it was the

14  spreadsheet or whether it was the bid papers, but I did have the

15  prices.

16  Q.  And if you were going to -- when you said you didn't know

17  how GPO was processing it, or you didn't know if GPO was

18  processing it correctly, why weren't you able to determine

19  whether or not GPO was processing it correctly at that time?

20  A.  Because -- at the time that I spoke to Mr. Burke?

21  Q.  Uh-huh.

22  A.  Because I did not have a copy of an invoice in front of me.

23  So in order for me to verify whether or not we were processing

24  them correctly or incorrectly, I would have to have an invoice

25  to review.

1    Q.   Okay.

2            MR. KING:  No more questions, Your Honor.  Thank you.

3            THE COURT:  Very well.  Thank you, Mr. King.

4            Mr. Lomas, do you wish to cross-examine now or after

5    lunch?

6            MR. LOMAS:  Your Honor, if we could do it now, that

7    would be preferred, so Mr. Adgerson can be on his way.

8            THE COURT:  Very well.

9            MR. LOMAS:  Thank you.

10                        **CROSS EXAMINATION**

11   BY MR. LOMAS:

12   Q.   Good morning, Mr. Adgerson.

13   A.   Good morning.

14   Q.   Could you just -- I don't know if we got it for the record.

15   Your full name, please?

16   A.   My name is Calvin Adgerson.

17   Q.   Can you spell your last name?

18   A.   A-D-G, as in George, E-R-S-O-N.

19   Q.   Thank you.  And you said you are retired from the GPO?

20   A.   That's correct.

21   Q.   And how long did you work for the GPO before you retired?

22   A.   I was an employee of the GPO for over 34 years.

23   Q.   And what was the general nature of your responsibilities at

24   the GPO?

25   A.   The first approximately six years I was in the production

1   area.  I was a typesetter.  And in 1980 I transferred over to

2   the finance area.

3   Q.  And what were your responsibilities in the finance area?

4   A.  In the finance area, originally I was a printing specialist,

5   and we reviewed agency billings.  We billed customer agencies

6   and reviewed the invoices that were received from the printing

7   contractors for correctness, to make sure that we were billed

8   the customer agencies correctly.

9   Q.  And did your responsibilities in finance change after that

10  point at all?

11  A.  About 10 years afterwards, I became a supervisor in the

12  payables area, and that area was directly responsible for paying

13  the commercial printing vendors.  That was in 1990.

14  Q.  And so were you reviewing to make sure vendors were being

15  paid properly?

16  A.  Yes, that's correct.

17  Q.  And if you spotted an issue -- if you identified an issue

18  with that, would you raise it?

19  A.  Yes.  We would raise the issue and take the necessary steps

20  to correct what was wrong if we found something that was billed

21  incorrectly, yes.

22  Q.  Now, if there was a question about a vendor contract, who

23  would you go to, or would there be somebody you would go to, to

24  discuss that?

25  A.  Yes.  If there was ever any discrepancy that we would find,

1    we would contact the contracting officer for clarification.

2    Q.  And so why would you need the contracting officer's

3    clarification?  Why wouldn't you, for example, be able to

4    provide that?

5    A.  Well, our area specifically is responsible for processing

6    the invoices.  And there may be occasion where we interpret

7    something incorrectly, and we would seek the contracting

8    officer's guidance because the contracting officer has final

9    authority.  They administer the contracts.  So that's where we

10   would go for clarification.

11   Q.  Now, when Mr. Burke first called you, were you aware of any

12   concern or issue about Record Press' contract or invoices?

13   A.  No, there was no issue, to my knowledge, about how the

14   invoices on this contract for Record Press were being processed.

15   Q.  And when Mr. Burke called you, did he tell you who he was?

16   A.  No.  Well, when he called me, he identified himself as a

17   representative of Mr. Wilmot from Record Press, and proceeded to

18   inquire about how we were processing the invoices on this

19   contract for payment.

20   Q.  Did you come to realize during the conversation that it was

21   not Mr. Wilmot or anybody from Record Press?

22   A.  Well, during the course of the conversation, yes.  During

23   the course of the conversation, I recollect that Mr. Burke had

24   asked me to fax a copy of the contract to him.  And my thinking

25   was, and this is what I related:  If you're who you say you are,

1   you should already have a copy of the contract.  And that's when

2   he identified himself.

3   Q.  And did you fax him a copy, Mr. Burke a copy of the

4   contract?

5   A.  No, I did not.

6   Q.  At any time did you tell Mr. Burke that a per-10-copy

7   running rate applied to the trimming, collating to size (sic),

8   and binding line item?

9   A.  No, I did not.

10  Q.  Did you tell Mr. Burke you would look into the matter?

11  A.  I referred Mr. Burke to the contracting officer once it was

12  determined to me who he was.

13  Q.  Now, after your phone call, did you do anything to follow up

14  on this call?

15  A.  Yes.  For my own satisfaction, I spoke to my section chief

16  and had her contact her contracting officer to verify that, one,

17  we had interpreted the contract correctly; and two - and she

18  could do this - that we were paying the invoices correctly.

19  Q.  And what was the name of your section chief?

20  A.  Rosa Smith.

21  Q.  Did she report to you?

22  A.  Yes.

23  Q.  And what did you learn through this follow-up?

24  A.  It was determined that we had been processing the invoices

25  correctly, and there were no issues in the way we were

1      processing them.

2      Q.  And so the price for collating, trimming to size, and

3      binding, is that $12.25 per 100 pages?

4      A.  Yes, that's correct.

5      Q.  And does a per-10-copy running rate apply?

6      A.  No, it does not.

7      Q.  Mr. Adgerson, are you familiar with an allegation that Burke

8      made in his complaint that mentioned your name?

9      A.  Yes.  Again, after our conversation, other than just to

10     verify that we were billing the contractors -- or we were paying

11     the contractors' invoices correctly, that was the end of it for

12     me as far as I was concerned, until my name happened to appear

13     in this case here, which was a shock to me, to be honest.

14              MR. LOMAS:  Your Honor, may I approach?

15              THE COURT:  Yes, you may.

16     BY MR. LOMAS:

17     Q.  Mr. Adgerson, could you flip to the paragraph that's marked

18     19 in this document?  And this document is the verified -- do

19     you see that this is the verified complaint in this matter,

20     United States of America ex rel Brian Burke v. Record Press?

21     A.  Yes.

22     Q.  Can you flip to Paragraph Number 19?

23     A.  (Witness complies.)

24     Q.  Do you see the sentence that begins, for example, "Calvin

25     Anderson"?

1    A.  Yes.

2    Q.  First, is that your name?

3    A.  No, it's not.

4    Q.  And second, the remainder of that sentence, is that true?

5    A.  No, that is not true.

6    Q.  Thank you, Mr. Adgerson.

7              MR. LOMAS:  No further questions.

8              THE COURT:  Now, Mr. King, do you have redirect

9    examination of Mr. Adgerson?

10             MR. KING:  No, I do not, Your Honor.

11             THE COURT:  You do not?  Very well.  Thank you,

12   Mr. Adgerson.  You may step down.

13             MR. VALDEZ:  May I be excused from the well,

14   Your Honor?

15             THE COURT:  May Mr. Adgerson be excused, Mr. Lomas?

16             Excuse me.  Mr. King, may Mr. Adgerson be excused?

17             MR. KING:  Absolutely, Your Honor.

18             THE COURT:  Very well.  You may be excused.  And

19   Mr. Valdez, you may be excused from the well of the court.

20   Thank you.

21             It is now approximately 12:35.  We will recess at this

22   time for lunch, and reconvene at 10 minutes before 2:00.

23             Mr. King, who will be your next witness?

24             MR. KING:  Mr. Burke will be the next witness.

25             THE COURT:  Very well.  Thank you very much.

1          (Lunch recess taken at 12:44 p.m.).

2

3

4          **CERTIFICATE OF OFFICIAL COURT REPORTER**

5

6          **I, Rebecca Stonestreet, certify that the foregoing is a**

7     **correct transcript from the record of proceedings in the**

8     **above-entitled matter.**

9

10

11

12    _____          _____

13    **SIGNATURE OF COURT REPORTER**                    **DATE**

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$0.25** [5] - 31:10, 31:13, 31:15, 31:23, 32:24
**$0.35** [1] - 23:6
**$0.60** [4] - 32:3, 32:18, 37:3, 38:17
**$1,386.70** [1] - 56:2
**$10** [7] - 29:5, 30:13, 30:21, 31:4, 33:20, 38:6, 38:11
**$106.40** [2] - 41:18, 42:11
**$12** [1] - 40:21
**$12.25** [27] - 10:7, 10:17, 11:5, 11:9, 11:16, 13:12, 13:24, 14:3, 14:15, 15:2, 15:8, 15:17, 15:24, 16:14, 17:2, 33:14, 39:6, 46:12, 52:21, 54:1, 55:7, 56:4, 56:6, 58:4, 58:13, 67:14, 78:3
**$147,000.23** [1] - 47:17
**$168** [2] - 40:25, 41:6
**$372.40** [4] - 41:14, 42:12, 55:4, 55:5
**$49,798.80** [2] - 41:5, 41:7

## 0

**00** [1] - 24:2
**000069** [1] - 20:5
**02** [1] - 24:5
**035** [3] - 33:6, 37:6, 38:25
**08-364** [2] - 1:3, 3:2

## 1

**10** [20] - 23:5, 23:9, 23:11, 25:3, 25:12, 25:20, 26:2, 26:4, 26:11, 35:13, 36:25, 37:2, 37:7, 41:4, 44:7, 45:7, 51:7, 51:10, 75:11, 79:22
**10-copy** [3] - 15:9, 52:25, 53:2
**10-minute** [1] - 43:22
**100** [35] - 10:18, 11:6, 11:10, 11:17, 12:9, 12:10, 13:12, 13:25, 14:3, 14:16, 15:2, 15:8, 15:17, 15:24, 16:15, 17:2, 33:14, 39:6, 40:6, 46:12, 46:18, 46:20, 51:18, 51:20, 51:22, 51:25, 52:1, 52:23, 54:2, 55:8, 56:4, 56:6, 58:4, 58:13, 78:3
**10706** [1] - 18:2
**10:04** [1] - 1:7
**11,320** [3] - 33:14, 37:4, 56:4
**11:26** [1] - 44:8
**12** [1] - 67:14

**1272** [4] - 42:25, 44:15, 44:19, 44:21
**12:00** [1] - 59:12
**12:35** [1] - 79:21
**12:44** [1] - 80:1
**14** [1] - 1:5
**1420** [1] - 1:12
**17** [1] - 2:3
**19** [3] - 2:11, 78:18, 78:22
**1900** [1] - 1:16
**1945** [1] - 48:13
**1980** [1] - 75:1
**1990** [1] - 75:13
**1:15** [1] - 59:13
**1st** [1] - 57:7

## 2

**2** [1] - 30:18
**20** [11] - 27:22, 29:10, 29:17, 29:20, 29:24, 33:6, 36:1, 36:12, 36:23, 45:17, 59:14
**20001** [1] - 1:23
**20005** [1] - 1:13
**20006** [1] - 1:17
**2003** [1] - 18:6
**2006** [1] - 57:7
**2007** [1] - 57:7
**2008** [1] - 57:16
**2011** [2] - 1:5, 6:11
**202** [4] - 1:14, 1:17, 1:21, 1:24
**20530** [1] - 1:20
**2231** [5] - 43:2, 44:17, 44:20, 49:13, 61:24
**2351** [2] - 23:15, 24:7
**2361** [1] - 24:9
**27** [1] - 2:12
**2:00** [1] - 79:22

## 3

**3,040** [2] - 39:6, 55:7
**30** [4] - 13:16, 15:6, 49:7
**307-2843** [1] - 1:21
**31** [3] - 6:11, 9:8, 57:7
**31st** [1] - 23:22
**34** [1] - 74:22
**34-plus-year** [1] - 13:17
**34-year** [1] - 15:20
**354-3249** [1] - 1:24
**37** [1] - 2:12
**3729(A** [1] - 9:8

## 4

**40** [7] - 27:19, 29:2, 29:11, 30:1, 38:2, 38:24, 45:17
**436-2641** [1] - 1:14
**48** [2] - 2:4, 18:1
**496-7183** [1] - 1:17

## 5

**54** [1] - 56:22
**555** [1] - 1:20
**560-page** [1] - 37:5
**566** [1] - 33:5

## 6

**60** [1] - 2:5
**65-year-old** [1] - 15:4
**6511** [1] - 1:23
**66** [7] - 22:9, 30:18, 31:12, 32:2, 33:1, 33:22, 38:12
**67** [13] - 22:12, 22:15, 32:16, 33:9, 33:17, 35:4, 38:20, 39:2, 39:9, 40:5, 46:11, 46:17, 52:12
**68** [1] - 20:1
**69** [16] - 19:22, 19:25, 40:7, 40:10, 40:11, 41:16, 41:25, 42:3, 42:4, 44:17, 44:18, 46:19, 46:21, 50:4, 50:19

## 7

**70** [4] - 23:15, 24:4, 24:5, 24:9
**706** [1] - 1:13
**71700** [6] - 27:14, 27:24, 37:16, 37:21, 45:17, 54:16
**71701** [10] - 27:24, 27:25, 28:15, 28:19, 29:12, 29:22, 29:24, 35:25, 45:17, 55:14
**74** [1] - 2:6
**76** [1] - 38:24

## 9

**90** [3] - 56:15, 56:16, 56:17

## A

**a.m** [1] - 1:7
**a.m.)** [1] - 44:8
**A1** [2] - 38:12, 38:13
**A2** [1] - 38:8
**able** [12] - 5:15, 5:17, 20:22,

21:14, 36:6, 36:16, 56:17, 63:13, 64:18, 64:20, 73:18, 76:3
**above-entitled** [1] - 80:8
**absolutely** [2] - 52:4, 79:17
**accept** [6] - 15:18, 17:5, 53:22, 53:25, 55:11, 56:8
**accompany** [1] - 8:3
**accordingly** [1] - 37:1
**accounting** [1] - 40:15
**accurate** [1] - 21:17
**Act** [4] - 9:7, 9:12, 14:8, 14:19
**Action** [1] - 1:3
**action** [2] - 43:8, 43:10
**actual** [4] - 53:17, 58:18, 70:15, 70:22
**addition** [3] - 40:6, 46:19, 53:14
**additional** [2] - 7:20, 57:9
**address** [2] - 17:24, 44:13
**addressing** [1] - 73:2
**ADG** [1] - 74:18
**Adgerson** [19] - 15:21, 15:22, 59:17, 59:23, 59:25, 60:5, 60:16, 60:19, 69:10, 74:7, 74:12, 74:16, 78:7, 78:17, 79:6, 79:9, 79:12, 79:15, 79:16
**ADGERSON** [2] - 2:5, 60:12
**adjusted** [3] - 37:1, 37:3, 37:5
**adjustment** [1] - 37:6
**administer** [1] - 76:9
**administered** [2] - 17:15, 60:8
**admissibility** [1] - 27:5
**admissible** [4] - 19:9, 19:11, 19:13, 26:20
**admission** [2] - 37:17, 37:19
**admit** [2] - 13:1, 19:14
**ADMITTED** [1] - 2:9
**admitted** [9] - 19:18, 24:20, 24:21, 26:17, 27:8, 28:23, 37:21, 43:18, 44:24
**affects** [1] - 6:4
**afternoon** [6] - 60:5, 60:9, 60:10, 60:16, 60:17
**afterwards** [1] - 75:11
**agencies** [2] - 75:5, 75:8
**agency** [2] - 59:1, 75:5
**ago** [2] - 71:15, 72:2
**agree** [3] - 14:15, 41:6, 41:11
**agreed** [2] - 17:6, 24:20
**agreement** [1] - 10:6
**aided** [1] - 1:25
**ALDRIDGE** [1] - 1:16
**allegation** [2] - 13:21, 78:7

**allegations** [1] - 13:8
**alleged** [1] - 13:5
**alleges** [2] - 6:25, 12:11
**allow** [1] - 4:24
**allowed** [1] - 9:14
**almost** [1] - 71:15
**alternatively** [1] - 59:13
**America** [1] - 78:20
**amount** [25] - 6:12, 6:15, 6:20, 14:4, 14:5, 16:7, 22:25, 23:2, 23:7, 25:3, 25:20, 26:2, 41:13, 41:15, 41:25, 42:1, 47:10, 55:1, 55:6, 56:1, 56:3, 56:12, 56:15, 56:16
**amounts** [2] - 11:12, 45:20
**analysis** [1] - 72:22
**analyzing** [1] - 72:17
**and..** [2] - 65:9, 65:18
**Anderson** [1] - 78:25
**answer** [3] - 36:6, 36:16, 67:19
**answered** [4] - 21:5, 29:8, 35:19, 47:13
**answers** [1] - 64:3
**anticipated** [1] - 44:3
**apologize** [2] - 21:13, 21:16
**appeal** [4] - 10:23, 10:25, 48:20
**appear** [3] - 11:12, 46:22, 78:12
**APPEARANCES** [1] - 1:11
**appeared** [1] - 32:7
**appellate** [8] - 10:24, 15:15, 48:15, 48:17, 48:18, 48:22, 53:13, 54:4
**appellate..** [1] - 49:1
**appellee's** [1] - 27:20
**appellees** [3] - 29:21, 36:2, 38:3
**appendices** [1] - 10:24
**appendix** [4] - 29:17, 29:21, 36:1, 53:9
**apples** [2] - 47:1, 47:2
**applied** [15] - 6:25, 14:6, 15:9, 31:5, 31:7, 31:8, 33:3, 33:10, 33:12, 33:23, 40:8, 56:11, 69:2, 69:13, 77:7
**applies** [4] - 10:8, 12:13, 26:5, 32:21
**apply** [20] - 6:17, 12:12, 15:11, 26:6, 30:19, 30:20, 31:2, 32:17, 32:20, 33:18, 34:4, 36:3, 36:13, 36:22, 38:14, 39:3, 43:11, 53:2, 58:7, 78:5
**applying** [1] - 6:24
**approach** [6] - 18:14, 23:18, 26:25, 37:10, 42:19, 78:14
**appropriate** [1] - 5:6

**approve** [2] - 15:18, 17:6
**area** [7] - 75:1, 75:2, 75:3, 75:4, 75:12, 76:5
**argued** [1] - 43:8
**argument** [1] - 45:14
**argumentative** [2] - 41:21, 45:10
**arise** [1] - 6:8
**arising** [2] - 34:12, 34:23
**arrives** [1] - 49:17
**aspect** [1] - 61:15
**Assistant** [1] - 7:24
**assisting** [2] - 3:20, 3:22
**associated** [2] - 4:20, 47:3
**assume** [1] - 4:7
**assuming** [1] - 6:13
**assumption** [6] - 6:23, 28:4, 39:23
**assure** [1] - 21:14
**attempt** [1] - 21:11
**attention** [6] - 8:24, 22:8, 26:18, 40:12, 46:21, 50:24
**Attorney** [1] - 7:24
**ATTORNEY'S** [1] - 1:19
**attorneys** [1] - 48:20
**AUSA** [1] - 59:23
**authenticity** [1] - 43:15
**authority** [1] - 76:9
**available** [1] - 4:22
**award** [5] - 40:13, 40:14, 47:8, 53:20
**aware** [5] - 6:8, 13:1, 57:16, 71:18, 76:11

# B

**balances** [1] - 54:13
**base** [4] - 7:8, 57:5, 57:6, 64:18
**based** [10] - 6:23, 23:1, 34:11, 43:1, 47:2, 47:22, 52:22, 53:12, 55:7, 56:4
**Basis** [1] - 40:13
**basis** [6] - 20:25, 21:11, 40:13, 40:14, 45:13, 47:8
**Bates** [1] - 19:22
**became** [1] - 75:11
**become** [1] - 20:1
**BEFORE** [1] - 1:9
**begin** [1] - 59:14
**begins** [2] - 24:2, 78:24
**behalf** [7] - 3:13, 3:16, 4:3, 8:21, 8:25, 15:3, 59:24
**behavior** [1] - 14:10
**bench** [2] - 3:7, 4:17
**BENCH** [1] - 1:8
**between** [3] - 6:18, 10:3, 24:8
**beverage** [1] - 7:11

**bid** [25] - 11:25, 12:3, 12:16, 15:6, 15:7, 15:8, 15:10, 18:22, 47:19, 49:17, 49:19, 49:22, 50:1, 50:8, 50:22, 52:3, 52:8, 52:19, 52:20, 52:24, 52:25, 53:2, 53:22, 53:25, 73:14
**bidder** [2] - 13:18, 47:17
**bidders** [3] - 47:1, 47:18
**bidding** [2] - 22:24, 40:7
**bids** [1] - 11:22
**billed** [4] - 36:20, 75:5, 75:7, 75:20
**billing** [10] - 43:10, 46:3, 51:19, 61:1, 61:3, 61:5, 63:2, 63:6, 66:3, 78:10
**billings** [1] - 14:22, 75:5
**bind** [1] - 53:16
**bindery** [2] - 53:11, 53:15
**binding** [39] - 10:3, 10:7, 10:14, 10:17, 11:4, 11:9, 12:7, 13:24, 29:9, 29:17, 29:20, 33:14, 38:2, 39:6, 46:12, 46:15, 46:18, 46:20, 51:25, 52:17, 53:5, 53:6, 54:1, 54:24, 55:3, 55:24, 58:5, 61:25, 63:4, 66:17, 67:6, 68:23, 69:2, 69:14, 69:23, 69:25, 71:12, 77:8, 78:3
**bit** [2] - 67:25, 71:7
**blow** [1] - 52:13
**branch** [2] - 61:1, 61:3
**break** [1] - 43:23
**Brian** [2] - 3:3, 78:20
**BRIAN** [1] - 1:3
**brief** [4] - 27:20, 38:3, 43:22, 54:4
**briefs** [4] - 10:24, 10:25, 11:1, 15:15
**bring** [1] - 20:16
**brought** [4] - 9:7, 10:23, 73:8, 73:10
**Building** [1] - 1:19
**BURKE** [1] - 1:3
**Burke** [88] - 3:3, 3:4, 3:12, 3:15, 4:14, 4:18, 6:24, 9:6, 10:21, 11:13, 11:15, 12:11, 12:19, 13:1, 13:8, 13:22, 16:11, 27:20, 36:2, 38:3, 57:16, 57:19, 60:20, 61:20, 61:21, 61:23, 62:5, 62:7, 62:11, 62:14, 62:22, 62:23, 63:8, 63:12, 63:20, 63:22, 63:24, 64:2, 64:4, 64:8, 64:9, 64:23, 65:8, 65:17, 65:20, 65:23, 65:25, 66:1, 66:6, 66:11, 66:15, 66:16, 66:20, 67:1, 67:11, 67:15, 67:20, 68:3, 68:8, 68:12, 68:15,

68:19, 69:1, 69:13, 69:22, 70:1, 70:7, 70:10, 70:23, 71:9, 71:11, 71:13, 71:20, 71:25, 72:11, 73:1, 73:9, 73:20, 76:11, 76:15, 76:23, 77:3, 77:6, 77:10, 77:11, 78:7, 78:20, 79:24
**Burke's** [11] - 5:14, 11:7, 13:8, 15:23, 16:4, 16:25, 24:22, 61:21, 62:3, 63:16, 72:18
**business** [3] - 48:12, 48:13, 48:14
**BY** [43] - 17:23, 18:16, 19:20, 20:9, 21:20, 22:7, 22:17, 25:17, 26:22, 27:2, 27:10, 29:1, 29:18, 30:5, 30:14, 31:1, 31:21, 32:11, 34:19, 35:23, 36:11, 36:21, 37:12, 37:24, 40:2, 41:23, 42:21, 45:2, 45:22, 46:5, 48:7, 60:15, 62:21, 65:6, 65:13, 69:12, 69:20, 71:6, 71:23, 72:9, 72:25, 74:11, 78:16

# C

**cafeteria** [1] - 7:10
**calculation** [1] - 6:20
**CALVIN** [2] - 2:5, 60:12
**Calvin** [3] - 15:21, 74:16, 78:24
**capacity** [4] - 3:20, 3:22, 4:12, 18:9
**captures** [1] - 14:18
**case** [35] - 3:2, 3:12, 4:8, 5:19, 6:16, 9:7, 9:15, 10:2, 10:21, 10:22, 11:3, 11:8, 11:19, 12:8, 13:6, 13:9, 13:20, 14:18, 23:2, 25:11, 26:17, 28:5, 29:15, 37:1, 43:9, 43:17, 44:21, 48:23, 49:23, 57:16, 57:20, 60:21, 78:13
**cases** [1] - 14:9
**cells** [1] - 46:22
**Center** [1] - 1:19
**certain** [2] - 5:25, 20:21
**certainly** [5] - 6:7, 7:14, 13:3, 42:18, 43:14
**CERTIFICATE** [1] - 80:4
**certify** [1] - 80:6
**change** [1] - 75:9
**changed** [2] - 14:10, 56:11
**characterizing** [1] - 34:1
**charge** [33] - 11:9, 14:5, 29:5, 31:10, 31:12, 33:14, 34:8, 34:14, 34:24, 34:25,

35:6, 35:24, 38:21, 39:6, 39:11, 39:14, 39:19, 39:21, 39:22, 40:3, 40:4, 46:6, 46:14, 47:22, 51:19, 54:23, 55:6, 55:23, 58:13, 58:18, 62:1, 67:14

**charged** [7] - 11:12, 16:7, 55:2, 56:1, 56:12, 63:9, 63:11

**charges** [14] - 9:13, 25:1, 34:7, 34:12, 34:13, 34:21, 34:23, 35:2, 36:1, 36:12, 39:18, 41:10, 45:23, 63:16

**charging** [10] - 13:11, 14:3, 16:14, 35:9, 51:8, 51:12, 52:1, 63:22, 64:10, 64:17

**checks** [1] - 54:13

**chief** [4] - 61:1, 61:3, 77:15, 77:19

**chiefs** [1] - 61:17

**Civil** [1] - 1:3

**civil** [1] - 3:2

**claim** [5] - 6:16, 11:13, 12:22, 14:23, 43:1

**Claims** [4] - 9:7, 9:12, 14:8, 14:18

**claims** [6] - 9:8, 9:9, 9:11, 15:23, 16:4, 16:25

**clarification** [3] - 76:1, 76:3, 76:10

**clarifying** [1] - 69:8

**clear** [5] - 3:11, 24:1, 27:21, 30:10, 72:7

**clearly** [6] - 9:10, 9:22, 10:17, 40:6, 40:7, 46:19

**CLERK** [1] - 3:2

**clerk** [3] - 7:6, 17:14, 60:6

**client** [1] - 18:11

**closed** [2] - 29:17, 72:8

**collated** [1] - 53:9

**collating** [29] - 10:2, 10:6, 10:14, 10:16, 11:3, 11:8, 12:6, 13:23, 42:12, 46:15, 53:5, 53:6, 53:25, 54:23, 55:2, 55:23, 58:5, 62:1, 63:3, 66:17, 67:6, 68:23, 69:2, 69:14, 69:23, 69:25, 71:12, 77:7, 78:2

**Collating** [7] - 33:13, 39:5, 46:11, 46:18, 46:19, 51:25, 52:16

**Color** [1] - 51:21

**COLUMBIA** [1] - 1:2

**column** [8] - 40:12, 40:17, 40:20, 40:22, 41:1, 50:18, 50:19, 50:25

**comfortable** [1] - 7:7

**coming** [1] - 8:17

**Commerce** [1] - 10:22

**commercial** [6] - 48:16,

61:1, 61:3, 61:5, 61:8, 75:13

**common** [1] - 14:22

**company** [1] - 15:4

**compare** [1] - 41:24

**compared** [1] - 47:17

**comparing** [1] - 47:1

**complaint** [4] - 11:13, 43:1, 78:8, 78:19

**Complete** [4] - 23:4, 35:3, 51:6, 52:15

**complete** [3] - 12:13, 51:7, 72:7

**completed** [1] - 44:1

**complicate** [1] - 9:15

**complies** [3] - 19:23, 56:23, 78:23

**compound** [3] - 35:18, 65:9, 68:1

**computer** [1] - 1:25

**computer-aided** [1] - 1:25

**concern** [2] - 68:10, 76:12

**concerned** [1] - 78:12

**concerning** [2] - 6:22, 10:2

**conference** [2] - 6:11, 23:22

**confined** [4] - 7:7, 24:16, 24:17, 44:23

**confirm** [3] - 14:25, 15:22, 16:4

**confirmed** [2] - 13:11, 16:6

**confuse** [1] - 9:15

**consecutive** [1] - 24:8

**consented** [1] - 4:19

**consistent** [7] - 35:2, 38:23, 46:3, 46:8, 47:7, 52:1, 56:7

**consistently** [1] - 36:20

**constitute** [2] - 9:11, 14:23

**constitutes** [2] - 50:9, 50:10

**construction** [1] - 21:15

**contact** [3] - 66:1, 76:1, 77:16

**contained** [1] - 9:13

**contemplated** [1] - 12:22

**contention** [1] - 24:15

**contents** [1] - 32:24

**context** [1] - 14:19

**continue** [5] - 17:1, 43:23, 44:11, 45:1, 45:4

**continued** [1] - 16:24

**continues** [5] - 15:14, 15:18, 17:4, 17:5

**contract** [162] - 6:18, 6:24, 9:14, 9:21, 9:23, 10:3, 10:10, 10:12, 10:17, 11:6, 11:9, 11:11, 11:14, 11:16, 11:22, 12:17, 12:19, 12:20, 13:3, 13:4, 13:10, 13:12, 13:24, 14:12, 14:13, 14:15, 14:20,

15:1, 15:12, 15:15, 15:16, 15:24, 16:5, 16:8, 16:13, 17:1, 17:3, 17:4, 19:1, 19:4, 19:6, 19:7, 19:16, 20:14, 21:22, 22:10, 23:11, 25:2, 26:3, 29:7, 30:7, 30:15, 30:17, 31:24, 32:7, 32:24, 33:7, 33:15, 33:21, 34:3, 34:7, 34:13, 34:24, 36:20, 38:7, 38:10, 38:18, 38:23, 39:1, 39:7, 39:14, 39:17, 40:5, 40:16, 42:15, 42:25, 43:1, 43:4, 43:9, 43:12, 43:13, 43:18, 44:14, 44:17, 44:20, 46:8, 47:9, 47:16, 49:12, 49:13, 49:16, 52:8, 53:20, 54:5, 54:8, 54:20, 55:9, 55:21, 56:6, 56:7, 57:1, 57:2, 57:4, 57:14, 57:19, 57:22, 58:2, 58:4, 58:11, 61:24, 62:5, 62:6, 62:8, 62:9, 62:11, 62:15, 63:3, 63:6, 63:9, 63:10, 65:18, 66:2, 66:7, 66:8, 66:10, 66:13, 66:14, 67:1, 67:4, 67:9, 67:12, 67:16, 67:21, 68:4, 68:7, 68:9, 68:18, 68:24, 69:24, 70:4, 70:9, 70:12, 70:21, 71:9, 72:17, 73:2, 73:5, 73:7, 73:8, 73:10, 73:12, 75:22, 76:12, 76:14, 76:19, 76:24, 77:1, 77:4, 77:17

**contract's** [1] - 14:21

**contracted** [1] - 49:3

**contracting** [10] - 15:5, 49:5, 49:8, 66:1, 76:1, 76:2, 76:7, 76:8, 77:11, 77:16

**contractor** [2] - 12:25, 14:19

**contractor's** [1] - 14:21

**contractors** [2] - 75:7, 78:10

**contractors'** [1] - 78:11

**contracts** [5] - 13:18, 15:21, 16:3, 45:24, 76:9

**contradict** [1] - 25:10

**convenient** [1] - 43:21

**conversation** [9] - 62:2, 65:7, 65:15, 65:16, 67:8, 76:20, 76:22, 76:23, 78:9

**conveyed** [1] - 65:8

**copies** [46] - 22:25, 23:2, 23:5, 23:7, 23:9, 23:11, 25:3, 25:12, 25:20, 26:2, 26:9, 26:10, 27:19, 27:22, 29:2, 29:10, 29:11, 29:17, 29:20, 29:24, 33:6, 35:13, 35:14, 35:24, 36:1, 36:3, 36:12, 36:13, 36:23, 36:25, 37:2,

37:7, 38:2, 38:24, 41:4, 45:6, 45:7, 45:12, 45:17, 51:7, 51:10, 53:8, 66:5, 68:13

**copy** [19] - 10:10, 11:2, 19:25, 22:12, 22:15, 28:4, 29:9, 29:19, 29:20, 31:10, 31:15, 31:23, 62:5, 73:22, 76:24, 77:1, 77:3

**corporate** [1] - 5:12

**corporation** [1] - 4:13

**correct** [43] - 4:9, 4:10, 7:25, 13:12, 29:23, 34:1, 34:5, 34:6, 35:11, 39:16, 39:20, 40:10, 42:16, 45:7, 45:25, 46:8, 48:11, 49:15, 49:21, 50:2, 50:5, 50:12, 50:17, 51:17, 51:23, 52:10, 53:3, 53:24, 54:22, 57:8, 57:18, 58:6, 63:17, 67:9, 67:10, 71:10, 73:3, 73:4, 74:20, 75:16, 75:20, 78:4, 80:7

**correctly** [11] - 61:25, 63:23, 68:10, 73:18, 73:19, 73:24, 75:8, 77:17, 77:18, 77:25, 78:11

**correctness** [1] - 75:7

**correspond** [9] - 29:7, 30:6, 30:15, 31:23, 32:1, 32:12, 34:2, 38:6, 71:2

**corresponded** [1] - 73:12

**corresponding** [4] - 40:18, 41:10, 41:12, 42:6

**corresponds** [3] - 31:16, 32:7, 41:25

**cost** [6] - 40:22, 40:24, 40:25, 41:3, 41:4, 71:12

**costs** [1] - 47:3

**counsel** [5] - 3:3, 8:20, 44:4, 59:11, 60:1

**course** [6] - 5:2, 7:7, 28:10, 62:2, 76:22, 76:23

**COURT** [115] - 1:1, 3:8, 3:11, 3:24, 4:1, 4:4, 4:7, 4:11, 4:16, 5:6, 5:9, 6:5, 7:1, 7:14, 7:18, 7:22, 8:1, 8:10, 8:13, 8:16, 8:22, 9:2, 9:5, 9:24, 17:8, 17:11, 17:13, 17:16, 17:18, 18:15, 19:10, 19:25, 20:4, 20:7, 20:19, 21:3, 21:9, 22:6, 22:16, 23:19, 23:25, 24:5, 24:8, 24:11, 24:14, 25:4, 25:13, 25:24, 26:13, 27:1, 27:7, 27:25, 28:10, 28:18, 28:21, 28:25, 29:8, 29:13, 29:25, 30:3, 30:10, 30:24, 31:20, 32:6, 35:18, 36:6, 36:9, 36:16, 36:19, 37:11, 37:20, 39:25, 41:22, 42:18, 42:20,

43:3; 43:7; 43:16, 43:25,
44:6, 44:9, 44:22, 45:9,
45:11, 45:15, 45:19, 46:1,
47:14, 48:2, 59:5, 59:8,
59:11, 59:19, 60:1, 60:4,
60:9, 60:11, 65:2, 65:10,
69:9, 69:17, 71:5, 71:22,
72:6, 72:23, 74:3, 74:8,
78:15, 79:8, 79:11, 79:15,
79:18, 79:25, 80:4, 80:13

**Court** [21] - 1:22, 1:22,
4:17, 6:7, 7:2, 7:3, 8:10,
13:5, 13:6, 13:14, 14:24,
15:25, 21:9, 24:15, 25:5,
26:13, 26:16, 43:16, 44:22,
44:25, 45:15

**court** [7] - 4:19, 7:6, 20:21,
24:15, 48:22, 53:13, 79:19

**Court's** [1] - 6:5

**Courthouse** [1] - 1:23

**courthouse** [1] - 7:4

**Courtroom** [2] - 17:15, 60:8

**courtroom** [5] - 4:20, 4:22,
5:4, 5:21, 7:20

**COURTROOM** [1] - 3:2

**cover** [17] - 12:13, 23:4,
29:5, 30:13, 30:20, 31:3,
32:4, 32:18, 35:3, 37:3, 38:6,
38:11, 38:18, 47:24, 51:6,
51:7, 53:15

**Covers** [3] - 32:3, 32:18,
38:17

**covers** [1] - 37:1

**cross** [2] - 48:4, 74:4

**CROSS** [3] - 2:2, 48:6,
74:10

**cross-examine** [2] - 48:4,
74:4

**CRR** [1] - 1:22

**current** [1] - 12:25

**customer** [2] - 75:5, 75:8

**cutting** [1] - 53:12

### D

**D.C** [1] - 1:23

**damages** [3] - 6:12, 6:15,
6:20

**DARRELL** [1] - 1:18

**DATE** [1] - 80:13

**date** [1] - 57:6

**David** [1] - 39:10

**DC** [3] - 1:13, 1:17, 1:20

**DEBORAH** [1] - 1:9

**decision** [1] - 44:13

**defendant** [7] - 3:16, 4:3,
5:12, 27:20, 29:21, 36:2,
38:3

**Defendant** [2] - 1:7, 1:15

**defense** [2] - 9:15, 9:18

**demonstrate** [1] - 19:13

**department** [7] - 53:10,
53:11, 53:15, 53:17, 61:7,
61:10, 61:14

**department's** [1] - 61:11

**deposition** [4] - 20:12,
20:24, 21:6, 21:24

**Deputy** [2] - 17:15, 60:8

**deputy** [3] - 7:6, 17:13, 60:6

**describe** [6] - 24:11, 29:3,
37:25, 46:9, 47:5, 53:4

**description** [4] - 27:15,
29:2, 29:13, 35:25

**designated** [1] - 20:5

**determine** [8] - 40:16,
46:25, 47:2, 47:9, 55:5, 56:3,
63:6, 73:18

**determined** [4] - 3:14, 56:5,
77:12, 77:24

**didn't..** [1] - 61:12

**difference** [3] - 14:9, 14:10,
16:22

**different** [7] - 5:11, 18:9,
28:3, 32:9, 43:3, 54:11,
70:16

**differently** [1] - 21:7

**digit** [1] - 24:5

**DIRECT** [3] - 2:2, 17:22,
60:14

**directly** [2] - 44:21, 75:12

**disagrees** [1] - 11:15

**discrepancy** [2] - 75:25

**discuss** [2] - 44:2, 75:24

**discussed** [5] - 6:10, 16:18,
66:10, 71:19, 72:14

**discussing** [1] - 51:1

**discussion** [2] - 75:25

**dismissed** [1] - 10:22

**disruption** [1] - 21:16

**DISTRICT** [3] - 1:1, 1:2,
1:10

**document** [18] - 18:12,
18:17, 18:19, 18:21, 18:23,
19:1, 19:21, 27:13, 28:14,
28:15, 37:5, 37:9, 37:13,
37:16, 42:23, 42:25, 78:18

**documents** [1] - 13:8

**dollars** [1] - 23:5

**done** [1] - 49:2

**down** [5] - 32:3, 40:23,
43:25, 59:9, 79:12

**dramatically** [1] - 5:11

**draw** [2] - 22:8, 40:12

**drawing** [1] - 46:21

**due** [1] - 5:8

**duly** [2] - 17:20, 60:12

**during** [5] - 8:8, 62:2,
76:20, 76:22

### E

**E-R-S-O-N** [1] - 74:18

**effort** [1] - 73:6

**either** [2] - 44:2, 45:16

**element** [5] - 14:1, 14:2,
14:11, 16:12, 16:21

**elicit** [2] - 4:8, 4:15

**elicited** [1] - 7:5

**elsewhere** [1] - 7:4

**embodied** [1] - 21:10

**employed** [2] - 60:19, 60:23

**employee** [6] - 12:24,
12:25, 13:2, 18:7, 74:22

**end** [3] - 65:7, 65:19, 78:11

**enforce** [2] - 6:5, 7:2

**engaged** [1] - 48:18

**entail** [1] - 48:17

**entails** [1] - 48:18

**entered** [2] - 24:23, 26:16

**entering** [2] - 20:13, 44:17

**entire** [1] - 50:9

**entitled** [1] - 80:8

**entry** [1] - 32:6

**equipment** [1] - 4:21

**escort** [1] - 7:6

**essential** [2] - 25:10, 26:3

**essentially** [4] - 22:24,
47:15, 51:8, 55:7

**established** [1] - 20:16

**estimation** [2] - 65:14,
65:16

**Evans** [3] - 27:20, 36:2,
38:3

**event** [1] - 5:16

**evidence** [14] - 9:10, 9:17,
9:22, 16:18, 19:19, 24:20,
24:21, 24:24, 26:11, 26:17,
27:9, 29:15, 37:23, 43:18

**ex** [2] - 3:3, 78:20

**exactly** [2] - 15:16, 63:15

**examination** [3] - 61:4,
61:5, 79:9

**EXAMINATION** [4] - 17:22,
48:6, 60:14, 74:10

**examinations** [1] - 8:8

**examine** [2] - 48:4, 74:4

**example** [4] - 5:25, 76:3,
78:24

**Excuse** [1] - 79:16

**excuse** [3] - 28:2, 53:19,
55:19

**excused** [5] - 79:13, 79:15,
79:16, 79:18, 79:19

**exhausted** [2] - 25:5, 25:14

**exhibit** [2] - 28:22, 37:19

**Exhibit** [41] - 18:13, 18:18,
19:11, 19:14, 19:17, 22:3,
22:5, 22:9, 26:24, 27:3, 27:5,

27:8, 28:13, 28:15, 28:17,
31:3, 31:16, 31:24, 32:13,
37:9, 37:21, 41:9, 42:22,
43:13, 43:17, 43:20, 44:14,
44:22, 49:12, 50:4, 50:11,
50:19, 52:12, 53:23, 54:14,
54:21, 55:13, 55:21, 56:20

**EXHIBIT** [3] - 19:19, 27:9,
37:23

**expenses** [1] - 47:24

**experience** [2] - 13:16,
15:20

**expert** [5] - 5:5, 5:14, 5:15,
5:22, 6:11

**explain** [1] - 51:2

**explicitly** [1] - 11:9

**expressing** [1] - 65:21

**extent** [1] - 9:19

### F

**face** [2] - 17:13, 60:6

**fact** [11] - 5:20, 9:16, 9:20,
25:10, 26:1, 26:3, 26:8,
26:12, 34:12, 34:22, 43:14

**failure** [1] - 43:11

**fair** [1] - 41:19

**fall** [1] - 39:14

**False** [4] - 9:7, 9:12, 14:8,
14:18

**false** [5] - 9:9, 9:11, 12:22,
13:22, 14:23

**falsity** [3] - 14:2, 14:11,
16:11

**familiar** [2] - 22:21, 78:7

**far** [4] - 61:18, 66:8, 71:18,
78:12

**fashion** [1] - 53:8

**fax** [2] - 76:24, 77:3

**February** [1] - 1:5

**field** [1] - 47:1

**file** [2] - 48:22, 48:23

**filed** [5] - 10:22, 11:13,
12:19, 57:16, 57:19

**filing** [1] - 13:9

**fill** [1] - 49:25

**filled** [4] - 49:20, 49:23,
50:16, 52:3

**final** [1] - 76:8

**finally** [1] - 16:20

**finance** [4] - 75:2, 75:3,
75:4, 75:9

**financial** [1] - 48:15

**firm** [1] - 18:11

**firms** [2] - 48:19, 48:25

**first** [17] - 5:2, 11:2, 14:11,
17:9, 21:4, 24:2, 27:11, 29:3,
29:5, 32:8, 38:5, 42:13, 57:6,
60:19, 74:25, 76:11, 79:2

**fix** [1] - 28:6
**flip** [3] - 50:3, 78:17, 78:22
**focus** [2] - 12:4, 50:24
**follow** [5] - 14:22, 35:9, 40:23, 77:13, 77:23
**follow-up** [1] - 77:23
**following** [1] - 29:2
**follows** [2] - 17:21, 60:13
**foot** [1] - 24:12
**FOR** [1] - 1:2
**force** [1] - 57:22
**foregoing** [1] - 80:6
**form** [1] - 32:7
**formation** [1] - 13:4
**formed** [1] - 49:16
**former** [2] - 12:24, 12:25
**forth** [1] - 6:22
**foundation** [3] - 39:24, 72:20, 72:21
**four** [7] - 4:21, 4:22, 57:5, 57:9, 71:15, 72:2, 72:13
**Fourth** [1] - 1:20
**fraud** [6] - 10:9, 11:13, 13:13, 13:20, 14:8, 16:6
**front** [14] - 5:4, 7:23, 54:15, 56:22, 63:7, 63:19, 64:1, 64:23, 66:5, 66:24, 68:1, 68:14, 73:5, 73:22
**full** [2] - 10:6, 74:15
**functioned** [1] - 61:16
**functioning** [1] - 61:19
**fundamental** [1] - 14:12

## G

**general** [1] - 74:23
**generally** [2] - 37:25, 48:14
**gentleman** [1] - 5:3
**George** [1] - 74:18
**given** [8] - 5:16, 5:18, 6:1, 19:10, 19:11, 26:15, 36:12, 44:3
**Gocial** [11] - 5:5, 5:7, 5:9, 5:14, 5:15, 6:1, 6:11, 6:21, 7:2, 7:3, 7:6
**governed** [1] - 44:24
**Government** [22] - 6:19, 7:21, 8:5, 8:20, 10:4, 10:5, 11:15, 11:20, 11:24, 13:2, 13:6, 13:7, 13:10, 13:21, 14:14, 14:25, 15:6, 18:22, 49:4, 49:6, 49:8, 53:19
**government** [15] - 9:18, 10:24, 12:24, 12:25, 14:20, 15:5, 15:17, 16:15, 16:22, 16:23, 48:25, 49:2, 59:1, 59:24
**governs** [2] - 43:4, 43:19
**GPO** [63] - 9:11, 9:16, 11:1,

13:15, 13:17, 13:25, 15:15, 15:20, 15:23, 16:1, 16:7, 17:3, 17:5, 19:2, 40:9, 40:12, 40:14, 42:15, 44:15, 46:25, 47:8, 47:11, 47:12, 49:4, 49:13, 49:17, 52:20, 53:22, 53:25, 54:5, 54:10, 54:12, 54:13, 54:18, 54:20, 55:11, 55:17, 55:20, 56:8, 57:13, 57:14, 57:19, 57:24, 58:1, 58:7, 58:11, 58:16, 58:21, 58:23, 60:23, 60:25, 64:21, 72:18, 73:11, 73:17, 73:19, 74:19, 74:21, 74:22, 74:24
**GPO's** [2] - 9:18, 16:2
**greater** [7] - 25:20, 26:10, 41:11, 41:20, 42:1, 42:7, 42:10
**ground** [1] - 45:9
**guidance** [1] - 76:8
**guided** [1] - 59:11
**guidelines** [2] - 48:21, 53:13

## H

**hand** [2] - 11:23, 23:23
**handed** [4] - 28:1, 28:4, 28:7, 28:9
**handing** [5] - 18:17, 23:16, 27:3, 28:14, 42:22
**hands** [1] - 62:11
**Hastings** [1] - 18:1
**hear** [24] - 5:2, 5:15, 6:2, 6:7, 6:21, 8:10, 8:13, 9:2, 10:12, 12:1, 12:2, 13:5, 13:7, 13:14, 14:13, 14:24, 15:2, 15:19, 15:25, 16:23, 20:22, 21:14, 23:19
**heard** [4] - 6:6, 6:9, 20:20, 20:21
**hearsay** [1] - 20:25
**help** [3] - 24:25, 47:19, 52:13
**himself** [2] - 76:16, 77:2
**history** [1] - 14:21
**hold** [1] - 22:4
**holding** [1] - 28:16
**home** [1] - 7:8
**honest** [1] - 78:13
**Honor** [78] - 3:10, 4:5, 4:10, 4:14, 5:8, 5:13, 6:10, 6:14, 6:21, 7:17, 8:5, 8:9, 8:12, 8:19, 9:1, 9:4, 9:23, 10:1, 10:10, 11:11, 11:18, 12:18, 16:22, 17:7, 17:12, 17:19, 18:14, 19:8, 20:3, 20:6, 20:15, 22:15, 23:15, 23:17, 23:18, 23:21, 24:4, 24:10,

24:13, 24:18, 25:8, 25:21, 25:23, 26:25, 27:6, 27:24, 28:2, 28:7, 28:16, 28:20, 28:24, 29:12, 30:2, 30:4, 31:18, 32:10, 37:10, 37:18, 42:17, 42:19, 43:6, 43:8, 43:24, 44:5, 44:12, 44:13, 48:1, 48:5, 59:7, 59:10, 59:22, 65:12, 74:2, 74:6, 78:14, 79:10, 79:14, 79:17
**HONORABLE** [1] - 1:9
**hopes** [1] - 7:15
**Hudson** [1] - 18:1
**HUGH** [2] - 2:3, 17:20
**Hugh** [3] - 3:23, 4:2, 18:1
**hundred** [3] - 67:14, 68:24, 70:2
**hundreds** [1] - 23:24

## I

**idea** [2] - 26:5, 65:7
**identical** [1] - 43:14
**identified** [5] - 55:14, 58:18, 75:17, 76:16, 77:2
**identify** [2] - 3:18, 62:19
**II** [18] - 22:11, 22:18, 32:16, 33:9, 34:6, 34:13, 34:23, 35:4, 35:7, 38:20, 39:2, 39:9, 39:17, 39:22, 40:4, 50:25, 52:15
**II(A** [4] - 39:18, 45:24, 46:3, 51:5
**II(A)** [1] - 32:16
**II(B** [9] - 41:12, 41:15, 41:20, 42:2, 42:7, 42:10, 45:24, 51:11
**II(B)** [3] - 41:2, 42:8, 46:4
**II(C** [1] - 51:14
**II(D** [18] - 10:16, 35:10, 39:19, 40:19, 40:20, 40:24, 41:11, 41:13, 41:14, 41:19, 42:1, 42:6, 42:8, 46:7, 46:9, 46:11, 46:17, 51:24
**II(D)** [2] - 33:17, 42:9
**IIA** [1] - 31:17
**impeach** [2] - 21:11, 25:9
**implicate** [1] - 9:19
**imply** [1] - 26:4
**important** [3] - 5:14, 5:23, 26:11
**inasmuch** [1] - 5:11
**INC** [1] - 1:6
**Inc** [1] - 3:3
**included** [1] - 52:25
**incomplete** [1] - 22:11
**inconsistency** [1] - 20:16
**inconsistent** [1] - 20:25
**inconvenience** [1] - 4:20

**incorrectly** [5] - 64:2, 66:12, 73:24, 75:21, 76:7
**indeed** [1] - 25:15
**indicate** [3] - 7:14, 22:10, 29:10
**indicated** [11] - 4:24, 8:16, 24:2, 25:4, 25:13, 31:2, 31:12, 55:12, 56:9, 70:8, 70:25
**indicates** [2] - 10:17, 46:19
**indicating** [2] - 12:5, 12:9
**indication** [1] - 40:15
**individual** [1] - 8:19
**individuals** [3] - 3:18, 8:2, 8:16
**industry** [1] - 13:17
**influence** [1] - 47:21
**information** [22] - 63:8, 63:13, 64:9, 64:18, 64:23, 65:22, 65:23, 65:24, 65:25, 66:1, 66:4, 66:6, 66:14, 66:20, 67:1, 67:11, 67:15, 67:20, 67:21, 68:3, 68:20
**inquire** [1] - 76:18
**inquired** [4] - 61:23, 66:16, 68:8, 68:9
**inquiry** [4] - 45:1, 61:22, 62:3, 62:18
**inserted** [1] - 32:23
**insider** [1] - 12:23
**instance** [3] - 37:3, 47:17, 53:9
**instructed** [1] - 58:7
**intend** [1] - 4:8
**intended** [1] - 24:23
**intends** [2] - 4:14, 7:2
**intention** [1] - 6:5
**interested** [1] - 48:19
**Interested** [1] - 1:18
**internal** [2] - 40:15, 46:24
**interpret** [3] - 14:20, 48:21, 76:6
**interpretation** [3] - 14:22, 63:10, 66:2
**interpreted** [1] - 77:17
**investigate** [1] - 62:3
**investigation** [2] - 72:17, 72:21
**invitation** [1] - 11:22
**invoice** [86] - 11:2, 11:7, 24:16, 25:11, 26:10, 27:12, 27:14, 27:15, 27:16, 27:19, 27:21, 28:8, 29:11, 29:22, 30:13, 30:19, 31:4, 32:17, 32:20, 32:21, 32:25, 33:5, 33:8, 33:11, 33:15, 33:18, 33:21, 33:24, 34:2, 34:9, 34:22, 35:2, 35:24, 35:25, 36:1, 36:4, 36:12, 36:14, 36:20, 37:8, 37:15, 37:16,

37:21, 38:1, 38:2, 38:5, 38:7, 38:11, 38:14, 38:19, 38:21, 38:25, 39:3, 39:11, 39:13, 41:10, 41:12, 41:14, 41:17, 41:20, 42:3, 42:9, 45:17, 45:23, 54:15, 54:18, 54:20, 54:24, 55:11, 55:14, 55:17, 55:18, 55:19, 55:20, 55:24, 56:8, 56:10, 56:18, 58:18, 64:25, 73:22, 73:24

**invoiced** [2] - 11:1, 35:14

**invoices** [84] - 6:14, 6:15, 9:10, 9:13, 10:20, 11:12, 11:14, 12:21, 13:10, 13:19, 13:22, 15:18, 15:21, 16:5, 17:5, 23:10, 23:23, 23:24, 24:17, 24:19, 24:20, 24:23, 24:24, 25:1, 25:6, 25:9, 25:19, 26:2, 26:5, 26:19, 26:23, 34:24, 35:10, 35:13, 43:4, 43:19, 44:23, 45:13, 45:16, 45:19, 46:1, 46:2, 46:3, 46:6, 54:9, 54:11, 58:2, 58:15, 58:19, 58:21, 61:8, 61:9, 61:24, 63:7, 63:19, 63:20, 63:23, 63:25, 64:1, 64:2, 64:5, 64:6, 64:7, 64:10, 64:19, 64:22, 65:4, 65:17, 66:5, 66:12, 66:24, 68:10, 68:11, 68:13, 68:14, 75:6, 76:6, 76:12, 76:14, 76:18, 77:18, 77:24, 78:11

**involved** [4] - 12:8, 32:4, 53:12, 66:18

**involvement** [1] - 13:4

**involves** [2] - 53:6, 70:22

**issue** [19] - 6:8, 9:19, 10:13, 10:19, 16:11, 23:10, 24:16, 24:17, 24:19, 43:9, 43:19, 55:20, 58:15, 75:17, 75:19, 76:12, 76:13

**issued** [2] - 40:14, 54:20

**issues** [4] - 26:16, 58:23, 59:1, 77:25

**item** [141] - 6:18, 10:2, 10:13, 10:14, 10:16, 10:18, 11:3, 12:7, 15:8, 27:11, 29:3, 29:4, 29:5, 29:7, 30:6, 30:9, 30:11, 30:12, 30:15, 30:17, 30:18, 30:20, 31:3, 31:9, 31:15, 31:16, 31:17, 31:22, 31:23, 32:1, 32:2, 32:3, 32:4, 32:12, 32:15, 32:16, 32:18, 32:22, 32:24, 32:25, 33:1, 33:2, 33:3, 33:5, 33:7, 33:9, 33:10, 33:12, 33:15, 33:17, 33:18, 33:20, 33:21, 33:22, 33:23, 34:3, 34:8, 35:1, 37:4, 38:5, 38:7, 38:10, 38:11, 38:12, 38:15, 38:17, 38:18,

38:20, 38:22, 38:24, 38:25, 39:2, 39:3, 39:5, 39:7, 39:9, 39:11, 40:19, 40:23, 41:2, 41:11, 41:12, 41:13, 41:15, 41:19, 41:20, 42:1, 42:6, 42:9, 43:11, 46:7, 46:9, 46:10, 46:11, 46:17, 47:22, 51:6, 51:9, 51:11, 51:13, 51:18, 51:21, 51:24, 52:13, 52:17, 52:20, 52:24, 53:5, 56:11, 56:16, 58:8, 58:24, 59:2, 66:17, 66:19, 66:21, 66:23, 67:2, 67:8, 67:12, 67:13, 67:17, 67:22, 67:24, 69:14, 69:19, 69:23, 70:2, 71:11, 72:15, 77:8

**items** [29] - 12:3, 12:4, 12:12, 16:10, 23:4, 26:7, 32:8, 34:2, 34:8, 34:14, 34:25, 35:3, 35:4, 35:7, 36:25, 39:14, 39:22, 40:4, 40:8, 45:24, 48:19, 50:18, 50:20, 50:22, 50:25, 51:3, 68:18, 70:16, 70:17

**itself** [2] - 50:22, 52:6

## J

**January** [2] - 6:11, 23:22
**job** [6] - 35:15, 36:23, 38:1, 48:21, 53:15, 72:19
**jobs** [2] - 35:13, 35:14
**JOHN** [1] - 1:15
**John** [1] - 3:5
**JUDGE** [2] - 1:9, 1:10
**Judiciary** [1] - 1:19
**Junior** [1] - 18:1
**jury** [1] - 4:25

## K

**keep** [1] - 21:16
**kind** [3] - 5:18, 59:20, 66:14
**kinds** [1] - 66:13
**King** [5] - 2:3, 2:5, 8:25, 43:7, 60:2
**king** [39] - 3:4, 4:12, 5:2, 9:2, 9:24, 14:4, 14:7, 16:21, 17:9, 17:18, 19:10, 19:25, 20:7, 20:21, 20:23, 21:3, 23:23, 24:1, 25:25, 29:10, 30:11, 30:25, 32:6, 35:21, 36:10, 44:11, 48:2, 50:6, 51:1, 59:5, 59:16, 60:11, 60:17, 69:10, 72:24, 74:3, 79:8, 79:16, 79:23
**KING** [98] - 1:12, 3:10, 4:14, 5:5, 5:8, 5:13, 9:1, 9:4, 9:6, 17:10, 17:19, 17:23, 18:14,

18:16, 19:20, 20:3, 20:9, 20:18, 21:4, 21:20, 22:7, 22:15, 22:17, 23:15, 23:18, 24:4, 24:7, 24:10, 24:13, 24:18, 25:8, 25:17, 25:23, 26:1, 26:21, 26:22, 26:25, 27:2, 27:4, 27:10, 27:24, 28:7, 28:11, 29:1, 29:12, 29:18, 30:2, 30:4, 30:5, 30:12, 30:14, 31:1, 31:21, 32:10, 32:11, 34:19, 35:22, 35:23, 36:11, 36:21, 37:10, 37:12, 37:17, 37:24, 40:2, 41:23, 42:17, 42:19, 42:21, 43:8, 43:24, 44:12, 45:2, 45:12, 45:18, 45:21, 45:22, 46:2, 46:5, 47:25, 59:7, 59:17, 60:3, 60:15, 62:21, 65:6, 65:12, 65:13, 69:12, 69:20, 71:6, 71:23, 72:9, 72:25, 74:2, 79:10, 79:17, 79:24

**knowing** [2] - 14:1, 16:25
**knowingly** [3] - 9:8, 9:9, 9:12
**knowledge** [11] - 9:17, 9:18, 12:23, 14:2, 16:12, 16:19, 19:4, 19:6, 21:8, 64:11, 76:13

## L

**L-A-M** [1] - 3:25
**label** [1] - 28:12
**laid** [1] - 39:24
**Lam** [2] - 3:6, 3:21
**LAM** [1] - 4:1
**LAMB** [1] - 3:24
**last** [6] - 3:19, 19:21, 20:1, 24:15, 50:3, 74:17
**law** [4] - 14:8, 14:12, 48:18, 48:25
**lawsuit** [1] - 12:20
**leading** [1] - 65:1
**learn** [1] - 77:23
**least** [1] - 7:11
**leave** [1] - 5:21
**leaves** [3] - 51:18, 51:20, 51:22
**leaving** [2] - 8:17, 8:18
**left** [4] - 8:3, 12:2, 50:18, 50:19
**less** [14] - 23:11, 24:10, 24:12, 25:3, 25:11, 26:2, 35:13, 42:1, 42:3, 42:7, 42:8, 42:10, 42:11, 45:6
**level** [3] - 13:15, 16:1, 46:25
**liability** [3] - 6:13, 6:22,

6:23
**limited** [1] - 6:14
**line** [159] - 6:18, 10:2, 10:13, 10:14, 10:16, 10:18, 11:3, 12:3, 12:4, 12:7, 12:12, 15:8, 16:10, 23:4, 26:6, 27:11, 29:3, 29:5, 29:7, 29:14, 29:16, 30:6, 30:8, 30:12, 30:15, 30:17, 30:20, 31:3, 31:9, 31:15, 31:16, 31:17, 31:22, 31:23, 32:1, 32:3, 32:4, 32:12, 32:15, 32:16, 32:18, 32:21, 32:23, 32:24, 32:25, 33:1, 33:3, 33:5, 33:7, 33:10, 33:12, 33:13, 33:14, 33:15, 33:17, 33:18, 33:20, 33:21, 33:23, 34:2, 34:3, 34:7, 34:8, 34:14, 34:25, 35:1, 35:3, 35:7, 36:25, 38:5, 38:7, 38:10, 38:12, 38:15, 38:17, 38:18, 38:21, 38:24, 38:25, 39:3, 39:5, 39:7, 39:9, 39:11, 39:14, 39:22, 40:4, 40:8, 40:19, 40:23, 41:2, 41:11, 41:12, 41:13, 41:15, 41:19, 41:20, 42:1, 42:6, 42:9, 43:11, 45:24, 46:7, 46:9, 46:10, 47:21, 50:18, 50:20, 50:22, 50:25, 51:3, 51:6, 51:9, 51:11, 51:13, 51:18, 51:21, 51:24, 52:13, 52:16, 52:17, 52:20, 52:24, 53:5, 56:11, 56:16, 58:8, 58:24, 59:2, 66:17, 66:18, 66:21, 66:23, 67:2, 67:8, 67:12, 67:13, 67:17, 67:22, 68:18, 69:14, 69:18, 69:23, 70:2, 70:16, 70:17, 71:11, 72:14, 77:8

**list** [1] - 50:20
**listed** [7] - 42:3, 46:17, 46:25, 68:24, 68:25, 69:18, 70:2
**lists** [1] - 40:7
**LLP** [1] - 1:16
**Lomas** [21] - 2:4, 2:6, 3:5, 3:17, 6:7, 7:1, 9:25, 17:8, 20:20, 23:20, 23:25, 27:7, 28:19, 28:22, 37:20, 48:3, 59:5, 74:4, 79:15
**LOMAS** [59] - 1:15, 3:21, 3:25, 4:2, 4:5, 4:10, 6:10, 7:17, 7:19, 7:25, 8:4, 8:12, 8:15, 8:19, 10:1, 19:8, 20:15, 20:23, 23:17, 23:21, 25:21, 27:6, 28:2, 28:20, 28:24, 30:8, 30:22, 31:18, 32:5, 34:16, 35:16, 36:5, 36:15, 37:18, 39:23, 41:21, 42:24,

43:6, 45:8, 45:10, 47:13,
48:5, 48:7, 59:4, 59:22,
62:19, 65:1, 65:9, 69:5,
69:16, 71:4, 71:21, 72:20,
74:6, 74:9, 74:11, 78:14,
78:16, 79:7
  **Lomas'** [1] - 24:14
  **LONG** [1] - 1:16
  **look** [15] - 18:24, 19:21,
22:10, 22:18, 27:11, 28:8,
40:17, 41:10, 42:4, 42:9,
52:15, 62:8, 70:20, 72:18,
77:10
  **looked** [1] - 42:14
  **looking** [4] - 29:22, 29:24,
40:11, 62:12
  **looks** [1] - 50:18
  **loosely** [1] - 29:16
  **losing** [1] - 15:12
  **lost** [1] - 10:23
  **lunch** [4] - 43:23, 59:12,
74:5, 79:22
  **Lunch** [1] - 80:1
  **lunchtime** [1] - 7:11
  **lying** [1] - 13:21

## M

  **machine** [1] - 1:25
  **MAGISTRATE** [1] - 1:9
  **mail** [1] - 49:18
  **management** [1] - 61:18
  **manager** [2] - 13:15, 16:1
  **managerial** [1] - 61:15
  **marked** [10] - 22:9, 28:14,
28:16, 43:12, 49:12, 50:3,
51:10, 52:11, 54:15, 78:17
  **marking** [5] - 18:12, 22:3,
26:23, 28:13, 37:8
  **materiality** [2] - 14:8, 16:20
  **matter** [10] - 3:15, 27:20,
36:2, 38:4, 44:23, 53:16,
67:7, 77:10, 78:19, 80:8
  **matters** [2] - 8:23, 8:25
  **MCKENNA** [1] - 1:16
  **mean** [11] - 8:13, 9:21,
47:11, 47:12, 51:7, 51:10,
51:18, 60:1, 62:8, 62:10,
69:21
  **meaning** [5] - 11:22, 46:22,
47:5, 47:6, 47:12
  **means** [3] - 14:12, 14:13,
16:12
  **meetings** [1] - 61:18
  **memory** [1] - 24:25
  **mention** [1] - 59:23
  **mentioned** [4] - 3:19,
15:19, 63:18, 78:8
  **merit** [1] - 15:23

**might** [7] - 6:1, 7:10, 71:24,
72:1, 72:5, 72:6, 72:10
  **Miller** [2] - 8:3, 28:1
  **mind** [1] - 30:10
  **mine** [2] - 22:11, 29:16
  **minutes** [3] - 44:7, 59:14,
79:22
  **mischaracterize** [1] - 35:17
  **mischaracterizes** [4] -
31:19, 34:16, 71:21, 72:20
  **misplaced** [1] - 20:2
  **misspoke** [1] - 30:2
  **mistakenly** [1] - 8:16
  **moment** [4] - 10:11, 42:17,
51:5, 56:21
  **money** [2] - 15:12, 56:17
  **morning** [9] - 3:8, 9:4, 9:5,
17:11, 17:12, 48:8, 48:9,
74:12, 74:13
  **MORNING** [2] - 1:5, 1:9
  **most** [1] - 26:15
  **move** [1] - 26:23
  **moved** [4] - 19:19, 27:9,
37:23, 53:14
  **moving** [3] - 4:20, 33:5,
38:17
  **MR** [156] - 3:10, 3:21, 3:25,
4:2, 4:5, 4:10, 4:14, 5:5, 5:8,
5:13, 6:10, 7:17, 7:19, 7:25,
8:4, 8:12, 8:15, 8:19, 9:1,
9:4, 9:6, 10:1, 17:10, 17:19,
17:23, 18:14, 18:16, 19:8,
19:20, 20:3, 20:9, 20:15,
20:18, 20:23, 21:4, 21:20,
22:7, 22:15, 22:17, 23:15,
23:17, 23:18, 23:21, 24:4,
24:7, 24:10, 24:13, 24:18,
25:8, 25:17, 25:21, 25:23,
26:1, 26:21, 26:22, 26:25,
27:2, 27:4, 27:6, 27:10,
27:24, 28:2, 28:7, 28:11,
28:20, 28:24, 29:1, 29:12,
29:18, 30:2, 30:4, 30:5, 30:8,
30:12, 30:14, 30:22, 31:1,
31:18, 31:21, 32:5, 32:10,
32:11, 34:16, 34:19, 35:16,
35:22, 35:23, 36:5, 36:11,
36:15, 36:21, 37:10, 37:12,
37:17, 37:18, 37:24, 39:23,
40:2, 41:21, 41:23, 42:17,
42:19, 42:21, 42:24, 43:6,
43:8, 43:24, 44:12, 45:2,
45:8, 45:10, 45:12, 45:18,
45:21, 45:22, 46:2, 46:5,
47:13, 47:25, 48:5, 48:7,
59:4, 59:7, 59:17, 59:22,
60:3, 60:15, 62:19, 62:21,
65:1, 65:6, 65:9, 65:12,
65:13, 69:5, 69:12, 69:16,
69:20, 71:4, 71:6, 71:21,

71:23, 72:9, 72:20, 72:25,
74:2, 74:6, 74:9, 74:11,
78:14, 78:16, 79:7, 79:10,
79:13, 79:17, 79:24
  **multiple** [3] - 68:18, 69:24,
70:17
  **multiples** [1] - 47:9
  **my..** [1] - 63:11

## N

  **name** [11] - 3:18, 3:19,
15:2, 17:24, 74:15, 74:16,
74:17, 77:19, 78:8, 78:12,
79:2
  **narrow** [3] - 6:13, 6:16,
66:25
  **narrowed** [1] - 23:22
  **nature** [4] - 4:25, 61:21,
63:1, 74:23
  **near** [1] - 19:1
  **necessarily** [2] - 70:24,
71:2
  **necessary** [2] - 8:7, 75:19
  **need** [3] - 6:21, 28:5, 76:2
  **needed** [1] - 14:9
  **never** [6] - 13:2, 20:13,
58:3, 58:9, 58:25, 59:3
  **nevertheless** [1] - 11:15
  **New** [1] - 18:2
  **next** [17] - 28:8, 31:9, 32:3,
32:23, 33:5, 33:13, 33:20,
37:8, 38:17, 38:24, 39:5,
53:10, 53:11, 59:14, 70:2,
79:23, 79:24
  **noise** [2] - 21:14, 21:19
  **non** [1] - 61:9
  **non-printing** [1] - 61:9
  **none** [2] - 67:13, 67:17
  **noon** [1] - 59:12
  **normal** [1] - 17:1
  **note** [3] - 29:9, 29:13, 44:15
  **noted** [1] - 38:4
  **notes** [1] - 4:18
  **nothing** [1] - 21:18
  **November** [1] - 57:7
  **Number** [3] - 22:9, 27:9,
78:22
  **NUMBER** [1] - 2:9
  **number** [22] - 3:2, 19:22,
23:11, 24:3, 24:6, 26:10,
27:13, 27:14, 30:6, 34:23,
35:7, 40:18, 41:7, 41:11,
41:12, 44:19, 45:12, 47:20,
50:4, 52:12, 53:7, 56:21
  **numbers** [9] - 32:23, 46:21,
46:24, 47:7, 47:8, 47:15,
52:6, 52:7, 52:9
  **numeral** [27] - 22:11, 22:18,

30:18, 31:17, 32:2, 32:16,
33:1, 33:9, 33:22, 34:3, 34:6,
34:13, 34:23, 35:4, 35:7,
35:10, 38:7, 38:12, 38:20,
39:2, 39:9, 39:15, 39:17,
50:25, 51:11, 51:15, 52:15
  **NW** [3] - 1:12, 1:16, 1:20

## O

  **O'Brien** [6] - 3:5, 3:17, 6:6,
9:25, 28:22, 48:3
  **O'BRIEN** [1] - 1:15
  **Oath** [2] - 17:15, 60:8
  **oath** [1] - 44:2
  **object** [5] - 21:1, 23:17,
35:16, 42:24, 69:6
  **objection** [44] - 4:11, 7:15,
19:14, 19:18, 20:15, 20:18,
21:9, 21:10, 23:19, 25:15,
25:21, 25:25, 26:13, 27:8,
28:23, 30:8, 30:22, 31:18,
32:5, 34:16, 36:5, 36:15,
36:19, 37:22, 39:23, 39:25,
41:21, 43:5, 44:25, 45:8,
45:16, 47:13, 60:2, 60:3,
62:19, 65:1, 65:2, 65:9, 69:5,
69:16, 69:17, 71:4, 71:21,
72:20
  **observe** [1] - 5:17
  **observing** [1] - 5:23
  **occasion** [1] - 76:6
  **October** [1] - 57:7
  **OF** [4] - 1:2, 1:8, 80:4,
80:13
  **OFF** [1] - 7:13
  **offered** [1] - 24:24
  **Office** [21] - 6:19, 7:21, 8:6,
8:20, 10:4, 10:6, 11:16,
11:20, 13:3, 13:6, 13:7,
13:11, 13:22, 14:14, 14:25,
15:7, 18:22, 49:4, 49:6, 49:9,
53:20
  **office** [1] - 66:23
  **OFFICE** [1] - 1:19
  **Office's** [1] - 11:24
  **officer** [8] - 4:4, 4:13, 5:12,
66:2, 76:1, 76:8, 77:11,
77:16
  **officer's** [2] - 76:2, 76:8
  **offices** [2] - 54:10, 54:12
  **OFFICIAL** [1] - 80:4
  **Official** [1] - 1:22
  **often** [1] - 48:18
  **older** [1] - 52:9
  **once** [1] - 77:11
  **one** [30] - 5:7, 6:16, 6:21,
14:20, 19:9, 21:15, 26:6,
28:3, 30:6, 30:9, 30:12,

31:10, 31:15, 31:22, 34:20,
35:14, 35:20, 42:17, 43:9,
54:9, 55:15, 59:20, 66:16,
66:18, 67:23, 68:17, 69:10,
73:9, 77:16

**opening** [3] - 4:25, 8:24,
9:3
**operate** [2] - 17:1, 17:4
**operation** [1] - 70:20
**operations** [1] - 61:19
**operator** [1] - 53:7
**opinion** [4] - 5:21, 5:22,
5:24, 6:23
**opinions** [2] - 5:17, 6:4
**opportunity** [1] - 6:3
**opposite** [1] - 21:25
**option** [3] - 57:5, 57:11,
57:12
**oranges** [2] - 47:2
**order** [2] - 6:2, 73:23
**ordered** [1] - 24:15
**orders** [1] - 26:16
**originally** [1] - 75:4
**outlines** [1] - 11:5
**outside** [1] - 5:7
**overall** [1] - 47:19
**overcharged** [1] - 13:23
**overcharging** [3] - 10:9,
13:13, 16:6
**overruled** [5] - 36:19,
39:25, 47:14, 65:2, 69:17
**own** [3] - 3:15, 16:17, 77:15

## P

**p.m.)** [1] - 80:1
**package** [3] - 50:9, 50:13,
50:14
**packing** [1] - 53:18
**page** [37] - 12:14, 18:24,
19:21, 20:1, 20:5, 22:8,
22:11, 23:6, 29:6, 30:13,
30:21, 31:4, 31:10, 31:12,
31:15, 31:23, 33:6, 33:20,
35:4, 37:1, 37:4, 38:6, 38:11,
38:25, 40:5, 41:4, 42:11,
46:20, 50:3, 51:11, 51:25,
52:1, 56:21, 57:1
**Page** [1] - 32:23
**pages** [37] - 10:18, 11:6,
11:10, 11:17, 12:9, 12:10,
13:12, 13:25, 14:3, 14:16,
15:2, 15:8, 15:17, 15:24,
16:15, 17:2, 24:8, 31:9, 33:5,
33:14, 38:24, 39:6, 40:6,
46:12, 46:18, 52:23, 54:2,
55:7, 55:8, 56:4, 56:6, 58:4,
58:13, 78:3
**Pages** [2] - 31:15, 31:22

**paid** [9] - 13:19, 54:7,
54:10, 55:12, 64:8, 64:15,
64:16, 65:4, 75:15
**papers** [1] - 73:14
**paragraph** [1] - 78:17
**Paragraph** [1] - 78:22
**paralegal** [3] - 3:5, 3:20,
3:22
**paralegals** [1] - 48:20
**part** [4] - 50:8, 50:13, 50:14,
50:24
**particular** [27] - 10:13,
22:25, 26:9, 32:4, 32:17,
32:21, 36:14, 36:25, 38:1,
40:19, 43:9, 43:11, 47:16,
48:21, 48:23, 51:12, 53:13,
56:10, 61:7, 63:2, 66:23,
67:8, 68:8, 68:22, 72:14,
72:19
**parties** [6] - 4:18, 14:12,
27:4, 43:21, 44:4, 48:19
**party** [2] - 5:9, 13:3
**Party** [1] - 1:18
**pass** [1] - 8:8
**passed** [2] - 53:9, 53:17
**pattern** [1] - 9:3
**pay** [4] - 15:18, 55:11, 56:8,
58:21
**payables** [1] - 75:12
**paying** [4] - 61:8, 75:12,
77:18, 78:10
**payment** [1] - 76:19
**payments** [2] - 17:6, 58:1
**pen** [1] - 28:13
**people's** [1] - 5:23
**per** [64] - 10:18, 11:5,
11:10, 11:16, 12:9, 12:10,
12:14, 13:12, 13:24, 14:3,
14:15, 15:2, 15:8, 15:17,
15:24, 16:15, 17:2, 23:6,
29:5, 30:13, 30:21, 31:4,
31:10, 31:12, 31:15, 31:23,
32:4, 32:18, 33:6, 33:14,
33:20, 35:3, 37:1, 37:4, 38:6,
38:11, 38:18, 38:25, 39:6,
41:4, 42:11, 46:12, 46:18,
46:20, 51:6, 51:10, 51:11,
51:18, 51:19, 51:22, 51:25,
52:1, 52:23, 54:1, 55:8, 56:4,
56:6, 58:4, 58:13, 67:14,
68:24, 70:1, 78:3
**Per** [1] - 40:6
**per-10** [3] - 36:3, 36:13,
36:23
**per-10-copy** [11] - 6:17,
10:7, 12:11, 12:13, 14:6,
51:8, 51:12, 56:10, 58:8,
77:6, 78:5
**per-100** [2] - 69:3, 71:12
**per-100-page** [1] - 69:15

**percent** [3] - 56:15, 56:16,
56:17
**perfect** [3] - 48:22, 53:14,
53:16
**perform** [2] - 35:13, 45:6
**perhaps** [3] - 7:8, 24:12,
43:22
**period** [1] - 72:12
**permit** [2] - 25:5, 43:16
**permitted** [1] - 8:6
**person** [2] - 19:4, 19:6
**personally** [1] - 16:4
**perspective** [1] - 61:18
**Philadelphia** [1] - 54:10
**phone** [4] - 7:15, 62:10,
73:1, 77:13
**phrased** [1] - 35:18
**physically** [2] - 64:12, 73:8
**place** [1] - 7:7
**plainly** [1] - 26:19
**Plaintiff** [2] - 1:4, 1:12
**PLAINTIFF** [5] - 17:20,
19:19, 27:9, 37:23, 60:12
**plaintiff** [2] - 2:10, 8:25,
17:10, 60:21
**Plaintiff's** [35] - 18:12,
18:17, 19:11, 19:14, 19:17,
22:3, 22:4, 26:24, 27:5, 27:7,
28:12, 28:15, 28:16, 31:3,
31:16, 31:24, 32:12, 37:9,
37:20, 41:9, 42:22, 43:12,
43:13, 44:14, 49:12, 50:4,
50:11, 50:19, 52:12, 53:23,
54:14, 54:21, 55:13, 55:21,
56:20
**playing** [1] - 46:25
**podium** [1] - 20:19
**point** [8] - 7:19, 8:11,
26:14, 59:15, 63:7, 63:18,
66:11, 75:10
**portion** [1] - 52:2
**position** [4] - 18:3, 60:25,
61:13, 61:14
**possible** [1] - 67:19
**posture** [1] - 5:11
**potter** [1] - 8:20
**practice** [1] - 43:10
**practitioners** [2] - 48:19,
49:1
**preclude** [1] - 16:18
**predecessor** [1] - 43:13
**preface** [1] - 35:16
**preference** [1] - 59:16
**preferences** [1] - 59:12
**preferred** [1] - 74:7
**preliminary** [2] - 8:23, 8:24
**prepared** [3] - 4:24, 19:13,
49:18
**presence** [1] - 4:12
**present** [2] - 5:1, 6:2

**presented** [2] - 9:9, 25:9
**president** [5] - 4:5, 18:4,
18:5, 18:10, 48:10
**PRESS** [1] - 1:6
**Press** [128] - 3:3, 3:4, 3:16,
4:3, 4:4, 4:6, 4:18, 6:18,
9:11, 9:12, 9:17, 9:20, 10:4,
10:5, 10:20, 10:25, 11:1,
11:12, 11:14, 11:16, 11:21,
12:16, 12:20, 12:21, 13:3,
13:9, 13:10, 13:11, 13:21,
13:23, 13:25, 14:5, 14:15,
15:1, 15:3, 15:5, 15:9, 15:12,
15:13, 15:14, 16:3, 16:5,
16:7, 16:13, 16:24, 17:3,
18:3, 18:4, 18:5, 18:7, 18:9,
18:11, 23:10, 25:2, 27:14,
34:4, 34:7, 34:13, 35:2, 35:6,
35:9, 35:12, 39:18, 39:21,
40:3, 40:11, 40:17, 40:18,
40:23, 41:2, 41:25, 42:6,
45:6, 46:14, 47:12, 48:10,
48:12, 48:13, 48:14, 48:15,
48:24, 49:5, 49:8, 49:19,
49:25, 50:15, 52:2, 52:7,
52:19, 52:24, 53:19, 53:20,
54:4, 54:7, 54:11, 54:18,
54:23, 55:2, 55:5, 55:17,
55:18, 55:19, 55:23, 56:1,
56:3, 56:12, 56:17, 58:7,
58:10, 58:13, 58:15, 58:23,
59:2, 63:22, 64:5, 64:7, 64:8,
64:10, 64:15, 65:4, 76:14,
76:17, 76:21, 78:20
**Press'** [11] - 16:16, 34:24,
35:2, 35:25, 37:16, 49:13,
53:2, 53:25, 57:14, 58:1,
76:12
**pressure** [2] - 51:14, 51:15
**pressure-sensitive** [2] -
51:14, 51:15
**price** [38] - 10:2, 10:6, 10:8,
11:5, 11:6, 11:11, 11:16,
12:10, 13:12, 13:24, 14:15,
15:1, 15:9, 15:16, 15:24,
16:8, 16:13, 16:14, 16:16,
16:17, 17:1, 17:5, 23:4, 37:1,
37:4, 37:5, 49:25, 50:16,
52:9, 52:19, 52:25, 54:1,
55:9, 56:5, 56:6, 58:4, 78:2
**priced** [1] - 16:10
**prices** [2] - 73:13, 73:15
**pricing** [2] - 23:1, 47:2
**Prince** [1] - 18:1
**print** [1] - 53:8
**printed** [8] - 10:24, 10:25,
32:3, 32:18, 33:6, 38:17,
38:24, 53:16
**printer** [3] - 22:25, 48:15,
48:16

**Printing** [22] - 6:19, 7:21, 8:6, 8:20, 10:4, 10:5, 11:15, 11:20, 11:24, 13:2, 13:6, 13:7, 13:11, 13:21, 14:14, 14:25, 15:7, 18:22, 49:4, 49:6, 49:9, 53:20

**printing** [16] - 13:16, 13:18, 16:2, 29:9, 29:16, 29:20, 38:2, 48:17, 48:18, 54:4, 58:10, 61:8, 61:9, 75:4, 75:6, 75:13

**proceed** [12] - 3:9, 3:14, 4:17, 4:19, 4:23, 5:3, 17:18, 19:15, 20:8, 21:13, 25:14, 60:11

**proceeded** [1] - 76:17

**proceeding** [1] - 3:15

**proceedings** [2] - 21:17, 80:7

**Proceedings** [1] - 1:25

**process** [5] - 22:24, 40:7, 53:22, 66:18, 70:22

**processed** [2] - 65:5, 65:18, 76:14

**processes** [2] - 70:20, 70:21

**processing** [22] - 61:9, 61:23, 61:24, 63:20, 63:25, 64:2, 64:5, 64:7, 66:12, 66:22, 66:23, 68:9, 68:11, 68:13, 73:17, 73:18, 73:19, 73:23, 76:5, 76:18, 77:24, 78:1

**procurement** [1] - 16:2

**produce** [3] - 47:3, 47:23

**produced** [1] - 1:25

**producing** [1] - 47:3

**product** [2] - 47:4, 52:16

**production** [5] - 27:19, 50:4, 52:11, 56:21, 74:25

**profit** [1] - 47:23

**program** [6] - 43:2, 44:19, 44:21, 49:13, 52:3, 53:7

**programming** [1] - 53:7

**proof** [3] - 31:10, 31:15, 31:22

**proofs** [1] - 31:12

**properly** [4] - 13:19, 61:16, 61:19, 75:15

**prospective** [3] - 11:21, 12:9, 16:10

**protect** [1] - 8:7

**provide** [21] - 54:4, 58:10, 63:8, 64:9, 64:20, 64:23, 65:22, 65:23, 65:25, 66:4, 66:6, 66:14, 66:20, 67:1, 67:11, 67:15, 67:20, 68:3, 68:19, 68:21, 76:4

**provided** [5] - 21:24, 63:12, 64:11, 65:23, 66:1

**provides** [2] - 36:13, 54:8

**pull** [3] - 11:2, 14:17, 73:7

**pulls** [1] - 44:21

**purely** [2] - 6:12, 6:23

**purpose** [1] - 25:6

**purposes** [1] - 23:22

**pursuant** [2] - 23:10, 25:2, 55:20

## Q

**quantity** [4] - 26:9, 37:4, 40:14, 46:25

**questioning** [3] - 63:4, 63:16, 66:3

**questions** [10] - 19:9, 19:12, 19:15, 26:19, 48:1, 59:4, 66:2, 72:18, 74:2, 79:7

**qui** [2] - 12:20, 12:22

**quite** [1] - 62:16

**quote** [5] - 14:17, 29:16, 29:17, 72:8

**quote/unquote** [1] - 71:19

## R

**raise** [2] - 75:18, 75:19

**raised** [2] - 58:23, 59:1

**rate** [115] - 6:17, 10:8, 12:11, 12:13, 14:6, 15:9, 22:19, 22:21, 22:23, 22:24, 23:3, 23:5, 23:8, 26:4, 26:5, 26:6, 26:8, 30:19, 30:20, 30:23, 31:2, 32:17, 32:20, 32:21, 33:3, 33:10, 33:12, 33:18, 33:23, 34:4, 34:7, 34:14, 34:15, 34:24, 34:25, 35:3, 35:6, 35:10, 36:3, 36:13, 36:14, 36:23, 37:2, 37:6, 38:14, 38:21, 39:3, 39:11, 39:14, 39:18, 39:19, 39:21, 40:3, 40:8, 40:20, 43:11, 45:24, 46:7, 46:15, 47:23, 51:8, 51:12, 52:1, 52:22, 52:25, 53:2, 55:7, 55:9, 56:4, 56:10, 58:8, 67:21, 68:4, 68:6, 68:8, 68:15, 68:16, 68:17, 68:20, 68:21, 68:22, 68:24, 68:25, 69:1, 69:3, 69:7, 69:8, 69:11, 69:13, 69:15, 69:18, 69:22, 69:25, 70:1, 70:2, 70:3, 70:4, 70:7, 70:8, 70:11, 70:12, 70:15, 70:25, 71:1, 71:2, 71:10, 71:12, 71:14, 71:16, 71:19, 71:25, 72:11, 77:7, 78:5

**rates** [9] - 67:16, 69:24, 70:17, 70:18, 70:19, 70:22,

70:24, 71:1

**re** [1] - 40:1

**re-ask** [1] - 40:1

**reach** [1] - 8:11

**read** [1] - 40:20

**reading** [3] - 30:11, 41:4, 46:11

**reads** [4] - 29:16, 29:20, 46:11, 46:17

**ready** [3] - 3:9, 4:23, 53:9

**realize** [3] - 7:22, 29:14, 76:20

**really** [1] - 47:18

**reason** [1] - 9:21

**reasons** [1] - 21:10

**Rebecca** [1] - 80:6

**REBECCA** [1] - 1:22

**received** [4] - 11:23, 61:20, 65:20, 75:6

**receiving** [1] - 60:20

**recent** [1] - 26:16

**recess** [6] - 43:22, 59:12, 59:15, 79:21, 80:1

**Recess** [1] - 44:8

**recognize** [7] - 7:23, 18:19, 20:10, 21:6, 27:16, 37:13, 42:23

**recognizes** [1] - 21:5

**recollect** [2] - 73:13, 76:23

**recollection** [1] - 25:5, 25:7, 25:14

**reconvene** [2] - 59:13, 79:22

**record** [14] - 1:6, 3:11, 3:13, 5:19, 17:25, 19:17, 21:17, 24:1, 27:12, 30:10, 48:22, 53:8, 74:14, 80:7

**RECORD** [1] - 7:13

**Record** [139] - 3:3, 3:4, 3:16, 4:3, 4:4, 4:6, 4:18, 6:18, 9:11, 9:12, 9:17, 9:20, 10:4, 10:5, 10:20, 10:25, 11:1, 11:12, 11:14, 11:16, 11:21, 12:16, 12:20, 12:21, 13:3, 13:9, 13:10, 13:11, 13:21, 13:23, 13:25, 14:5, 14:14, 15:1, 15:3, 15:5, 15:9, 15:12, 15:13, 15:14, 16:3, 16:5, 16:7, 16:13, 16:16, 16:24, 17:3, 18:3, 18:4, 18:5, 18:7, 18:9, 18:11, 23:10, 25:2, 27:14, 34:4, 34:7, 34:13, 34:24, 35:2, 35:6, 35:9, 35:12, 35:25, 37:16, 39:18, 39:21, 40:3, 40:11, 40:17, 40:18, 40:23, 41:2, 41:25, 42:6, 45:6, 46:14, 47:12, 48:10, 48:12, 48:13, 48:14, 48:15, 48:24, 49:5, 49:8, 49:13, 49:19, 49:25,

50:15, 52:2, 52:7, 52:19, 52:24, 53:2, 53:19, 53:20, 53:25, 54:4, 54:7, 54:11, 54:18, 54:23, 55:2, 55:5, 55:17, 55:18, 55:19, 55:23, 56:1, 56:3, 56:12, 56:17, 57:14, 58:1, 58:7, 58:10, 58:13, 58:15, 58:23, 59:2, 63:22, 64:5, 64:7, 64:8, 64:10, 64:15, 65:4, 76:12, 76:14, 76:17, 76:21, 78:20

**RECROSS** [1] - 2:2

**redirect** [2] - 59:6, 79:8

**REDIRECT** [1] - 2:2

**reduced** [2] - 56:15, 56:17

**refer** [25] - 23:3, 23:8, 30:11, 30:12, 30:17, 31:10, 32:15, 32:25, 33:8, 33:15, 33:21, 37:15, 38:11, 38:19, 39:1, 39:8, 40:13, 49:11, 51:5, 52:5, 54:14, 55:13, 56:20, 57:9, 70:21

**reference** [2] - 3:12, 22:19

**referenced** [4] - 33:1, 33:9, 33:17, 33:22

**referencing** [8] - 35:25, 38:12, 38:20, 39:2, 39:9, 40:5, 40:20, 41:16

**referred** [3] - 3:19, 8:3, 67:17, 70:6, 77:11

**referring** [16] - 20:24, 30:13, 40:9, 41:15, 46:1, 63:10, 63:12, 67:7, 69:7, 69:18, 69:24, 70:1, 70:7, 70:11, 70:24, 71:1

**refers** [7] - 29:4, 29:9, 38:1, 44:19, 53:5, 67:8, 72:8

**reflect** [6] - 19:17, 26:12, 34:12, 34:22, 46:24, 51:19

**reflected** [3] - 34:8, 47:7, 64:24

**reflecting** [2] - 47:8, 58:15

**reflects** [1] - 3:13

**refresh** [1] - 24:25

**refreshing** [1] - 25:7

**regard** [1] - 7:8

**regarding** [10] - 19:15, 21:7, 26:19, 32:8, 34:21, 63:9, 64:9, 67:11, 67:12, 67:16

**regards** [3] - 61:25, 67:3, 72:12

**reiterate** [1] - 45:5

**rel** [2] - 3:3, 78:20

**related** [4] - 10:21, 26:3, 71:10, 76:25

**relating** [1] - 9:8

**relation** [1] - 63:2

**relator** [5] - 3:4, 9:7, 12:19, 12:22

**relevance** [6] - 25:21,
25:24, 26:14, 42:24, 45:10,
45:15
**relevant** [5] - 5:17, 26:15,
44:23, 45:13, 45:20
**reluctant** [1] - 29:14
**remain** [1] - 44:1
**remainder** [1] - 79:4
**remember** [6] - 64:11,
64:14, 71:15, 72:4, 72:13,
72:16
**removing** [1] - 28:12
**renew** [3] - 57:12, 57:14,
57:19
**renewed** [2] - 15:16, 17:3
**repeat** [5] - 23:7, 36:9,
46:13, 61:2, 63:23
**rephrase** [6] - 19:5, 30:24,
34:10, 65:10, 69:9, 72:23
**report** [1] - 77:21
**reported** [2] - 1:25, 61:17
**reporter** [1] - 20:21
**REPORTER** [2] - 80:4,
80:13
**Reporter** [2] - 1:22, 1:22
**representative** [1] - 76:17
**represents** [1] - 37:6
**request** [12] - 8:8, 8:14,
11:24, 12:3, 15:7, 26:2,
49:17, 49:19, 49:22, 49:25,
50:8, 50:22
**requested** [2] - 4:22, 8:5
**require** [2] - 7:3, 70:20
**required** [4] - 5:21, 40:7,
49:23, 61:14
**requires** [3] - 14:8, 14:9,
36:23
**requiring** [1] - 36:25
**respect** [25] - 3:15, 5:8,
6:15, 8:4, 14:11, 16:20,
26:16, 30:8, 30:22, 34:12,
34:17, 34:18, 34:22, 36:15,
39:17, 40:5, 47:15, 51:2,
51:7, 51:24, 58:24, 59:2,
61:10, 67:2, 72:21
**respond** [8] - 25:23, 62:14,
62:18, 63:13, 63:14, 63:15,
72:17
**response** [7] - 15:7, 24:14,
25:24, 62:23, 63:24, 64:20,
68:12
**responsibilities** [3] - 74:23,
75:3, 75:9
**responsibility** [1] - 13:18
**responsible** [5] - 16:2,
61:8, 61:15, 75:12, 76:5
**result** [2] - 65:14, 65:16
**resume** [1] - 44:6
**retired** [2] - 74:19, 74:21
**retrieve** [2] - 7:16, 43:20

**return** [1] - 44:10
**review** [6] - 13:9, 21:21,
52:2, 62:6, 62:8, 73:25
**reviewed** [11] - 5:19, 13:7,
13:8, 15:23, 16:4, 16:5,
44:16, 49:18, 75:5, 75:6
**reviewing** [5] - 13:18,
15:20, 16:24, 62:15, 75:14
**ROBINSON** [1] - 1:9
**role** [4] - 8:1, 61:7, 61:10,
61:11
**Roman** [27] - 22:11, 22:18,
30:18, 31:17, 32:2, 32:16,
33:1, 33:9, 33:22, 34:3, 34:6,
34:13, 34:23, 35:4, 35:7,
35:10, 38:7, 38:12, 38:20,
39:2, 39:9, 39:15, 39:17,
50:25, 51:11, 51:15, 52:15
**Room** [1] - 1:23
**room** [2] - 7:4, 59:19
**rooms** [1] - 5:7
**Rosa** [1] - 77:20
**row** [2] - 5:4, 7:23
**RP** [42] - 19:22, 19:25, 20:1,
20:5, 22:9, 22:12, 22:15,
23:4, 24:2, 24:5, 30:18,
31:12, 32:2, 32:16, 33:1,
33:9, 33:17, 33:22, 35:4,
38:12, 38:20, 39:2, 39:9,
40:5, 40:7, 40:10, 41:16,
42:3, 42:4, 44:17, 44:18,
46:11, 46:17, 46:19, 46:21,
50:4, 50:19, 51:11, 52:12,
56:22
**RPR** [1] - 1:22
**rule** [2] - 6:6, 7:2
**ruled** [2] - 44:22, 44:25
**run** [1] - 45:6
**running** [103] - 6:17, 10:8,
12:11, 12:13, 14:6, 15:9,
22:19, 22:21, 22:23, 22:24,
23:3, 23:5, 23:8, 26:4, 26:6,
26:8, 30:19, 30:20, 30:22,
31:2, 32:17, 32:20, 32:21,
33:3, 33:10, 33:12, 33:18,
33:23, 34:4, 34:7, 34:14,
34:15, 34:24, 34:25, 35:3,
35:6, 35:10, 36:3, 36:12,
36:14, 36:22, 37:2, 37:6,
38:14, 38:21, 39:3, 39:11,
39:14, 39:18, 39:19, 39:21,
40:3, 43:11, 45:24, 46:7,
46:14, 52:25, 53:2, 56:10,
58:8, 67:16, 67:21, 68:4,
68:6, 68:15, 68:16, 68:17,
68:20, 68:21, 68:22, 69:1,
69:7, 69:8, 69:11, 69:13,
69:22, 70:3, 70:6, 70:7, 70:8,
70:11, 70:12, 70:14, 70:15,
70:19, 70:22, 70:24, 70:25,

71:2, 71:10, 71:14, 71:16,
71:19, 71:25, 72:3, 72:4,
72:10, 72:15, 77:7, 78:5
**runs** [1] - 45:6

## S

**satisfaction** [1] - 77:15
**scope** [1] - 6:13
**screen** [7] - 10:11, 10:15,
11:5, 11:19, 12:5, 14:17,
52:12
**seat** [4] - 17:14, 17:16,
44:10, 60:6
**seated** [2] - 3:18, 5:3
**second** [4] - 11:7, 14:1,
35:20, 79:4
**Secretary** [1] - 10:22
**section** [6] - 61:1, 61:4,
61:5, 61:17, 77:15, 77:19
**sections** [1] - 61:16
**see** [24] - 5:17, 10:10,
10:11, 10:15, 11:4, 11:18,
12:5, 12:6, 12:12, 19:24,
22:18, 29:3, 40:18, 44:18,
47:19, 52:17, 53:22, 54:16,
55:14, 78:19, 78:24
**seeing** [4] - 11:14, 12:20,
12:21, 16:25
**seek** [1] - 76:7
**senior** [2] - 13:14, 16:1
**sensitive** [2] - 51:14, 51:15
**sent** [3] - 11:20, 49:17,
49:22
**sentence** [2] - 78:24, 79:4
**serve** [1] - 48:23
**service** [1] - 7:11
**services** [3] - 54:4, 54:7,
58:10
**SESSION** [2] - 1:5, 1:9
**set** [1] - 12:4
**shaving** [1] - 53:17
**sheet** [1] - 12:3
**shock** [1] - 78:13
**short** [1] - 59:18
**shorthand** [1] - 1:25
**show** [14] - 9:10, 9:17, 9:22,
11:7, 13:22, 14:1, 14:4, 14:7,
15:13, 16:12, 16:15, 16:21,
25:6, 29:24
**shown** [1] - 20:24
**shows** [2] - 16:9, 51:2
**sic** [2] - 15:13, 77:7
**side** [4] - 4:24, 5:4, 12:2,
21:15
**signature** [3] - 18:23,
18:24, 80:13
**significance** [1] - 29:15
**simple** [3] - 6:21, 9:20, 10:1

**simply** [4] - 6:24, 24:24,
45:20, 65:21
**single** [5] - 10:2, 10:3,
10:13, 26:10, 35:20
**sit** [1] - 8:7
**sitting** [1] - 25:19
**six** [3] - 23:5, 48:20, 74:25
**size** [30] - 10:3, 10:7, 10:14,
10:16, 11:4, 11:8, 12:7,
13:23, 33:13, 39:5, 46:12,
46:15, 46:18, 46:20, 51:25,
52:16, 53:5, 53:6, 53:12,
54:1, 54:23, 55:2, 55:23,
58:5, 63:3, 67:6, 69:2, 69:14,
77:7, 78:2
**slightly** [2] - 5:10
**smaller** [1] - 41:7
**Smith** [1] - 77:20
**solely** [1] - 43:1
**solo** [2] - 48:19, 48:25
**someone** [1] - 3:20
**sorry** [13] - 8:18, 20:18,
23:7, 29:12, 31:6, 34:10,
45:12, 55:20, 61:2, 61:12,
64:19, 69:5, 71:8
**sort** [2] - 12:23, 13:1
**sounded** [1] - 20:23
**speaking** [2] - 37:25, 43:2
**specialist** [1] - 75:4
**specific** [10] - 24:21, 62:16,
62:20, 66:17, 66:18, 67:13,
67:22, 67:24, 70:21, 72:12
**specifically** [10] - 61:25,
62:25, 63:3, 64:15, 65:3,
70:13, 71:16, 72:2, 72:14,
76:5
**spectator** [1] - 8:2
**spell** [1] - 74:17
**spoken** [1] - 73:9
**spotted** [1] - 75:17
**spreadsheet** [30] - 11:19,
11:20, 11:23, 12:2, 12:15,
16:9, 20:10, 20:13, 21:5,
21:6, 21:8, 21:21, 40:9,
40:12, 41:16, 42:14, 44:15,
44:16, 44:19, 50:6, 50:13,
50:15, 52:2, 52:6, 52:7,
72:18, 73:11, 73:14
**stack** [4] - 24:2, 24:11, 25:6
**staff** [1] - 48:20
**stand** [5] - 8:6, 17:14,
44:10, 59:25, 60:7
**stapled** [1] - 50:14
**state** [3] - 17:24, 27:12,
57:1
**statement** [7] - 4:24, 4:25,
9:3, 20:17, 20:25, 21:12,
24:1
**statements** [1] - 8:24
**STATES** [2] - 1:1, 1:10

**States** [7] - 1:19, 3:3, 3:13, 3:14, 10:4, 10:5, 78:20
**status** [2] - 6:11, 23:21
**statute** [1] - 12:23
**stay** [3] - 8:2, 41:1, 41:17
**step** [5] - 43:25, 59:9, 59:24, 67:23, 79:12
**stepping** [1] - 68:1
**steps** [1] - 75:19
**still** [13] - 4:8, 5:24, 7:11, 28:22, 49:8, 57:22, 58:4, 58:10, 58:13, 58:15, 58:21, 63:14, 70:10
**stipulate** [4] - 19:8, 27:4, 37:17, 37:18
**stipulation** [2] - 19:10, 28:3
**stock** [2] - 51:14, 51:15
**Stonestreet** [1] - 80:6
**STONESTREET** [1] - 1:22
**stranger** [1] - 12:19
**Street** [4] - 1:12, 1:16, 1:20, 18:1
**subject** [1] - 67:7
**submission** [2] - 11:24, 49:18
**submit** [3] - 17:4, 54:9, 54:11
**submitted** [6] - 9:11, 9:13, 15:10, 25:2, 52:19, 52:24
**substance** [1] - 19:15
**substitution** [1] - 28:22
**sufficient** [1] - 7:16
**suggest** [2] - 25:8, 26:18
**suit** [1] - 12:22
**Suite** [1] - 1:13
**Sullivan** [2] - 16:1, 16:8
**supervisor** [1] - 75:11
**supervisors** [2] - 61:17, 73:9
**supplied** [1] - 15:6
**surprised** [1] - 25:18
**suspended** [1] - 58:1
**sustain** [2] - 21:9, 26:13
**sustained** [6] - 31:20, 41:22, 45:11, 65:10, 71:5, 71:22
**sworn** [4] - 17:14, 17:20, 60:6, 60:12

## T

**table** [5] - 3:18, 4:12, 25:19, 32:23, 60:1
**tall** [1] - 24:12
**tam** [2] - 12:20, 12:22
**technical** [1] - 4:21
**term** [12] - 10:2, 15:16, 16:16, 16:17, 57:1, 57:4, 67:4, 67:5, 70:11, 71:10, 72:8
**terminated** [1] - 57:24
**terms** [7] - 49:25, 50:16, 66:9, 66:10, 66:11, 66:13, 66:14
**testified** [14] - 17:21, 21:7, 26:9, 35:12, 44:16, 45:5, 45:7, 45:23, 46:24, 60:13, 63:1, 71:9, 71:11
**testify** [6] - 5:24, 15:3, 15:11, 15:14, 15:22, 43:14
**testifying** [5] - 6:12, 16:8, 21:25, 24:25, 47:11
**testimony** [51] - 4:8, 4:15, 5:15, 5:16, 5:18, 5:22, 5:23, 5:25, 6:2, 6:3, 6:13, 6:14, 6:22, 7:5, 7:9, 10:12, 12:1, 16:23, 20:24, 21:2, 21:25, 25:10, 26:12, 31:14, 31:19, 34:1, 34:11, 34:17, 34:21, 34:22, 35:17, 39:13, 42:13, 44:1, 44:2, 44:3, 44:19, 45:3, 45:5, 46:14, 47:7, 59:14, 63:21, 65:21, 70:10, 70:23, 71:3, 71:21, 71:24, 72:21
**text** [12] - 12:13, 23:5, 31:9, 31:15, 31:22, 33:6, 37:1, 37:4, 38:24, 41:4, 42:11, 51:11
**Text** [2] - 33:20, 35:3
**that..** [1] - 70:22
**THE** [123] - 1:2, 1:9, 3:8, 3:11, 3:24, 4:1, 4:4, 4:7, 4:11, 4:16, 5:6, 5:9, 6:5, 7:1, 7:13, 7:14, 7:18, 7:22, 8:1, 8:10, 8:13, 8:16, 8:22, 9:2, 9:5, 9:24, 17:8, 17:11, 17:12, 17:16, 17:17, 17:18, 18:15, 19:10, 19:25, 20:4, 20:6, 20:7, 20:19, 21:3, 21:9, 22:6, 22:16, 23:19, 23:25, 24:5, 24:8, 24:11, 24:14, 25:4, 25:13, 25:24, 26:13, 27:1, 27:7, 27:25, 28:10, 28:18, 28:21, 28:25, 29:8, 29:13, 29:25, 30:3, 30:10, 30:24, 31:20, 32:6, 35:18, 36:6, 36:8, 36:9, 36:16, 36:18, 36:19, 37:11, 37:20, 39:25, 41:22, 42:18, 42:20, 43:3, 43:7, 43:16, 43:25, 44:5, 44:6, 44:9, 44:22, 45:9, 45:11, 45:15, 45:19, 46:1, 47:14, 48:2, 59:5, 59:8, 59:10, 59:11, 59:19, 60:1, 60:4, 60:9, 60:10, 60:11, 65:2, 65:10, 69:9, 69:17, 71:5, 71:22, 72:6, 72:23, 74:3, 74:8, 78:15, 79:8, 79:11, 79:15, 79:18, 79:25

**therefore** [1] - 45:19
**thinking** [1] - 76:24
**thinks** [1] - 9:16
**third** [3] - 8:19, 14:7, 29:14
**thousands** [1] - 25:18
**three** [4] - 8:17, 14:24, 24:5, 61:16
**three-digit** [1] - 24:5
**throughout** [1] - 14:20
**to..** [1] - 36:15
**today** [16] - 5:16, 9:6, 10:11, 12:1, 12:18, 13:1, 13:14, 14:14, 14:24, 15:22, 16:23, 22:1, 23:23, 57:22, 60:18, 63:21, 65:21, 71:24
**Tom** [1] - 16:1
**top** [1] - 44:18
**total** [4] - 37:5, 47:10, 47:16, 55:1
**toward** [1] - 56:22
**transcript** [2] - 1:25, 80:7
**TRANSCRIPT** [1] - 1:8
**transcription** [1] - 1:25
**transferred** [2] - 73:10, 75:1
**trial** [2] - 3:7, 4:17
**TRIAL** [1] - 1:8
**trimming** [36] - 10:3, 10:7, 10:14, 10:16, 11:4, 11:8, 12:6, 13:23, 33:13, 39:5, 46:11, 46:15, 46:18, 46:19, 51:25, 52:16, 53:5, 53:6, 53:12, 53:17, 54:1, 54:23, 55:2, 55:23, 58:5, 61:25, 63:3, 67:6, 68:23, 69:2, 69:14, 69:23, 69:25, 71:12, 77:7, 78:2
**true** [6] - 5:13, 63:21, 72:5, 72:10, 79:4, 79:5
**try** [3] - 9:15, 9:19, 34:20
**trying** [3] - 19:13, 63:15, 66:25
**turn** [2] - 8:24, 26:18
**twice** [2] - 57:15, 57:21
**two** [18] - 6:14, 6:15, 7:19, 8:2, 8:16, 10:20, 23:23, 24:17, 24:20, 24:21, 26:19, 32:8, 43:4, 43:19, 44:23, 54:9, 54:11, 77:17
**TYLER** [1] - 1:12
**Tyler** [1] - 3:4
**type** [2] - 48:14, 53:4
**typeset** [4] - 29:5, 30:13, 30:20, 31:3
**Typeset** [2] - 38:6, 38:11
**typesetter** [1] - 75:1
**typical** [1] - 12:21

## U

**U.S** [5] - 1:19, 1:23, 7:24, 18:22, 49:18
**unclear** [1] - 34:17
**under** [26] - 9:8, 9:12, 12:8, 15:15, 17:4, 21:15, 27:15, 29:13, 34:3, 34:6, 39:15, 39:22, 40:4, 40:17, 40:22, 41:2, 41:24, 44:2, 50:25, 52:15, 54:5, 54:8, 54:20, 58:2, 58:10, 63:2
**understood** [3] - 15:1, 16:8, 24:18
**undertake** [1] - 62:3
**unfortunately** [2] - 21:18, 56:19
**unit** [1] - 40:20
**UNITED** [2] - 1:1, 1:10
**United** [7] - 1:19, 3:2, 3:13, 3:14, 10:4, 10:5, 78:20
**unlawful** [1] - 43:10
**unreasonable** [3] - 15:13, 16:16, 16:17
**unthinkable** [1] - 14:21
**up** [14] - 10:11, 10:23, 11:2, 14:17, 20:16, 21:17, 45:4, 52:13, 67:25, 71:7, 73:7, 73:10, 77:13, 77:23
**USC** [1] - 9:8
**uses** [1] - 70:12

## V

**vague** [11] - 30:8, 30:22, 32:5, 34:18, 36:5, 36:15, 41:21, 62:19, 69:5, 69:6, 71:4
**VALDEZ** [2] - 1:18, 79:13
**Valdez** [5] - 7:23, 8:4, 8:5, 59:23, 79:19
**Valerie** [2] - 3:6, 3:21
**various** [1] - 46:22
**vendor** [3] - 12:16, 15:15, 75:22
**vendors** [7] - 11:21, 11:22, 12:9, 16:3, 16:10, 75:13, 75:14
**verified** [2] - 78:18, 78:19
**verify** [3] - 73:23, 77:16, 78:10
**versus** [1] - 3:3
**veteran** [2] - 13:17, 15:20
**via** [1] - 49:17
**victim** [1] - 13:5
**virtually** [1] - 21:18
**voices** [1] - 21:16
**voluminous** [1] - 53:8

## W

**wait** [2] - 5:7, 7:3
**waiting** [1] - 59:22
**Washington** [6] - 1:13, 1:17, 1:20, 1:23, 54:9, 54:10
**whatsoever** [1] - 7:15
**whistleblower** [1] - 12:23
**white** [1] - 51:15
**whole** [1] - 52:6
**William** [2] - 3:5
**WILLIAM** [2] - 1:15, 1:15
**WILMOT** [3] - 2:3, 4:2, 17:20
**Wilmot** [70] - 3:6, 4:2, 4:4, 4:9, 4:15, 5:10, 15:3, 15:11, 17:10, 17:11, 17:24, 18:1, 18:3, 18:12, 18:17, 18:19, 19:21, 20:4, 21:5, 21:21, 22:3, 22:8, 22:9, 23:16, 24:25, 25:4, 25:18, 26:8, 26:23, 27:3, 27:11, 28:14, 29:19, 30:7, 31:2, 31:14, 31:22, 34:1, 34:20, 35:6, 35:12, 36:7, 36:17, 36:22, 37:8, 37:13, 37:25, 39:21, 41:6, 41:24, 42:4, 42:13, 42:22, 42:23, 43:14, 44:1, 44:9, 44:16, 44:20, 45:3, 45:23, 46:13, 46:21, 47:25, 48:8, 49:11, 56:21, 59:9, 76:17, 76:21
**Wilmot's** [2] - 4:12, 15:2
**winner** [1] - 40:16
**wish** [3] - 6:6, 6:8, 74:4
**withdraw** [1] - 44:14
**WITNESS** [9] - 2:2, 17:12, 17:17, 20:6, 36:8, 36:18, 44:5, 59:10, 60:10
**Witness** [3] - 19:23, 56:23, 78:23
**witness** [34] - 3:6, 5:4, 5:7, 5:20, 5:22, 6:12, 7:3, 7:4, 7:24, 8:21, 17:9, 17:14, 17:20, 18:14, 21:12, 23:18, 23:24, 25:9, 25:13, 26:25, 28:3, 28:4, 28:8, 28:9, 37:10, 42:19, 44:10, 59:14, 59:19, 60:7, 60:12, 69:6, 79:23, 79:24
**witnesses** [9] - 6:6, 6:22, 7:2, 7:20, 7:23, 8:6, 8:7, 14:25, 59:24
**word** [9] - 11:5, 29:16, 70:13, 71:16, 72:3, 72:12, 72:15
**words** [14] - 21:10, 24:6, 43:3, 46:9, 70:3, 70:8, 70:12, 70:15, 70:25, 71:2, 71:13,

71:25, 72:10
**wrap** [2] - 45:4, 53:15
**wraparound** [1] - 23:4
**written** [1] - 40:6
**wrongdoing** [1] - 13:1

## X 

**Xerox** [1] - 53:7

## Y

**year** [2] - 57:5, 57:6
**years** [14] - 13:16, 15:6, 49:7, 57:5, 57:9, 57:11, 57:12, 71:15, 72:2, 72:13, 74:22, 74:25, 75:11
**York** [1] - 18:2