1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF COLUMBIA

3    BRIAN BURKE                    CIVIL ACTION NO. 08-364

4    VERSUS                         WASHINGTON,D.C.

5    RECORD PRESS, INC.             FEBRUARY 14, 2011

6                                   1:45 P.M.

7          **TRANSCRIPT OF BENCH TRIAL (PM SESSION)**

8          **BEFORE THE HONORABLE DEBORAH H. ROBINSON**

9          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

10   A P P E A R A N C E S:

11   FOR THE PLAINTIFF,             Tyler J. King, Esq.
                                    1420 N Street, NW
12                                  Suite 706
                                    Washington, DC 20005
13                                  (202) 436-2641

14   FOR THE DEFENDANT,             John William Lomas, Esq.
                                    MCKENNA LONG & ALDRIDGE LLP
15                                  1900 K Street, NW
                                    Washington, DC 20006
16                                  (202) 496-7183
                                    William T. O'Brien, Esq.
17                                  MCKENNA LONG & ALDRIDGE LLP
                                    1900 K Street, NW  Suite 100
18                                  Washington, DC 20006
                                    (202) 496-7107
19
     REPORTED BY:                   WENDY C. RICARD, RPR, CCR
20                                  OFFICIAL COURT REPORTER
                                    333 Constitution Avenue,NW
21                                  Room #6718
                                    Washington, DC  20001
22                                  202-354-3111

23   Proceedings recorded by mechanical stenography.

24   Transcript produced by computer-aided transcription.

25

1                            **I N D E X**

2

3        **WITNESSES:**                                    **PAGE:**

4        Morris Gocial..............
              By Mr. King                              5
5
         Brian Thomas Burke.........
6             By Mr. King                              17
              By Mr. O'Brien........                   30
7

8        Raymond Sullivan...........
              By Mr. Lomas..........                   60
9             By Mr. King...........                   78

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          P-R-O-C-E-E-D-I-N-G-S
 2              THE COURT: Now, good afternoon.  Mr.  King.
 3              MR. KING:  Yes, Your Honor.  The parties have
 4      discussed the possibility of stipulating to damages with the
 5      idea being that Mr.  Gocial, the expert for Mr.  Burke, would
 6      not be needed to testify.
 7                  Now, the -- Mr.  Gocial is prepared to testify, and
 8      Mr.  Burke, you know, wants him to testify.  Mr.  Burke needs
 9      to prove damages.  One of the --
10              THE COURT: Is there any reason that Mr. Gocial cannot
11      testify now?
12              MR. KING:  No.
13              THE COURT: Can we do that, then?
14              MR. KING:  Certainly.
15              THE COURT: Is that without objection, Mr.  Lomas?
16              MR. LOMAS:  Yes, Your Honor.  Thank you.  I think the
17      question is that what we had offered to do is stipulate to the
18      amount of the difference between the charges on the two
19      invoices that Record Press charged and the amount of the
20      charges that would be charged assuming the theory of the case
21      of Mr.  Burke, that the --
22              THE COURT: Well, that stipulation has been rejected.
23      Since Mr.  Gocial is here, he can testify subject, of course,
24      to whatever objections might be made with respect to any
25      individual questions.
```

1           MR. LOMAS:  Sure.

2           THE COURT: If the parties wish for Mr.  Gocial to --

3      of if they agree --

4           MR. LOMAS:  No, Your Honor.  I think the issue was --

5           THE COURT: -- that Mr.  Gocial should testify now or

6      if Mr.  King wants him to testify now, then I see no reason why

7      he cannot, and he could then be excused.

8           MR. LOMAS:  Yes, Your Honor.  I think the basis of

9      declining the stipulation seemed to be wanting Mr.  Gocial to

10     testify outside the bounds of what was agreed to at the January

11     31st status conference because he only submitted a report on

12     damages and the amount of damages, and since we'd be offering

13     to stipulate to the amount of damages, it sounds like Mr. King

14     wants to take him outside that scope and discuss matters that

15     are related to liability.

16          THE COURT: Again, I will certainly hear objections to

17     any questions as they are asked, but the stipulation has been

18     rejected, and I gather that it has, then Mr.  Gocial will be

19     sworn, and the inquiry will proceed subject to whatever

20     objections and ruling on objections may arise during his

21     testimony.

22          MR. LOMAS:  Okay.  Thank you, Your Honor.

23          THE COURT: Is that satisfactory?

24          MR. LOMAS:  Yes.

25          MR. KING:  Yes, Your Honor.

1          THE COURT: Mr. King, is it your request to call Mr.

2     Gocial next?

3          MR. KING:  Yes, Your Honor.

4          THE COURT:  Very well.  Good afternoon, sir.  Now,

5     let me ask you to please step forward to face the deputy clerk

6     to be sworn.

7     *          *          *          *

8          **MORRIS GOCIAL**, called as a witness in this case,

9     after having been duly sworn, testified as follows:

10    *          *          *          *

11         THE COURT:  Now, good afternoon.  Now, I note, sir,

12    that you have a -- you may have a seat.  I note that there is a

13    binder in your hand.  I will permit you to leave the binder

14    there on the table, but you must keep it closed until such time

15    as the Court has indicated that you are free to review it or to

16    read from portions of it or look at portions of it to refresh

17    your memory during the course of your testimony.  We haven't

18    reached that point yet, so I'll direct you to please keep it

19    closed in the meantime.

20         THE WITNESS: I understand.

21         THE COURT:  Thank you.  Now, Mr. King, please

22    proceed.

23         MR. KING:  Thank you, Your Honor.

24    **DIRECT EXAMINATION BY MR. KING:**

25    Q.   Mr. Gocial, could you please state and spell your name for

1    the record?

2    A.    Morris Gocial; G-O-C-I-A-L.

3          (Whereupon, there was a brief pause to deal with

4    microphone/headset issue.)

5          THE COURT REPORTER:  Could you spell your name again?

6          THE WITNESS:  G-O-C-I-A-L.

7          THE COURT: I believe you may continue, Mr.  King.  Is

8    everyone able to hear?  Very well.  I think we've made an

9    adjustment for one of the mics.  Very well.  Please proceed.

10   BY MR. KING:

11   Q.    Mr.  Gocial, where do you reside?

12   A.    I reside in Philadelphia at 440 Avenue of the Arts,

13   Philadelphia, Pennsylvania.

14   Q.    Could you explain for the Court your educational

15   experience?

16   A.    Yes.  I graduated from Temple University in Philadelphia

17   with a Bachelor in Business Administration.

18   Q.    And describe your work experience, please?

19   A.    Okay.  When I -- after I graduated from college, I worked

20   at Pricewaterhouse; then I went to a smaller firm, Fischbein

21   and Company, and then I went out on my own.  I've been out on

22   my own since 1974, and I've grown my company to about

23   70-something people right now with approximately 20 partners.

24   Q.    And what is the nature of the business?

25   A.    We are a CPA firm, management consulting firm, with

1    specialties in the areas of litigation support and business
2    evaluations.
3    Q.    And your professional designations, if you will?
4    A.    I'm a Certified Public Accountant.  I'm a Certified
5    Forensic Accountant.  I'm a Certified Valuation Analyst. I'm
6    certified in financial forensics.
7    Q.    And memberships in professional organizations?
8    A.    I belong to the American Institute of CPA's; the
9    Pennsylvania Institute of CPA's; the New Jersey Society of
10   CPA's because I'm registered in both of those states as a CPA.
11   I belong to the National Association of Certified Valuation --
12   Association -- the National Evaluation Association.
13   Q.    Uh-huh.
14   A.    And I'm also on the Pennsylvania Institute of CPA's
15   Business Evaluation Committee and the Pennsylvania Institute of
16   CPA's Forensic and Litigation Committee.
17   Q.    Have you had an opportunity to lecture?
18   A.    I have lectured on occasion, yes.
19   Q.    Okay.  And what generally is the nature of those lectures?
20   A.    I testified -- I lectured at a lawyers' seminar in
21   reference as to how to select an expert witness.
22   Q.    Uh-huh.
23   A.    I testified at a divorce conference as to what the role of
24   a forensic accountant would be.  I testified in front of the
25   legal administrators to teach them how to read financial

1    statements.

2    Q.    Have you had experience in providing expert testimony in

3    cases before?

4    A.    I have.

5    Q.    Okay.  All right, we're prepared to move now to the issues

6    at stake here.  And let's just get right to the invoices.  Mr.

7    Gocial, I'm handing you a document.

8              Your Honor, may I approach?

9              THE COURT: Mr.  King,  is it your intention to ask

10   the Court to permit Mr.  Gocial to render an opinion and

11   testify as an expert?

12             MR. KING:  Yes.  Would the Court admit Mr.  Gocial at

13   this time?

14             THE COURT: Mr.  Lomas and Mr. O'Brien, do you wish to

15   inquire in the nature of voir dire before you respond?

16             MR. O'BRIEN:  Your Honor, the only thing I'd be

17   interested in --

18             THE COURT:  I can hear you, Mr.  O'Brien, but let me

19   ask you to come to the microphone, please, so we'll be certain

20   that the backup recording equipment is operating.

21             MR. O'BRIEN:  Thank you, Your Honor.  We just want to

22   be crystal clear about what opinion Mr.  Gocial is being

23   offered for.  Again, if we go back to that lengthy January 31

24   hearing that we had, it was as to two invoices, the amount of

25   damages per two invoices, and if that is what he's being

1    offered as an expert on, then we would stipulate to his

2    qualifications for that.

3              THE COURT: Mr.  King?

4              MR. KING:  Yes, Your Honor.  Mr.  Gocial's testimony

5    at this time pertains to damages as they're reflected in the

6    invoices.

7              THE COURT: And when you say "the invoices", you mean

8    the two invoices which are at issue?

9              MR. KING:  That's correct, Your Honor.

10             THE COURT: In other words, the opinions you intend to

11   elicit concern the two invoices?

12             MR. KING:  That's correct, Your Honor.

13             THE COURT: Very well.  Thank you, Mr.  King.  And

14   with that, is it correct, Mr.  O'Brien, you have no objection

15   to permitting Mr.  -- or to the Court receiving Mr.  Gocial as

16   an expert for the purpose of rendering an opinion regarding

17   damages arising from those two invoices?

18             MR. O'BRIEN:  That's correct, Your Honor.  And no

19   opinion as to liability as we carefully went over in the

20   January 31 hearing, nothing with contract interpretation.

21             THE COURT: Very well.  Mr.  Gocial has not been

22   offered as an expert with respect to that matter, so I assume

23   you will ask him no questions about that, Mr. King; am I

24   correct?

25             MR. KING:  That's correct, Your Honor.

1          THE COURT: Very well.  You may proceed.  The Court

2     will receive Mr. Gocial as an expert with respect to offering

3     -- for the purpose of receiving an opinion with respect to

4     damages arising from the two invoices.

5          Now, you may --

6          MR. KING:  May I approach the witness, Your Honor?

7          THE COURT: Yes, you may.

8          MR. KING:  Thank you.

9     BY MR. KING:

10    Q.   Mr. Gocial, I'm handing you Record Press invoice 87-1700.

11    And that is Plaintiff's Exhibit D.  Mr. Gocial, you had an

12    opportunity to review this invoice as part of your report; is

13    that correct?

14    A.   Yes, I did.

15    Q.   And if we could just quickly go through these line items

16    and indicate where you found any overcharging, if at all.

17         MR. O'BRIEN:  Objection, your Honor.  There's one

18    line out of an issue.  It's collating, trimming to size and

19    binding --

20         MR. KING:  Okay.  If we want to zero in on the

21    disputed line item.

22         THE COURT: Very well.  Let me ask you then, Mr.

23    King, please rephrase your question.

24         MR. KING:  Okay.

25         THE COURT: Thank you.

```
1   BY MR. KING:

2   Q.   Mr. Gocial, could you indicate for the Court which line

3   item on Plaintiff's Exhibit D and refer to it by the name and

4   not really the number of it.

5   A.   Okay.

6   Q.   Refer to the line item wherein the damages that you've

7   identified occurred.

8            THE WITNESS:  Your Honor, may I pull out my own copy

9   of this so I don't have to recalculate some of the numbers?

10            THE COURT:  When you say "your copy of this", do you

11   mean --

12            THE WITNESS:  The exact copy of this invoice that I

13   did some mathematical calculations on.

14            THE COURT:  Is that without objection?

15            MR. O'BRIEN:  Your Honor, the objection would be

16   there's one line at issue; it's point 1225, $372.40.  So it's a

17   matter of moving the decimal place.

18            THE COURT: Well, let me ask you, Mr. King, will you

19   inquire please of Mr. Gocial whether he is able to testify

20   without resort to the materials in his binder?

21   BY MR. KING:

22   Q.   Are you -- in order to answer this question, are you able

23   to answer it just based on the face of this invoice?

24   A.   Yes, I can.

25   Q.   You can?  Okay.  Then for the purposes of this particular
```

```
1    question, can you identify the line item on this invoice by the
2    name of it, which refers to -- which has a -- which is included
3    in the damages in your report in this matter?
4    A.   Okay.  The fourth amount from the top which is totalling
5    of $372.40, it reads from left to right, 3,040 in quantity
6    column; the description is collating, trimming to size, and
7    binding charge; 3,040 pages at 12.25 per 100 pages.
8          And the price, it is point, 1225 cents -- doesn't
9    have a dollar mark, but that's what I believe that it refers
10   to; and the total amount is $372.40.
11   Q.   And based on your analysis of the invoice and the amount
12   of damages, what did you determine the precise amount of
13   damages in this particular invoice to be?
14   A.   My calculations suggest that this line should be $37.24;
15   therefore, is overstated by about 37, -- three -- well, the
16   difference between $37.24 and $372.40.
17   Q.   Okay.  Thank you, Mr.  Gocial.
18          MR. KING:  Your Honor, may I approach the witness
19   again?
20          THE COURT: Yes.
21   BY MR. KING:
22   Q.   Mr.  Gocial, I'm handing you a document, it's labeled with
23   Bates number RP-69.  This is an attachment to Plaintiff's
24   Exhibit A.  In rendering --
25          MR. O'BRIEN:  Your Honor, I'm going to object to the
```

```
1     introduction of this spreadsheet.  This goes not to damages,
2     but to contract -- this is a contract that's being put in front
3     of the witness.
4              MR. KING:  Your Honor, if I may respond?
5              THE COURT: Mr.  King.
6              MR. KING:  It's not true that this is a contract.
7     The contract is a very specific document.  This is a -- this is
8     another document that other people have testified to today with
9     respect to this matter.  My line of questioning for Mr.  Gocial
10    here is simply whether or not he reviewed this in his -- in
11    preparing his report, and if he reviewed it whether or not it
12    affected his calculation of the amount of damages.
13             MR. O'BRIEN:  Your Honor, if I may?
14             THE COURT: You may inquire of Mr.  Gocial what he
15    considered in forming his opinion.
16             MR. KING:  Uh-huh.
17    BY MR. KING:
18    Q.   Mr.  Gocial, did you have an opportunity to review this
19    spreadsheet?
20             THE COURT: The question would be in a non-leading
21    form; what was it that Mr.  Gocial reviewed?
22    BY MR. KING:
23    Q.   Mr.  Gocial, what did you review in forming your opinion?
24    A.   I reviewed the invitation for bid, Contract No.  2231-S,
25    which is the contract that I believe covers this particular
```

1   invoice, and part of that contract included this spreadsheet.

2   So, therefore, I read the entire contract, including this

3   spreadsheet, and that is the information that I utilized to

4   formulate my opinion.

5   Q.   Okay.  Did the -- having an opportunity now to look at the

6   spreadsheet again, does the spreadsheet change your opinion or

7   the report in my manner?

8   A.   I found this spreadsheet not to be of any value in terms

9   of my being able to formulate an opinion.  There are too many

10  questions and unanswered questions as to what this really means

11  relative to the actual contract --

12          MR. O'BRIEN:  Objection, Your Honor.  When he says

13  "what this really means", it's going to contract

14  interpretation, and, again, he's only here for damages, not to

15  say what the contract means or the interpretation of the

16  contract.

17          THE COURT: The objection is overruled with the

18  understanding that the witness may complete his answer, which

19  is a part of the inquiry of what he reviewed in order to

20  formulate the opinion.

21          THE WITNESS:  To support my opinion, I looked at this

22  contract and the numbers as presented here didn't make any

23  sense when you compare --

24          THE COURT: The question is only at this point what

25  you reviewed in formulating your opinion.

1              THE WITNESS:  I thought I answered that already, Your

2     Honor.

3     BY MR. KING:

4     Q.    And then it was just whether or not having the opportunity

5     to see this again today has changed in any way your

6     understanding of the amount of damages at issue here?

7     A.    It has not changed my mind.

8              MR. KING:  Okay.  Thank you, Your Honor.

9              THE COURT: You may continue.

10             MR. KING:  Yes.  The -- may I approach, again, Your

11    Honor?

12             THE COURT: Yes.

13    BY MR. KING:

14    Q.    I'm now handing you what's been marked as Plaintiff's

15    Exhibit C.  This is the invoice, 87-1701.  Did you have an

16    opportunity to review this invoice in rendering your report?

17    A.    I did.

18    Q.    Could you identify for the Court by using the words in the

19    line item, which line item in this -- in this invoice

20    represents a damage in your expert report?

21    A.    It is the 6th line item down that starts under the

22    quantity, 11,320, with the description:  Collating, trimming to

23    size, and binding charge; 11,320 pages at $12.25 per hundred

24    pages.

25         The price is point 1225 cents.  I'm sorry it should read

1    12 point 25 cents or point 1225 dollars, which totals up to

2    $1,386.70.

3    Q.   How did you calculate the amount of damages with respect

4    to this particular line item?

5    A.   Because this line item didn't take into consideration the

6    running rate of 10 copies, I recalculated it and came up with a

7    dollar amount; that line should have been of $138.67.  And the

8    damage, therefore, would be the difference between $138.67 and

9    the $1,386.70.

10   Q.   And having the spreadsheet that I also handed you before,

11   RP-69, having the opportunity to see that again today, does

12   having that opportunity to see it change or affect your

13   analysis of the damages at issue in this invoice?

14   A.   It does not.

15              MR. KING:  No further questions, Your Honor.

16              THE COURT: Very well.  Thank you very much, Mr.

17   King.

18              Mr.  Lomas or Mr. O'Brien, you may cross-examine.

19   Mr.  Lomas?

20              MR. LOMAS:  No, Your Honor.  No questions.  Thank

21   you.

22              THE COURT: Very well, thank you.  Mr.  Gocial, thank

23   you very much, sir.  You may step down.

24              THE WITNESS:  Thank you, Your Honor.

25              MR. KING:  Your Honor, is Mr.  Gocial required to

```
 1    leave the courtroom at this point or can he stay now that he's

 2    done testifying?

 3          THE COURT:  Am I correct that you do not intend to

 4    call Mr. Gocial -- in other words, that you have completed

 5    your inquiry of Mr. Gocial; is that correct?

 6          MR. KING:  Yes, Your Honor.

 7          THE COURT: Very well, I assume in that event the

 8    defendant has no objection?

 9          MR. LOMAS:  No, Your Honor.  We will not be calling

10    Mr. Gocial.

11          THE COURT:  Very well, thank you.  Then, yes, sir,

12    you are free to stay.  Now, Mr. King, is Mr. Burke your next

13    witness?

14          MR. KING:  Yes.

15          THE COURT: Very well.  Mr. Burke, good afternoon.  I

16    will ask you to please step around toward the witness chair and

17    face the deputy clerk to be sworn.

18    *         *         *              *         *

19          **BRIAN THOMAS BURKE,** called as a witness in this case,

20    after having been duly sworn, testified as follows:

21    *         *         *              *         *

22          THE COURT:  Mr. King.

23    **DIRECT EXAMINATION BY MR. KING:**

24    Q.   Mr. Burke, please state and spell your name for the

25    record.
```

1   A.   My name is Brian Thomas Burke; B-R-I-A-N; T-H-O-M-A-S;

2   B-U-R-K-E.

3   Q.   And where do you live?

4   A.   I live at 145 East 23rd Street, Apartment 4-R, New York,

5   New York, 10010.

6   Q.   Mr. Burke, please explain the events that arose wherein

7   you received a bill from Record Press for -- or not from Record

8   Press, I'm sorry, but please describe the events that led to

9   your receiving a bill for the copy charges that are disputed in

10  this matter.

11  A.   I was a plaintiff in a case against the Department of

12  Commerce, Bureau of Census.  They were represented by the U.S.

13  Attorney's office.  It was an EEO case.  And I guess, perhaps,

14  I should ask the Court at this time for a reasonable

15  accommodation.  I do have a disability, photophobia.  It's

16  myopia.  And that's one of the issues at hand in that case, but

17  discrimination for lack of work assigned to me.

18          THE COURT: Let me interrupt you for just one moment.

19  Mr. King, what is the accommodation that Mr. Burke requires?

20          MR. KING:  Mr. Burke, I think, is best to explain,

21  Your Honor.

22          THE WITNESS:  Your Honor, as I guess as a

23  non-attorney I just want, you know, I have to wear prescription

24  lenses.  I have to apologize.

25          THE COURT: Oh, no apology is necessary.  Is there

1   anything else that you require of the Court?  I thought I heard

2   you say that there's an accommodation you need?

3          THE WITNESS:  No, Your Honor.  That's the only

4   accommodation.

5          THE COURT:  That's the only one?

6          THE WITNESS:  Yes.

7          THE COURT: Very well.  I certainly have no objection

8   whatsoever to your continuing to wear your glasses, your

9   sunglasses.

10          MR. KING:  Thank you, Your Honor.

11          THE WITNESS:  Thank you, Your Honor.  Yes.  And,

12   well, anyway, the courts -- the district court judge threw out

13   the case, and I appealed it to the Second Circuit.  In the

14   Second Circuit, the United States prevailed, and that case was

15   dismissed in the Second Circuit.

16          After that case, under case law there is -- the U.S.

17   Attorney's Office was allowed to do a motion for cause I

18   understand.  They did do that for the cost of the briefs and

19   the printing costs.  I opposed that motion and --

20   BY MR. KING:

21   Q.   Mr. Burke, if you don't mind, I'm just going to interrupt

22   you on that point and then let me introduce an exhibit to you.

23          If I may approach, Your Honor?

24          THE COURT:  Yes.

25   BY MR. KING:

1    Q.   I'm handing Mr.  Burke Plaintiff's Exhibits C and D.   Mr.

2    Burke, these are the invoices -- can you -- if you have a

3    moment to look at the invoices.  Those are the invoices from

4    Record Press that correspond to the brief and the appendix in

5    that matter; is that correct?

6    A.   Yes.

7    Q.   Let me just go ahead and I'll ask you the question:  If --

8    it's the case, though, correct, that the bill that you just

9    testified about was a different bill than these invoices,

10   correct?

11   A.   I believe there was an added seven percent to those bills.

12   Q.   So the bills that you received from the -- as part of the

13   bill of costs included these charges, but also included an

14   additional charge of seven percent, correct?

15   A.   That is my understanding at this time, yes.

16   Q.   Okay.  After you received the bill, what did you do?

17   A.   Well, I had a certain time to respond to a motion.  I

18   believe it was 14 days, and I did procrastinate a bit.  I'm a

19   working man, and that last day was to respond to -- I reviewed

20   the bill and, of course, I had printed my own briefs, and I saw

21   that the costs were -- some of them seemed competitive, and one

22   line was an outrageous cost for binding costs, which was

23   approximately 85 percent of the costs.

24        And I immediately was struck by this irregularity, it

25   seemed, someone who pays for binding themselves, and --

1    Q.   What did you decide to do after that happened?

2    A.   I made some phone calls.  I made a number of phone calls.

3    I wish could remember the exact order.  I don't know if I

4    called GPO first, or I did call Record Press, and I did speak

5    to Mr.  Wilmot and Mr. -- and he said that --

6              MR. O'BRIEN:  Objection, Your Honor; as to hearsay.

7              THE COURT: Sustained.

8    BY MR. KING:

9    Q.   Mr.  Wilmot -- I'm sorry -- Mr.  Burke, you said that you

10   called the GPO.  Did you speak with Mr.  Adgerson when you

11   called the GPO?

12   A.   I spoke with Mr.  Adgerson and a number of people.

13   Q.   How did you introduce yourself to Mr.  Adgerson?

14   A.   Well, I -- as I said, I made a number of calls.  Probably

15   10 to 15 calls trying to speaking to Mr.  Adgerson, and I was

16   as he's testified basically referred to him, and I, as myself,

17   Brian Burke, and I explained --

18             MR. O'BRIEN:  Objection, Your Honor.

19             THE COURT: Let me ask you to come to the podium, Mr.

20   O'Brien.

21             MR. O'BRIEN:  Yes, Your Honor.

22             THE COURT:  What is your objection?

23             MR. O'BRIEN:  Mr.  Burke's statements that he is

24   testifying to now are hearsay.  So there's been no

25   demonstration for why that should be an exception to hearsay.

```
 1                THE COURT: Mr.  King.

 2                MR. KING:  Well, Your Honor, to be questioned of

 3      whether or not Mr.  Burke said that he was himself or someone

 4      else is at issue right now, and the point of Mr.  Burke's

 5      testifying about what he said is to determine not whether or

 6      not it's true that he is Mr.  Burke, but that he actually made

 7      these statements.

 8                And that the reason for his testimony is to deal with

 9      the fact that there's conflicting testimony that he did not in

10      fact say these words, and now he's able to testify, and he can

11      be cross-examined.  The rules regarding hearsay and the

12      unavailability of a person and the inability to cross-examine

13      them are not at issue.

14                Mr.  Burke is the declarant.  He's here in court

15      making this statement.  He's not talking about what someone

16      else said outside the court, and for all these reasons, he can

17      testify about what he said to Mr. Adgerson.

18                THE COURT: The Court will overrule the objection

19      based upon your representation that you are not offering the

20      statement for the truth of the matter asserted in it.  It's

21      simply to explain subsequent conduct.

22                MR. KING:  Thank you, Your Honor.

23      BY MR. KING:

24      Q.   Mr.  Burke, you -- again, how did you introduce yourself

25      -- how did you represent yourself to Mr.  Adgerson when you
```

1    called?

2    A.   It was not a long conversation.  I identified myself as I

3    did with all the other 10 to 15 people I called that day.  I

4    gave them my name and why I was calling, that I was a plaintiff

5    in a case, and I lost this case, and I was served this motion

6    for costs and within it was a bill from GPO, and I was

7    inquiring about that one line on this bill that I believe as I

8    do today is an outrageous charge.

9    Q.   Did Mr. Adgerson provide you information about the --

10   about the contract?

11           MR. O'BRIEN:  Objection.  Any statement by Mr.

12   Adgerson will be hearsay.

13           THE COURT: Mr. King.

14           MR. KING:  First of all, Your Honor, I'm not asking

15   him to repeat a statement of Mr. Adgerson.  I'm asking him

16   whether or not Mr. Adgerson provided him with information.  I

17   will ask him whether or not Mr. Adgerson made certain

18   statements, but, again, the question is not whether or not the

19   statements are true; the question is whether or not the

20   statements were made.

21           And at issue here is, you know, already today we've

22   had a defense put up a copy of the verified complaint in the

23   case, pointing out that Mr. Burke made a claim in his verified

24   complaint that contradicts the testimony of a witness.  Mr.

25   Burke's good faith in filing the complaint is called into

1    question.

2         Mr. Burke's knowledge of statements made by GPO

3    officials to him as it pertains to his state of mind reflects

4    his good faith, and the -- Mr. Burke's testimony on what was

5    said to him implicates the question of whether or not the

6    statement was made and not so much whether or not -- you know,

7    what the statement is true.

8         And, to be perfectly honest with you, we're not going

9    to even be able to get close today to whether or not Mr. Burke

10   is going to be able to provide hearsay testimony on whether or

11   not Mr. Adgerson's statements are true and how that relates to

12   liability in the case.

13        This line of questioning is simply what did -- is

14   what Mr. Adgerson says he told you true or did he tell you

15   something else?  Is it true that --

16        THE COURT:  First of all, the question which was

17   asked -- the Court finds that the question which was asked was

18   compound.  The Court is prepared to overrule the objection to

19   the question of whether Mr. Burke spoke with Mr. Adgerson,

20   however, the Court will sustain the objection to what may well

21   be your follow-up question, which is what did Mr. Adgerson

22   say.  The Court would find that is hearsay, and it is

23   inadmissible.

24        I would also note for the record that this is a

25   matter that should come as no surprise to any of the parties

 1    because, although, the pretrial conference was conducted off

 2    the record, this is an issue which arose at least to some

 3    extent at that time and may have indeed been addressed at an

 4    earlier point.

 5            If you wish to ask the first part of the compound

 6    question, the Court is prepared to overrule the objection to

 7    that, but I will not permit the further question regarding what

 8    Mr. Adgerson said in response, if anything -- we recognize -- I

 9    apologize.  I will not permit the question regarding what Mr.

10    Adgerson said, finding that it is inadmissible hearsay.

11            MR. KING:  Okay.

12    BY MR. KING:

13    Q.   Mr. Burke, what was the nature of your inquiry with Mr.

14    Adgerson?

15    A.   Well, basically, it was a question that was fairly

16    specific.  I was looking at this bill, and I saw some of the

17    costs seemed quite competitive, per page costs, and the

18    collating, trimming, and binding costs were this outrageous

19    charge, and it certainly just didn't -- it defied logic to me,

20    just as any type of contract, whether it was --

21    Q.   And Mr. Burke, did the -- did Mr. Adgerson confirm or

22    deny your suspicion?

23            MR. O'BRIEN:  Objection, Your Honor.

24            THE COURT: The objection is sustained on the ground

25    previously stated; that is, the answer would be hearsay.

1          MR. KING:  Okay.  And so, Your Honor, any question

2    about anything that Mr. Adgerson said is hearsay; is there no

3    room for any statement that Mr. Adgerson said to fall under an

4    exception to this rule?

5          THE COURT: I am reluctant to rule in advance because

6    I have not heard the question.  It may be that there is some

7    question as to which the Court would find the answer does not

8    call for inadmissable hearsay, but, certainly, questions

9    regarding what Mr. Adgerson said about his understanding of

10   the invoice or the billing practice would be inadmissible

11   hearsay.

12   BY MR. KING:

13   Q.   Mr. Burke, it's true that you did not have a copy of the

14   contract at this time?

15   A.   That is absolutely correct.

16   Q.   But you did have a copy of the invoices?

17   A.   I -- well, it was invoices plus seven percent.

18   Q.   Right.  You had a copy of the Department of Justice's

19   invoices to you, correct?

20   A.   Correct.

21   Q.   And so the nature of the conversation was that you were

22   providing -- is it true that the nature of the conversation

23   involved you --

24          THE COURT: Well, let's also not -- I will remind you

25   that since this is direct examination, your inquiry must

1    proceed by non-leading questions.

2           MR. KING:  Thank you, Your Honor.

3    BY MR. KING:

4    Q.   Mr. Burke, did -- could you please explain to the Court

5    whether or not Mr. Adgerson cited any words from the contract

6    that he was reviewing?

7           MR. O'BRIEN:  Objection, Your Honor.

8           THE WITNESS:  Yes.

9           THE COURT: Sustained.

10          MR. KING:  Okay, Your Honor.  And then I would just

11   respond that again if the question is whether or not Mr.

12   Adgerson used specific words, it goes to whether or not the

13   statement was made and not whether or not those words are true

14   or whether or not they have some relationship to something

15   else.

16          THE COURT: You are certainly free to ask what Mr. --

17   you're certainly free to ask Mr. Burke what he did in response

18   to whatever it was that he was told.

19          MR. KING:  Okay.

20   BY MR. KING:

21   Q.   Mr. Burke, based on the words that Mr. Adgerson used in

22   responding to your inquiry, what did that lead you to do?

23   A.   Well -- well, I was told not to use this word in court,

24   but basically I answered, "Oh, so it's fraud," and that was

25   basically the end of the conversation.  Then I immediately

1  called the Inspector General for the Government Printing Office

2  prior to getting the contract, and then I spoke to I guess it

3  was a Mr. Lloyd Rawls(Phonetic) from the Government Printing

4  Office and gave him the full information, that based --

5          MR. O'BRIEN:  Your Honor, his statements, Mr.

6  Burke's statements, again, he's talking about hearsay, his

7  conversations with Mr. Rawls.  There's no exception for that

8  that's been cited for hearsay.

9          THE COURT: The Court is prepared for Mr. Burke to

10  finish his answer to the question without regard and no further

11  question has been asked, but I assume that consistent with the

12  Court's earlier rulings, he will not ask what the inspector

13  general said.

14  BY MR. KING:

15  Q.  And let's narrow in on just a couple of categories of what

16  you did because obviously you did a lot, but let's narrow in

17  the focus.  What did you do in response to your conversation

18  with Mr. Adgerson in relation to the case, Burke v. Evans, in

19  which those charges were assessed?

20  A.  Well, after I dealt with the inspectors general's office,

21  I -- actually, Mr. Rawls -- excuse me, Mr. Adgerson did tell

22  me that I could get a copy of the contract from the

23  Philadelphia office, the contracting officer, and I did get a

24  hold of not the contract officer apparently for this, but a

25  co-worker.  And she sent me a copy by e-mail of the 2231-S, and

1    given what the information I gleaned from Mr.  Adgerson and the

2    contract itself, I filed a reply to the U.S. -- United States

3    as motion for costs.

4    Q.   And, Mr. Burke, was your opposition to those costs, was

5    your contesting of those costs, ever opposed?

6    A.   It was not opposed, and I'd like to point out within that

7    motion in my reply, I did make a contemporaneous account

8    paraphrasing what Mr.  Adgerson said under oath, and it was

9    upheld by the Second Circuit.

10   Q.   What did you end up paying for those costs?

11   A.   The Court quashed the motion and, certainly, wouldn't want

12   to presume why, but they apparently took my word on this.

13   Q.   Mr.  Burke, please explain what you did in response to the

14   conversation with Mr.  Adgerson and having received the

15   contract in relation to this case?

16   A.   Yeah, well, of course, when I discovered what I guess is

17   now controversial, what my opinion is in this case, and what I

18   believe the correct amount should be, I filed the pages for the

19   motion, and I did also I believe called the Department of

20   Justice about it, this information.

21   Q.   I'm sorry, Mr.  Burke.  My question, though, has to do

22   with this particular case.

23   A.   All right.

24   Q.   And the question is just was -- how did this prompt you --

25   how did your conversation with Mr.  Adgerson and your having

1   the contract prompt you to get involved in this particular

2   matter?

3   A.   Well, after a little research, I realized that I believed

4   they were in violation of the Federal False Claims Act, and I

5   called some law firms and I obtained retained counsel, and, of

6   course, it was a complaint filed under seal with the Department

7   of Justice.

8          MR. KING:  Thank you, Mr. Burke.  No further

9   questions.

10         THE COURT: Thank you very much, Mr. King.  Mr.

11   O'Brien?

12         MR. O'BRIEN:  Yes, Your Honor.

13         THE COURT: You may cross-examine.

14   **CROSS-EXAMINATION BY MR. O'BRIEN:**

15   Q.   Mr. Burke, I believe you've just indicated that at the

16   time that you filed this complaint, you did not have the actual

17   invoices from Record Press, correct?

18   A.   Did counsel mean by actual invoices if I had invoices plus

19   seven percent more, it would certainly mimic or mirror the

20   invoices, so I wouldn't necessarily agree with your statement.

21   Q.   Sure.  And what I mean by the specific invoices, Mr.

22   Burke, is the Plaintiff's Exhibit D and C.  If we could pull

23   those up?

24   A.   I don't believe I had this identical document.  I had a

25   similar document.

1    Q.   And you've never worked for Record Press; is that correct,

2    Mr.  Burke?

3    A.   That's correct.

4    Q.   And you've never worked for the Government Printing

5    Office; am I right?

6    A.   That's correct.

7    Q.   And you did not participate in the drafting of the

8    contract between Record Press and the Government Printing

9    Office, correct?

10   A.   That's correct.

11   Q.   And when you filed your complaint, you did not have these

12   two invoices, this is Plaintiff's C and D, correct?

13   A.   I wouldn't agree with that.  I believe what I had was a

14   similar document with seven percent --

15   Q.   Okay.  Well, I'm asking you about these two exact

16   invoices, sir.  You didn't have these two exact invoices,

17   right?

18   A.   Well, this is -- my copy is of some invoices.  No.  I

19   didn't have this exact document.

20   Q.   As a matter of fact, you stated in your verified complaint

21   that relator does not have access to Record Press' invoices,

22   correct?

23   A.   Well, again, you're characterizing what is a Record Press

24   invoice.  I believe I did have a Record Press invoice, but not

25   this exact document.  It was simply seven percent added to it.

1    Q.   And the seven percent, you're talking about the bill of

2    costs that you received from the GPO; is that correct?

3    A.   I'm talking about the seven percent that the Government

4    Printing Office adds to their invoices when they send it to the

5    Department of Justice.

6    Q.   Right.  And it's the bill of costs that you received from

7    the government, right?

8    A.   It was a bill of costs with documents attached.

9    Q.   Right.  And that is the bill of cost that prompted you to

10   make these phone calls that you've been talking about to the

11   government, right?

12   A.   To the government and others, yes.

13   Q.   But the amounts that you included in your verified

14   complaint are not the amounts from the Record Press invoices,

15   Exhibit C and D, correct?

16   A.   There is a seven percent added due to the GPO's overhead

17   added to the cost.

18   Q.   Right.  So when you stated in your verified complaint for

19   instance that Record Press charged $1,483.77, that was false,

20   correct?

21   A.   This was on information I believe that was represented by

22   the government as being their costs.  I wasn't aware at the

23   time of the seven percent added, and I was not informed of it,

24   so it was off by seven percent.

25   Q.   So your complaint stating that Record Press charged the

1    government $1,483.77, your verified complaint, was wrong?

2    A.    It was to the extent that I was being charged the amount

3    that I put in the complaint what Record Press was paid or what

4    they requested under their -- what I contend is a false claim

5    was seven percent less.

6    Q.    And it was also seven percent less than $398.47, right?

7    A.    That's correct.  And I would certainly point out that

8    might be an incentive for GPO to not want to discover this

9    information.

10   Q.    And so when you put that in your complaint at Paragraph 15

11   that Record Press charged the government or charged $398.47,

12   that was false, right?

13   A.    Well, the amount that Record Press charged the government

14   was seven percent less than I was being charged by the

15   government.  So the government was, in fact, I guess profiting

16   from the overcharge.

17   Q.    And, sir, if you look at Record Press exhibit or rather

18   the Record Press invoice that is listed at Plaintiff's Exhibit

19   C, the amount that was charged to the government was -- if you

20   look at the line item, $12.25 per 100 pages, correct?

21   A.    Well, if these documents are correct.

22   Q.    Right.  And then if you look at Plaintiff's Exhibit D, and

23   you'll see the line item for the amount for collating, trimming

24   to size and binding charge, that's $12.25 per 100 pages,

25   correct?

1   A.   If these documents are correct.

2   Q.   In your verified complaint at Paragraph 12, you stated

3   that Record Press charged $12.50 per page, correct?

4   A.   I don't have a copy of the complaint in front of me.

5   Q.   Sure.  Let us get that for you.  If we could show you a

6   copy of your verified complaint at Paragraph 12, sir, and for

7   the convenience of the Court, we'll pull it up on the screen

8   and for you, Mr. Burke, as well.  And --

9           THE COURT: Is it on your screen, Mr. Burke?  I have

10   it here.

11           THE WITNESS:  I have one page there, a cover page.

12   BY MR. O'BRIEN:

13   Q.   Sure.  And I'm going to ask you to look at Paragraph 12,

14   Mr. Burke.

15   A.   (Witness complies.)

16   Q.   Do you see that, Mr. Burke?

17   A.   Yes.

18   Q.   And you see where you say that Record Press' contract with

19   GPO incorporated the terms, conditions, and specifications set

20   forth in the request for proposal and sets the cost for binding

21   a 10-copy run of a brief or appendix at $12.50 per 100 pages;

22   do you see that, sir?

23   A.   Yes, I do.

24   Q.   This is what you alleged in your verified complaint,

25   right?

1      A.    If this is a correct copy of the complaint, yes.

2      Q.    And, in fact, Record Press charged $12.25 per 100 pages,

3      right, sir?

4      A.    That isn't my information.

5      Q.    Well, if we just looked at the invoices that your counsel

6      put into record showing that they charged $12.25 per 100 pages,

7      right, sir?

8      A.    In the invoice I got from the government, it wasn't broken

9      down with the seven percent, so we didn't make an assumption,

10     and we made the assumption that they were charging $12.50

11     instead of $12.25.

12     Q.    In fact, when you filed the case, you just had the GPO

13     request for proposal, but the line item for the collating,

14     trimming and binding, that was blank, right?

15     A.    Mr. Adgerson gave me some numbers, and I believe --

16     Q.    That's not my question, sir.  The document that you had,

17     the line item for collating, trimming and sizing, that was

18     blank, right?

19     A.    The -- was blank, but as you can see in the

20     contemporaneous document I filed with Court the day I

21     discovered the overcharge or fraud --

22     Q.    Sir, my question is just --

23     A.    -- I got those numbers, 12.50.

24     Q.    Yeah, 12.50; which is not the amount that was charged,

25     right, sir?

1      A.    It was information that was given to me by GPO.  I didn't

2      make it out of air.

3      Q.    But you didn't have the Record Press invoices when you

4      filed, you told us, right, sir?

5      A.    I had a conversation with Mr. Adgerson who gave me this

6      number, 12.50.

7      Q.    And, sir, when you filed your complaint, you had the RFP

8      from the government, but not the line items that were filled in

9      by Record Press, right?

10     A.    I had line items given to me by Mr. Adgerson.

11     Q.    You have to listen to my question, okay?

12            THE COURT: The Court is going to interject at this

13     point.  Mr. O'Brien has asked a question I believe three

14     times, perhaps, phrasing it slightly differently each time, and

15     that is the question that you must answer.

16            THE WITNESS:  I apologize to the Court, Your Honor.

17            THE COURT:  Do you want Mr. O'Brien to repeat it?

18            THE WITNESS:  Yes.  I have to apologize.  Sorry.

19     BY MR. O'BRIEN:

20     Q.    Sure.  Mr. Burke, when you filed your complaint, you had

21     from the GPO a blank request for proposal; it did not have the

22     line items filled in for collating, trimming, and sizing and

23     binding, right?

24     A.    The document that I was e-mailed by GPO on the day of the

25     discovery was blank, yes, as far as those line items.

1    Q.   And there were no price terms filled in, right?

2    A.   On that particular document, there were no price terms.

3    Q.   Now, Mr. Burke, you mentioned in response to questions

4    from Mr. King that you filed this case after you received the

5    bill of costs from the <u>Burke v. Evans</u> case; is that right?

6    A.   From information I gleaned from that, yes.

7    Q.   And Mr. Evans, this was your lawsuit against Mr. Evans

8    who was the Secretary of Commerce; am I right?

9    A.   Yes.  Mr. Evans, and then they wanted to change it to I

10   guess Mr. Gonzales who became the new Secretary of Commerce.

11   Q.   Now, in that case, you're alleging that you were the

12   victim of employment discrimination, Title VII; is that right?

13   A.   I believe Title VII, the Rehabilitation Act, yes.

14   Q.   And the Court dismissed your case; is that right, sir?

15   A.   That's correct.

16   Q.   Now, in the dismissal, the Court found that you had come

17   forward with, quote:  Nothing beyond the realm of conclusory

18   assertions and speculation to support your claims; am I right?

19   A.   Well, I don't have that information in front of me.  I

20   can't recall exactly what the Court said, but --

21   Q.   Well, let's go ahead and mark an exhibit that I'd like to

22   put in front of you.

23              MR. KING:  Your Honor, I'm going to object on the

24   grounds of relevance.

25              THE COURT: Mr. O'Brien?

```
 1            MR. O'BRIEN:  It goes to his motivation.  First of
 2    all, Your Honor, he testified as to it on direct, but it also
 3    goes to his motivation, the basis of his investigation, the
 4    reason he filed this lawsuit; he's saying it was in response to
 5    this bill of costs.
 6            Also, specifically, in this case, it goes to his
 7    honesty, his credibility, because there's statements in the
 8    decision that go to his credibility.  As a witness, there's
 9    traditional impeachment.
10            THE COURT:  The objection is overruled.
11            MR. O'BRIEN:  May I approach, Your Honor?
12            THE COURT: Yes.
13    BY MR. O'BRIEN:
14    Q.   Mr. Burke, we have put in front of you a copy of the
15    decision from the Burke v. Evans case, and if I could ask you
16    to turn to Page 16, please.  And for the convenience of the
17    Court, we'll also put it up on the screen, and, also, Mr.
18    Burke, for you on the screen.
19            THE COURT: I see that there is an opinion now on my
20    screen.  Do you have the opinion on your screen, Mr. Burke?
21            THE WITNESS:  I have Page 5 on the screen.  You asked
22    for Page 16?
23            MR. O'BRIEN:  Yes.  We'll turn to Page 16 for you,
24    Mr. Burke, on the screen as well, okay?
25            THE WITNESS:  All right.  Yes.
```

BY MR. O'BRIEN:

Q.   Okay.  Mr.  Burke, the question I had asked you is that the Court found in this case that you had come forward with nothing beyond the realm of conclusory assertions and speculation to support your claims?

If you look at the first full paragraph on the left column there, sir, at Page 16?

A.   Yes, I see that.

Q.   So does this refresh your recollection that the Court had found that you had nothing but conclusory assertions and speculation to support your claims?

A.   Well, they dismissed the case, so that -- yes, that was their legal opinion.  Yes.

Q.   The Court also found that your allegations were based on vague recollections of conversations with third parties; do you see that, sir?

A.   In the middle of the next paragraph.

Q.   And, likewise, it said that you had unsupported conclusions drawn from documents produced by the defendants in that case; do you see that?

A.   Yes.  That's exactly what it says, yes.

Q.   Further, in that case, sir, the Court found that you had attempted to rely on an affirmation that contradicted your prior deposition testimony; do you recall that?

A.   Where is that?

1    Q.   We'll pull the page out for you, sir.  Do you see where it

2    says, plaintiff may not rely on an affidavit, or, in this case,

3    an affirmation, which contradicts his prior deposition

4    testimony to create an issue of fact precluding summary

5    judgment; do you see that, sir?

6    A.   Yeah.  They quoted another case.  I don't understand what

7    you're --

8    Q.   I just wanted to refresh your recollection that the Court

9    had found this; do you recall that?

10   A.   Well, can I get what line -- you're kind of taking --

11   Q.   Well, you have a hard copy in front of you as well, sir,

12   on Page 16, and if we could also zoom back.

13   A.   Yes.  I believe that was an issue regarding my recognizing

14   Mr. Brown(Phonetic) who -- that was the first time I had met

15   him, and I, certainly, at the deposition, I was made aware that

16   based on his voice and appearance that he was the one that made

17   the remarks.  So, certainly, there was perhaps that slight

18   contradiction.

19   Q.   Sure.  So it is your memory --

20             THE COURT:  Just the following:  If it is your

21   contention, Mr. O'Brien, that in the opinion there are

22   references to a finding by a court regarding Mr. Burke's

23   credibility, I believe that those would be relevant to this

24   proceeding.  If -- the Court cannot conclude that the same

25   would be true with regard to findings of the Court regarding

```
1    matters such as, for example, the sufficiency of the evidence.
2              The Court cannot conclude without anything more that
3    a court's finding that the evidence was insufficient --
4              MR. O'BRIEN:  I understand, your Honor.
5              THE COURT:  -- had a bearing on Mr. Burke's
6    credibility.  So I will ask that if there are findings
7    regarding, for example, credibility issues, that you may
8    certainly highlight those, but that the Court would find no
9    relevance or probative value, with all due respect to other
10   judges, in a mere determination that there was insufficient
11   evidence --
12             MR. O'BRIEN:  Understood, Your Honor.
13             THE COURT: -- that do not have any bearing upon Mr.
14   Burke's credibility.
15             MR. O'BRIEN:  No, I understand, Your Honor.  And just
16   another -- I really just have another question on this opinion
17   and would move on.  But the Court that we're talking about in
18   this decision here, Your Honor, is contradiction of prior
19   deposition testimony against an affirmation.
20             So this is the language that is highlighted near
21   Burke Affidavit Exhibit 4 in which the Court says the plaintiff
22   may not rely on an affidavit, in this case, an affirmation,
23   which contradicts his prior deposition testimony.  So it goes
24   to inconsistencies between sworn testimony and affirmation.
25   That was the only --
```

1          THE WITNESS:  That's your words.  It should simply

2     say it contradicts, and I agree that the Court, it did

3     contradict it because the information I gleaned at a later time

4     upon my deposition of Mr.  Brown.

5     BY MR. O'BRIEN:

6     Q.   Okay.  And you --

7     A.   Drawing a conclusion.

8     Q.   The Second Circuit affirmed the dismissal of your case in

9     Burke v. Evans; is that right?

10    A.   I'd point out, Mr. O'Brien, if I didn't lose this case, I

11    would not have got a bill of costs, and I wouldn't have found

12    the overcharge.

13    Q.   Well, sir, that's not exactly my question; my question was

14    that the Second Circuit affirmed the dismissal of the lower

15    court here, right?

16    A.   That's correct.

17    Q.   And also they did that in a summary order, right?

18    A.   Yes.

19    Q.   Okay.  And then that's when you subsequently got the bill

20    of costs, right?

21    A.   I believe that I may have done a motion for hearing, but

22    at some point, I did get a motion for costs, yes.

23    Q.   At some point, did you also send a letter to Senator

24    Charles Schumer about this case?

25    A.   I approached a number of politicians and media individuals

1    who I thought would be interested in this activity, yes.

2    Q.   And did those individuals include Senator Schumer?

3    A.   If you -- if I gave that information to you, then I'm sure

4    that's what I did, yes.

5    Q.   And you also said media --

6            MR. KING:  Object on the grounds of relevance to this

7    line of questioning about whether or not Mr.  Burke talked to

8    other people.

9            THE COURT: Sustained.

10           MR. O'BRIEN:  Well, Your Honor, I would like to ask

11   Mr.  Burke about his motivation for filing this lawsuit, and it

12   is related to that, if I may.  It also goes to his impeachment

13   bias and his state of mind, and, likewise, counsel did not

14   object to the exhibit we identified for Mr.  -- letter to Mr.

15   Schumer when -- in his pretrial statement, there was no

16   objection to the identification of this trial exhibit, so I'd

17   ask a little bit of leeway to ask him about this letter.

18           THE COURT: What is the relevance of the letter to the

19   issues now before the Court?

20           MR. O'BRIEN:  Your Honor, this goes to --

21           THE WITNESS:  Your Honor, could I just -- I think

22   there is -- if I could answer the question, I might -- I think

23   it would be informative of the Court and Mr.  O'Brien.

24           THE COURT: Just one moment, Mr.  Burke.  Right now

25   I'm speaking with the lawyers.

```
1              THE WITNESS:  Sure.

2              THE COURT: Your lawyer has objected to the question.

3              MR. O'BRIEN:  Mr.  Burke has indicated he's willing

4       to answer it, but, in any event, it does, I believe, Your

5       Honor, go to bias.

6              THE COURT:  There is an objection pending.

7              MR. O'BRIEN:  Yeah.

8              THE COURT: The Court is prepared to sustain the

9       objection.  I have not heard any proffer from you, Mr.

10      O'Brien, regarding why the letter would be relevant to any

11      issue having to do with liability.

12             MR. O'BRIEN:  Sure.

13             THE COURT:  Should there be some other issue that

14      emerges at some later point, the Court can address it then.

15             MR. O'BRIEN:  Well, there are two other issues if I

16      may, Your Honor; one would be for vexatiousness.  I mean under

17      the False Claims Act statute, if there is evidence of

18      vexatiousness, it's the defendant's right to ask about that.

19      So not as to liability, but vexatiousness would be one ground.

20             THE COURT: Is that the issue to which you believe

21      it's relevant?

22             MR. O'BRIEN:  I do, Your Honor.

23             THE COURT: Mr.  King?

24             MR. KING:  If I could just ask Mr.  O'Brien to

25      clarify.
```

```
 1              MR. O'BRIEN:  Sure.

 2              MR. KING:  The point is that evidence of

 3     vexatiousness, that's a liability under the Act?

 4              MR. O'BRIEN:  No.  Under 31 U.S.C. 3730(d)4, Your

 5     Honor, the -- we're entitled to ask questions or lay a

 6     foundation for vexatiousness to recover attorney's fees and

 7     costs as the defendant in a case like this, so I think that

 8     under that section of the False Claims Act alone, we would be

 9     entitled to ask questions on that.

10              THE COURT: So you do not contend that the answer is

11     relevant at all to liability?

12              MR. O'BRIEN:  That's right, Your Honor.  We're not

13     asking it with respect to liability, it goes to the

14     vexatiousness issue.

15              MR. KING:  Your Honor --

16              THE COURT: Mr.  King, with the understanding that the

17     question is coming in for that limited purpose, although, we --

18     the Court has made no finding regarding liability at this

19     point, in order to streamline the proceeding, is there any

20     objection to the question being asked now while Mr.  Burke is

21     on the stand?

22              MR. KING:  That's fine.

23              THE COURT: And you will, of course, have the

24     opportunity to redirect.

25              MR. KING:  I would point out that the Rule 11 motion
```

```
 1    has been filed accusing Mr. Burke of filing frivolously; that
 2    that motion had already been decided and overruled.  It seems
 3    like this is another opportunity to try to bring up whether or
 4    not that motion should be granted, when it's already been
 5    denied.
 6             But in the interest of streamlining, for the limited
 7    purpose of whether or not this is vexatiousness, it is -- I
 8    will not object on that.
 9             THE COURT: Very well.  Thank you very much, Mr. King.
10    The objection has been withdrawn, so, Mr.  Burke, let's ask Mr.
11    O'Brien to repeat the question.  We've had so much dialog --
12             THE WITNESS:  Yes.  Could you please repeat the
13    question?
14             THE COURT: Please state your question, and, then, Mr.
15    Burke, you will answer the question.
16    BY MR. O'BRIEN:
17    Q.   Sure.  Mr.  Burke, you contacted Senator Schumer at some
18    point in connection with this case; is that right?
19    A.   Mr.  O'Brien, I'd like to point out that my understanding
20    is --
21    Q.   I'm sorry, sir.  That's a very simple question.  Just, you
22    did write a letter to Senator Charles Schumer about this case,
23    right?
24    A.   I wrote a letter to the head of the joint committee on
25    printing, who has jurisdiction over the Government Printing
```

1     Office.

2     Q.    Okay.  But you also wrote a letter to Senator Charles

3     Schumer, right?

4     A.    Well, that is Senator Charles Schumer.  He's the head of

5     the joint committee on print --

6     Q.    Thank you.  Let's go ahead and mark -- I'm sorry.  We

7     don't have to mark it.  If I may approach the witness?

8                  THE COURT: You may.

9                  MR. O'BRIEN:  Thank you, Your Honor.

10    BY MR. O'BRIEN:

11    Q.    And for -- Mr.  Burke, for your convenience, we've also

12    put it up on the screen in front of you, and it's also on Judge

13    Robinson's screen.  So Mr.  Burke, this is the letter from you

14    to Senator Schumer, and it's dated May 8th, 2009, right?

15    A.    Correct.

16    Q.    It's also -- you've also sent it to "TWIMC", I take it

17    that's "To Whom It May Concern"?

18    A.    Correct.

19    Q.    Now, you wrote to Senator Schumer that you were suing

20    Record Press in the name of the people to recover paid

21    fraudulent claims; am I right?

22    A.    That's what it says, yes.

23    Q.    And you also gave Senator Schumer this Court's case

24    number, right; 08-CV-364?

25                 MR. KING:  Your Honor, objection.  The document

1    speaks for itself.  If Mr. O'Brien wants to ask some other

2    question other than what the document says, I can understand,

3    but we can all read the document.

4            THE COURT: The objection is sustained.

5    BY MR. O'BRIEN:

6    Q.   Well, did you invite Mr.  -- rather Senator Schumer's

7    office to submit an amicus curiae in the case before this Court

8    right now?

9    A.   Well, it says you are welcome to supply an amicus curiae,

10   but that's not -- wasn't my request.  So you may request for

11   something else other than that.

12   Q.   Were you welcome to the Senator to submit an amicus curie

13   in this case?

14   A.   Well, I said his offices, it may not be him personally.

15   Perhaps, his counsel or the government joint committee on

16   printing's counsel.

17   Q.   Did you ask Senator Schumer to send a FOIA to the

18   Inspector General at the Department of Justice?

19   A.   Yes.  That was my request or request for information.

20   Q.   Did you tell Senator Schumer that, quote:  Thousands of

21   New York citizens individually defrauded, as well as

22   taxpayers?

23   A.   I made an assumption that there was a number other people

24   who were served with these bills of costs.  It turns out that

25   was incorrect information, but, of course, if they were

1    overcharging the government, then all citizens would be

2    defrauded.

3    Q.    Did you approach the New York Post about the case before

4    this Court?

5    A.    Yes.

6    Q.    Did you contact a reporter named Mr.  Golding(Phonetic)

7    about this story?

8    A.    Yes.

9    Q.    Did you try to get the New York Post to do a story on

10   Record Press' alleged fraud?

11   A.    Well, I wouldn't characterize what the New York Post would

12   or would not do.  I gave them information.

13   Q.    Well, was it your hope that the New York Post would do a

14   story on Record Press' alleged fraud?

15   A.    I would hope that the public would be informed about

16   situations such as that.

17   Q.    In your letter to Senator Schumer and to whom it may

18   concern, nowhere in this letter do you name Calvin Adgerson,

19   correct?

20   A.    That's correct.

21   Q.    But this is in May 2009 that you wrote this letter, right?

22   A.    I guess I don't understand the question, counsel.  Why

23   would that be -- why would I put his name in there?  I don't

24   understand.

25   Q.    It's a simple question, sir.  I'm just asking you as of

1    May 8th, 2009, when you're writing to Senator Schumer, you

2    don't name Calvin Adgerson, right?

3    A.    What would I name him as?

4    Q.    Sir, is it "yes" or "no"?

5    A.    I didn't use Mr. Adgerson's name in this letter. I don't

6    understand the question, though.

7    Q.    Sure. But -- thank you for answering. The question has

8    been answered, but this is a year-and-a-half after you filed

9    your verified complaint, right?

10   A.    Again, I don't understand what -- why would I put his name

11   in the paper that was filed -- I filed in the Burke versus

12   Evans case on the day that I spoke to him.

13            THE COURT: I'm sorry. Mr. King, was there an

14   objection to the question that was asked?

15            MR. KING:  Objection. Again, on the grounds of the

16   fact that this line of questioning is just asking Mr. Burke to

17   confirm dates in the letter, et cetera. If the question has to

18   do with why Mr. Burke didn't do something or did do something,

19   I can understand, but just reiterating again what's in the

20   letter, again, I would object on the same basis that the

21   document speaks for itself.

22            THE COURT: The objection is sustained.

23   BY MR. O'BRIEN:

24   Q.    Did you believe, sir, after you got the bill of costs that

25   individuals including yourself were defrauded when they lost

1     cases in the Second Circuit?

2     A.    I have to acknowledge that I made an assumption that the

3     U.S. Attorney's Office would -- identical to my case for people

4     who lost cases filed bills of costs, and I certainly didn't

5     think of any reason why they wouldn't.  Upon further

6     investigation, I couldn't find any other bills of costs on

7     people who lost cases, which is, perhaps, another issue for

8     some other forum, but I did have some incorrect information.

9     Q.    But my question is:  At the time that you were putting

10    together your complaint, did you believe that individuals,

11    including yourself, were defrauded when they lost cases in the

12    Second Circuit?

13    A.    I believed that it -- I did draw a conclusion that other

14    people were treated similarly to myself and given bills of

15    costs or perhaps law firms were given bills of cost and paid

16    them, and they would have been defrauded.  If no other

17    individuals or law firms were given bills of costs by the U.S.

18    Attorney's Office in the Southern District of New York, then

19    that information would not be accurate other than as

20    taxpayers.

21    Q.    But it was your belief that people who lost cases in the

22    Second Circuit were being defrauded because they got

23    overbilled; is that correct?

24    A.    That's correct.  I, again, as Record Press is the

25    contractor for the U.S. Attorney's Office, Southern District of

1      New York or through the Government Printing Office, if they

2      were also submit bill of costs by the Department of Justice and

3      in that Second Circuit, then that presumption is they would

4      have been identically defrauded as the attempt was against

5      myself.

6      Q.   And you told us earlier that in response to getting that

7      bill of costs, you notified the so-called joint committee on

8      printing; is that right?

9      A.   I understand under the Federal False Claims Act, I'm

10     required to notify the appropriate author.

11     Q.   So you notified the joint committee on printing?

12     A.   I notified employees of the joint committee on printing,

13     yes.

14     Q.   And you also contacted Congress; is that right?

15     A.   The joint committee on printing is a congressional

16     organization, and I understand the Government Printing Office

17     is a Congressional agency.  They have complete authority over

18     the Government Printing Office.  So the joint committee, the

19     Senate and the House of Representatives, so, of course, by

20     contacting the joint committee on printing, I would be

21     contacting Congress, yes, that's correct.

22     Q.   And you also contacted the Senate; is that right?

23     A.   Yes.  They are part of the joint committee on printing.

24     Q.   Sir, the New York Post never did a story on this; is that

25     right?

1    A.   To my knowledge, they have not yet done a story on this,
2    no.
3    Q.   Are you aware that the GPO investigated your complaint
4    against Record Press?
5    A.   I hope so.  I was supposed to get a closing report, but I
6    have not gotten any information on that filing.
7    Q.   Well, you were aware that the GPO found no fraud, right,
8    sir?
9    A.   Excuse me?  Could you repeat that question?
10   Q.   Yes.  You're aware that the GPO found no fraud with
11   respect to your complaint; is that correct?
12           MR. KING:  Objection.  Speculation.
13           THE COURT: Can you rephrase your question please, Mr.
14   O'Brien?
15           MR. O'BRIEN:  Yes, Your Honor.
16   BY MR. O'BRIEN:
17   Q.   Let me ask a different question if I may then.  It might
18   help clarify; you're aware that the GPO presented information
19   to your counsel that there was no fraud found with respect to
20   your complaint about Mr.  Wilmot and Record Press, right?
21   A.   Are you talking about the Inspector General of the GPO or
22   the GPO itself that got the seven percent?
23   Q.   Sir, I'm talking about whether you're aware in September
24   of 2009 if that senior GPO representatives presented
25   information to your counsel showing that there was no fraud

1    committed by Record Press?

2    A.   I'm aware that Mr.  Sullivan did meet with my counsel,

3    and, no, I would disagree with your statement.  They gave no

4    evidence.  They gave that spreadsheet which is the most

5    illogical piece of mathematics I've ever seen in my life, and

6    -- implies more fraud.  So I would have to answer the negative.

7    Q.   But you're aware that the -- that Mr. Sullivan of the GPO

8    met with your prior counsel; is that correct, sir?

9    A.   I am aware of that, yes.

10   Q.   And that he provided information with respect to your

11   complaints against Record Press?

12   A.   They supplied a similar spreadsheet, which they did not

13   have Record Press named in it, and I pointed it out to my

14   counsel at the time these nonsensical numbers that make the

15   spreadsheet less than worthless, perhaps, fraudulent in and of

16   itself.

17   Q.   So that's a "yes" that you're aware that Mr.  Sullivan of

18   the GPO met with your prior counsel?

19   A.   I'm aware he met with them, yes.

20           MR. O'BRIEN:  Court's indulgence.  No further

21   questions at this time, Your Honor.

22           THE COURT: Thank you, Mr.  O'Brien.  Will you have

23   redirect examination, Mr.  King?

24           MR. KING:  No, your Honor.

25           THE COURT: Very well.  In that event, Mr.  Burke, you

1      may step down or return to your seat at the table next to your

2      lawyer.

3                THE WITNESS:  Thank you, Your Honor.

4                THE COURT:  Thank you.  Mr.  King?

5                MR. KING:  The plaintiff has no other witness to

6      call, Your Honor.

7                THE COURT: Are there other exhibits that you intend

8      to move into evidence?

9                If you wish to -- perhaps, this is the time that the

10     parties would appreciate a brief recess just so that you can

11     determine that you have moved in everything you believe you

12     have moved in.  You're welcome to speak with the deputy clerk

13     when she's free just to confirm that your list corresponds with

14     her list.

15               MR. KING:  Thank you, Your Honor.

16               THE COURT:  So once that has been accomplished, is it

17     correct that you will rest?

18               MR. KING:  That's correct, Your Honor.

19               THE COURT:  And your intention, Mr.  O'Brien, Mr.

20     Lomas, at that point?

21               MR. LOMAS:  Yes, Your Honor.  We'll make a motion for

22     under Rule 52(c) to enter judgment based on the evidence that

23     was presented in Mr.  Burke's case.

24               THE COURT:  Will you be prepared to proceed with the

25     motion after the brief recess?

1          MR. LOMAS:  Yes, Your Honor.

2          THE COURT:  Will you be prepared at that time to

3    respond to the motion, Mr. King?

4          I ask the question that way because we do have some

5    degree of flexibility.  This is a bench trial.  I can take a

6    brief recess; you can proceed with your motion, and I can hear

7    your response tomorrow.  I can hear the motion and the response

8    tomorrow.

9          Perhaps, the thing to do is to take a recess of,

10   let's say, 20 minutes.  I will hear the motion, and then if you

11   wish me to wait until tomorrow for you to have an opportunity

12   to reply, we can do that.

13         MR. KING:  Okay.  Thank you, Your Honor.

14         THE COURT: Very well.  For now, we'll take a 20-

15   minute recess.  Thank you.

16         (Whereupon, there was a brief recess; thereafter,

17   court resumed as follows:)

18         THE COURT: We're back on the record now.  Mr. King,

19   did you have an opportunity to review your exhibit list and

20   compare it to the list maintained by the clerk?

21         MR. KING:  Yes, Your Honor.  And the only document I

22   had that has not --

23         THE COURT: Let me ask you to come back to the podium,

24   please.

25         MR. KING:  I'm sorry.  The only document that I have

1     that has not been offered yet is the expert report.

2          MR. O'BRIEN:  Your Honor, we would object to the

3     entry of the expert report.  No witness testified about --

4          THE COURT: Well, I was prepared to ask a question or

5     two.  What is the basis of your request to admit the report?

6     The expert has testified, of course, and has been excused.  And

7     no questions were asked by you regarding the report while the

8     expert was present.  So what is the basis now for moving to

9     admit the report?

10          MR. KING:  Well, the report provides the information,

11    you know, the supplementary information upon which the expert

12    formed his opinions, and I understood that the expert filed his

13    report with the Court.  It was very clear that he was

14    submitting this report pursuant to the testimony that he was

15    going to offer, and this is the documentation that supports his

16    testimony.

17          I wouldn't need him to authenticate it because it's

18    already very clearly his expert report.  It's just a request

19    that the -- having the testimony before the Court, having heard

20    his testimony, that his report now be admitted in support of

21    his testimony.

22          THE COURT: Mr.  Lomas or Mr.  O'Brien -- thank you,

23    Mr.  King.  You may have a seat for the moment.  Mr.  Lomas?

24          MR. LOMAS:  Thank you, Your Honor.  The expert report

25    is hearsay.  If Mr.  King wanted to elicit background and

support of Mr. Gocial's opinion, he could have done so on the
stand. We have had no opportunity to cross-examine Mr. Gocial
on anything that is in that expert report.

And just with respect to being that it was filed with
the Court, of course, the Court struck the filing as improper
because it's an expert report, it was just the discovery matter
to be served on the parties; but, again, in the end, I mean,
it's a hearsay statement, and we have had no opportunity to
cross-examine Mr. Gocial so it's improper to be admitted at
this time. Thank you.

THE COURT: Thank you, Mr. Lomas. To the extent that
there is a request pending to admit the report as an exhibit,
the Court will deny the request. The Court finds that the
exhibit is not admissible largely for the reasons offered by
counsel for the defendant.

The Court did not read the exhibit, and I recall that
when we were last in court, the Court noted on the record that
the Court took great pains to avoid reading the report and
addressed without regard to the contents of the report, the
motions that were pending at that time concerning the testimony
or anticipated testimony of Mr. Gocial, so the Court has not
seen the report.

In any event, Mr. Gocial was present and testified
in response to the questions that were asked of him regarding
what he considered in formulating his opinion. So there is no

```
1     prejudice to the plaintiff, and, indeed, the report would

2     likely not have been received into evidence in any circumstance

3     since the report is hearsay.

4           The report is a -- typically, as in this case, the

5     report was provided in accordance with the rules governing

6     discovery and would not be -- would not be regarded as evidence

7     in the ordinary circumstance, particularly, whereas here the

8     witness was present and testified regarding the basis of his

9     opinion and indeed stated his opinion.

10          For those reasons, the Court will deny the request to

11    admit the report into evidence.

12          Now, Mr. King, with regard to your other exhibits?

13          MR. KING:  No other exhibit, Your Honor.

14          THE COURT: So let me remind you to come back to

15    podium, please.  So do you rest at this time?

16          MR. KING:  Yes, Your Honor.  The plaintiff has no

17    other exhibits or witnesses to call.

18          THE COURT:  Very well.  Thank you, Mr. King.

19          MR. KING:  Thank you, Your Honor.

20          THE COURT: Now, Mr. Lomas.

21          MR. LOMAS:  Yes, Your Honor.  As I mentioned before

22    we broke, we would like to move for judgment under 52(c), but

23    for the convenience of one of the witnesses, Mr. Sullivan, who

24    is here and has been patiently waiting, we would be willing to

25    go forward with Mr. Sullivan's testimony, who we would be
```

1    calling on our case, and we discussed that with Mr.  King and

2    he was fine with that, as well, and then discuss the Rule 52

3    motion after Mr.  Sullivan has completed his testimony if

4    that's all right with Your Honor.

5              THE COURT:  That is perfectly fine.  Very well.  You

6    may call Mr.  Sullivan.

7              MR. LOMAS:  Thank you.  Yes.  And, also, Mr.  Valdez,

8    again, is here, and he would like to be at counsel's table

9    while Mr.  Sullivan is present if that's okay with Your Honor.

10             THE COURT: Is that again without objection, Mr.

11   King?

12             MR. KING:  Yes, Your Honor.

13             THE COURT:  Very well, thank you.  Mr. Valdez, you

14   may return to the well of the court, and, Mr.  Lomas, you may

15   call Mr.  Sullivan.

16             MR. LOMAS:  Thank you.  Record Press calls Mr.

17   Sullivan to the stand.

18             THE COURT: Now, good afternoon.  Let me ask you, sir,

19   to please face the deputy clerk to be sworn.

20   *         *         *         *         *

21   **RAYMOND SULLIVAN,** called as a witness in this case,

22   after having been duly sworn, testified as follows:

23   *         *         *         *         *

24             THE COURT: Now, good afternoon.  Mr.  Lomas.

25   **DIRECT EXAMINATION BY MR. LOMAS:**

1   Q.   Good afternoon, Mr. Sullivan.  Could you please state
2   your name?
3   A.   Raymond Sullivan.
4   Q.   And do you work for the Government Printing Office?
5   A.   Yes.
6   Q.   And how long have you worked for the Government Printing
7   Office?
8   A.   Approximately 35 years.
9   Q.   And could you tell us about your history with the
10  Government Printing Office?  Did you -- when did you start with
11  them?
12  A.   I started with the Government Printing Office straight out
13  of college, was hired into a management trainee program; a
14  three-year program.  After that, I became a printing
15  specialist, was involved in writing, certifying, and awarding
16  contracts.
17       From there I became involved in automation efforts; did a
18  lot of work on printing cost estimating systems and electronic
19  procurement systems within GPO.  I moved from there to a staff
20  director position where I wrote policy and regulation and
21  contract terms.  After that, I moved to a position of over a
22  division called the "Term Contracts Division", which is the
23  type of contract that is in question.  I supervised that
24  division that specifically related -- worked on these types of
25  contracts.

1           After that I moved to a position of -- my title was

2      "Director of Major Acquisitions".  I handled large scale

3      acquisitions such as a worldwide A-76 contract for all of the

4      State Department printing areas and the 2010 census.  My

5      current title is I am "Acting Managing Director of Customer

6      Services", which oversees all of the print procurement

7      functions at the GPO.

8      Q.   The printing procurement functions, is that referring to

9      printing that's procured from outside vendors?

10     A.   Correct.

11     Q.   Would -- such as one of those outside vendors be Record

12     Press, for example?

13     A.   Yes.

14     Q.   So throughout your time at the GPO, have you had the

15     opportunity to review contracts with vendors, outside vendors,

16     for printing services?

17     A.   Yes.  I have done that pretty much my whole career.

18     Q.   And what is your position now -- how is that in relation

19     on an organization chart, for example, with respect to the head

20     of GPO?

21     A.   The head of the agency is the public printer.  There is an

22     assistant public printer beneath him, and I report directly to

23     that person.

24     Q.   Okay.  Now, are you familiar with the Record Press

25     contract that is -- that this case is about?

1     A.    I have reviewed that contract, yes.

2     Q.    And when did you first review that contract?

3     A.    I want to say at August of 2009, I was asked to fill in

4     for a director who was over the east coast regional offices who

5     had been reviewing this case and was retiring, and I was given

6     this to review upon his retirement.

7     Q.    So you were reviewing the contract in response to this

8     case here?

9     A.    Yeah.  I believe that we were preparing to meet with

10    attorneys for both sides, and I was just going to give GPO's

11    interpretation, and there were some questions on our

12    procurement policies and practices that I was trying to answer.

13    Q.    And then what did your review for -- that you were just

14    discussing now, what did that entail?

15    A.    Well, basically, I was told that there were questions

16    concerning the billing and the interpretation of the contract,

17    so I reviewed the contract.  I reviewed the invoices; there

18    were two invoices in particular that were in question.  I

19    reviewed those invoices.

20          I was looking -- this had been reviewed multiple times

21    before.  Our financial management area had reviewed it; a

22    director in our financial management area had reviewed it.  The

23    director who I was taking over had reviewed it.  I believe our

24    inspector general had reviewed it several times.

25          So I was just one final review to familiarize myself

1    before I sat down with the attorneys, but I was just looking

2    for any improper billing or anything wrong with the way the

3    contract was written.

4    Q.   Did you find anything wrong with any of the billings under

5    that contract?

6    A.   No.  The invoices that I looked at were billed correctly.

7    I believed that the contract was interpreted clearly by the

8    contractor and GPO.  There was a meeting of the minds, and I

9    did not see any irregularities.

10   Q.   So Record Press did not -- did Record Press, excuse me --

11   did Record Press overcharge the GPO in those two invoices for

12   collating, trimming to size, and binding?

13   A.   No.  In my review, it revealed that they billed exactly

14   according to the contract.

15   Q.   Okay.  I'd like you to refer what was previously marked as

16   Plaintiff's Exhibit A.  I don't know if it's on the witness

17   stand or if we can have the clerk hand you the --

18           THE COURT:  There's a copy of Exhibit A there.

19           MR. LOMAS:  It was previously moved --

20           THE DEPUTY CLERK:  I don't have any exhibits --

21           THE COURT: Mr.  Sullivan, are you able to read what

22   was just posted on the screen?

23           THE WITNESS:  Let me try with my glasses on.  I'm

24   sorry.  Uh, yes.

25   BY MR. LOMAS:

1    Q.   Okay.  And this was previously marked as Plaintiff's

2    Exhibit A, and if you look on the pages marked RP-52, is this

3    the contract that you reviewed?

4    A.   I have a copy of a bid form in front of me.

5            MR. LOMAS:  Can I hand you another copy?  I handed

6    the clerk another copy of --

7            THE COURT:  Oh, you're getting a hard copy of the

8    exhibit now.

9            MR. LOMAS:  Yes; okay.  Again, that's the exhibit

10   that was previously entered as Plaintiff's Exhibit A.

11   BY MR. LOMAS:

12   Q.   Now, Mr. Sullivan, is that the contract that you

13   reviewed?

14   A.   Yes, it is.

15   Q.   How was this contract formed?

16   A.   The -- our basic contracting, we're responsible as an

17   organization for procuring printing for all of the agencies

18   within the federal government, legislative, executive, and

19   judicial.  We usually get a request from the agency; it might

20   be Treasury or Internal Revenue Service or the U.S. Attorney's

21   Office to write a contract.  We develop an invitation for bid.

22   Most of these contracts are handled as sealed bids.

23        So we would develop an invitation for bid; that bid would

24   normally be distributed to approximately 20 to 40 contractors.

25   It would be posted online, and then there would be a public bid

1    opening in which the bids were read.

2         We would then -- it would go to a printing specialist who

3    would review the actual bids, check them for price

4    reasonableness, verify that the low contractor was capable of

5    actually producing the product, and we also maintain detailed

6    performance history on all of our vendors.

7         So we would review performance history and just to make

8    sure that we were awarding to the low responsive, responsible

9    contractor.  Award would then be made based through a purchase

10   order issued to the contractor, the low contractor.

11   Q.   Was there -- are there any documents that are sent with

12   the request for bid to potential contractors, at least -- let

13   me rephrase that.  Excuse me.

14        Were there any documents sent with this particular

15   invitation for bid to potential contract vendors?

16   A.   I believe the previous abstract, which is the last page of

17   this document I am looking at, was sent along with this

18   contract.

19   Q.   On the screen, if we could go to Page 69 of Plaintiff's

20   Exhibit A, and is the page that you're talking about, the

21   abstract, is that the page that's marked at the bottom, RP-69?

22   A.   Yes.

23   Q.   And could you tell us about -- could you tell the Court

24   about what this is, this abstract is?

25   A.   Basically, this abstract, when we go out for bid on a term

1    contract, we're not sure exactly what products we're going to

2    be buying, and there's a range of products.  So we'll break

3    down the product by various line items, either pages or covers,

4    or whether it drills or not drills and receive prices for those

5    individual line items, and we develop a basis of award.

6        This abstract, basically, we take the bids that come in

7    for the individual line items from the various printing

8    companies, enter them into this abstract, which would give us a

9    total dollar value for a year estimated on our basis of award

10   figures.  We use it for comparing line items across -- like if

11   I had 10 contractors bidding, I could look at an individual

12   line item across and pick out any discrepancies or

13   abnormalities in the pricing.

14   Q.   So do the line items on this spreadsheet match the line

15   items that are in the invitation for bid?

16   A.   Well, in this particular case, the abstract, this

17   abstract, would be a copy of the previous contract.  In other

18   words, it was -- this abstract -- there was a contract prior to

19   this.  I don't know how many years, but this abstract would

20   include all of the prices from the previous contract.

21       So it's possible that there were some changes in this

22   contract.  I don't believe there were.

23   Q.   So the abstract reflects bids -- are you saying the

24   abstract reflects bids that were made under the prior term of

25   this contract?

1    A.    This particular abstract I'm looking at now does, yes.

2    Q.    And so why would this abstract be sent by the GPO to the

3    vendors that were bidding on the new contract?

4    A.    There's multiple reasons:  One is we want them to know --

5    our goal is to get the best possible prices we can for our

6    customers.  We tend -- our bid prices tend to be very

7    competitive.  A lot of times, we'll have new vendors coming in.

8         By attaching this abstract, they know right away who their

9    competition is, who bid on this last time, how the prices are

10   running, whether they are capable of competing with them or not

11   competing and would also clear up any, you know, exactly how

12   we're going to be pricing that, any interpretation issues.

13   Q.    So when you say that the bidding is very competitive, and

14   it sort of helps -- did you say it sort of helps identify

15   whether -- helps vendors identify whether they're able to

16   compete on the bid?

17   A.    Sure.

18   Q.    And so, for instance, -- so could you explain that?  Does

19   that mean, for instance, that the vendor might not be able to

20   have a price that low enough to make the bid?

21   A.    Right.  A lot of times we'll find that vendors want to

22   compete, but once they see the pricing that we're getting,

23   they'll either make a decision, okay, I'm not -- I can't

24   compete in that printing vendor.

25        Some of them compete on price.  Some of them compete more

1    on service.  You know, so it depends on the particular

2    contract, but, yes, we save ourselves a lot of trouble and also

3    the printing firms a lot of trouble if they can see what the

4    competition pool is up front.

5    Q.    Now, I'd like to refer you to the section on this

6    spreadsheet that has a group of line items under the Roman

7    Numeral II on the left column, and if you look on the screen,

8    it's kind of been blown up for you a little bit so you can see

9    more clearly.

10         You mentioned, I think, that the spreadsheet gives some

11   information about how the GPO accepts -- expects there to be

12   prices for certain of the line items.  Does this portion here

13   provide that information?

14   A.    Yes.

15   Q.    And so what does this say -- what information does this

16   communicate to potential vendors about the line item to a

17   complete cover?

18   A.    Complete cover will be price per 10 copies.

19   Q.    Then what does it communicate to a potential vendor about

20   line item 2-B, text per page?

21   A.    The exact same thing, will be priced per 10 copies.

22   Q.    How about with respect to line item "C", pressure

23   sensitive cover stock?

24   A.    Cover stock will be per 100 leaves.

25   Q.    Then what about with respect to line item 2-D, collating,

1       trimming to size, and binding?

2       A.    That would be per 100 page.

3       Q.    So would a per-10-copy running rate also apply to the line

4       item 2-D, collating, trimming to size, and binding?

5       A.    No, obviously not.

6       Q.    Okay.  If you could flip back to the page marked RP-67 of

7       Plaintiff's Trial Exhibit A.

8       A.    (Witness complies.)  Okay.

9       Q.    Okay.  And then do you see on that page, RP-67, is there a

10      line item there for collating, trimming to size, and binding?

11      A.    Yes.

12      Q.    What is the price that's in this bid for that line item?

13      A.    $12.25 per 100 pages.

14      Q.    Does the per-10-copy running rate apply to that price?

15      A.    No.

16      Q.    Which line items does the per-10-copy running rate apply

17      to on this page?

18      A.    On this page, it would apply to the complete cover and the

19      text per page.

20      Q.    And how do you know that?

21      A.    Well, there's multiple reasons:  One, if you're looking at

22      "C", leaves, and C-1 and C-2, obviously, that already has per

23      100 leaves "D" has per 100 pages; "A" and "B" do not.  The

24      running per copy or the running rate is normally something that

25      we use to apply to a machine production.  It's -- in most

1    printing, most of our printing contracts, we have a make ready

2    charge.

3         It costs a certain amount of money to prepare a piece of

4    equipment to get it ready to run something, but once it starts

5    running, that cost, the running rate, is different.  So the

6    larger the runs, the cheaper it will be, and that's the way we

7    would normally price printing.

8         Here, we're looking at copying; because it's copying, we

9    don't have a make-ready, but we're still using the term

10   "running rate".

11   Q.   Okay.  So would other individuals in the printing

12   industry, vendors and so forth, know that a running rate would

13   not apply to things like the pressure sensitive cover stock,

14   and collating, trimming to size, and binding?

15   A.   Sure.  That would be common knowledge in the printing

16   industry, and particularly in our -- we have a very restricted

17   community of bidders.  We have maybe 10,000 printers nationwide

18   that bid strictly on government work, so it's a small

19   community, and one of the advantages that we have in our

20   procurement operations, one of the reasons we get such

21   effective pricing is that there is -- the communication

22   between us, we have people that are experts in printing buying

23   printing from these people, so everybody understands what we're

24   talking about.

25        It reduces the risk to the printer because they know that

1    we have evaluated this and that we're telling them all of the

2    attributes that are going to be purchased under this contract.

3    Q.   I'd like to refer you now to what was marked as

4    Plaintiff's Exhibit D.  Do you have a copy of that to hand the

5    witness?  Or --

6              THE DEPUTY CLERK:  I don't have any copies.

7              THE COURT: Are you able to read the copy on the

8    screen?

9              THE WITNESS:  Yes.  With some difficulty, but I can

10   read it.

11             MR. LOMAS:  Oh, okay.  Well, if you can read the copy

12   on the screen --

13   BY MR. LOMAS:

14   Q.   All right.  So this is the invoice that's A-71700 and was

15   previously entered in as Plaintiff's Trial Exhibit D with the

16   reference RP-659 at the bottom.

17        Mr. Sullivan, is this one of the invoices that you

18   mentioned you reviewed earlier in response to this case?

19   A.   Yes.

20   Q.   And do you see in the middle of the page, is there a

21   charge there for collating, trimming to size, and binding?

22   A.   Yes, there is.

23   Q.   And what was the price -- what was the amount charged

24   there?

25   A.   The amount charged is $372.40.

1    Q.    And what was the price that was charged?

2    A.    The price listed here is -- let's see if I can -- somebody

3    just put something up in front of me that --

4    Q.    Let me ask that question, again:   What is the price for

5    the collating, trimming to size, and binding charge that's

6    listed on this invoice

7    A.    The total price is -- it keeps bouncing around.  The total

8    price is -- are we done?  Okay.  The total price is $372.40.

9    Q.    What was the rate that was charged for collating, trimming

10   to size, and binding on this invoice?

11   A.    It looks like they have that broken down here as 12.25 per

12   100 pages.

13   Q.    And is that the contract price?

14   A.    Yes.

15   Q.    So is the charge here that Record Press billed the --

16   excuse me -- is the charge for collating, trimming to size, and

17   binding that Record Press billed the GPO for this case correct?

18   A.    Yes.

19   Q.    Now, I'd like to refer you to what was marked as

20   Plaintiff's Exhibit C, and, hopefully, we'll bring that up on

21   the screen for you.  Okay.  So on the screen you should see a

22   copy of what is titled Invoice A-71701, which was previously

23   marked as Plaintiff's Exhibit C and has the production number

24   at the bottom, RP-660; is this the second invoice that you

25   reviewed when you -- in response to this matter?

1    A.   Yes.

2    Q.   And is there a charge for collating, trimming to size, and

3    binding on this invoice?

4    A.   Yes, there is.

5    Q.   And what is the amount that Record Press billed for

6    collating, trimming to size, and binding in this invoice?

7    A.   $1,386.70.

8    Q.   And what was the price rate that Record Press charged?

9    A.   12.25 per 100 pages.

10   Q.   And was that the contract price?

11   A.   Yes.

12   Q.   And is this -- is the amount that Record Press charged

13   for collating, trimming to size, and binding in this invoice

14   the correct amount pursuant to the contract?

15   A.   Yes, it is.

16   Q.   Now, if a running rate per-10-copy would apply to this

17   line item, what would it do to the amount?

18   A.   It would divide them by 10, and part of my review of this

19   thing when you -- if you took that logic, these prices would

20   become unreasonable.

21   Q.   So when you say you would divide it by 10, would the price

22   then be just 10 percent of what it is, the amount be just 10

23   percent of what it is on this invoice?

24   A.   Correct.

25   Q.   And so just roughly, is that a reduction of a little bit

1    over a thousand dollars; is that right?

2    A.   I'm not sure I can do the math that quick in my head.  I

3    don't --

4    Q.   Fair enough.  In any event, you said such a reduction

5    would be -- what was your word, unreasonable?

6    A.   I think it's unreasonable when you try to apply that to

7    the other line items, in particular, one of the things I'm

8    looking at here would be pressure sensitive cover stock, which

9    is $12.50 per 100 leaves.  If you applied the 10-copy-rate to

10   that, then you'd be down to $1.25 for a hundred leaves of

11   pressure sensitive cover stock, which I would determine

12   unreasonable.

13   Q.   If the per-10-copy running rate applied and the amount for

14   collating, trimming to size, and binding would be reduced by 90

15   percent, would the GPO be able to find a contractor that could

16   do this work for that amount of money?

17   A.   Well, I don't believe anybody would bid those types of

18   prices.  If I saw those prices that low, I would question it as

19   far as whether or not there had been an error made in the bid

20   process.

21   Q.   Now, Mr. Sullivan, did you provide the results of your

22   review, this information we're just discussing, to Mr. Burke

23   or his counsel?

24   A.   I believe that I met with previous counsel.  Again, I

25   think that was in September of '09, yes.

1    Q.   And did you explain what you just testified here today?

2    A.   I did.

3    Q.   Did you provide a copy of -- or did you provide any

4    documentary evidence?

5    A.   I don't believe so.

6         MR. LOMAS:  I'm handing to the clerk and ask that it

7    be marked as Defendant's Exhibit 1 and if you could pass to the

8    witness?

9         THE DEPUTY CLERK:  Thank you.

10   BY MR. LOMAS:

11   Q.   Mr. Sullivan, you've been handed what has been marked as

12   Defendant's Exhibit 1.  If you could take a moment to look at

13   this document and see if it helps you remember if you provided

14   anything to -- any documents to Mr. Burke's counsel during

15   that September 2009 meeting?

16   A.   Yes.  Yes.  This was provided.

17   Q.   And what is this document?

18   A.   This is a copy of the abstract from the current contract.

19   Q.   So the contract that we discussed earlier which was marked

20   as Plaintiffs's Exhibit A, the Record Press/GPO contract?

21   A.   Correct.

22   Q.   If I can refer you to the portion again with Roman numeral

23   II, that identifies the different line items, and,

24   specifically, line item 2-D, the collating, trimming to size,

25   and binding line item; what does this abstract say about that

1    line item?

2    A.   Per 100 pages.

3    Q.   And is Record Press' price under the contract indicated

4    there?

5    A.   Yes; $12.25.

6    Q.   And is $12.25 per 100 pages the contract price?

7    A.   Yes.

8    Q.   And does the per-10-copy running rate apply to that line

9    item?

10   A.   No, it does not.

11          MR. LOMAS:  Your Honor, at this time, I'd like to

12   move this exhibit, Defendant's Exhibit 1, into evidence.

13          THE COURT: Is that without objection, Mr. King?

14          MR. KING:  No objection.

15          THE COURT: Very well.  Defendant's Exhibit 1 will be

16   admitted without objection.

17   BY MR. LOMAS:

18   Q.   Mr. Sullivan, despite Mr. Burke's lawsuit, does the GPO

19   still contract with Record Press?

20   A.   Yes, we do.  This was a one year contract with four option

21   years, and the final option year was exercised I believe in

22   November of 2010.

23   Q.   So the GPO exercised their option again?

24   A.   Yes.

25   Q.   And is the price in this contract still $12.25 per 100

1   pages for the collating, trimming to size, and binding line

2   item?

3   A.   Yes, it is.

4   Q.   And does the per-10-copy running rate still not apply?

5   A.   Yes.

6        MR. LOMAS:  Thank you.  I have no further questions.

7        THE COURT:  Thank you, Mr. Lomas.  Mr. King, you

8   may cross-examine.

9   **CROSS-EXAMINATION BY MR. KING:**

10  Q.   Good afternoon, Mr. Sullivan.  Thank you for your time

11  today.

12  A.   Good afternoon.

13  Q.   If you take a look at the exhibit that defendant's just

14  offered you, it's Defendant's Exhibit 1.  It's this abstract.

15  If you take a look at the column labeled "Basis of Award" --

16  have you identified that column?

17  A.   Yes.

18  Q.   What does the basis of award refer to?

19  A.   Let's see if I can explain this simply.  We -- when an

20  agency would come to us for the establishment of a new

21  contract, say the very first time they come to setup a contract

22  and say it's for briefs or something like that, what we try to

23  determine is how much work is going to be placed on that

24  contract.

25       So we would ask them, okay, how many orders are you going

1    to place; how many pages are each order going to be; how many

2    of the orders are going to have proofs; how many orders are

3    going to be on this type of stock or this particular trim size,

4    and that estimate is what we use as a basis of award.

5        And then that is entered into the invitation for bid, and

6    on this -- when the bids come back, those basis numbers are

7    multiplied by the unit item prices to give us an estimate for

8    the total dollar value of that contract for a year.

9        And that is actually what we base our award on, would be

10   the contractor that came up with the lowest dollar figure, on

11   that basis of award, but it's a -- the simplest way I can put

12   it, it's our best guess of what is going to happen on that

13   contract for the next year for each of those line items.

14   Q.   Then is it the case that if -- well, let's look directly

15   at it, then, for line item 2-D under this abstract, the basis

16   of award is 14?

17   A.   Uh-huh.

18   Q.   Does that refer to 14 pages or 14 copies or 14 jobs or,

19   you know, what --

20   A.   That would refer to 1,400 pages.

21   Q.   That would refer to 1,400 pages.

22   A.   You have a per-100-page price, and we're saying that's --

23   our guess was that's going to happen 14 times.  So, basically,

24   over the term of this contract, we were estimating that that

25   would be 1,400 pages.

1    Q.    Okay.  You stated also that the way basis of award is used

2    to provide that total estimate is that you take that basis of

3    award of 14, you multiple it by the unit rate, and the unit

4    rate is the price that the contracting partner -- party

5    submits; you multiply those two together, and you get your

6    total costs; is that correct?

7    A.    Correct.

8    Q.    Now, if you -- if the basis of award of 14 means it's

9    1,400 pages, why isn't that factored into the costs?

10              MR. LOMAS:  Objection.  Vague.

11   BY MR. KING:

12   Q.    Why isn't the rate of per 100 pages factored into the

13   costs?

14              THE COURT: Objection withdrawn?

15              MR. LOMAS:  No.  I still believe it's vague, but --

16              THE COURT: What is your objection, Mr. Lomas?

17              MR. LOMAS:  Well, I just don't understand what the

18   question he's asking, so I don't know if the witness -- but it

19   seems vague to me.

20              THE COURT: May I ask you to rephrase your question,

21   please, Mr. King?

22              MR. KING:  Yes.

23   BY MR. KING:

24   Q.    You said that -- I asked you what does 14 refer to; does

25   it refer to copies, pages, et cetera, right?  And so, again,

1    what was your answer to that question?

2    A.   The 14 would -- in this particular case that we're talking

3    about -- we're getting a price per 100 pages, and so we're

4    trying to make an estimate over the next year how many times

5    that's going to happen or what's the total bulk of this line

6    item.

7         So what we're using here is this is 14 -- somebody made a

8    guess that this was going to be 14; so you'd be 14 times 100

9    pages.  So the quantity that we're talking about there would be

10   1,400 pages, and the dollar figure would be $171.50 if that's

11   what that says.

12   Q.   Okay.  Now, I'm having difficulty understanding your

13   calculations because you're referring to 14 times 100 pages,

14   but then you refer to the cost of $171.50; but that calculation

15   is based on 14 times the unit rate of $12.25.

16        So is it the case that $171.50 is based on the basis of

17   award times the unit rate or is it the case that $171.50, the

18   cost, is based on the basis of award times the per-page-amount

19   of 100 per page?

20   A.   I'm not totally sure I understand what you're asking; the

21   171 is 14 times 12.25.

22   Q.   That's right.  Is the per-100-pages' rate for this line

23   item reflected at all in the cost of $171.50?

24   A.   Yeah, I believe the per-100-page rate is $12.25.  So we're

25   multiplying that times 14; so, yes, it is -- in that, it is in

1      that calculation which gets us to the 171.50.

2      Q.   And where is it in that calculation?

3      A.   I'm not -- I'm not sure how I can be more clear; 14 times

4      12.25 equals 171.50; 12.25 is the unit rate, correct?

5      Q.   Yeah.  That's -- so you just stated the formula, but I did

6      not hear you say 100 pages.  So where in that formula does the

7      100 pages --

8      A.   $12.25 is per 100 pages.

9      Q.   So you multiply 12.25 per 100 pages?

10     A.   No.

11              MR. LOMAS:  Objection, Your Honor.

12              THE COURT:  Overruled.

13              MR. LOMAS:  Mischaracterizes testimony in asking this

14     question in a number of different ways, and he's answered it.

15              THE COURT:  The objection's overruled.

16     BY MR. KING:

17     Q.   The -- okay.  You just stated the formula, 14 --

18              THE COURT:  Well, are you withdrawing the question

19     that occasioned the objection?  I overruled the objection.

20              MR. KING:  I was waiting for an answer.  I wasn't

21     getting an answer.  So I thought I might --

22              THE COURT:  So are you going to ask another question?

23              MR. KING:  Could you answer the question?

24              THE WITNESS:  At this point, I'm not sure what the

25     question was.

```
1    BY MR. KING:

2    Q.   Okay.  Do you agree that the number $171.50 is a product

3    of the two numbers, 14 times $12.25?

4    A.   Yes, I do.

5    Q.   Okay.  Do you also agree then that $171.50 does not

6    include the per-100-page rate?

7    A.   I do not agree with that statement.

8    Q.   Okay.  How does that number reflect the per-100-page rate?

9    A.   If you have a something that you're trying to buy, and

10   it's $12.25 per 100, okay, and you're going to buy 14 of them,

11   you're going to end up with 1,400.  In this case, 1,400 pages,

12   and you're going to pay $171.50.

13   Q.   Okay.  I think I understand what you're saying now.

14   You're saying that $171.50 really represents a per-100-page

15   amount?

16   A.   No.

17   Q.   No?  Are you sure?

18   A.   Yes. $12.25 is the per-100-page rate; 171 represents 14

19   times that, which was our estimate of the total number of pages

20   that would be procured under this for a year.

21   Q.   Okay.  Then $171.50, does that represent a per page

22   amount?

23   A.   No.

24   Q.   Why?

25   A.   Why?   Again, I'm not sure what question you're asking.  I
```

1    don't know -- I'm struggling how to make this any clearer.

2    Q.    Let me rephrase the question.  I asked you if $171.50

3    represents a per-100-page amount, and you said, no.  And then I

4    asked you does $171.50 represent a per page amount, and you say

5    no.  And so if it doesn't represent either per 100 pages or per

6    page, what does it represent?

7    A.    It represents the cost of 1,400 pages.

8    Q.    At --

9    A.    It's a sum of other rates, unit -- it is a sum of the per

10   page unit rate times a quantity.

11   Q.    How is it possible mathematically for that to represent an

12   amount corresponding to 1,400 pages when you've only multiplied

13   it by 14?

14   A.    The 14 is multiplied by the per-100-page rate.  So there

15   is --

16   Q.    Okay.  Where in this chart is 14 multiplied by 100?

17   A.    Where in this chart -- it's not in this chart.

18   Q.    That's right.

19   A.    I mean as far as being specifically directed in there.

20   Q.    That's right.  That rate of per-100-pages is not applied

21   in this chart.

22   A.    Incorrect.

23          MR. LOMAS:  Objection.  Mischaracterizes testimony.

24          THE COURT: Sustained.

25   BY MR. KING:

1      Q.   That per-100-page is not multiplied at all in this chart,

2      is it?

3                 MR. LOMAS:  Objection.  Mischaracterizes his

4      testimony.

5                 THE COURT: The objection is sustained.

6      BY MR. KING:

7      Q.   If we go now up to the top, 2-A, this also has a value for

8      basis of award; do you see that value there?

9      A.   Which line?

10     Q.   Line item 2-A?

11     A.   For complete cover?

12     Q.   Yes; for complete cover?

13     A.   Is that what we're referring to?

14     Q.   Yes.  And can you identify the number there for basis of

15     award?

16     A.   1,327.

17     Q.   Okay.  That's what I see, as well.  Now, if you follow the

18     row over to the cost, is it true that the cost is a value that

19     is equal to the basis of award times the unit rate?

20     A.   Correct.

21     Q.   And, in this case, what does the basis of award represent?

22     A.   The basis of award would represent, again, our anticipated

23     quantity, which would be 1,327, times -- in this case, we're

24     talking 10 copies.

25     Q.   So it's a quantity of what?

1     A.    The total quantity would be --

2     Q.    I'm saying it's a -- what is it a quantity of, pages;

3     copies --

4     A.    Covers.

5     Q.    It's a quantity of what?

6     A.    Complete covers.

7     Q.    Okay. And when you are calculating the costs here, you

8     testified earlier that you do apply this per-10-copy rate here,

9     but does this chart apply the per-10-copy rate?

10    A.    It applies it in the same way that the previous line item

11    we were talking about applies it.

12    Q.    Does it multiply the rate at all in the chart?

13    A.    You'd have to rephrase that question for me.

14    Q.    When you say "apply", what do you mean by "apply"?  You

15    said that it applies the rate; what do you mean by "applies the

16    rate"?

17    A.    The calculations are based -- for this particular line

18    item, we're talking complete cover per-10-copies.  That works

19    the same way as the line item before we were talking about

20    collating per 100 pages, and I don't think I ever -- we ever

21    communicated or I ever got to the point where there was an

22    understanding, but -- of how those line items worked, but they

23    work, but they both work identically.

24    Q.    Uh-huh.  When you say that the line item in this chart

25    applied the per-10-copy rate, you're not saying that that rate

1    is actually used as a multiplier in this line item, are you?

2              MR. O'BRIEN:  Objection.  Vague.

3              THE COURT: Sustained.

4    BY MR. KING:

5    Q.   Do you know what I mean by -- you know what I mean by

6    multiplying, right?

7              MR.  O'BRIEN:  Objection.

8              THE WITNESS:  I believe I do.

9    BY MR. KING:

10   Q.   Okay.  Is the per-10-copies rate here in line item 2-A

11   used in terms of multiplying it against the basis of award, the

12   unit rate or the cost?

13   A.   No, it is not.

14   Q.   Okay.  The cost there of, the total cost -- I'm reading it

15   as 7,962;  do you also see that?

16   A.   Yes.

17   Q.   Okay.  That total cost there, then, that refers to copies

18   or covers or pages or what?

19   A.   That is the estimated value for a number -- the basis of

20   award number of covers for the year.

21   Q.   Okay.

22   A.   In this case, it would be -- and again I'm having trouble

23   seeing this, but 13,270 covers are what we estimated for the

24   year.  That dollar figure represents what it would cost for

25   this particular vendor to supply that number of covers for one

1    year.

2    Q.   Again, when you stated earlier that the rate in this

3    abstract corresponds to the contract, and you had reviewed the

4    contract and you reviewed the paragraph II, Roman numeral II,

5    and below there was the line item D that referred to collating,

6    trimming to size, and binding, and you determined that the

7    running rate did not apply to that item, that line item --

8            THE COURT:  I'm not certain that the record is clear

9    that Mr. Sullivan agrees with your characterization of his

10   testimony.  So before you ask a question predicated upon an

11   agreement, let me ask you to inquire whether Mr. Sullivan

12   agrees that your summary is accurate.

13           MR. KING:  Thank you, Your Honor.

14   BY MR. KING:

15   Q.   Is that an accurate reflection of what you had stated

16   before?

17   A.   Could you give that to me again?  It was quite a bit.

18   Q.   Yes.  I'm sorry.  You had testified --

19           THE COURT:  Do you wish assistance from the court

20   reporter to read the question back?

21           MR. KING:  I don't think that's necessary.  I'll just

22   make the point that you testified earlier about the application

23   of the running rate to those various line items in the contract

24   itself; in the contract as opposed to this abstract.

25           THE WITNESS:  Yes, I did.

1    BY MR. KING:

2    Q.   Okay.  And in that testimony, you made distinctions

3    between applying the running rate to certain line items and

4    others.

5    A.   I did make those distinctions on the running per-10-copy

6    rate at the top of those columns, yes.

7    Q.   Uh-huh.  And the basis was that the running rate would

8    apply to A and B, but it did not apply to D?

9    A.   The running per-10-copies, that's correct.

10   Q.   Did -- had you discussed this interpretation with Mr.

11   Wilmot or anyone with Record Press prior to this contract

12   having been executed?

13   A.   I have never met or had any discussions with Mr.  Wilmot.

14   Q.   Okay.  Did you ever have an opportunity to review whether

15   or not the basis of award reflected in this abstract actually

16   corresponded to the proportion of the work actually done?

17   A.   Yes, I did.

18   Q.   And what did you find?  Did you find that they were, that

19   this basis of award is accurate?

20   A.   No.  There are figures in the basis of award that are not

21   accurate based on the -- again, it was an estimate up front

22   looking at the invoices.  It was not totally accurate, which in

23   some cases would have been a concern for me.

24       But in this particular instance, since there was only one

25   bidder, again, that basis of award had no -- it served no

1   function as far as awarding this contract.  One of the main

2   functions of the basis of award would be to determine bidders'

3   ranking, and there was only a single bidder on this contract.

4           MR. KING:  Okay.  No further questions.  Thank you.

5           THE COURT: Thank you, Mr.  King.  Mr.  Lomas, do you

6   have redirect?

7           MR. LOMAS:  We do not, Your Honor.  Thank you.

8           THE COURT:  Very well.  Thank you very much, Mr.

9   Sullivan.  You may step down.  And, Mr.  Valdez, I'll ask you

10  to please return to the area outside the well of the court.

11  Thank you.

12          It is now approximately 20 minutes until five.  My

13  intention was to recess no later than five.  If you believe,

14  Mr.  Lomas, that you can make your motion and complete your

15  argument on it in 15 minutes, I will hear it now.  Otherwise --

16  and I will permit you to respond tomorrow, Mr.  King, after you

17  have had an opportunity to prepare to respond because your

18  response would go beyond the time that we must recess for the

19  day.

20          Alternatively, we will simply adjourn for the day now

21  and resume tomorrow, and it will be in the afternoon, I am

22  reminded, because of a scheduling conflict in the morning.  In

23  other words, we will resume tomorrow at 2:00 p.m. for

24  arguments.

25          MR. KING:  Your Honor, if I may, I do have a matter

1    pending in another jurisdiction tomorrow that's very far away.

2    It is at 12 o'clock.  I would not be able to return by two.  I

3    can try to reschedule it, but the next day, the following day,

4    is great.

5              THE COURT: Bear with me one moment, please, while I

6    confer with the deputy clerk.

7              (Whereupon, there was a brief pause in the

8    proceedings.)

9              May I suggest later tomorrow; would you be available

10   tomorrow, Mr. King?  For example, at 3:30 or even 4:00?

11             MR. KING:  If I hurry, I could be here by four.  I am

12   -- you know, --

13             THE COURT: Let me ask you to return to the podium,

14   please.

15             MR. KING:  Your Honor, the Court is I think a little

16   bit over three hours away, Salsbury, Maryland, and the hearing

17   is at 12.  I can try to have the hearing moved up to an earlier

18   time, and I would be happy to do so.  And I would be happy to

19   rush back here for four o'clock, but I just do want you to know

20   that it involves a long drive that could interfere with that

21   time.

22             THE COURT: How soon will you be able to determine

23   whether you would be able to advance the time of the matter

24   tomorrow?

25             MR. KING:  In the morning, I would be able to make a

```
1    determination about that, but, at this time, because it's after
2    four o'clock, the other parties are -- basically, their office
3    is closed after four, so I wouldn't be able to get a response
4    today.
5              THE COURT: Perhaps, we better look at Wednesday
6    morning.  Ms.  Miller?
7              THE DEPUTY CLERK:  I'm sorry.
8              THE COURT: Bear with us just one moment.  Wednesday
9    at 9:30?
10             MR. LOMAS:  If I may, Your Honor, the motion is very
11   simple, and it would only take a few moments to go through, so
12   if Mr.  King could respond afterwards today, I mean, in the
13   time that we have left -- can I offer that as a suggestion?
14             THE COURT:  Is everyone ready to continue at this
15   point?
16             MR. KING:  I'm not opposed to continuing at this
17   point.
18             THE COURT:  Very well.  I believe we can proceed,
19   then.
20             MR. LOMAS:  Thank you, Your Honor.  So Record Press
21   would like to move -- respectfully moves for judgment pursuant
22   to Rule 52(c), which states that if a party has been fully
23   heard on an issue during a non-jury trial, and the Court finds
24   against the party on that issue, the Court may enter judgment
25   against the party on a claim or defense that cannot -- that can
```

1    be -- that under the controlling law can be maintained or

2    defeated only with a favorable finding on that issue.

3           Now, this morning I read you a quote from another

4    False Claims Act case:  If both the contractor and the

5    government interpret the contract one way throughout the

6    contract's history, it is unthinkable that the contractor's

7    billings which followed these common interpretation could

8    constitute a false claim.

9           THE COURT: What is the citation to the case?

10          MR. LOMAS:  Yes, Your Honor.  That's U.S. Ex rel

11   McCoy v. Seaward Marine Services, 972 F 2d 344.  The evidence

12   at trial today, Your Honor, demonstrates that both Record Press

13   and the Government Printing Office, the only two parties to the

14   contract, understood that the collating, trimming to size, and

15   binding price was $12.25 per 100 pages throughout the entire

16   term of the contract.

17          The contract was entered in when the GPO sent an

18   invitation for bid to Record Press.  The invitation for bid was

19   attached -- there was a spreadsheet attached to that invitation

20   for bids that stated that the price for collating, trimming to

21   size, and binding should be billed on a per-100-page basis.

22          You heard the GPO witness, Mr. Sullivan, and you

23   heard from Mr. Wilmot from Record Press that both confirmed

24   that.  You heard from Mr. Wilmot today from Record Press that

25   Record Press submitted a bit of $12.25 per 100 pages for that

1    line item.  And then you heard from both Record Press and the

2    Government Printing Office, again, the only two parties to that

3    contract, that the government accepted that bid.

4              Mr.  Sullivan specifically stated that there was a

5    meeting of the minds between the parties and that the contract

6    price for collating, trimming to size, and binding was $12.25

7    per 100 pages.  There was no dispute that the invoices clearly

8    state that Record Press charged $12.25 per 100 pages.

9              Mr.  Burke is not contesting that they aren't; he is

10   only contesting that the contract price is not $12.25 per 100

11   pages, but it's fundamental contract law.  The contract means

12   what the two parties to that contract say it means.

13             For example, this Court, in Youngblood versus

14   Vistrionics, Civil Action no.  05-21, and the case cite there

15   is 2006 Westlaw 209-2636.  This is just the case from --

16             THE COURT: 209 --

17             MR. LOMAS:  Yes; 209-2636.  This is a case in this

18   district from 2006.  It is axiomatic that contracts should be

19   construed to a impart to party's intent.  Clearly so, when as

20   in the instant case, neither party disputes that intent.

21             And, Your Honor, you heard today from both parties to

22   the contract, Record Press and the GPO -- there's never been

23   any doubt between those two parties as to what the contract

24   price was.  It's clearly $12.25 per 100 pages.

25             You heard today that even after Mr. Burke raised this

claim and challenged the price that the GPO investigated,

reviewed the contract, reviewed the invoices, found that --

confirmed that the contract price was $12.25 per 100 pages,

confirmed that there was no overcharging, and confirmed that

there was no fraud.

Remember, this is not just a contract's case, this is

a fraud case.  The allegation here is that Record Press lied to

the government, is defrauding the government.  So what Mr.

Burke would have you find -- would have the Court find, excuse

me, is that when -- a party lying to the other party, when both

parties agree on the same thing, that the contract price is

$12.25 per 100 pages.

Mr.  Burke offered no evidence suggesting that the

contract price is anything otherwise.  Again, we heard from the

only two parties to the contract and about the formation; that

we had a bid of the $12.25 per 100 price and an acceptance.

We heard from Mr.  Sullivan that said that those in

the printing industry would know that a per-10-copy running

rate would not apply to a line item such as the line item 2-D

for collating, trimming to size, and binding.  It already had

the per-100-page aspect to it.

So all we're left here is the opinion, apparently, of

Mr.  Burke that he doesn't like the price or that the price is

wrong.

And, Your Honor, this Court has rejected finding any

1   false claim liability on the opinion of a non-party, a

2   non-party to a contract.  Actually, I'd like to read you a --

3          THE COURT: -- the opinion cited at -- reported at

4   2006 Westlaw --

5          MR. LOMAS:  No.  Actually, I'm going to give you

6   another quote there, and the Court -- this Court said:  It need

7   not -- and this was in another False Claims Act case, and that

8   opinion was U.S. Ex rel Herbert "v" National Academy of

9   Sciences.  That was Civil Action 90-2568; the cite is 1992

10  Westlaw 247587, and that was September 1992.

11         And this Court said:  It need not address the dubious

12  proposition that plaintiff's personal opinion can be the basis

13  of a fraud suit, especially when the purported victim disagrees

14  with that legal opinion.

15         Well, you heard today from the Government Printing

16  Office, the alleged victim here, there was no fraud.  The

17  Government Printing Office reviewed the contract, reviewed the

18  invoices, confirmed that there was no fraud; that Record Press

19  had billed the correct contract price.

20         You heard from Mr. Sullivan with his 30 years of

21  experience in the industry say that it was clear to him by

22  looking at the contract that the contract price was $12.25 per

23  100 pages.

24         And then after Burke raised this issue, what did the

25  GPO do?  Reviewed, showed it was -- you know, found no fraud,

1    and then renewed the contract two more times.  They continue to

2    work with Record Press.  They continue to pay Record Press

3    $12.25 per 100 pages for the collating, trimming to size, and

4    binding line item because that is what the parties agreed to

5    do.

6           So there is no finding -- there can be no finding of

7    the elements of a False Claim Act.  There can be no falsity

8    because the contract price is $12.25 per 100 pages.  There can

9    be no knowing falsity because Record Press had always

10   understood that the contract price was $12.25 per 100 pages.

11          And there can be no materiality, there can be no --

12   it didn't make a difference even if Mr.  Burke's interpretation

13   was correct because the GPO has heard Mr.  Burke's

14   interpretation, rejected it, and continued to pay the invoices

15   to this day.

16          Thank you, Your Honor.

17          THE COURT: Thank you, Mr.  Lomas.  Mr.  King?

18          MR. KING:  Your Honor, the only evidence before the

19   Court on the GPO's meeting of the minds in this contract is the

20   testimony of Mr.  Sullivan, who testified that he did not talk

21   to Mr.  Wilmot or anyone with Record Press at the time that the

22   contract was formed.  The testimony of Mr.  Adgerson involved

23   admissions that the GPO does misinterpret its contracts.  He

24   testified that --

25          MR. LOMAS:  Objection, Your Honor.  Object to that

1    characterization of Mr. Adgerson's testimony. I don't recall

2    any time where he said that there was any issue --

3        THE COURT: I don't contemplate objections at this

4    point. I was actually preparing to ask you, Mr. King, what is

5    the testimony of Mr. Adgerson on that point to which you

6    refer?

7        MR. KING: It was the testimony that had to do with

8    Mr. Adgerson's role in what he does, And he testified to the

9    fact that part of his job is to deal with times when they have

10   -- when they have incorrectly interpreted a contract.

11       And, moreover, when Mr. Adgerson testified, he

12   testified that there was a question in his mind after he spoke

13   with Mr. Burke as to whether or not the contract had been

14   interpreted correctly, and the point is that, of all of the

15   testimony that's given today, none of it has to do with a

16   person who's going to testify and say that I was with Mr.

17   Wilmot when he signed the contract. I had negotiations with

18   him about it, and we agreed that these terms were going to mean

19   this particular thing.

20       THE COURT: Well, do we agree that it would have been

21   -- do you acknowledge that it would have been incumbent upon

22   the plaintiff to prove the plaintiff's case that some other

23   interpretation of the contract should have been operative?

24       MR. KING: Yes. The plaintiff has proved that the

25   contract interpretation which involves application of the

1    running rate to a particular line item is the only

2    interpretation that's reasonable.

3          The -- this suggestion that the GPO disagrees with

4    that interpretation and, in fact, agrees with Record Press'

5    interpretation is based on evidence about what they say after

6    the fact.

7          In order for Record Press to succeed in this argument

8    that there was -- both parties, you know, agree on what the

9    intent is, there would have to be some evidence that that

10   intent was manifested prior to the time that the contract was

11   --

12         THE COURT:  But the burden of showing that would have

13   been on the plaintiff, wouldn't it?  In other words, this case

14   was brought by the plaintiff, and the plaintiff has the burden

15   of proof.

16         MR. KING:  No.  But the plaintiff certainly does --

17         THE COURT: You don't dispute that, do you, that the

18   plaintiff has the burden of proof?

19         MR. KING:  The plaintiff certainly has the burden of

20   proof to show that those invoices charged for an amount that

21   does not reflect what the contract says and that he has done.

22   What Mr. -- what Record Press' defense is is that Record Press

23   is stating that they have proved that the GPO interpreted the

24   contract in the same way that Record Press has, but --

25         THE COURT: Aren't those the only two parties to the

1    contract?

2            MR. KING:  The two parties to the contract are Record

3    Press and GPO, but the defense that is being raised is this

4    defense that the -- there can be no liability when the two

5    interpretations are the same.

6            But the point is that the only evidence of the

7    interpretation that is being provided is -- the evidence that

8    is being provided of their interpretation does not relate to

9    the interpretation as it existed at the time the contract was

10   formed, and it is only the intent of the parties at the time

11   the contract is formed which is going to be relevant to how the

12   contract should be interpreted.

13           THE COURT: What has -- what evidence do you believe

14   you have offered with regard to some other interpretation of

15   the contract?

16           MR. KING:  The contract itself is the most important

17   example of the evidence of its interpretation.  The contract

18   itself says that the running rate applies to that line item.

19   When -- if you listen closely to the testimony of the -- of the

20   witnesses here today, you will have seen that, for example,

21   when asked the question, why doesn't that running rate apply to

22   that line item, the -- Mr. Adgerson did not state that there

23   was some -- that the GPO spreadsheet, for example, he did not

24   testify that the GPO spreadsheet is used to interpret the

25   contract.

1           The question was asked to Mr.  Wilmot two times; the

2      first time he didn't mention the GPO spreadsheet.  He just

3      mentioned the fact that line item D refers to per 100 pages,

4      and the other ones don't.  The second time he was asked, he did

5      refer to the spreadsheet. but when asked about the spreadsheet,

6      the emphasis was placed on the contract totals and not the line

7      items.

8           The point is that -- and there are other examples of

9      how the question of whether or not you apply the line item --

10     for any witness here today who says that the line item, that

11     the running rate does not apply to the line item in answering

12     why that is, they base it on some information outside of the

13     contract.

14          THE COURT: Which witnesses -- to which witnesses do

15     you refer when you say any witness who testified to something

16     --

17          MR. KING:  The -- Mr.  Wilmot and Mr.  Sullivan.

18     Both testify about this spreadsheet.  And the fact that the

19     spreadsheet is somehow indicative of what the contract say, but

20     there is only one contract, and it says what it says.  It is

21     the proof of its meaning.

22          THE COURT: Now, it was you who called Mr.  Wilmot, do

23     you agree?

24          MR. KING:  Yes.

25          THE COURT:  I'll return to the question I asked

1    earlier then:  What evidence has the plaintiff offered with

2    respect to any other interpretation of the contract?

3            In other words, the witness that you called,

4    witnesses, the first two witnesses you called, both testified

5    that they were in agreement regarding the interpretation of the

6    contract provision.

7            Would you agree that that is a fair characterization

8    of the testimony of Mr. Wilmot and Mr. Adgerson?

9            MR. KING:  Yes.

10           THE COURT: What evidence is there then that the

11   plaintiff has offered that the Court should disregard that

12   testimony and make a finding that the contract -- the parties

13   intended something different?

14           MR. KING:  Well, first of all, again, Mr.  Adgerson

15   was not -- was not involved in the contract negotiation and

16   making.

17           THE COURT: That is who you called in your case,

18   though, is that -- do you acknowledge that that is so?

19           MR. KING:  Well, the parties stipulated to admitting

20   the contract.  The contract is evidence.  The contract speaks

21   for itself.  The contract has a running rate; it clearly

22   applies to each of the line items that are in the corresponding

23   Roman numeral.

24           The rest of the testimony does nothing to change

25   that.  The -- you know, self-serving statements of Record Press

1     that their interpretation is correct are not corroborated by

2     any GPO testimony that reflects manifestation of intent at the

3     time the contract was formed.

4            The only GPO testimony regarding their interpretation

5     and the fact that it corroborates Mr. Wilmot's has to do with

6     their reflections after the fact, and there is no evidence in

7     the record at this time that shows what the GPO's intent was at

8     the time of entering into the contract except for the contract

9     itself, and the contract itself is very clear.

10           THE COURT: You may continue.

11           MR. KING:  Mr.  Burke also called an expert.  The

12    expert had offered his assessment of the damages.  The expert

13    had an opportunity to review this spreadsheet that forms the

14    basis for the GPO's interpretation.  The expert testified that

15    it was not reliable in his -- as a way for him to assess the

16    damages.

17           There is testimony that the GPO, the evidence shows

18    that the GPO receives a markup or a percentage, interest -- or

19    interest on each of these bills.  Obviously, the GPO does not

20    want Mr.  Burke's interpretation to be the correct

21    interpretation because it would mean that they had also been

22    involved in this to the extent that overcharges are reflected

23    in their amount.

24           THE COURT:  You agree that there is no allegation in

25    the complaint with respect to the matter to which you just

1      referred?

2              MR. KING:  No.  The matter to which I'm referring has

3      to do with an inference regarding the intent of the parties.

4      The idea that -- essentially, the idea is that the more Record

5      Press charges, the more GPO makes.  If Record Press' invoices

6      reflect a higher amount than they should, then that is good for

7      the GPO.  And that's -- it's not surprising that the GPO would

8      offer testimony today that supports Record Press'

9      interpretation because the fact is that the GPO profits from

10     Record Press' increased charges.

11             And to respond with some case law regarding this

12     issue, United States Ex rel Tyson v. Amerigroup Three, Inc, 48

13     F. Supp 2d 719, citing United States Ex rel Ash v. Teller, 2004

14     Westlaw 1093784, is the quote:  Mere acquiescence would not --

15     would preclude False Claims Act liability any time a government

16     employee and a defendant were in cahoots.

17             The idea is that just bringing in a government

18     official who is going to concede to the charges is not enough

19     to escape liability.

20             Another case, the United States v. Southern

21     Management Corp, 326 F. 3d 669, stands for the proposition that

22     this government knowledge defense is based upon the effect the

23     government's knowledge has on the defendant's mental state.

24             Again, the point is that the question is not:  What

25     does the government say today about its interpretation in

1        looking back; the question is:  What evidence is there that the

2        defendant knew what the government was going to interpret the

3        contract as at the time that the contract was signed.

4                There's no evidence that's been presented today to

5        suggest that Mr.  Wilmot or Record Press knew what the

6        government was going to say today or after the fact about their

7        contract.  The idea is that the defendant needs to be aware of

8        whatever interpretation is being offered before the contract is

9        formed.

10               One more case:  A county water agency, 929 F. 2d

11       1416, stands for the proposition that the -- that the

12       government knowledge alone does not provide an absolute

13       defense.

14               And, again, just to wrap up, Your Honor, the point is

15       that the argument being made that today both parties have

16       testified that their interpretation is the same does not get

17       them to the point of overcoming the fact that it is really a

18       question of what they knew at the time the contract was formed

19       and not what they're saying in hindsight.  Thank you.

20               THE COURT: Thank you, Mr.  King.  Mr.  Lomas?

21               MR. LOMAS:  Your Honor, the False Claims Act has

22       three elements that we spoke about today.  There has to be

23       false claim; there has to be a knowledge on that on the part of

24       the defendant; and there has to be materiality.  And it's the

25       burden of proof -- it's Mr.  Burke's burden of proof on all

1      three of those points.

2              On the falsity issue, he's asking the Court to assume

3      falsity based on their -- based on Mr. Burke's understanding

4      and opinion of a contract.  This Court has rejected that in the

5      case that I referenced earlier.  All the evidence that was

6      presented today, all of it, confirms that the only two parties

7      to this contract understood from the first moment that Record

8      Press submitted a bid, all the way through to this day, today,

9      two years after, three years after Mr. Burke filed his claim,

10     that they understood the collating, trimming to size, and

11     binding term is $12.25 per 100 pages.

12              We're hearing this new conspiracy argument where

13     they're suggesting that government witnesses are in cahoots

14     with Record Press.  You have a 35-year veteran of the GPO who's

15     testified on the stand today.  I mean attacking, essentially,

16     his character based on this assumption without any evidence,

17     without any discussion of that on the stand.

18              Now, with respect to the knowledge element, he has --

19     it is Mr. Burke's burden to prove that Record Press knew that

20     their interpretation of the -- their understanding of the

21     contract was wrong, and in this -- again, in this court,

22     Massachusetts Housing Finance, the Court said that:  That it's

23     only where a contractor's purported interpretation of the

24     contract borders on the frivolous and is so plainly lacking in

25     merit that the requisite state of mind can be inferred.  That's

1    Massachusetts Housing Finance, 456 F. Supp 2d.

2              You heard today again that the only --

3              THE COURT: F. Supp 2d --

4         MR. LOMAS:  Oh, I'm sorry.  I apologize.  I didn't

5    give you the full cite, did I?  Sixty-two.

6              THE COURT: Thank you.  You may continue.

7         MR. LOMAS:  Again, you heard the only evidence that

8    was offered by either party today confirmed that the two

9    parties to the contract had always understood the contract to

10   have the same meaning.  How Record Press' interpretation could

11   be considered frivolous on that basis is just -- it just

12   doesn't make any sense.

13             And now with respect to some of the statements that

14   Mr. King made about some of the testimony today, Mr.  -- with

15   respect to the expert, he did not testify about the reliability

16   of the spreadsheet.  He testified that it didn't change his

17   opinion about the amount of damages.

18             Again, Mr.  Gocial was only here to testify on the

19   amounts of damages, assuming liability.  So the fact that this

20   spreadsheet -- you know, he didn't use that spreadsheet, of

21   course he wouldn't use that spreadsheet.  All he needed to do

22   to calculate damages was the contract and the invoices, and,

23   again, the GPO reviewed those contracts and the invoices and

24   confirmed that the invoices matched the contract.

25             And the discussion at the end of Mr. King's argument

```
1    with respect to the government knowledge defense, again, that's

2    a defense, an affirmative offense, after the plaintiff is able

3    to prove his burden on showing falsity, knowledge, and then

4    materiality.  He has known -- there is no evidence to satisfy

5    any of those elements.  So the government knowledge defense

6    doesn't even come into play until after the fact.

7            But in none of those cases that Mr.  Burke cited was

8    the government, the alleged victim, the Government Printing

9    Office, confirming that there was no fraud.  That's not the

10   issue that was in those cases.

11           Here you have the alleged victim confirming that

12   there was no fraud, and, again, this is a fraud case.  There

13   are civil penalties involved in -- I mean this is -- Record

14   Press is being accused of lying to the government.  And the

15   person or the organization that he is being accused of lying to

16   is confirming that they never were lied to and that everything

17   -- that Record Press has always operated properly under the

18   contract.

19           So Mr.  Burke has not met his burden on any of the

20   required elements, and, in fact, the evidence proves the

21   opposite of each of the elements that he needs to show in this

22   case.  Thank you, your Honor.

23           THE COURT:  Counsel, thank you very much.  The Court

24   will take the Rule 52 motion under advisement and rule by way

25   of a written memorandum, opinion and order.
```

1          To the extent that further proceedings are indicated

2    as a consequence of the Court's determination of the Rule 52(c)

3    motion, you will be notified when such further proceedings will

4    take place.  At this time, the Court is prepared to take the

5    Rule 52(c) motion under advisement.

6          Now, is there anything further with respect to this

7    matter at this time, Mr.  King?

8          MR. KING:  No, Your Honor.

9          THE COURT: Mr.  Lomas or Mr.  O'Brien?

10         MR. LOMAS:  No, Your Honor.  Thank you.

11         THE COURT: Very well.  Thank you very much.  The

12   Court has the copies of the exhibits that counsel provided to

13   the Court.  I will ask you to maintain, you, counsel, all of

14   you, to maintain the remaining copies.

15         Very well.  Anything further before we recess?

16         Thank you very much.

17         MR. KING:  Thank you, Your Honor.

18         MR. LOMAS:  Thank you, Your Honor.

19         MR. O'BRIEN:  Thank you, Your Honor.

20         (Whereupon, these proceedings concluded at 5:20 P.M.)

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4          I, Wendy C. Ricard, Official United States Court

5     Reporter in and for the District of Columbia, do hereby

6     certify that the foregoing proceedings were taken down by

7     me in shorthand at the time and place aforesaid,

8     transcribed under my personal direction and supervision,

9     and that the preceding pages represent a true and correct

10    transcription, to the best of my ability and understanding.

11

12

13

14                        _____

15                        Wendy C. Ricard, RPR, CCR

16                        Official U.S. Court Reporter

17

18

19

20

21

22

23

24

25